UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80804-CIV-COHN/SELTZER

PRUCO LIFE INSURANCE COMPANY,

      Plaintiff,

vs.

STEVEN M. BRASNER, individually and as
Principal of Infinity Financial Group, LLC;
MARK A. TARSHIS; INFINITY FINANCIAL
GROUP LLC; WELLS FARGO BANK, N.A.,
as Securities Intermediary; and John Does 1-10,

      Defendants.

_____/

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM
## OF WELLS FARGO BANK, N.A., AS SECURITIES INTERMEDIARY

Defendant Wells Fargo Bank, N.A., as Securities Intermediary ("Wells Fargo"), by and through its undersigned counsel, as and for its answer and affirmative defenses to the Complaint filed by Plaintiff Pruco Life Insurance Company ("Plaintiff" or "Prudential"), states as follows:

1.     In response to Paragraph 1 of the Complaint, Wells Fargo admits that the Complaint purports to seek rescission (in the guise of declaratory relief) against Wells Fargo and to bring an action for fraud, civil conspiracy, breach of contract, negligent misrepresentation and declaratory judgment against the other defendants but denies all remaining allegations contained therein.

2.     In response to Paragraph 2 of the Complaint, Wells Fargo admits that the term "life settlements" has been used to describe the lawful sale of enforceable life insurance policies to third-party investors in the secondary market for life insurance but is

without sufficient knowledge to admit or deny the remaining allegations contained therein and therefore denies the same.

3.      In response to Paragraph 3 of the Complaint, Wells Fargo states that it is without sufficient knowledge to admit or deny the allegations contained therein, which are vague and ambiguous as phrased, and therefore denies the same.

4.      In response to Paragraph 4 of the Complaint, Wells Fargo states that it is without sufficient knowledge to admit or deny the allegations contained therein, which are vague and ambiguous as phrased, and therefore denies the same.

5.      Upon information and belief, Wells Fargo denies the allegations in Paragraph 5 of the Complaint.

6.      In response to Paragraph 6 of the Complaint, Wells Fargo denies the allegation that the Berger Policy is an illegal wagering contract but is without sufficient knowledge to admit or deny the remaining allegations contained therein and therefore denies the same.

7.      In response to Paragraph 7 of the Complaint, Wells Fargo admits that Prudential seeks a declaration that the Berger Policy is void *ab initio* and denies all remaining allegations contained therein.

8.      In response to Paragraph 8 of the Complaint, Wells Fargo admits that Prudential seeks to retain the premiums paid in connection with the Berger Policy or, alternatively, to offset its "costs" incurred in connection with the Berger Policy and denies the remaining allegations contained therein.

9.      In response to Paragraph 9 of the Complaint, Wells Fargo admits that Prudential has purported to allege various claims for damages against defendants other than Wells Fargo, and denies all remaining allegations contained therein.

10.      In response to Paragraph 10 of the Complaint, Wells Fargo neither admits nor denies the allegations contained therein, which appear to be nothing more than statements of Prudential's present and future intent.  However, Wells Fargo denies that Prudential's continuing treatment of the policy as "in-force" is not a waiver of Prudential's positions as asserted in this action or any other rights under the Berger Policy or at law.

## PARTIES

11.      Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 11 of the Complaint and therefore denies the same.

12.      In response to Paragraph 12 of the Complaint, Wells Fargo admits that Wells Fargo Bank, N.A. is a national banking association with its principal place of business in California and that Wells Fargo Bank, N.A. maintains a regular place of business in Minneapolis, Minnesota, from which it operates as Securities Intermediary in connection with the Berger Policy.  Wells Fargo avers that, since December 2008, it has served as Securities Intermediary on behalf of its client with respect to the Berger Policy. Therefore, any reference in this pleading to "Wells Fargo" should be construed to mean Wells Fargo acting in its capacity as Securities Intermediary on behalf of its client.

13.      Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 13 of the Complaint and therefore denies the same.

14.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 14 of the Complaint and therefore denies the same.

15.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 15 of the Complaint and therefore denies the same.

16.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 16 of the Complaint and therefore denies the same.

**JURISDICTION AND VENUE**

17.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 17 of the Complaint and therefore denies the same.

18.     In response to Paragraph 18 of the Complaint, Wells Fargo admits that this Court has personal jurisdiction over the named defendants and denies all remaining allegations therein.

19.      In response to Paragraph 19 of the Complaint, Wells Fargo admits that venue is proper in this Court and denies all remaining allegations contained therein.

**BACKGROUND**

20.     Wells Fargo admits that Steven Brasner previously acted on behalf of Prudential; Wells Fargo is without sufficient knowledge to admit or deny the remaining allegations in Paragraph 20 of the Complaint and therefore denies the same.

21.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 21 of the Complaint and therefore denies the same.

22.     Wells Fargo is without sufficient information to admit or deny the allegations in Paragraph 22 of the Complaint and refers to the document attached to the Complaint as Exhibit A, which speaks for itself.

23.     Wells Fargo is without sufficient information to admit or deny the allegations in Paragraph 23 of the Complaint and refers to the document attached to the Complaint as Exhibit A, which speaks for itself.

24.     Wells Fargo is without sufficient information to admit or deny the allegations in Paragraph 24 of the Complaint and refers to the document attached to the Complaint as Exhibit A, which speaks for itself.

25.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 25 of the Complaint and therefore denies the same.

26.     Upon information and belief, Wells Fargo denies the allegations in Paragraph 26 of the Complaint.

27.     Upon information and belief, Wells Fargo denies the allegations in Paragraph 27 of the Complaint.

28.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 28 of the Complaint and therefore denies the same, except, upon information and belief, it specifically denies any allegation regarding a "plan," and otherwise refers to the documents attached to the Complaint as Exhibits B and C, which speak for themselves.

29.     In response to Paragraph 29 of the Complaint, Wells Fargo admits that Ms. Berger's husband, Richard Berger, was listed as the beneficiary on the Berger Application as well as the subsequently issued Berger Policy, and denies all remaining allegations therein.

30.    Wells Fargo neither admits nor denies the allegations in Paragraph 30 of the Complaint and refers to the documents attached thereto as Exhibits B and C, which speak for themselves.

31.    Upon information and belief, Wells Fargo denies the allegations in Paragraph 31 of the Complaint.

32.    Wells Fargo neither admits nor denies the allegations in Paragraph 30 of the Complaint and refers to the documents attached thereto as Exhibits B and C, which speak for themselves.

33.    Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 33 of the Complaint and therefore denies the same.

34.    Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 34 of the Complaint and therefore denies the same, and, further, refers to the document attached thereto as Exhibit D, which speaks for itself.

35.    In response to Paragraph 35 of the Complaint, Wells Fargo, upon information and belief, denies that the Berger Policy was procured for sale on the secondary market, and is without sufficient knowledge to admit or deny the remaining allegations therein and therefore denies the same.

36.    In response to Paragraph 36 of the Complaint, Wells Fargo, upon information and belief, denies that the Berger Policy was procured for sale on the secondary market, neither admits nor denies the remaining allegations in Paragraph 36, and refers to the document attached thereto as Exhibit D, which speaks for itself.

37.    In response to Paragraph 37 of the Complaint, Wells Fargo neither admits nor denies the allegations in the first sentence, and refers to the document attached to the

Complaint as Exhibit D, which speaks for itself.  Further, Wells Fargo admits that certain premiums for the Berger Policy have been paid by persons other than Mrs. Berger, and is without sufficient knowledge to admit or deny the remaining allegations therein and therefore denies the same.

38.     Wells Fargo neither admits nor denies the allegations in Paragraph 38 of the Complaint and refers to the document attached thereto as Exhibit D, which speaks for itself.

39.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 39 of the Complaint and therefore denies the same.

40.     Wells Fargo neither admits nor denies the allegations in the first two sentences of Paragraph 40 of the Complaint and refers to the document attached thereto as Exhibit D, which speaks for itself.  Wells Fargo further states that is without sufficient knowledge to admit or deny the remaining allegations in Paragraph 40 and therefore denies the same.

41.     Upon information and belief, Wells Fargo denies the allegations in Paragraph 41 of the Complaint.

42.     Upon information and belief, Wells Fargo denies the allegations in Paragraph 42 of the Complaint.

43.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 43 of the Complaint and therefore denies the same.

44.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 44 of the Complaint and therefore denies the same.

45.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 45 of the Complaint and therefore denies the same.

46.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 46 of the Complaint and therefore denies the same.

47.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 47 of the Complaint and therefore denies the same, except that Wells Fargo specifically denies that the Berger Policy was procured for sale on the secondary market.

48.     Upon information and belief, Wells Fargo denies the allegations in Paragraph 48 of the Complaint.

49.     In response to Paragraph 49 of the Complaint, Wells Fargo admits that Prudential issued the Berger Policy, number V1208044, on the life of Arlene Berger in the amount of $10 million on or about April 13, 2006 and that Exhibit F attached to the Complaint appears to be a copy of said policy, and is without sufficient knowledge to admit or deny the remaining allegations in Paragraph 49 and therefore denies the same.

50.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 50 of the Complaint and therefore denies the same.

51.     In response to Paragraph 51 of the Complaint, Wells Fargo admits that approximately $620,000 in premiums had been paid toward the Berger Policy as of the filing of this action and is without sufficient knowledge to admit the remaining allegation therein and therefore denies the same.

52.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 52 of the Complaint and therefore denies the same, except that

Wells Fargo admits to having seen documents produced in discovery suggesting that on or about June 16, 2006, a Prudential Financial Policy Change form was submitted to Prudential requesting to change the owner and beneficiary of the Berger Policy to the Wilmington Trust Company as trustee of the Arlene Berger 2006 Life Insurance Trust d/t/d. 6/5/06 (the "Arlene Berger 2006 Life Insurance Trust"), which request Prudential confirmed and reflected in its records.  Wells Fargo refers to these documents as the best evidence thereof.

53.     Upon information and belief, Wells Fargo denies the allegation in Paragraph 53 of the Complaint, and, upon information and belief, avers that Arlene Berger, as Settlor under the Arlene Berger 2006 Life Insurance Trust, retained discretion as to what to do with the Berger Policy, and further avers that Arlene Berger's husband, Richard Berger, was at all times the sole beneficiary under the Arlene Berger 2006 Life Insurance Trust.

54.     Wells Fargo admits the allegations in Paragraph 54 of the Complaint.

55.     Wells Fargo denies the allegations in Paragraph 55 of the Complaint.

56.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 56 and therefore denies same.

57.     Wells Fargo is without sufficient knowledge to admit or deny the allegations in Paragraph 57 of the Complaint and therefore denies the same, except that Wells Fargo specifically denies that the Berger Policy was procured for sale on the secondary market.

## COUNT I

58.     Wells Fargo hereby incorporates and restates its responses set forth in Paragraphs 1 through 57, above, as if set forth herein at length.

59.     Wells Fargo denies the allegations in Paragraph 59 of the Complaint.

60.     Wells Fargo denies the allegations in Paragraph 60 of the Complaint.

61.     Wells Fargo denies the allegations in Paragraph 61 of the Complaint.

62.     Wells Fargo denies the allegations in Paragraph 62 of the Complaint.

63.     Wells Fargo denies the allegations in Paragraph 63 of the Complaint.

64.     Wells Fargo denies the allegations in Paragraph 64 of the Complaint.

## COUNT II

65.-69.     Paragraphs 65 through 69 of the Complaint are not directed to Wells Fargo, but merely seek damages in tort from other defendants, and therefore do not warrant a response from Wells Fargo.  However, in an abundance of caution, Wells Fargo, upon information and belief, denies the allegations in Paragraphs 65 though 69 consistent with its responses set forth in Paragraphs 1 through 64 above.

## COUNT III

70.-73.     Paragraphs 70 through 73 of the Complaint are not directed to Wells Fargo, but merely seek damages in tort from other defendants, and therefore do not warrant a response from Wells Fargo.  However, in an abundance of caution, Wells Fargo, upon information and belief, denies the allegations in Paragraphs 70 though 73 consistent with its responses set forth in Paragraphs 1 through 64 above.

## COUNT IV

74.-78.        Paragraphs 74 through 78 of the Complaint are not directed to Wells Fargo, but merely seek damages in tort from other defendants, and therefore do not warrant a response from Wells Fargo.  However, in an abundance of caution, Wells Fargo, upon information and belief, denies the allegations in Paragraphs 74 though 78 consistent with its responses set forth in Paragraphs 1 through 64 above.

## COUNT V

79.-83.        Paragraphs 79 through 83 of the Complaint are not directed to Wells Fargo, but merely seek damages in contract from other defendants, and therefore do not warrant a response from Wells Fargo.  However, in an abundance of caution, Wells Fargo, upon information and belief, denies the allegations in Paragraphs 79 though 83 consistent with its responses set forth in Paragraphs 1 through 64 above.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

1.        The Complaint fails to state a claim against Wells Fargo upon which relief can be granted.  Plaintiff fails to state a claim for declaratory relief and/or rescission because (i) the necessary elements of such claims have not and cannot be pled or proven by Plaintiff, including, but not limited to, restoring the parties to the *status quo ante*; and (ii) an insurable interest existed as a matter of law at the inception of the Berger Policy in accordance with Section 627.404 of the Florida Statutes.

## Second Affirmative Defense

2.      Plaintiff's claims are barred by the Policy's incontestability provision required under Section 627.455, Florida Statutes.  Under the incontestability provision, the contestability period expired no later than May 2008, more than two years prior to the initiation of this action and more than four years after the issuance of the Berger Policy.

## Third Affirmative Defense

3.      Plaintiff's purported claim for rescission (and/or declaratory relief) is barred under the ratification doctrine as a result of Plaintiff's acceptance of the benefits under the Berger Policy, including Plaintiff's retention of the premiums paid to date for the Berger Policy.

## Fourth Affirmative Defense

4.      Plaintiff's claims against Wells Fargo are barred based upon Plaintiff's failure to make an election of remedies with respect to either seeking to rescind the Berger Policy (and returning the parties to the *status quo ante* by returning all premiums received to date) or, alternatively, seeking to affirm the Berger Policy and retaining the policy premiums received to date.

## Fifth Affirmative Defense

5.      Plaintiff's claims are barred by the doctrine of waiver.  More specifically, Plaintiff has voluntarily and knowingly relinquished its right, if any, to rescind (or to seek declaratory relief with respect to) the Berger Policy based upon its actions and inactions, including, but not limited to, retaining the Berger Policy premiums and continuing to accept additional premiums well after having obtained sufficient notice of the facts and circumstances that allegedly form the basis for Prudential's purported claim for

rescission.  Plaintiff knew or should have known of, and/or recklessly turned a blind eye to, several facts and circumstances concerning the application, issuance, and subsequent transfer of the ownership and beneficial interest in the Berger Policy that Plaintiff now claims are hallmarks of so-called "STOLI" (which Plaintiff refers to as "stranger-originated life insurance") transactions.

6.       Yet, Plaintiff ignored these and other specific facts that under its own internal guidelines it considered to be "warning signs" or "red flags" of a potential stranger-originated life insurance policy (hereinafter referenced as the "internal red flags"), and Plaintiff did nothing to adequately and timely challenge the Berger Policy until over four years after its issuance (and after collecting premiums in excess of $600,000 during these four years).  To the contrary, after expiration of the two-year contestability period applicable to the Berger Policy, Plaintiff expressly confirmed in 2008 through verification of coverage and other statements to inquiring secondary market brokers, potential investors, and other third parties that the Berger Policy was in full force and effect as well as confirming other material facts concerning the validity of the Berger Policy, including representing that it was no longer contestable.  Prudential then waited until July 2010 to challenge the Berger Policy, commencing this action only after the Wall Street Journal published a series of unflattering articles about Prudential's agent Steven Brasner.

7.       Moreover, Plaintiff waived its alleged claims by confirming and recording in its records the assignment of the Berger Policy after the expiration of the two-year contestability period, and by accepting premiums (which Plaintiff knew or should have known were paid by a premium financing lender), including accepting premiums after the

expiration of the contestability period, and failing to return the premiums received prior to seeking rescission.   Despite having the right to request certain information concerning the assignment of the Berger Policy, Prudential failed to request any such information

## Sixth Affirmative Defense

8.     Plaintiff's claim(s) against Wells Fargo are barred because Wells Fargo's client is a *bona fide* third party purchaser for value of the Berger Policy.   In late December 2008, which was well after the expiration of the two-year contestability period, the Berger Policy was acquired by Wells Fargo's client in the secondary market for a significant sum, which far exceeds the Policy's cash surrender value.

## Seventh Affirmative Defense

9.     Plaintiff's claims are barred under the doctrines of *in pari delicto* and imputation in that the alleged wrongful acts of the Plaintiff's agents, including Defendant Steven Brasner, are imputed to Plaintiff based upon the fact that said acts were done sufficiently in furtherance of the interests of Plaintiff, including boosting sales of Plaintiff's life insurance policies and yielding to Plaintiff significantly high premiums, the benefits of which Plaintiff has accepted and seeks to retain.    By issuing the Berger Policy and its other actions and inactions, Plaintiff has ratified the acts of its agents, including Defendant Steven Brasner.

## Eighth Affirmative Defense

10.     Plaintiff's claims are barred by the applicable statute of limitations under Florida law.

## **Ninth Affirmative Defense**

11.     Plaintiff's claims are barred by the doctrine of unclean hands because Plaintiff knew or should have known of, and/or recklessly turned a blind eye to, several facts and circumstances concerning the application, issuance, and subsequent transfer of the ownership and beneficial interest in the Berger Policy that Plaintiff now claims are hallmarks of so-called "STOLI" (which Plaintiff refers to as "stranger-originated life insurance") transactions.   Yet, Plaintiff ignored these and other alleged "internal red flags" and did nothing to adequately and timely challenge the Berger Policy until over four years after its issuance (and after collecting premiums in excess of $600,000 during these four years).

12.     To the contrary, after expiration of the two-year contestability period applicable to the Berger Policy, Plaintiff expressly confirmed in 2008 through verification of coverage and other statements to inquiring secondary market brokers, potential investor and other third parties, including Coventry First LLC ("Coventry First") (from which Wells Fargo's client purchased the Berger Policy), that the Berger Policy was in full force and effect.   In addition, by making these statements, Prudential also confirmed other material facts concerning the validity of the Berger Policy, including representing that it was no longer contestable.   At the time it made these representations, Plaintiff knew or should have known that the inquiries were being made for the purpose of informing secondary market investors, such as Wells Fargo's client, on whether to purchase these policies from the existing owners as permitted by Florida law, including, but not limited to, Sections 627.404 and 622.422 of the Florida Statutes.

13.     Indeed, Plaintiff intended that potential investors such as Wells Fargo's client, who is a foreseeable recipient of such information, would rely on Plaintiff's verification of coverage to the secondary market.   This enabled Plaintiff to continue to receive and accept the significantly high policy premiums for over four years until Plaintiff decided to belatedly challenge the Berger Policy based upon an alleged lack of insurable interest at inception.   Thus, Plaintiff waited until July 2010 to challenge the Berger Policy, commencing this action only after the Wall Street Journal published a series of unflattering articles about Plaintiff's agent Steven Brasner, including the arrest of Mr. Brasner in Florida in April 2010.   Even with this and other publicly available information concerning Brasner, Plaintiff waited almost three months before bringing this suit.

14.     Prior to the commencement of this action, Wells Fargo's client had long since relied upon Plaintiff's verification of coverage and other representations prior to the acquisition of the Berger Policy for a significant sum in December 2008.  After acquiring the Berger Policy, Wells Fargo's client has paid and/or tendered premiums to Prudential to date totaling approximately $200,000 (*i.e.*, approximately $35,000 every quarter). Accordingly, Plaintiff comes to the Court with unclean hands in seeking equitable relief against Wells Fargo, which relief should be denied.

**Tenth Affirmative Defense**

15.     Plaintiff's claims are barred under the doctrine of estoppel.  In particular, Plaintiff should be estopped from seeking to rescind the Berger Policy and/or seeking declaratory relief as to the validity of the Berger Policy because Plaintiff knew or should have known of, and/or recklessly turned a blind eye to, several facts, circumstances

and/or characteristics concerning the application, issuance, and subsequent transfers of the ownership and beneficial interest in the Berger Policy that Plaintiff now claims in this action are hallmarks of so-called "STOLI" transactions.  Yet, Plaintiff ignored these and other alleged "internal red flags" and did nothing to adequately and timely challenge the Berger Policy until over four years after its issuance (and after collecting premiums in excess of $600,000 during these four years).

16.     In fact, not only did Plaintiff not challenge the Berger Policy, but, after expiration of the two-year contestability period applicable to the Berger Policy, Plaintiff expressly represented in 2008 through verification of coverage and other statements to inquiring secondary market brokers and other third parties, including Coventry First (from whom Wells Fargo's client purchased the Berger Policy), that the Berger Policy was in full force.  Further, Plaintiff also represented other material facts concerning the validity of the Berger Policy, including the fact that it was no longer contestable.  At the time it made these representations, Plaintiff knew that the inquiries were being made for the purpose of informing secondary market investors, such as Wells Fargo's client, on whether to purchase these policies from the existing owners as permitted by Florida law, including, but not limited to, Sections 627.404 and 622.422 of the Florida Statutes.

17.     Indeed, Plaintiff intended or expected that investors such as Wells Fargo's client, who is a foreseeable recipient of such information, would rely on Plaintiff's verification of coverage to the secondary market so that Plaintiff could continue to receive and accept the significantly high policy premiums until the time seemed right, from Prudential's perspective, to belatedly challenge the Berger Policy based upon an alleged lack of insurable interest at inception.  In the current instance, that timing was

precipitated by the well-reported arrest of Mr. Brasner in Florida in April 2010.  Even with this and other publicly available information concerning Brasner, Plaintiff waited almost three months before bringing this suit.

18.     Prior to commencement of this action, Wells Fargo's client had long since relied upon Plaintiff's verification of coverage and other representations prior to the acquisition of the Berger Policy for a significant sum in December 2008, and thereafter paying and/or tendering premiums to date totaling approximately $200,000 (*i.e.*, approximately $35,000 every quarter).  Accordingly, Plaintiff should be estopped from obtaining the relief it seeks in this action as against Wells Fargo.

<b><u>Eleventh Affirmative Defense</u></b>

19.     To the extent Plaintiff claims that an alleged "agreement" to transfer the Berger policy predated the issuance of the Policy, such an "agreement" would be barred under Florida's statute of frauds (Section 725.01, Florida Statutes), which provides that no action shall be brought upon any agreement that is not to be performed within one year unless such agreement is in writing.

<b><u>Twelfth Affirmative Defense</u></b>

20.     Plaintiff's claims are barred by the doctrine of ratification.  Among other things, Plaintiff ratified the Berger Policy.

<b><u>Thirteenth Affirmative Defense</u></b>

21.     Plaintiff has breached its duty of good faith and fair dealing in connection with the Berger Policy.

**Fourteenth Affirmative Defense**

22.     Plaintiff has failed to join an indispensable party (Mrs. Arlene Berger) to this action.

**Fifteenth Affirmative Defense**

23.     Plaintiff's claims against Wells Fargo are stale and barred, in whole or in part, by the doctrine of laches.  Wells Fargo has been prejudiced and continues to be prejudiced by the alleged claim(s) against it in this action, which are inconsistent with Plaintiff's prior acts and/or omissions, including its representations.  Plaintiff's delay and inaction is prejudicial to Wells Fargo.

**Sixteenth Affirmative Defense**

24.     Plaintiff's claims are barred because it cannot seek a judicial determination of a political question that has already been addressed by the Florida Legislature in Chapter 627 of the Florida Statutes, including, but not limited to, Sections 627.404, 627.422, and 627.455.  Accordingly, Plaintiff is precluded from having the Court substitute its judgment for that of the Florida Legislature.

**Additional Affirmative Defenses**

25.     Wells Fargo reserves the right to interpose any and all additional affirmative defenses to the Complaint as may be revealed through discovery.

WHEREFORE, Wells Fargo respectfully requests that the Court enter judgment, ordering as follows:

(i)     Dismissing the alleged claim for declaratory relief (and/or rescission) against Wells Fargo with prejudice;

     (ii)    Granting Wells Fargo its costs and attorneys' fees incurred in this action; and

     (iii)    Granting Wells Fargo such other and further relief as the Court deems just and proper.

**COUNTERCLAIM**

**Preliminary Statement**

1.    Defendant/Counterclaim-Plaintiff Wells Fargo Bank, N.A., as Securities Intermediary on behalf of its client with respect to the Berger Policy ("Wells Fargo"), brings this counterclaim against Plaintiff/Counterclaim-Defendant Pruco Life Insurance Company ("Prudential") and seeks damages against Prudential for its negligent misrepresentations regarding the validity of the Berger Policy at issue in this action, including Prudential's verification of coverage, which Wells Fargo's client relied upon in acquiring the Berger Policy.

2.    In sum, Prudential turned a blind eye to certain specific facts that under its own internal guidelines it considered to be "warning signs" or "red flags" of a potential stranger-originated life insurance policy (hereinafter referenced as the "internal red flags") both during and after its underwriting of the Berger Policy so that it could collect lucrative premiums.  Then, after the two-year contestability period under the Berger Policy had expired, Prudential made representations to potential purchasers in the secondary market, such as Wells Fargo's client, concerning the validity and incontestability of the Berger Policy so that Prudential could continue to reap the benefits and keep collecting additional premiums for several more years.  Now, contrary to its prior representations, Prudential has attached the "STOLI" (which Prudential refers to as "stranger-originated life insurance") label to the Berger Policy as a pretext and in a

20

belated attempt to try to void the Policy, avoid paying the $10 million death benefits under the Policy, and somehow also try to retain all premiums that it has collected over the past four years, which to date is over $600,000.  Prudential's misconduct has damaged Wells Fargo's client, a *bona fide* third-party purchaser of the Berger Policy, who relied on Prudential's representations as to the validity and incontestability of the Policy in acquiring it, and paying premiums since December 2008.

## Parties

3.     Wells Fargo Bank, N.A. is a national banking association with its principal place of business located in San Francisco, California.  Since December 2008, Wells Fargo Bank, N.A. has served as Securities Intermediary on behalf of its client with respect to the Berger Policy.  The Berger Policy is held by Wells Fargo, as Securities Intermediary.  Therefore, any reference in this pleading to "Wells Fargo" should be construed to mean Wells Fargo, acting in its capacity as Securities Intermediary on behalf of its client.

4.     Prudential is incorporated in the State of Arizona, and its principal place of business is located in Newark, New Jersey.

## Jurisdiction and Venue

5.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between Wells Fargo and Prudential.

6.      This Court has personal jurisdiction over Prudential because, among other things, Prudential commenced this action in Florida and Prudential issued the Berger Policy in Florida.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because, among other things, a substantial part of the events giving rise to the claims occurred in this district.

### Factual Background

**Prudential's Strategy:  Issue Profitable Life Insurance Policies; Collect High Premiums For Years; And Then Belatedly Challenge These Policies After They Have Been Sold In The Secondary Market**

8.      Upon information and belief, in 2003, Prudential appointed Steven Brasner as a non-exclusive insurance agent of Prudential to solicit applications for life insurance policies.

9.      Upon information and belief, Prudential has actively and purposefully marketed and solicited high-value life insurance policies to elderly individuals and encouraged its agents, such as defendant Steven Brasner, to do the same due to the high premiums and lapse rates associated with such policies (and low cash surrender values on such policies).  Besides generating a high cash flow for Prudential, these elderly-insured policies were extremely profitable for Prudential because the insured's increasing life expectancy made it difficult for him or her to continue paying the high premiums until death, which meant that these policies would likely lapse.  When these policies lapsed for failure to pay premiums, Prudential would gain a windfall because it would be entitled to keep the premiums but would never be required to pay out the policy amount.

22

10.     There is a legitimate secondary market for life insurance policies. Consistent with applicable laws (such as Sections 627.422 and 627.404 of the Florida Statutes), the owner of a life insurance policy is entitled to sell his or her policy in the secondary market, even to a person without an insurable interest.  Through this secondary market, institutional investors purchase policies from willing sellers/insureds and continue to pay premiums until the death benefits become due.  As a result, Prudential, which initially counted on a certain percentage of its life insurance policies to lapse, is now forced to honor more policies than it planned to.  Instead of honoring these policies, Prudential has embarked on a nationwide crusade against the secondary market, through litigation and otherwise.  It is now engaged in an improper, post-hoc challenge to the validity of certain policies years after their issuance and well after expiration of the statutorily-required two-year contestability period.  And, inconsistent with its position that these policies are void, it is seeking to retain the high premiums that it has collected over the years.  This lawsuit is part of Prudential's crusade.

**Prudential Turns A Blind Eye To Its Underwriting And Issues The Berger Policy**

11.     The underwriting for the Berger Policy took over ten months and involved the submission of three applications: an initial application in July 2005, a second application in February 2006, and a third application in April 2006.  Throughout this entire underwriting process, Prudential raised "internal red flags" as to the possibility that the policy being sought was "STOLI" (which Prudential refers to as "stranger-originated life insurance") or that it would be part of a "life settlement."

12.     In July 2005, Arlene Berger submitted her initial application with Prudential for the issuance of a $10 million life insurance policy.  This application was

procured by Prudential's agent, Steven Brasner.    Prudential then commenced the underwriting process and, through this process, became aware that the policy might ultimately be sold in the second market.    Thus, during this underwriting process, Prudential became aware of certain "internal red flags" that issuance of the Berger Policy would run counter to its underwriting guidelines.    In particular, Prudential's application review and technical underwriting staff became suspicious of a possible "life settlement" regarding this initial application that was submitted by its agent, Brasner.    In internal written communications, Prudential underwriters stated as follows:

- 8/4/2005: *"Tech team should probably pay special attention to the Brasner case.  Looks li[ke] there are a lot of unanswered questions.  May be appropriate to explicitly ask about settlement, ask for an illustration, etc. if the case proceeds."*

- 8/17/2005: *"Ms. Evenson – The application was not in good order with a lot of detail le[ft] off.  We don't know the owner and the bene[ficiary] details.  These are **red flags** of a potential settlement case.  Please question the producer as to who wil [sic] be the bene[ficiary] and owner, ask for a copy of the illustration, a full copy of the trust a [sic] ask then [sic] to confirm that the client has no intention of selling this contract [on] the Settlement market." (Emphasis added.)*

- 9/12/2005: *"Hold for: APS's – Burton, Metkan, Felker, FC – regarding possible settlement."*

- 11/28/2005: *"Joel – field is asking for medical offer, none of requested information has be[en] received.  All medical requirements have been received.  Could offer PB, shoul[d] we offer noting possible settlement case?*

  *I probably wouldn't without the requested information; however, due to the amount, an officer needs to review this case.  I would check with whatever officer this needs to go to.  They will need to co-sign anyway.*

  *Gloria – Please review the above notes.  Field is asking for a medical offer, but have not responded to any of our field corre. regarding possible settlement an [ ] amount determined.  Should we offer medically without requested information?*

24

> *Cheryl- we have been giving medical offers on these cases but I would remind t[he] agent that Prudential does not participate in settlement cases and also we nee[d] owner and beneficiary information along with third party verification of financials and justification for the amount . . . ,"*

13.     Nonetheless, Prudential disregarded these "internal red flags."   In December 2005, it assigned a policy number (V1196581) to the initial Berger application. Then, supposedly due to "outstanding underwriting requirements," it eventually shelved this application and asked Mrs. Berger to submit another application.

14.     It is apparent that Prudential relaxed or disregarded its own underwriting guidelines and disregarded "internal red flags" that it knew or should have discovered during its underwriting process.

15.     Just two months later, in February 2006, Arlene Berger submitted, through Brasner, another life insurance application to Prudential.  Prudential, purportedly carrying its burden to investigate the representations made in this application, reviewed and analyzed it.  The same Prudential underwriters who had reviewed the initial application again raised suspicions of a possible "life settlement" concerning this second application:

- March 8, 2006*:  "Gloria – This is a case we thought was possible a [sic] settlement case back in June[.]  We ended up FIUing due to outstanding FC's including 3ʳᵈ party financials . . . ."*

16.     The Prudential underwriters highlighted additional "internal red flags": (i) the absence of a trust to take ownership of the policy in light of the "estate planning" purposes stated in the application; (ii) the absence of a trust in connection with the second application, even though the first application called for one; (iii) applications for other life insurance policies Arlene Berger was seeking from other insurers; (iv) Richard Berger (Arlene's husband), the source of Arlene's income, purportedly did not have his own life insurance; and (v) a question as to whether Mark Tarshis could serve as an

independent source of financial verification given that he operated in the same company as Steven Brasner.

17.     Prudential turned a blind eye to these additional "internal red flags" and continued to ignore the "internal red flags" that it had previously identified.

18.     Prudential issued the Berger Policy (number V1208044) on the life of Arlene Berger in the amount of $10 million naming her husband Richard Berger as the beneficiary.  According to the Berger Policy itself, the issue date of this Policy was April 13, 2006.  In its Complaint, Prudential alleges that the Berger Policy was placed "in force" on or about May 10, 2006.

19.     In June 2006, a request was made to change the owner and beneficiary of the Berger Trust to Wilmington Trust Company, as Trustee of the Arlene Berger 2006 Life Insurance Trust dated June 5, 2006 (the "Arlene Berger 2006 Life Insurance Trust"), identifying Richard Berger as the sole beneficiary under this Trust.  As Settlor under this Trust, Arlene Berger retained discretion as to what to do with the Berger Policy. Prudential accepted and confirmed this requested change of owner and beneficiary.  In doing so, Prudential once again turned a blind eye to a potential "internal red flag" and disregarded its own underwriting guidelines.

20.     A nationally recognized lending institution, LaSalle Bank (now known as Bank of America), provided "premium financing" for the payment of the Berger Policy premiums.  In fact, Prudential received, on or about July 18, 2006, a $331,077.29 wire payment from LaSalle Bank to pre-pay the premiums through the two-year contestability period.

21.     Premium financing arrangements, such as those involved here, are expressly allowed by law.  *See* § 627.826, *et seq.*, Fla. Stat.

22.     LaSalle Bank, as lender, and Wilmington Trust, as Trustee of the Arlene Berger 2006 Life Insurance Trust and as borrower, entered into a premium financing arrangement and executed standard LaSalle loan documents, including a Note and Security Agreement.  Upon information and belief, upon maturity of the loan in 2008, rather than repay the loan, the Trustee of the Arlene Berger 2006 Life Insurance Trust, at the direction of Arlene Berger, chose to relinquish the Berger Policy to LaSalle Bank in satisfaction of the loan.

### Prudential Fails To Contest The Berger Policy During The Two-Year Contestability Period

23.     In accordance with the requirements of Section 627.455, the Berger Policy contains an incontestability provision.  Through this incontestability provision, Prudential promised that it would not contest the validity of the Berger Policy after the expiration of the two-year contestability period.

24.     During the two-year contestability period, Prudential had the burden to conduct further investigations or take other actions to challenge the Berger Policy. However, Prudential failed to conduct an investigation or to contest the Berger Policy during the two-year contestability period.  Instead, Prudential continued to turn a blind eye and continued to collect significant premiums under the Berger Policy.  The two-year contestability period under the Berger Policy expired in April 2008 (or no later than May 2008).  It was not until over two years later that Prudential, for the first time, sought to contest the Berger Policy when it commenced this action in July 2010.  Prudential was

thus able to collect premiums in excess of $600,000 before suddenly claiming the Policy to be void.

25.      In addition to the actual or constructive knowledge that it acquired through the underwriting process, Prudential also acquired knowledge through its agent, Steven Brasner.  Brasner's knowledge of the facts and circumstances surrounding the issuance of the Berger Policy must be imputed to Prudential, particularly since Brasner's acts were done sufficiently in furtherance of the interests of Prudential.   Brasner's involvement boosted sales of Prudential's life insurance policies and yielded significant premiums, the benefits of which Prudential has accepted and seeks to retain.

26.      Prudential terminated Brasner in November 2007.  Prudential also knew or should have known that a lawsuit had been commenced in June 2008 against its agent, Brasner, and others in this District challenging certain life insurance policies procured by Brasner (*AXA Equitable Life Ins. Co. v. Infinity Financial Group LLC, et al.*, Case No. 9:08-CV-80611-Hurley).  These facts should also have raised "internal red flags" about the Berger Policy.  Nonetheless, Prudential failed to challenge the Policy and, among other things, verified coverage of the Policy after these events.

### Prudential's Verification Of Coverage And Other Representations That The Berger Policy Is Enforceable And Incontestable

27.      Florida law expressly allows the sale of life insurance policies to third parties.  Thus, consistent with Section 627.422 of the Florida Statutes, the Berger Policy provides that it is freely assignable.

28.      Prudential routinely provides information on its life insurance policies to third parties, including investors on the secondary market, who are potential purchasers

of such policies.  Prudential thus provides verification of coverage on its policies, including confirmation that the policy is in force and is no longer contestable.

29.     Thus, in 2008, after the expiration of the two-year contestability period under the Berger Policy, Prudential supplied such verification of coverage and made other representations regarding the Berger Policy to inquiring secondary market brokers and potential purchasers.   In providing such verification of coverage and other representations, Prudential knew that these inquiries were being made for the purpose of informing secondary market investors, such as Wells Fargo's client, who were considering whether to purchase these policies from the existing owners as permitted by Florida law.  *See* §§ 627.404 and 622.422, Fla. Stat.

30.     Prudential was separately contacted in April, May, July, August, November, and December of 2008 by representatives known to Prudential to be associated with secondary market brokers on behalf of existing and/or future secondary market investors for verification of coverage of the Berger Policy.  In each instance, Prudential verified that coverage was in effect for the Berger Policy.  In fact, in 2008, Prudential issued responsive letters acknowledging that it had "determined that this information is being provided in connection with the potential sale of this policy [the Berger Policy] under a viatical or life settlement agreement."

31.     In particular, on or about December 10, 2008, Prudential directly provided verification of coverage of the Berger Policy to Coventry First LLC ("Coventry First"), which sold the Berger Policy to Wells Fargo's client in late December 2008.  At that time, Prudential confirmed that the Berger Policy was in full force and effect (and thus

enforceable), and also confirmed that the two-year contestability period had expired and, therefore, that the Berger Policy was no longer contestable.

32.     In reliance upon Prudential's verification of coverage and Prudential's representation that the Berger Policy was not contestable, Wells Fargo's client purchased the Berger Policy from Coventry First in late December 2008 for a significant sum. Since then, the Berger Policy has been held by Wells Fargo, as Securities Intermediary, on behalf of its client.

33.     On or about December 24, 2008, Wells Fargo, on behalf of its client, submitted to Prudential a request for change of ownership and beneficiary of the Berger Policy.  Prudential accepted this requested change of ownership and beneficiary.  Thus, by letter dated January 9, 2009, Prudential provided written "confirmation" to Wells Fargo that its request for a change of ownership and beneficiary of the Berger Policy had been accepted by Prudential.  (A true and correct copy of Prudential's January 9, 2009 correspondence is attached hereto as Exhibit 1.)

34.     Since Wells Fargo became the owner and beneficiary of the Berger Policy, Prudential has regularly issued invoices to Wells Fargo for premiums owed under the Berger Policy.  Since then, premiums have been paid and/or tendered to Prudential totaling approximately $200,000 (*i.e.*, approximately $35,000 every quarter).

35.     All premiums due under the Berger Policy have been paid and tendered to Prudential, and all conditions precedent to the filing of this counterclaim have occurred, been performed by Wells Fargo, on behalf of its client, and others, and/or been waived by Prudential.

## COUNT I:  NEGLIGENT MISREPRESENTATION

36.     Wells Fargo incorporates by reference the allegations made in paragraphs 1 through 35 as though fully set forth herein.

37.     Prudential made express representations of material fact concerning the validity and incontestability of the Berger Policy through Prudential's verification of coverage of this Policy and other representations.  In particular, in 2008, Prudential represented to Coventry First (who sold the Berger Policy to Wells Fargo's client) that the Berger Policy was enforceable and that its two-year contestability period had expired, and then also confirmed Wells Fargo's requested change of ownership and beneficiary. However, these representations are in direct conflict with allegations now made by Prudential in its Complaint and the inconsistent position that it now conveniently takes in this action.  Before making these representations, Prudential believed that the Berger Policy was suspect due to numerous "internal red flags" it had discovered during underwriting process and afterwards.  Through its representations, Prudential nonetheless confirmed the validity and incontestability of the Policy.

38.     Prudential made such representations in the course of Prudential's business in which it has a pecuniary interest.  Prudential supplied such representations for the guidance of others, such as Wells Fargo's client and other purchasers/investors in the secondary market, who were foreseeable recipients of such information.

39.     Prudential was negligent in repeatedly making these representations. Prudential either knew or should have known that its representations were not true (based on what it previously believed to be "internal red flags" raised during the underwriting process).  Or it made these representations without knowledge of their truth or falsity.

Prudential's negligence is particularly glaring given the "internal red flags" Prudential identified but conveniently disregarded; the imputation of Brasner's knowledge to Prudential; and Prudential's failure to conduct any further investigation after issuing the Berger Policy or to contest the Policy during the two-year contestability period.

40.    Prudential intended or should have known that a third-party investor, such as Wells Fargo's client, rely on its representations.  Wells Fargo's client is a person for whose benefit and guidance Prudential intended to supply such representations for use in the acquisition of the Berger Policy in the secondary market.  Prudential intended or expected such representations to influence third party investors (which are foreseeable recipients of such information), such as Wells Fargo's client, in connection with the purchase of the Berger Policy in the secondary market.  Prudential thus either intended or expected, through its verification of coverage and other representations, to induce a third-party investor to acquire the Berger Policy in the secondary market.  This enabled Prudential to continue to collect premiums under the Policy.

41.    Wells Fargo's client is a *bona fide* third-party purchaser who justifiably relied on Prudential's verification of coverage of the Berger Policy and other representations concerning the validity and incontestability of the Policy.  In fact, had Prudential not issued its verification of coverage, Wells Fargo's client would not have acquired the Berger Policy.  Thus, in connection with its purchase of the Berger Policy in late December 2008, Wells Fargo's client justifiably relied on Prudential's verification of coverage and other representations concerning the status of the Berger Policy.

42.    Wells Fargo's client has suffered significant damages as a result of Prudential's negligent misrepresentations, including, but not limited to, the significant

acquisition costs incurred in acquiring the Berger Policy and the additional premiums of approximately $200,000 paid since acquisition of the Berger Policy.

WHEREFORE, Wells Fargo respectfully requests that the Court enter judgment in favor of Wells Fargo and against Prudential and award to Wells Fargo its damages. And, if appropriate, the Court should also award Wells Fargo the attorneys' fees and costs incurred in connection with this action and such other relief as the court deems just and proper.

Date:  February 4, 2011
       Miami, Florida

Respectfully submitted,

/s John K. Shubin_____
John K. Shubin (Fla. Bar No.: 771899)
jshubin@shubinbass.com
Juan J. Farach (Fla. Bar No.: 957704)
jfarach@shubinbass.com
Shubin & Bass, P.A.
46 S.W. 1st Street, Third Floor
Miami, Florida 33130
Telephone: (305)381.6060
Facsimile:  (305)381.9457
*Attorney for Defendant, Wells Fargo*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 4, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all Counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_____ s/ Juan J. Farach _____
Juan J. Farach, Esq.

**SERVICE LIST**
**Pruco Life Ins. Co v. Brasner, et al.**
**Case No. 10-CV-80804 Cohn/Seltzer**
**United States District Court, Southern District of Florida**


Wendy L. Furman, Esq.
wfurman@pettfurman.com
PETT FURMAN, PL
2101 N.W. Corporate Blvd., Suite 316
Boca Raton, Florida 33431
Tel. (561) 994-4311
Fax (561) 982-8985
*Pruco Life Insurance Company*
Service by CM/ECF


Stephen A. Serfass, Esq.
Stephen.serfass@dbr.com
Michael D. Rafalko, Esq.
Michael.rafalko@dbr.com
DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
Tel. (215) 988-2700
Of Counsel/Pro Hac Vice
*Attorneys for Plaintiff,*
*Pruco Life Insurance Company*
Service by CM/ECF


Rod A. Feiner, Esq.
refiner@coker-feiner.com
COKER & FEINER
1404 S. Andrews Avenue
Ft. Lauderdale, Florida 33316
Tel. (954) 761-3636
Fax (954 761-1818
*Counsel for Defendant, Mark Tarshis*
Service by CM/ECF


Steven M. Brasner, *pro se*
sbrasner@infinitywealthadvisors.com
Service by email