## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Pruco Life Insurance Company,

                Plaintiff,

v.

Steven M. Brasner, individually and as
principal of Infinity Financial Group, LLC,
Mark A. Tarshis, Infinity Financial Group,
LLC, Wells Fargo Bank, N.A., as Securities
Intermediary, and John Does 1-10,

                Defendants.

CASE NO. 10-CV-80804-COHN/Seltzer

## PLAINTIFF PRUCO LIFE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 56, Plaintiff Pruco Life Insurance Company ("Pruco") hereby files this motion for summary judgment and memorandum of law as follows:

## INTRODUCTION

This is a case about a life insurance policy obtained so that it could be sold to investors with no insurable interest in the life of the insured.  This stranger-originated life insurance ("STOLI") policy was the brain-child of a man whose name is now synonymous with STOLI – Steven Brasner ("Brasner") – and his cohorts at Infinity Financial Group, LLC ("Infinity"),[1] Coventry Capital I, LLC and Coventry First, LLC (collectively, "Coventry").  Pruco's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment ("SUMF"), at ¶¶ 5-9.

In January, 2009, Florida Insurance Commissioner Kevin McCarty released a 213-page Office of Insurance Regulation Report entitled Stranger Originated Life Insurance and the Use of Fraudulent Activity to Circumvent the Intent of Florida's Insurable Interest Law ("OIR Report").  The OIR Report defines STOLI as "a practice or plan to initiate, or originate a life insurance policy for the benefit of investors who seek payment by purchasing life insurance on a stranger."  The OIR Report lists hallmarks of STOLI activity including, but not limited to:

- Seniors being induced to obtain life insurance they do not want or need for any legitimate purpose;
- Misrepresentations to insurers in the application for insurance; and
- Trust ownership of the resulting policy, with the trust applying for a non-recourse premium financing loan that allows the lender to take control of the policy and sell it in the secondary market following the expiration of the policy's two-year contestable period.

SUMF, at ¶¶ 1-4.

---

[1] Brasner was a principal of Infinity.  Both Infinity and Brasner were former defendants in this action.  Pruco obtained a default final judgment against Brasner and Infinity on January 4, 2011 [D.E. #61].

The OIR Report condemns STOLI transactions, concluding that "it is imperative that the state act to prevent seniors and all Floridians from becoming victims of fraudulent STOLI transactions."  The life insurance transaction that is the subject of this case has all the hallmarks and abuses condemned by the OIR Report.  *Id.*, at ¶ 4.

Brasner and Coventry conspired to procure a $10 million Pruco policy (the "Berger Policy") on the life of Florida citizen Arlene Berger ("Ms. Berger").  Brasner and Coventry agreed at the outset that Berger Policy would be paid for by a non-recourse premium financing loan, and would be sold to an investor some two years later after the Berger Policy's contestable period expired.  SUMF, at ¶¶ 19-20, 23.  As was also intended and agreed upon by Brasner, Coventry and others from the outset, the Berger Policy was controlled by Coventry at all times and was relinquished by the Coventry-controlled trust when the premium financing loan matured; then the Berger Policy was sold twice within the span of thirty days shortly after the expiration of the contestable period.  *Id.* at ¶¶ 54-56, 65-67.  The entire transaction was structured from stem to stern to give the false impression of legitimacy when, in fact, it was always nothing more than an elegantly disguised wagering contract.  The facts marshaled in discovery prove the STOLI nature of the scheme.

Pruco is entitled to summary judgment.  First, the Berger Policy was a wagering contract which was procured for the purpose of being sold on the secondary market.  As such, the Berger Policy lacked an insurable interest at inception and is therefore void *ab initio* as a matter of law and well-settled public policy.  Second, Pruco was the victim of intentional and egregious fraud in the policy application process.  The fraudulent nature of the STOLI transaction, coupled with the lack of insurable interest at inception which renders the Berger Policy void *ab initio*, entitles Pruco to retain the premium paid toward the Berger Policy as a matter of law.  And, finally, Pruco is entitled to a dismissal of Wells Fargo's counterclaim for negligent misrepresentation. Wells Fargo has failed to uncover a single shred of material evidence in discovery that would

support that claim.  Accordingly, Wells Fargo's counterclaim fails as a matter of law and must be dismissed.

## FACTUAL BACKGROUND

Pursuant to Fed. R. Civ. P. 10(c), Pruco adopts and incorporates by reference its Statement of Undisputed Material Facts, and the supporting Affidavits of Thomas Farrell ("Mr. Farrell") (the "Farrell Aff."), Tawanna Hollis ("Ms. Hollis") (the "Hollis Aff.") and the Declaration of Michael D. Rafalko, Esquire (the "Rafalko Decl."), which have been filed as exhibits to Pruco's SUMF.

## LEGAL STANDARD

Summary judgment is proper when there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(C); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1326 (11th Cir. 1998).  If the moving party establishes the absence of any genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party may not merely rest on the pleadings, but must affirmatively establish through admissible evidence that a triable material fact remains.  *Celotex Corp.*, 477 U.S. at 324. Conclusory allegations, unsubstantiated assertions, and mere scintillas of evidence do not satisfy this burden.  *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

Count I of Pruco's Complaint (the only remaining Count) seeks a declaration from the Court that the Berger Policy is void *ab initio*.[2]  Under Fed. R. Civ. P. 38, there is no right to a

---

[2]     Wells Fargo has asserted a counterclaim against Pruco for negligent misrepresentation.  Wells Fargo only intends to pursue this claim if Pruco prevails on its declaratory judgment action.  *See* Wells Fargo's Opposition to Motion to Dismiss, at 16-17 [D.E. # 90].  Accordingly, the outcome of both causes of action hinge on the Court's ruling on Pruco's equitable action.  Additionally, and perhaps more importantly, Wells Fargo has not made a timely jury demand on its negligent misrepresentation claim under Fed. R. Civ. P. 38.  For both these reasons, the negligent misrepresentation claim does not automatically trigger a jury trial in this action.

jury in actions that historically would have been tried in the courts of equity, such as actions for declaratory judgment.  *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 121-22 (5th Cir. 1973) ("[t]he right of trial by jury does not extend to cases historically cognizable in equity") (citing Fed. R. Civ. P. 38(a); *Katchen v. Landy*, 382 U.S. 323 (1966)).[3]  Because Pruco's declaratory judgment action is an equitable action in which no right to a trial by jury exists, and indeed no jury demand has been made, the Court would serve as the finder of fact at trial.  Accordingly, the Court is in a position to determine, at the summary judgment stage, the issues of law and fact that would ultimately be subject of a trial in this case.  *See Lifetime Homes, Inc. v. Residential Development Corp.,* 510 F. Supp. 2d 794, 799 (M.D. Fla. 2007) ("in cases where the parties have agreed to a bench trial . . . the Court is the trier of fact and may review the works and weigh the evidence at the summary judgment stage.").  In this case, because it will ultimately be tried by the Court, and given that no material facts are in dispute, it is proper for a decision on the applicable facts and law to be rendered at the summary judgment stage.  *See, e.g., Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991) ("at the summary judgment stage a judge in a bench trial has the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could not possibly lead to a different result.").

## ARGUMENT

## I.   THE BERGER POLICY LACKED AN INSURABLE INTEREST AT INCEPTION AND IS VOID *AB INITIO*

### A.   Every Policy of Life Insurance Issued In Florida Must Be Supported By an Insurable Interest at Inception

Florida law requires that every policy of life insurance be supported by an insurable interest at inception.  Florida's insurable interest statute provides in pertinent part:

---

[3]      Furthermore, neither party has made a demand for a jury trial within the fourteen day period "after the last pleading directed to the issue is served," as required by Fed. R. Civ. P. 38(b).  Pursuant to Rule 38(d), "[a] party waives a jury trial unless its demand is properly served and filed."  Accordingly, even if the action between Wells Fargo and Pruco were not equitable in nature, this case would still be tried with the Court as the finder of fact.

> …[N]o person shall procure or cause to be procured or effectuated an insurance contract on the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives, or to any person having, at the time such contract was made, an insurable interest in the individual insured.

Fla. Stat. § 627.404(1) (2011).

Wells Fargo has not contested the fact that every policy of life insurance issued in Florida must be supported by an insurable interest at inception.  Further, in denying Wells Fargo's motion to dismiss [DE #64], this Court held that:

> Florida Courts have long held that insurable interest is necessary to the validity of an insurance contract…  Pursuant to Florida Statute § 627.404, an "insurable interest"  includes several enumerated interests, including (1) an individual's interest in her own life, body and health and (2) an individual's interest in the life, body and health of "another person to whom the individual is closely related by blood or law and in whom the individual has a substantial interest engendered by love and affection."

*Pruco Life Ins. Co. v. Brasner*, Civ. No. 10-80804, 2011 U.S. Dist. LEXIS 1598 at *9-10 (S.D. Fla. Jan. 7, 2011) (internal citations omitted).  Although life insurance policies may be assigned to entities without insurable interests, any such assignments must be made "in good faith, and not [as] sham assignments made simply to circumvent the law's prohibition on 'wagering contracts'."  *Id.* at 10 (quoting *AXA Equitable Life Ins. Co. v. Infinity Fin. Group, LLC*, 608 F. Supp. 2d 1349, 1356 (S.D. Fla. 2009)).

### B.    A Life Insurance Policy That Lacks an Insurable Interest at Inception is Void *Ab Initio*

The evidence in this action demonstrates that the Berger Policy was procured for the purpose of being sold in the secondary market to a stranger-investor with no insurable interest in Ms. Berger's life.  Such "wagering contracts" are against public policy and void *ab initio*.  *See Meerdink v. American Ins. Co.* 188 So. 764, 766 (Fla. 1939) ("[F]undamental principles of insurance … require that a person shall have an insurable interest before he can insure: a policy issued when there is no such interest is void."); *Atkinson v. Wal-Mart Stores, Inc.,* Civ. No. 08-

691, 2009 WL 1458020, at *3 (M.D. Fla. May 26, 2009) ("Florida courts have long held that insurable interest is necessary to the validity of an insurance contract and, if it is lacking, the policy is considered a wagering contract and void *ab initio* as against public policy.") (*citing Knott v. State ex rel. Guaranty Income Life Ins. Co.*, 186 So. 788, 789-790 (Fla. 1939)); *Brasner*, 2011 U.S. Dist. LEXIS 1598 at *9-10 (same); *Beard v. Am. Agency Life Ins. Co.*, 550 A.2d 677, 681 (Md. 1988) ("if a person enters into a contract for insurance upon the life of another while lacking an insurable interest in that individual, the contract is a mere gambling contract which is against public policy and void.").

While policies that are voidable are subject to the two-year contestable period, policies that are void *ab initio* are legal nullities. *See Schneberger v. Wheeler,* 859 F.2d 1477, 1480 (11th Cir. 1988) (applying Florida law) ("If a contract or note is void *ab initio,* it is a nullity."); 17A C.J.S. *Contracts* § 137 ("A contract that is void never attains legal effect as a contract and cannot be enforced, whereas a contract that is voidable is one where one or more of the parties have the power, by the manifestation of an election to do so, to avoid the legal relations created by the contract."); *Brasner*, 2011 U.S. Dist. LEXIS 1598 at *14-21.

This Court, in denying Wells Fargo's motion to dismiss, held that if Pruco could prove the allegations pleaded in its complaint, it would have established that the policy lacked an insurable interest and is void. *Pruco Life Ins. Co. v. Brasner*, Civ. No. 10-80804, 2011 WL 134056, at *4 (S.D. Fla. Jan. 07, 2011) ("Plaintiff's allegations here, if proven . . . would demonstrate that the Berger Policy was not procured in good faith, and that there was therefore no valid insurable interest."). Pruco has developed uncontroverted facts in discovery which prove each of the salient allegations of the Complaint.

### C.      The Facts Developed in Discovery Demonstrate
###            That the Berger Policy was a Wagering Contract

The Berger Policy was a wagering contract and is void *ab initio*.  Ms. Berger's testimony alone proves that the Berger Policy was STOLI.  SUMF, at ¶¶ 13-18.  When her testimony is considered in the broader context of the other facts developed in discovery, there can be absolutely no question about the fact that the Berger Policy was STOLI.  The facts show that the STOLI scheme had two critical components which transpired simultaneously: (1) Brasner procured a $10 million policy from Pruco by fraudulent means (*Id.* at ¶¶ 38-43); and (2) Coventry arranged for premium to be financed through a non-recourse premium financing loan (the "NRPF Loan").  *Id.* at ¶¶ 30-32.  The fraudulent procurement of the Berger Policy was critical because investors seek to purchase high face amount policies, and a woman with Ms. Berger's true means would not qualify for a $10 million policy, so Brasner needed to artificially inflate (by a factor of ten) Ms. Berger's assets and net worth (and to make other material misrepresentations) in order to induce Pruco to issue the Berger Policy.  *Id.* at ¶¶ 13-16, 48. Similarly, the NRPF Loan program orchestrated by Coventry was critical because it was the source of the premium for the Berger Policy, and it provided a cloak of superficial legitimacy for the procurement and ultimate sale of the policy.  *Id.* at ¶¶ 30-32.  The facts show that the NRPF Loan program was used in this case as a sophisticated cover for illegal STOLI activity.

###      1.      Ms. Berger's Testimony Alone Proves That The Berger Policy Was
###             STOLI

The Court need look no further than Ms. Berger's testimony in order to conclude that the Berger Policy was a wagering contract.  Ms. Berger testified that she approached Brasner, through her accountant, Mark Tarshis ("Tarshis"), looking to learn more about a "free insurance" scheme that she and her husband, Richard Berger ("Mr. Berger"), had heard about at lunch seminars marketed to Florida seniors.  SUMF, at ¶¶ 10-11.  Ms. Berger testified that she had no

need or want of life insurance, no estate to protect, and a total net worth that *never* exceeded $1.5 million.  *Id.* at ¶¶ 13-14.

Ms. Berger further testified that she had no intention of keeping any policy of insurance issued on her life, and that she had no intent or expectation that the Berger Policy would be for her benefit or the benefit of her family (or anyone else with a valid insurable interest in her life). SUMF, at ¶ 17.  In fact, she always knew that the Berger Policy would be sold to investors who would own the policy and collect the death benefit when she died.  *Id.*  Ms. Berger also testified that neither she, nor her family, did, or ever would have, paid any of the premium for the Berger Policy at any time, under any circumstances.  *Id.* at ¶ 18.  Unbeknownst to Ms. Berger, the Berger Policy was to be trust-owned and premium was to be financed through the NRPF Loan. *Id.* at ¶¶ 19-20.

Although Ms. Berger ostensibly initiated the STOLI scheme by reaching out to Brasner to learn about a "free insurance" deal, she had little direct involvement in the plan after its inception aside from signing documents.  Ms. Berger did not know of the existence of the 2006 Arlene Berger Life Insurance Trust (the "Trust") that was created to own the Berger Policy, the fact that premium was financed through the NRPF Loan or the amount of the NRPF Loan. SUMF, at ¶¶ 19-20.  She never knew the identity of the owner or beneficiary of the Berger Policy, and does not know the identity of the present owner and beneficiary of the Policy.  *Id.* at ¶ 22  She merely signed the documents she was instructed to sign by Brasner and his cohorts without reading or understanding those documents.  *Id.* at 21.

### 2. Brasner And Coventry Launched The STOLI Scheme To Procure The Berger Policy In November, 2005

Brasner and Coventry began assembling the pieces of a "successful" STOLI transaction in November, 2005.  SUMF, at ¶ 25.  Brasner's cohorts ordered an "inspection report" for Ms. Berger and instructed Ms. Berger to lie to Worldwide Inspection Services ("WIS") – the third-

party vendor that prepared the inspection report – about her assets and net worth.  *Id.* at ¶¶ 26-27. At Brasner's direction, Ms. Berger falsely "confirmed" that her net worth was $10.45 million and that she was seeking insurance for the purpose of "estate conservation."  *Id.*

Shortly thereafter, on December 12, 2005, Brasner's cohorts ordered a life expectancy report on Ms. Berger.  SUMF, at ¶ 28.  The life expectancy report set forth Ms. Berger's projected lifespan.  Life expectancy reports are used by STOLI promoters to gauge the value of a policy in which they wish to invest – generally speaking, the longer the prospective insured's lifespan, the less valuable the policy will be because the investor will be required to pay premium for a longer time before the insured dies and the death benefit is paid.  *Id.* at ¶ 29. There is no purpose for ordering a life expectancy report prior to the issuance of a policy; the only purpose for doing so is because the policy was going to be sold in the secondary market. The December 12, 2005 life expectancy report was just one of at least *seventeen* such reports ordered on Ms. Berger.  *Id.*

> **3.    The First Critical Step In The STOLI Scheme Was Securing The Bergers' Participation In Coventry's NRPF Program**

On January 25, 2006, the first critical step in the STOLI scheme took place.  On that date, at Brasner's direction, the Bergers signed documents cementing their participation in Coventry's NRPF Loan program.  SUMF, at ¶ 30.  Coventry effectively ensured that it would control every aspect of the scheme – the Berger Policy, the Trust and the NRPF Loan – until the Berger Policy was sold to an investor, Lavastone Capital, LLC ("Lavastone"), in 2008.  The NRPF Loan program operated as follows:

- An application would be submitted to Pruco seeking a $10 million policy on Ms. Berger's life;
- The Trust and a "premium finance sub-trust" (the "Sub-Trust") would be created in precisely the form directed by Coventry;
- The Trust would be designated as owner and beneficiary of the Berger Policy shortly after issuance;

- Mr. Berger would be designated as "co-trustee" of the Trust in order to maintain the superficial appearance that Mr. Berger held an interest in the Berger Policy (as discussed below, any such appearance was a complete fiction);
- The Sub-Trust would apply for the NRPF Loan with Bank of America (and the premium financing would be concealed from Pruco);
- Bank of America would fund the first two years' premium for the Berger Policy, with the Trust as borrower, and Coventry as "program administrator" – two years' premium would be financed so the Berger Policy would be past its two-year contestability period when the NRPF Loan matured;
- The NRPF Loan would accrue interest at a staggering 18.94%, ensuring that the Trust never could, or would, repay the loan upon maturity;
- After two years, the NRPF Loan would reach maturity and the Berger Policy – the only collateral for the loan – would be relinquished to Bank of America by the Trust in satisfaction of the loan;
- Bank of America would sell the Berger Policy to Coventry who, by that time, had already been marketing the policy for resale to secondary market investors; and
- Coventry would sell the Berger Policy to one of those investors (Lavastone, in this case), netting itself a tidy "origination fee" in the process.

*Id.*

The NRPF Loan program was used to make the Berger Policy appear to be supported by an insurable interest when, in fact, it was a well-disguised STOLI policy. Aside from the Bergers' own testimony, in which they unequivocally stated that they had no need for life insurance, paid no premiums, had no expectation of being paid the Berger Policy death benefit, and always knew that an investor would own and benefit from the Berger Policy, Coventry effectively stripped the Bergers of any control they might ostensibly have exercised over the transaction on January 25, 2006 – months before the policy was issued. SUMF, at ¶¶ 13-14, 20-23, 31-32. Coventry and Brasner directed Ms. Berger to sign an Authorization to Release Medical Records and Special Irrevocable Power of Attorney (the "Power of Attorney"), and Mr. Berger to sign a Borrower's Special Irrevocable Power of Attorney (the "Borrower's Power of Attorney"). *Id.* at ¶¶ 31-32 By those critical documents, the Bergers irrevocably appointed Coventry as their attorney-in-fact and effectively divested themselves of any control over the Berger Policy, the Trust or the NRPF Loan. *Id.* The Power of Attorney and Borrower's Power of Attorney effectively ensured that once the Berger Policy was issued, the Bergers would not

receive the death benefit.  Moreover, Coventry was free to market the Berger Policy to investors and, upon maturation of the NRPF Loan and its relinquishment in satisfaction of the NRPF Loan, to sell the Berger Policy in the secondary market. The Bergers were merely along for the ride. *Id.*

### 4.    The Second Critical Step In The STOLI Scheme Was Brasner's Fraudulent Procurement Of The Berger Policy

With the Bergers' agreement in place to participate in the NRPF Loan program, Brasner set in motion the second critical step in the STOLI scheme.  SUMF, at ¶ 35.  On February 21, 2006, an application was submitted to Pruco seeking $10 million of coverage on the life of Arlene Berger (the "Application").  *Id.*  It was accompanied by a Client Information Form ("Information Form") signed by Brasner, and later by a Confidential Financial Statement ("Financial Statement"), purportedly generated and signed by the Bergers' accountant.  *Id.* at ¶ 37.  Each of those documents was rife with fraudulent misrepresentations regarding the reason for and amount of insurance, Ms. Berger's finances, the source of premiums, the fact that premium would not be financed, and that there were no policies of insurance on Ms. Berger's life with other insurers.[4]  *Id.*  By way of example, the Financial Statement represent to Pruco that Ms. Berger had a net worth of $15.95 million – by her own admission, more than ten times her highest ever true net worth.  *Id.* at ¶ 38.  These misrepresentations were intended to (and did) induce Pruco to issue a $10 million policy on Ms. Berger's life on April 13, 2006 – an amount of insurance that vastly exceeded the amount for which someone of Ms. Berger's true net worth could qualify.  *Id.* at ¶¶ 43-44.  Pruco paid Brasner $195,337.76 in commissions for placing the Berger Policy.  *Id.* at ¶ 45.

---

[4]        In fact, on November 22, 2005, an application was submitted to American General Life Insurance Company for a $10 million life insurance policy insuring Ms.  Berger.  That policy was placed in force on January 4, 2006.  The American General policy was part of the same STOLI/"free insurance" scheme, set up by Brasner SUMF, at ¶ 36.

5.    **Brasner and Coventry Concealed From Pruco The Fact That Ms. Berger Was Not Paying Premium, And That *Coventry* Paid The Initial Premium For The Berger Policy**

The subterfuge did not stop with the phony Financial Statement.  An initial premium payment of $81,871.75 was made on May 2, 2006.  SUMF, at ¶ 46.  The circumstances of that payment demonstrate that the Bergers were not in control of this transaction and provide a clear indication of the extent of the plan that was in place at the time of the purchase of the Berger Policy.  The payment was not made by Ms. Berger; nor was is made by the Trust (which was not created until June 5, 2006); and it was not paid pursuant to the NRPF Loan (which was not entered until July 17, 2006).  The initial premium payment was made by *Coventry*.  *Id.* at ¶ 47.  Moreover, Coventry and Brasner intentionally concealed from Pruco the fact that Coventry made the payment.  This subterfuge was accomplished as follows: Coventry wired $81,871.75 to Brasner's Infinity bank account; Brasner then turned around and arranged for a cashier's check to be made payable to Pruco in that amount.  *Id.* at ¶ 48.  Brasner's former assistant, Patricia Wagner ("Wagner"), testified that the initial premium payment was paid from Coventry, to Brasner, to Pruco via certified check, so that Coventry and Brasner could conceal from Pruco that Ms. Berger did not pay the initial premium.  Wagner referred to the initial premium payment as a game of "smoke and mirrors," which was intended to mislead Pruco.  *Id.*  There was no legitimate basis for Coventry to make the initial premium payment.  Coventry made that payment because it was already in complete control of the Berger Policy.  *Id.* at 31-32.  Coventry and Brasner made the payment in a deceptive manner because Coventry knew that if the initial premium did not appear to come from Ms. Berger, Pruco might suspect that the Berger Policy was a wagering contract.

Two months later, after the Berger Trust was created and the loan papers[5] were executed,[6] Bank of America issued two payments pursuant to the NRPF Loan – one directly to Pruco for premium in the amount of $331,077.29[7], and the second, a check in the amount of $81,870.75, was made payable to Ms. Berger at Brasner's address.  SUMF, at ¶ 49.  There was no legitimate basis for the second payment.  *Id.*  Bank of America released the payment to "Ms. Berger" at the direction of Brasner and Coventry to make it appear that Bank of America was reimbursing Ms. Berger for the initial premium payment.  *Id.*  Of course, Ms. Berger testified that she did not pay any of the premium toward the Berger Policy, so there was nothing to reimburse.  *Id.* at ¶ 18.  Upon receipt of the check from Bank of America in the amount of $81,870.75, Brasner had Ms. Berger come to his office and endorse the check over to him personally.  *Id.* at ¶ 50.  Brasner then deposited the check in his account, and wrote a check for $81,870.75 to Lifetime Assets Corporation, a Coventry affiliate, to reimburse Coventry for the initial premium payment.  *Id.*  As with the coordination of the initial premium payment to Pruco, the process used by Bank of America, Brasner and Coventry to reimburse Coventry demonstrates the use of "smoke and mirrors" to make the wagering contract look legitimate.  *Id.* at ¶¶ 48, 50.

> **6.**    **As Was Planned And Agreed From Prior To Inception, The Berger Policy Was Shopped To Investors In The Secondary Market Before The NRPF Loan Reached Maturity, Then Sold To Lavastone**

Coventry began shopping the Berger Policy to secondary market investors in March and April, 2008, which coincided with the expiration of the Berger Policy's two-year contestable

---

[5]    The loan papers, specifically the Note and Security Agreement, require Bank of America to make distribution of the loan proceeds to the insurer as premium.  SUMF, at ¶ 49, n. 8.

[6]    The Trust was finalized on June 5, 2006 and the Note and Security Agreement formalizing the NRPF Loan was executed on July 17, 2006 – over 2 months after the initial premium payment was paid by Coventry.  SUMF, at ¶ 49, n. 9.

[7]    This payment was wired to Pruco with reference to the originator being Ms. Berger, giving the entirely false appearance that the funds came from Ms. Berger.  SUMF, at ¶ 49, n. 10.

period.  SUMF, at ¶ 51.  In fact, the Berger Policy was shopped to investors months before the NRPF Loan matured in September, 2008, because Coventry knew all along that the NRPF Loan would never be repaid and the Berger Policy would be relinquished.  *Id.*  Also in May, 2008, Brasner arranged for $172,826.86 to be wired from Dunnam & Dunnam Life Escrow Services to the Bergers' bank account.  Brasner described this payment to the Bergers as an "insurance disbursement."  *Id.* at ¶ 52.  Other than the Berger Policy, the Bergers testified that they knew of no policy insuring their lives that was ever sold.  *Id.* at ¶ 53.  Thus, the $172,826.86 payment had to represent Brasner's compensation to the Bergers for their participation in the STOLI scheme involving the Berger Policy.

As had been planned all along, on September 15, 2008, the day before the NRPF Loan reached maturity, the Trust relinquished the Berger Policy to Bank of America in satisfaction of the NRPF Loan.  SUMF, at ¶¶ 54-56.  Bank of America then cooperated with Coventry to sell the Berger Policy to a secondary market investor.  *Id.* at ¶ 57.  On December 12, 2008, a deal was struck between Bank of America, Coventry and Wells Fargo (in its capacity as securities intermediary for Lavastone) whereby Lavastone purchased the Berger Policy from Bank of America and Coventry.  *Id.* at ¶ 64.  Coventry was also paid a significant "origination fee" by Lavastone as a result of this sale.  *Id.*

### 7.    Wagner Confirmed The Berger Policy Was A Wagering Contract

Brasner's assistant, Patricia Wagner, personally assisted Brasner with numerous STOLI transactions, including the procurement of the Berger Policy.  Wagner testified that:

- The Berger Policy was procured with the specific intent and plan to sell it on the secondary market shortly after the expiration of the contestability period (SUMF, at ¶ 17);
- Wagner and Brasner worked with Coventry to facilitate the ultimate sale of the Berger Policy to a secondary market investor *Id.* ¶¶ 21, 30-34;
- The initial premium payment on the Berger Policy was provided to Brasner by Coventry Capital, to conceal from Pruco that it was not the Bergers making this payment (*Id.* at ¶ 48); and

- Coventry provided waiver authorization forms to Brasner, to be signed by Ms. Berger, that would allow Coventry to divulge her personal medical records and health information to secondary market investors.[8] *Id.* at ¶¶ 30-31.

### D. Pruco is Entitled to an Adverse Inference Against Wells Fargo Based Upon Brasner Invoking His Fifth <u>Amendment Privilege Against Self-Incrimination</u>

The facts set forth above are more than sufficient to demonstrate that the Berger Policy was a wagering contract and is void *ab initio*. There is, however, one additional piece to the evidentiary puzzle. Brasner was deposed in this matter on May 19, 2011, and again on August 16, 2011, this time on behalf of Infinity. Brasner invoked his Fifth Amendment privilege against self-incrimination in response to every substantive question that was asked at each deposition.[9] Significantly, Brasner asserted his Fifth Amendment privilege in response to the following questions:

- "And your plan from the outset for each of the life insurance policies you obtained insuring the lives of Ms. And Ms. Berger was for those policies to be sold on the secondary market, right?"
- "And you knew from before the time [the Berger] Policy was issued that the policy was being obtained for the purpose of gambling on the life of Ms. Berger, right?"
- "And when you procured [the Berger] Policy, you did so knowing it would be sold to investors; is that right?"
- "The purpose for [the Berger] Policy was to allow strangers to wager on her [] life; is that right?"
- "And your intention and plan from prior to the issuance of [the Berger] Policy was that all of the premium that was ever to be paid for [the Berger] Policy would be paid by secondary market investors?"

---

[8]      Ms. Wagner testified: "Q: And the reason you need to obtain these records that you just referred to, in this case . . . is for the sale of the policy? A: Correct." SUMF, Rafalko Decl., Exh. 2 at 144:6-9.

[9]      Pruco notes that Brasner inappropriately invoked the Fifth Amendment when he was deposed on behalf of Infinity. The United States Supreme Court has held that corporations and other artificially created collective entities do not have the authority to invoke a Fifth Amendment protection against incrimination. *See Braswell v. United States*, 487 U.S. 99, 102 (1988). The Southern District of Florida has also held that a corporate entity, such as the Infinity Entities, does not have the ability to assert its Fifth Amendment right against self incrimination. *See Martinez v. Majestic Farms, Inc.*, 05-60833, 2008 WL 239164, at *2 (S.D. Fla. Jan. 28, 2008) ("It is undisputed that Defendant, as a corporation, does not have a Fifth Amendment privilege against self-incrimination, and, so must provide a corporate representative for a deposition.").

- And a key component of your STOLI plan was that once the loan which is the subject of the note and security agreement we have been looking at matured which was shortly after the expiration of the contestable period on [the Berger] Policy, that policy would be sold to secondary market investors, is that right?"

SUMF, at ¶ 68.

The Eleventh Circuit and Florida state courts have consistently held that "the trier of fact may take an adverse inference against the parties to a civil action refusing to testify on Fifth Amendment grounds." *United States v. Two Parcels of Real Property Located in Russell County, Alabama,* 92 F.3d 1123, 1129 (11th Cir. 1996); *see also Vasquez v. State,* 777 So.2d 1200, 1203 (Fla. Ct. App. 2001) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Moreover, where the adverse inference is "trustworthy" and will "advance the search for the truth," the trial court is permitted to draw an adverse inference against a party when a non-party has invoked the Fifth Amendment in the action. *See S.E.C. v. Monterosso*, 746 F.Supp. 2d 1253, 1263-64 (S.D. Fla. 2010) (citing *LiButti v. U.S.,* 107 F.3d 110 (2d Cir. 1997) (delineating a number of non-exclusive factors to aid trial courts in determining whether adverse interests may be drawn against a party from the invocation of the Fifth Amendment privilege by a non-party.)); *S.E.C. v. Lauer,* 03-cv-80612, 2008 WL 4372896 at *23 (S.D. Fla. Sept. 29, 2008) (citing *F.D.I.C. v. Fidelity & Deposit Co. of Maryland,* 45 F.3d 969, 977-78 (5th Cir.1995) (holding that evidence of a non-party's invocation of the Fifth Amendment privilege is admissible so long as it is relevant and its probative value is not outweighed by the danger that it may unfairly prejudice the party to that suit)).

The Court has the power to draw an adverse inference against Brasner. Because Brasner invoked the Fifth Amendment in response to the foregoing questions, Pruco is entitled to the inference that, had he answered them truthfully and accurately, he would have answered "yes" to each one. More importantly, however, consideration of the *LiButti* factors in this case demonstrates that Brasner's invocation of his Fifth Amendment rights entitles Pruco to an

16

adverse inference against Wells Fargo.  In *Monterosso*, the Southern District of Florida adopted

the factors delineated by the Second Circuit in *LiButti*, and stated those factors as follows: "(1)

the nature of the relevant relationships; (2) the degree of control of the party over the non-party

witness; (3) the compatibility of the interests of the party and non-party witness in the outcome

of the litigation; and (4) the role of the non-party witness in the litigation."  *Monterosso*, 746

F.Supp.2d at 1263-64 (citing *LiButti*, 107 F.3d at 123-24).  The Court further stated that

"[w]hether these or other circumstances unique to a particular case are considered by the trial

court, the overarching concern is fundamentally whether the adverse inference is trustworthy

under all of the circumstances and will advance the search for the truth."  *Monterosso*, 746

F.Supp.2d at 1264 (quoting *LiButti*, 107 F.3d at 124).

In light of the *LiButti* factors, the circumstances of this case are sufficient that the adverse

inference against Brasner apply equally to Pruco's claims against Wells Fargo.  Most

importantly, the interests of Brasner and Wells Fargo are perfectly aligned.  Both Branser and

Well Fargo benefit from concealment of the STOLI fraud – Brasner avoids conviction on the

criminal charges against him;[10] Wells Fargo avoids the financial implications of a void *ab initio*

policy.  Brasner's assertion of his Fifth Amendment privilege, therefore, advances the interests of

Wells Fargo.

### E.     The Uncontroverted Facts of Record Demonstrate that the Berger Policy Lacked an Insurable Interest at Inception and is Void *Ab Initio*

Bearing all of the aforementioned facts in mind – (1) the fraudulent procurement of the

Berger Policy; (2) the NRPF Loan, and terms of the Power of Attorney and Borrower's Power of

Attorney; (3) the Bergers' testimony that they participated in a STOLI scheme; (4) Wagner's

testimony that the Berger Policy was STOLI; (5) the adverse inference stemming from Brasner's

---

[10]     In April, 2008, Brasner was arrested and charged with 22 felony counts of alleged grand theft, fraud and other offenses in connection with his procurement of a combined $78 million in STOLI policies.  SUMF, at ¶ 9.

invocation of the Fifth Amendment; (6) and, most notably, the fact that Ms. Berger, Brasner and Coventry accomplished precisely the scheme that they set out to accomplish – there can be no question about the fact that the Berger Policy was a wagering contract, lacked an insurable interest at inception, and is void *ab initio*.  These facts demonstrate from the outset the Berger Policy was obtained, not to protect against any legitimate risk of loss faced by the Bergers, but for the purpose of benefiting investors with no insurable interest in Ms. Berger's life.

## II.    PRUCO IS ENITLED TO RETAIN THE PREMIUM PAID TOWARD THE BERGER POLICY

The uncontroverted facts in this case demonstrate that Pruco was the victim of fraud in the procurement of the Berger Policy.  In furtherance of their STOLI scheme, Ms. Berger, Brasner, Infinity and others fraudulently misrepresented Ms. Berger's finances and net worth, the purpose for insurance, the source of premiums, the fact that premium would be financed, and the fact that American General had issued a $10 million policy insuring Ms. Berger's life, among other misrepresentations.  SUMF, ¶¶ 36-43.  Pruco would not have issued the Berger Policy if it had known the truth.  *Id.* at ¶ 44.  Pruco has also been harmed by the issuance of the Berger Policy, by its payment of $195,337.76 in commissions to Brasner and Infinity (which are effectively unrecoverable), costs of underwriting and administering the Policy, and the costs of this lawsuit to properly have the Berger Policy declared void *ab initio*.  *Id.* at ¶ 45.

Courts in Florida and elsewhere have held that where a life insurance policy is procured by fraud and lacked an insurable interest at inception, the insurer need not return the premium. The Fifth District Court of Appeals in *TTSI Irrevocable Trust v. Reliastar Life Ins. Co.*, 60 So.3d 1148, 1149 (Fla. Ct. App. 2011) held on May 13, 2011 that "[w]here a party wrongfully procures a life insurance policy on an individual in whom it has no insurable interest, the party is not entitled to a return of premiums paid for the void policy."  The *TTSI* decision, which involved a similar STOLI scheme in which a policy was declared void *ab initio*, also distinguished between

cases in which a carrier has elected the remedy of rescission, and those where the policy is void *ab inito* as a matter of law for lack of an insurable interest at inception.[11]  *Id* at 1150.  The Court concluded that the insurer was entitled to keep the premium, holding that "as a general rule, contracts that are void as contrary to public policy will not be enforced by the courts *and the parties will be left as the court found them*."  *Id.* (emphasis added).[12]

## III.   WELLS FARGO'S COUNTERCLAIM MUST BE DISMISSED

Wells Fargo brings a counterclaim against Pruco for negligent misrepresentation. Specifically, Wells Fargo alleges that on December 10, 2008, a Coventry representative called Pruco in order to obtain what Wells Fargo improperly refers to as a "verbal verification of coverage."  SUMF, at ¶ 58.  At that time, Wells Fargo alleges, Pruco negligently represented to Coventry that the policy was valid, in-force and incontestable.  *See* Contercl. ¶ 37.  Wells Fargo alleges that Coventry then re-communicated that information to Wells Fargo and Lavastone which induced Lavastone to purchase the Berger Policy to its detriment.  The record in this

---

[11]      "Rescission is an equitable remedy where the primary obligation is to undo the original transaction and restore the former status of the parties.  Moreover, rescission is an elective remedy and the party may, but is not obligated to, exercise its right to rescind the transaction….  By contrast, the present case does not involve a *voidable* contract.  Rather, neither party could elect to give effect to the policy at issue because it was void at the outset."  *Id.* at 1150 (internal citations omitted) (emphasis in original).

[12]      The *TTSI* decision is in line with other decisions around the country which have held that where an insurer brought an action resulting in a fraudulently-procured policy being declared void for lack of insurable interest at inception, public policy permits the carrier to retain the premium.  In *PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust,* Civil No. 08-572 (MJD/SRN), 2010 WL 2539755, *4-5 (D. Minn. Mar. 2, 2010), for example, the court held that "[a] contrary rule would be an invitation to commit fraud":

> If all moneys thus voluntarily paid can be recovered or must be returned by the insurer as a condition precedent to pleading the fraud as a defense, a party who contemplates obtaining insurance by false representations may well feel that he is taking no chances of loss, but is entering upon a transaction in which he stands to gain large returns without any possibility of endangering his investment.  If the fraud is never discovered, the beneficiary under the policy which will be issued to him will receive the full benefit of the contract.  If it by chance is discovered, his estate will receive back all that has been paid by the guilty party, and the trouble and expense attending upon the transaction will be thrown upon the innocent party.

*Id.* at *5.  The *Morello* district court opinion was affirmed by the Eighth Circuit Court of Appeals.  *PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust,* --- F.3d ---, 2011 WL 2717950, at *4-5 (8th Cir. July 14, 2011); *see also Wuliger v. Manufacturers Life Ins. Co.,* 567 F.3d 787, 799-800 (6th Cir. 2009) (holding that the receiver of life settlement company could not recover premiums paid to insurer for fraudulently obtained life insurance policies under unjust enrichment theory).

action demonstrates that Wells Fargo's claim is baseless and should be dismissed for at least three reasons: <u>first</u>, Pruco never made certain representations that Wells Fargo has alleged (*Id.* at ¶ 62); <u>second</u>, none of the representations that Pruco *did* make were false (*Id.* at ¶ 60); and, <u>third</u>, Wells Fargo cannot show reasonable reliance on any alleged misrepresentation by its client, Lavastone, because the information it allegedly relied upon was both true and ascertainable from the face of the Berger Policy, and because Jessica Bunsick, the Coventry employee who spoke with Pruco, misrepresented to Pruco the entity on whose behalf she was calling in order to obtain information about the Berger Policy without arousing any suspicion at Pruco that the information was being gathered in connection with a contemplated secondary market sale of the Berger Policy.  *Id.* at ¶¶ 58-63.

### A.  Legal Standard for Negligent Misrepresentation

In order to succeed on a claim for negligent misrepresentation, Wells Fargo must prove that: "(1) there has been a misrepresentation of material fact; (2) the party making the misrepresentation either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representation was made with the intent to induce another to act on the misrepresentation; and (4) the plaintiff suffered a resulting injury while acting in justifiable reliance upon the misrepresentation."  *See Zurich Am. Ins. Co. v. Hi-Mar Specialty Chems. LLC*, No. 08-80255, 2010 WL 298392 at *5 (S.D. Fla. Jan. 19, 2010) (citing *Fla. Women's Med. Clinic, Inc. v. Sultan*, 656 So. 2d 931, 933 (Fla. Ct. App. 1995).  This Motion focuses on Wells Fargo's inability, as a matter of law, to make out the First, Third and Fourth elements of a negligent misrepresentation claim.

### B.  Pruco Never Made the Representations Alleged

Wells Fargo's negligent misrepresentation claim rests on its allegation that "in 2008, [Pruco] represented to Coventry First (who sold the Berger Policy to [Lavastone]) that the Berger

Policy was enforceable and that its two year contestability period had elapsed." *See* Countercl. ¶ 37.  This statement is at best a half-truth.  Discovery has revealed the following uncontroverted facts:

- On December 10, 2008, Coventry employee Jessica Bunsick called Pruco to seek financial information about the Berger Policy.  Ms. Bunsick spoke with Pruco call center employee Tawanna Hollis.  SUMF, at ¶ 58.
- Ms. Bunsick asked Ms. Hollis questions about the Berger Policy, including: the cash surrender value, account value, date of the last premium payment and amount, due date of the next premium payment, monthly cost of insurance, interest rate, the fact that there were no liens or assignments against the Policy, and the fact that the Trust was the owner of the Policy.  Ms. Hollis answered each of these questions truthfully and accurately.  *Id.* at ¶ 60.
- Ms. Bunsick also asked: "could you please confirm that since the policy is past the two-year mark, that it is past contestability in (*sic*) suicide?"  *Id.* at ¶ 61.
- Ms. Hollis accurately responded: "Yes, it is past the two-year mark."  *Id.*

Conspicuously absent from this conversation are alleged representations that the Berger Policy was valid and enforceable.  In fact, Ms. Bunsick never asked – and Ms. Hollis made no comment or representation – about the validity or enforceability of the Berger Policy, the underlying insurable interest, any misrepresentations transmitted to Pruco in support of the Policy, Pruco's dealings with Mr. Brasner, whether the two-year contestable period is a bar to an insurable interest challenge – which, as a matter of law, it is not –  or any other information that might arguably be used in support of a negligent misrepresentation claim.[13]  SUMF, at ¶ 62.

### C.     The Representations Ms. Hollis Made Were True and Correct

When you strip away the fluff from Wells Fargo's misrepresentation claim, the only "representation" that remains is Ms. Hollis' statement that, "yes, [the Berger Policy] is past the

---

[13]     To the extent Wells Fargo would argue that Pruco had a duty to inform Wells Fargo's client of any potential future challenge to the Policy based on lack of insurable interest or otherwise, that argument would be misplaced because no such duty existed, no such information was requested, and the failure to provide information about the possibility of a future challenge to the Policy is not a misrepresentation.  *See Hauben v. Harmon*, 605 F.2d 920, 925 (5th Cir. 1979) ("A failure to disclose mere possibilities cannot be a failure to disclose material facts.").  The facts of record show that Pruco had no knowledge in 2008 that the Berger Policy lacked an insurable interest, or that the Berger Policy was the subject of a secondary market transaction.  Further, Tawanna Hollis, a call center employee, would not have been the appropriate person to make representations about insurable interest or suspected secondary market activity on behalf of Pruco.

two year mark." SUMF, at ¶ 61.  This statement cannot be the basis of a negligent misrepresentation claim for several reasons.  <u>First</u>, the statement was true.  It is axiomatic that in order to state a claim based upon a misrepresentation, the alleged misrepresentation must be false.  *Jallali v. Nova Southeastern Univ., Inc.*, --- So.3d ----, 2011 WL 520305 at *1 (Fla. Ct. App. Feb. 16, 2011) (holding that representations made by defendant were true, and thus, did not constitute actionable fraudulent or negligent misrepresentation).  Wells Fargo cannot base its negligent misrepresentation claim on a representation that was true.

Second, Pruco continues to treat the Berger Policy as in-force.  Although Pruco has initiated this action seeking a declaration that the Policy is void *ab initio* for lack of insurable interest at inception, Pruco has and will continue to treat the Policy as in-force until the Court declares the Policy void *ab initio*.  Consistent with that position, Pruco has placed the policy in suspense so that it will not lapse for the duration of this civil action and has stopped accepting premium pending the outcome of the litigation.  *See Transp. Can. Ins. Co., v. Soil Tech Distributors, Inc.,* 966 So. 2d 8, 10 (Fla. Ct. App. 2007) (an insurer may file a declaratory judgment action in order to determine the validity of an insurance policy); *Baron Oil Co. v. Mut. Fire Ins. Co.,* 470 So. 2d 810, 815 (Fla. Ct. App. 1985) (insurer may have a court determine its obligations under an insurance policy).

And, <u>third</u>, it is absurd for Wells Fargo to seek to rely upon information in support of a negligent misrepresentation claim that was plainly apparent to Wells Fargo from the face of the contract.  Bunsick – in asking Ms. Hollis to "please confirm that since the policy is past the two year mark, that it is past contestability in (*sic*) suicide" – already knew the Policy was beyond the two-year mark.  SUMF, at ¶ 62.  Wells Fargo would have this Court believe that by stating that the Policy was "beyond the two year mark," Pruco represented a fact that Wells Fargo did not already know and, further, that the representation somehow translated into a broader, affirmative representation that Pruco would never challenge the Berger Policy on any basis, including lack

of insurable interest (which is not bound by the two-year contestable period). Of course, Pruco made no such representation.[14]

### D. Wells Fargo Cannot Demonstrate that Pruco Intended to Induce Wells Fargo or Lavastone to Purchase the Berger Policy

In pursuing a negligent misrepresentation claim, a plaintiff must prove that it is one of the entities that the alleged misrepresenting party intended to influence with its information. *See Morgan v. W.R. Grace & Co.*, 779 So. 2d 503, 506 (Fla. Ct. App. 2000). There is no record evidence to support that Pruco intended to induce Lavastone to purchase the Berger Policy. In fact, the uncontroverted facts of record show that Pruco had no intention of inducing anyone to purchase the Berger Policy in the secondary market. Similarly, Ms. Hollis had no knowledge of any contemplated or pending secondary market transaction involving the Berger Policy, nor any intention of inducing Lavastone or anyone else to buy the Policy. SUMF, at ¶ 63. Pruco did not even know the identity of Lavastone until April 29, 2011, late in discovery in this action.

In withstanding Pruco's motion to dismiss Wells Fargo's counterclaim on this basis, Wells Fargo's defense rested on its interpretation of the Restatement (Second) of Torts § 552, which "permits recovery for pecuniary losses suffered by persons who reasonably relied upon *false information* provided by someone acting in the course of their business, profession, and employment" [DE #142 at 15] (emphasis added). Wells Fargo argued that Pruco's motion to dismiss should be denied because Wells Fargo had pleaded that Pruco made misrepresentations about the Berger Policy to Coventry with the intention that those misrepresentations would be conveyed to, and relied upon, by Lavastone. This Court denied Pruco's motion to dismiss, but held that in order for Wells Fargo to succeed on its negligent misrepresentation claim, it must

---

[14]    Moreover, Wells Fargo and Lavastone cannot claim to have "reasonably relied" on a representation that was plainly apparent from the face of the Berger Policy in support of a negligent misrepresentation claim. *See Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1296 (S.D. Fla. 2007) (holding that "Plaintiffs' express assertions that they relied on oral representations in lieu of [the relevant contractual terms] . . . underscores the fact that any reliance on oral statements is unreasonable as a matter of law.").

ultimately prove "that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group [i.e., a secondary market purchaser]." *Id*. at 16. For the sake of its motion to dismiss, however, Wells Fargo's "allegations that Plaintiff provided [a] verification of coverage to Coventry First with full understanding that Coventry First intended to rely on and relay the information to potential purchasers, such as [Lavastone]…[was] enough to survive dismissal." *Id* at 16-17.

Discovery has revealed at least three reasons why Wells Fargo's theory of inducement falls apart. <u>First</u>, as set forth above, the representations made by Ms. Hollis were *true*. SUMF, at ¶ 60. Pruco cannot have wrongfully induced Lavastone to act to its detriment by conveying true and accurate information.

<u>Second</u>, Pruco never provided Wells Fargo with a "Verification of Coverage" as Wells Fargo has incorrectly alleged. Verification of Coverage – or "VOC" – is a term of art that Wells Fargo seeks to misconstrue for its benefit. A true VOC must be provided in writing. Pruco provides formal, written VOCs when a written request for information about a policy is submitted in the proper format. Pruco provides written VOCs because the statutes of most states require Pruco to provide the information upon request.[15] In fact, Wells Fargo deposed Tracie Rubery, a Process Management Associate at Prudential who is responsible for responding to VOC requests. Ms. Rubery testified that a VOC request is a written request received by Prudential and handled according to defined policies and procedures – and that such VOCs are never oral. The information provided to Coventry on December 10, 2008 was not a VOC. Irrespective of Wells Fargo's improper use of the term, however, the transcript of the December

---

[15]     Although Florida does not have a statutory requirement relating to Verifications of Coverage, thirty-nine states do, most of which require the insurer to respond to a request for Verification of Coverage within thirty days of receiving such request. *See e.g.* National Association of Insurance Commissioners Viatical Settlements Model Act, § 9(A)(4). Even though Florida has not adopted a VOC statute, secondary market providers like Coventry routinely seek written VOCs from Pruco in connection with policies of life insurance issued in Florida.

10, 2008 call itself demonstrates that Ms. Hollis never made any representation or gave any verification of the validity of the Berger Policy. *See* Hollis Aff. at Exh. 1, attached as Exh. A to Pruco's SUMF.

Third, and perhaps most compellingly, it is a factual impossibility for Pruco to have "provided [a] verification of coverage to Coventry First with the full understanding that Coventry First intended to rely on and relay the information to potential purchasers, such as [Lavastone]" when Pruco *never knew* it was communicating with Coventry. SUMF, at ¶¶ 58-59. When Bunsick called Pruco on December 10, 2008 to request information about the Berger Policy, she misrepresented to Pruco that she was calling on behalf of Wilmington Trust, the present owner of the Policy. *Id.* at ¶ 59. Pruco, therefore, reasonably (yet mistakenly) believed it was providing information to Wilmington Trust. *Id.* Bunsick even answered questions posed by Ms. Hollis to confirm that she was, in fact, speaking with the policy owner. *Id.* At no time did Bunsick reveal the fact that she was calling on behalf of Coventry. *Id.* Bunsick's misrepresentation destroys Wells Fargo's argument that Pruco knowingly provided false information to Coventry.

## **CONCLUSION**

For the reasons set forth above, Pruco respectfully requests that its Motion for Summary Judgment be granted, that the Berger Policy be declared void *ab initio*, that an adverse inference be granted against Brasner and Wells Fargo, that Pruco be entitled to retain the premium paid toward the Berger Policy, that Wells Fargo's counterclaim be dismissed with prejudice, that Pruco be awarded fees and costs incurred in connection with this legal action, and that the Court award any other relief it deems just and proper.

Dated:  August 19, 2011

PETT FURMAN, PL
Attorneys for Plaintiff
2101 N.W. Corporate Blvd., Suite 316
Boca Raton, FL 33431
(561) 994-4311
(561) 982-8985 (fax)


By:___s/Wendy L. Furman
     Wendy L. Furman
     Fla. Bar No. 0085146
     wfurman@pettfurman.com

*Of Counsel*
Stephen A. Serfass *(Admitted Pro Hac Vice)*
Michael D. Rafalko *(Admitted Pro Hac Vice)*
Nolan B. Tully *(Admitted Pro Hac Vice)*
**DRINKER BIDDLE & REATH LLP**
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
(215) 988-2700
Stephen.serfass@dbr.com
Michael.rafalko@dbr.com
Nolan.tully@dbr.com

*Attorneys for Plaintiff*
*Pruco Life Insurance Company*

## CERTIFICATE OF SERVICE

    I certify that on August 19, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

John K. Shubin, Esq.
Shubin & Bass, P.A.
46 S.W. 1st Street, Third Floor
Miami, FL 33130
jshubin@shubinbass.com
*Counsel for Wells Fargo*


s/Wendy L. Furman
Wendy L. Furman