## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| Pruco Life Insurance Company, | CASE NO. 10-CV-80804-COHN/Seltzer |
|               Plaintiff, | |
| v. | |
| Steven M. Brasner, individually and as principal of Infinity Financial Group, LLC, Mark A. Tarshis, Infinity Financial Group, LLC, Wells Fargo Bank, N.A., as Securities Intermediary, and John Does 1-10, | |
|               Defendants. | |

## PRUCO LIFE INSURANCE COMPANY'S STATEMENT OF UNDISPUTED
## MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Pruco Life Insurance Company ("Pruco") submits this statement of undisputed material facts in support of its Motion for Summary Judgment.

## I.    INTRODUCTION

1.    In January, 2009, Florida Insurance Commissioner Kevin McCarty released a 213 page Office of Insurance Regulation report entitled Stranger-Originated Life Insurance ("STOLI") and the Use of Fraudulent Activity to Circumvent the Intent of Florida's Insurable Interest Law (the "OIR Report").  *See* OIR Report, attached as Exhibit 1 to the Declaration of Michael D. Rafalko, Esq.[1]  The OIR Report defines STOLI as "a practice or plan to initiate, or originate a life insurance policy for the benefit of investors who seek to profit by purchasing life insurance on a stranger."  *Id.* at 12.  The purpose of such a STOLI transaction is to "obtain cash by selling that policy to a stranger whose only interest is in the early demise of the insured."  *Id.*

2.    Among the many hallmarks of such STOLI transactions, the OIR Report specifically identifies:

- Seniors being induced to obtain life insurance policies they would otherwise not buy or need (Rafalko Decl., Exh. 1 at 13);
- Seniors being "wined and dined" and promised "free insurance" (*id* at 13);
- Seniors being induced to obtain life insurance policies they would otherwise not buy or need (*id* at 13);
- Misrepresentations being made to the insurance carrier in the application for insurance – particularly as to the insured's net worth – in order for the prospective insured to qualify for a high face amount policy (*id* at 13);
- Seniors being coached to "properly" respond to an insurance carrier's questions about the prospective coverage in order to avoid alerting the carrier to the presence of a STOLI scheme (*id* at 13);
- Applying for insurance with multiple insurance carriers in order to maximize profits (*id* at 13); and
- Structuring the STOLI transaction in order to attempt to circumvent state insurable interest laws and the policy's two-year contestable period.  *Id.* at 14.

---

[1]    Michael D. Rafalko's Declaration is Attached as Exhibit A to Pruco's Statement of Material Facts.

3.      According to the OIR Report, to attempt to circumvent insurable interest laws and the two-year contestable period, generally "in a STOLI transaction, the promoters and investors will establish an irrevocable trust to obtain a premium finance loan, obtain an insurance policy on a senior, and pay the life insurance premium for two years, i.e., the contestability period." Rafalko Decl., Exh. 1 at 14.  "Typically, these premium finance loans are non-recourse loans meaning the life insurance policy is the only collateral for the loan and the premium finance lender can only pursue collection of the collateral if there is a default."  *Id.*  "Seniors are told that in a default situation, the trust will then sell the policy and the seniors will receive a profit, less the cost of the loan and interest.  *Id.*  This arrangement appears to be beneficial to seniors as they enjoy life insurance 'free' for two years and then after two years, collect a significant cash payment for his or her participation in the scheme."  *Id.* at 15.

4.      The OIR Report states that "STOLI policies are procured in a manner that circumvents insurable interest laws by allowing persons with no insurable interest in the life of the insured at the time of purchase to obtain a policy for which they could not otherwise directly apply."  Rafalko Decl., Exh. 1 at 2.  Based upon the *many* harmful aspects of STOLI transactions to Florida seniors, the OIR Report concludes that it "is imperative that the State act to protect seniors and all Floridians from becoming victims of fraudulent STOLI transactions."  *Id.* at 2, 4.

## II.     STEVEN BRASNER: PORTRAIT OF A STOLI PRODUCER

5.      Former defendant Steven Brasner ("Brasner") was the producer of a $10 million life insurance policy (the "Berger Policy") issued by Pruco on the life of Florida citizen Arlene Berger ("Ms. Berger").  Brasner was formerly appointed as a non-exclusive life insurance producer with Pruco; his appointment was terminated in 2007 for failure to repay a debt.[2]  *See*

---

[2]      Brasner's termination was not related to STOLI or suspected STOLI activity.

Affidavit of Thomas Farrell, Vice President of Life Underwriting with The Prudential Insurance Company of America, at ¶ 3.[3]

6.      Prior to 2005, Brasner placed life insurance policies in the $50,000-250,000 face amount range.  In 2005, however, Brasner discovered the STOLI market.  Brasner began selling policies in the $3 million to $30 million range.  This jump was a direct result of Brasner's involvement in the STOLI market.  *See* Deposition Testimony of Patricia Wagner, Rafalko Decl., Exh. 2 at 25:17-27:12.

7.      In orchestrating STOLI deals, Brasner submitted fraudulent applications and related information to life insurers to induce them to issue high face amount policies.  Brasner's goal was to procure policies that would be attractive to investors so that the policies could be resold on the secondary market.  Some 85% of the applications submitted by Brasner after 2005 contained false information.  Rafalko Decl., Exh. 2 at 73:21-74:13; 125:15-126:25.

8.      In 2008, the first of at least ten civil lawsuits was filed against Brasner and his business Infinity Financial Group, LLC ("Infinity") in connection with STOLI policies for which Brasner acted as producer.  These suits allege fraud, conspiracy, breach of contract, and sought declarations rescinding and/or declaring the policies he produced void, among other relief.  *See* Leslie Scism, *Regulators Rein In Murky Life Policies*, The Wall Street Journal, June 21, 2010, Rafalko Decl., Exh. 3.

9.      In April, 2010, Brasner was arrested and charged with 22 felony counts of grand theft, fraud and other offenses related to the fraudulent procurement of some $78 million in life insurance policies from various carriers.  These charges are currently pending against Brasner in Florida's 15th Judicial Circuit.  *See* Rafalko Decl., Exh. 3.

---

[3]      Thomas Farrell's Affidavit is Attached as Exhibit B to Pruco's Statement of Material Facts.

### III    ARLENE BERGER SEEKS "FREE INSURANCE" FROM BRASNER

10.     The story of the Berger Policy begins in mid-2005 when Ms. Berger and her husband, Richard Berger ("Mr. Berger," together "the Bergers") approached their accountant, Mark Tarshis ("Tarshis"), about a "free insurance" scheme they had heard about at lunch seminars marketed to Florida seniors.  Tarshis referred the Bergers to Brasner, who was a licensed insurance producer with Pruco and other carriers.  *See* Deposition Testimony of Arlene Berger, Rafalko Decl., Exh. 4 at 42:6-43:5; 45:5-47:17.

11.     The "free insurance" scheme the Bergers sought to engage in was, in fact, a STOLI scheme.  *See* Rafalko Decl., Exh. 2 at 28:20-29:6.  The Bergers agreed to participate in the STOLI scheme with Brasner.  *See* Deposition Testimony of Richard Berger, Rafalko Decl., Exh. 6 at 68:10-70:7; Rafalko Decl., Exh. 4 at 58:25-60:11.

12.     Brasner, at the time, did not have experience doing STOLI deals, so he sought advice from fellow insurance producer Kevin Bechtel at Life Brokerage Equity Group ("LBEG"), who had experience doing STOLI deals.  Bechtel taught Brasner how to structure a STOLI deal.  Rafalko Decl., Exh. 2 at 145:7-146:5; 203:12-22.  LBEG was later listed as the broker general agency, or "BGA," on the Berger Policy and was paid a commission of $34,858.25.  Farrell Aff. at ¶ 4.

13.     In 2005 and 2006, Ms. Berger had no need or want for life insurance for any legitimate purpose, particularly in the amount of $10 million.  Rafalko Decl., Exh. 4 at 60:6-61:17.

14.     In 2005 and 2006, Ms. Berger had no estate to protect, particularly not in the amount of $10 million.  Rafalko Decl., Exh. 4 at 103:14-109:25.

15.     In fact, Ms. Berger's net worth has always been lower than $1 million – a far cry from the $15.95 million that was ultimately represented to Pruco.  Rafalko Decl., Exh. 5 at 41:2-43:6.

16.     In 2005, at the time when she agreed to participate in the STOLI scheme with Brasner, Ms. Berger's net worth was less than $700,000.  Rafalko Decl., Exh. 6 at 55:19-56:1.

17.     Ms. Berger never had any intention to keep any insurance policy issued on her life.  Rafalko Decl., Exh. 6 at 70:15-71:6; Exh. 4 at 97:15-98:11.  In fact, She always knew that the Berger Policy would ultimately be owned by a third party that would collect the death benefit when she died.  *Id.* at Exh. 4 at 65:20-67:2.

18.     Neither Ms. Berger nor her family would have paid any premium toward the Berger Policy under any circumstances.  Rafalko Decl., Exh. 4 at 59:10-60:5.  Ms. Berger and her family *could not* have afforded to pay premium for the Berger Policy.  *Id.* at Exh. 6 at 83:23-84:15.  Neither she nor her family did, in fact, pay any premium for the Berger Policy.  *Id.* at Exh. 4 at 159:15-23.

19.     Rather, as discussed below, Brasner's plan was for the premium to be financed through a non-recourse premium financing loan ("NRPF Loan") orchestrated by Coventry Capital I, LLC ("Coventry").[4]  *See* NRPF Loan Note and Security Agreement, Rafalko Decl., Exh. 7 at WT-0051-52, 54.  Ms. Berger never knew the amount or source of the NRPF Loan that was ultimately used to pay premium for the Berger Policy.  *Id.* at Exh. 4 at 113:3-24.

20.     Ms. Berger did not know of the existence of the trust established in her name (discussed below) which was installed by Brasner as owner and beneficiary of the Berger Policy one month after the Berger Policy was delivered.  The trust was the borrower under the NRPF

---

[4]     Coventry Capital I, LLC and its affiliate, Coventry First, LLC, are referred to collectively as "Coventry" herein.

Loan that ultimately was used to pay premium for the Berger Policy.  Rafalko Decl., Exh. 4 at 135:17-23.

21.     The Bergers signed all documents Brasner presented in furtherance of their agreement to procure insurance for the purpose of being sold on the secondary market.   The Bergers did not read these documents; nor were the documents explained to them by Brasner or his employees.  Rafalko Decl., Exh. 4 at 102:4-103:1; Exh. 6 at 71:8-74:6.

22.     Ms. Berger knew nothing about the terms or conditions of the Berger Policy.  She does not know – and never has known – the identity of the current owner and beneficiary of the $10 million Policy insuring her life.  Rafalko Decl., Exh. 4 at 66:17-68:6; 203:22-204:13.

23.     The Bergers always knew that, pursuant to the "free insurance" scheme, the Berger Policy would be transferred to investors who would ultimately own the policy and collect the $10 million death benefit upon Ms. Berger's death.  Rafalko Decl., Exh. 6 at 69:17-70:3.

## IV.     PRE-APPLICATION: STEPS TAKEN BY MS. BERGER, BRASNER, COVENTRY AND OTHERS TO SET THE STAGE FOR A "SUCCESSFUL" STOLI TRANSACTION

24.     As discussed below, an application for insurance was ultimately submitted to Pruco on February 21, 2006 (the "Application") which resulted in the issuance of the Berger Policy; but that is not where the STOLI process began.  *See* Application, Rafalko Decl. at Exh. 8.

### A.     <u>False Financial Information Provided at Brasner's Direction</u>

25.     On November 28, 2005, LBEG employee Joann Godin ("Godin") requested an "Inspection Report" on Ms. Berger from Worldwide Inspection Services ("WIS"), a third-party vendor whose duty it was to verify a prospective insured's finances and net worth, among other information.  *See* Inspection Report, Rafalko Decl., Exh. 9; Deposition Testimony of Kathleen Rutherford, Rafalko Decl., Exh. 10 at 16:22-17:25.

26.     On November 28, 2005, Ms. Berger confirmed the following information for WIS over the telephone:

- The purpose for her seeking insurance was "estate planning;"
- She had no other life insurance in-force and no applications for life insurance pending;
- She had a total annual income of $250,000;
- She owned real estate valued at $2.5 million;
- She held stocks valued at $6 million;
- She had personal assets of $250,000;
- She had cash assets of $700,000;
- She had $1 million in Certificates of Deposit; and
- She had total assets and a total net worth of $10.45 million.

*See* Rafalko Decl., Exh. 9; Rafalko Decl., Exh. 10 at 138:10-141:7.

27.     The information confirmed for WIS was false.  In fact, Brasner had provided Ms. Berger with a script to use during the call so that the call would not alert WIS that the information was inaccurate.  Rafalko Decl., Exh. 4 at 121:5-122:17.  WIS completed the Inspection Report on November 29, 2005 and the Inspection Report was submitted to Pruco in support of the Application.  Rafalko Decl., Exh. 9; Farrell Aff. at ¶ 7.

**B.      Five Months Prior to the Issuance of the Berger Policy, LBEG Obtains First of at Least Seventeen Life Expectancy Reports on Arlene Berger For The Sole Purpose of Selling the Berger Policy To A Stranger Investor**

28.     On December 12, 2005, before the Application was even submitted to Pruco, LBEG ordered a life expectancy report on Ms. Berger.  *See* 12/12/05 Life Expectancy Report, Rafalko Decl., Exh. 11.

29.     Life expectancy reports are used by STOLI promoters to gauge the life expectancy – and thus the profitability – of a policy insuring a prospective insured.  The longer the insured's projected life expectancy, the less valuable a policy is likely to be in the secondary market because of the need for the STOLI promoter to continue to pay hundreds of thousands if not millions of dollars in premium over many years before the insured dies and the death benefit

becomes payable.  Farrell Aff. at ¶ 14.  Discovery has revealed that this was the first of at least

seventeen life expectancy reports obtained on Ms. Berger.

### C.     Coventry Gains Control of the Berger Policy Three Months Prior to Issuance

30.     On January 25, 2006, before the Application was submitted to Pruco, the Berger

Policy was pre-approved by LaSalle Bank, predecessor in interest to Bank of America (referred

to hereinafter as "Bank of America") for the NRPF Loan, which was administered by Coventry

and loaned by Bank of America.  *See* Exh. 24 to Joint Motion To File Confidential Documents

Under Seal, D.E. #175, at Proverian-85; Proverian-88-95; and Proverian-109.  In connection

with the NRPF Loan administered by Coventry:

- A trust would be created to take ownership of the Policy (The Arlene Berger 2006 Life Insurance Trust, referred to hereinafter as "the Trust"), as well as a premium financing sub-trust (the "Sub-Trust") of precisely the form directed by Coventry (*id.* at Proverian-131-138; Proverian-111-123);
- A $10 million Policy with Pruco would be obtained on the life of Ms. Berger (*id.* at Proverian-95);
- The Berger Policy would be owned by the Trust (*id.* at Proverian-131-138);
- The Sub-Trust would apply for the NRPF Loan with Bank of America (*id.* at Proverian-122-123);
- The first two years of policy premium would be financed with Bank of America as lender, the Trust as borrower, and Coventry as program administrator (*id.* at Proverian-88-95);
- The NRPF Loan would generate interest at a staggering 18.94%, ensuring that the Trust and/or Ms. Berger never could, or would, repay the loan, effectively making relinquishment of the Berger Policy (or default) upon maturity of the loan the Bergers' only option (*id.* at Proverian-95);
- The Berger Policy would be the only collateral for the NRPF Loan (*id.* at Proverian-88-95); and
- Bank of America could foreclose on the loan and take the Berger Policy in the event of a default by the borrower; or, in the alternative, the Berger Policy could simply be relinquished to Bank of America in complete satisfaction of the loan (*id.* at Proverian-90).

31.     An Authorization to Release Medical Records and Special Irrevocable Power of

Attorney ("Power of Attorney") was among the NRPF Loan program documents executed by

Ms. Berger, at Brasner's direction, on January 25, 2006.  By this Power of Attorney, Ms. Berger

irrevocably relinquished all control over the Berger Policy and the NRPF Loan to Coventry.  *See* Exh. 5 to Motion For Seal, D.E. #175, at WF-281-282.  This document has been provided for the Court's *in camera* review as an exhibit to the Parties' Joint Motion For Seal [D.E. #175].  Pruco considers this document a critical piece of the STOLI scheme as it divested Ms. Berger of control over the Berger Policy.  Pruco requests that the Court closely consider the information in, and implications of, this document.

32.      Also on January 25, 2006, at Brasner's direction, Mr. Berger executed a Borrower's Special Irrevocable Power of Attorney ("Borrower's Power of Attorney").  By the Borrower's Power of Attorney, Mr. Berger irrevocably relinquished to Coventry any control he would have held over the Trust or its sole asset, the Berger Policy.[5]  *See* Exh. 24 to Motion For Seal, D.E. #175, at Proverian-105-106.  In conjunction with the Power of Attorney cited in paragraph 31, this document placed Coventry in complete control of the Berger Policy beginning on January 25, 2006, three months before the Berger Policy was issued.  Pruco similarly requests that the Court closely review and consider the information in this document.

33.      Ironically, Mr. Berger did not even know that the Trust was created.  Rafalko Decl., Exh. 6 at 149:6-151:1.

34.      Coventry had positioned itself to hold complete control over the Berger Policy, the NRPF Loan and the Trust before the Application was ever submitted or the Trust created.  *See* Exh. 24 to Motion For Seal, D.E. #175, at Proverian-85-138.

## V.      THE APPLICATION FOR THE BERGER POLICY WAS SUBMITTED TO PRUCO WITH MANY MATERIAL MISSTATEMENTS AIMED AT INDUCING

---

[5]      The Coventry NRPF Loan program called for Mr. Berger to be designated as the "co-trustee" of the Trust in order to give the superficial appearance that if Ms. Berger died, Mr. Berger would receive the death benefit.  This appearance was, of course, a complete fiction.  The Borrower's Power of Attorney ensured that fact by stripping Mr. Berger of any control over the Trust or the Berger Policy.  *See* Exh. 24 to Motion For Seal, D.E. #175, at Proverian-105-106; Proverian 131-138.

**PRUCO TO ISSUE THE BERGER POLICY AND ENABLING THE
SECONDARY MARKET SALE OF THE BERGER POLICY**

35.     With all prerequisites in place for a "successful" STOLI transaction, Ms. Berger

and Brasner signed and submitted the Application to Pruco on February 21, 2006.  Rafalko Decl.

at Exh. 8.

36.     The Application contained a representation that there was no existing life

insurance coverage in-force on Ms. Berger's life with another insurer.  Rafalko Decl., Exh. 8, at

Pru-54.  That representation was false.  By February 21, 2006, a $10 million life insurance policy

on Ms. Berger's life was in-force with American General Life Insurance Company, No.

U10032844L, having been issued on December 15, 2005 (the "AG Policy").  *See* American

General Life Ins. Co. policy no. U10032844L, Rafalko Decl., Exh. 12.  The AG Policy was part

of the same STOLI "free insurance" scheme as the Berger Policy.  Rafalko Decl., Exh. 2 at

106:1-113:5.

37.     On February 21, 2006, Brasner signed and submitted a Client Information Form

("Information Form") in support of the Application.  The Information Form represented that:

- The purpose and $10 million face amount of the Berger Policy were determined based upon an "estate analysis;"
- The purpose of the insurance was "estate conservation;"
- The source of the initial and future premiums was to be Ms. Berger's "current income or savings account" (*i.e.* not financed);
- Premium would be paid by Ms. Berger;
- Ms. Berger had an annual income of $274,000;
- Ms. Berger had cash assets of $700,000;
- Ms. Berger had savings of $700,000;
- Ms. Berger's home was valued at $2.5 million;
- Ms. Berger had investments valued at $7 million;
- Ms. Berger had personal property valued at $250,000.

Rafalko Decl., Exh. 8 at Pru-59-60.

38.     Further, on March 8, 2006, Brasner's assistant, Patricia Wagner ("Wagner"),

submitted to Pruco (through LBEG) a Confidential Financial Statement ("Financial Statement")

for Ms. Berger.  *See* March 8, 2006 email from J. Godin to B. Pyle, Rafalko Decl., Exh. 13.  The

Financial Statement purports on its face to have been prepared and signed by Tarshis.  *See*

Financial Statement, Rafalko Decl., Exh. 14.  In fact, the dollar amounts listed in the Financial

Statement were concocted by Mr. Brasner.  Rafalko Decl., Exh. 2 at 96:1-97:1.

> 39.     The Financial Statement represented to Pruco that Ms. Berger's assets included:

- Cash in the amount of $700,000;
- Personal real estate in the amount of $3.5 million;
- Commercial and investment real estate valued at $4.5 million (which was allegedly recently inherited from deceased, non-immediate family members);
- Stocks and mutual funds valued at $6 million;
- Certificates of deposit valued at $1 million;
- Personal property valued at $250,000 and;
- Total annual income of $274,000.

Rafalko Decl., Exh. 14.

> 40.     Thus, the Financial Statement represented that Ms. Berger's total net worth of

$15.95 million.[6]  Rafalko Decl., Exh. 14.  That was false and grossly overstated Ms. Berger's net

worth.  Rafalko Decl., Exh. 5 at 41:2-43:6; Rafalko Decl., Exh. 6 at 55:19-56:1.

> 41.     Brasner, through Godin of LBEG, represented to Pruco that "Mr. Tarshis is [the

Bergers'] financial planner and tax advisor.  He has known [the Bergers] for years.  After

thoroughly evaluating Ms. Berger's estate and tax situation, this recommendation [for a $10

million Pruco policy] was made."  *See* March 14, 2006 email from J. Godin to B. Pyle, Rafalko

Decl., Exh. 15. That representation was false.  Rafalko Decl., Exh. 4 at 103:21-104:6.

> 42.     Further, each of the aforementioned representations in the Information Form and

Financial Statement was false.  Rafalko Decl., Exh. 4 at 103:14-109:25; 196:25-199:16.

---

[6]     The difference in value between the assets and net worth set forth in the Client Information Form ($10.45 million) and Financial Statement ($15.95 million) was represented to Pruco to relate to a real property valuation which accounted for the differences between the New York and Florida real estate markets, and $4.5 million in commercial and investment real estate which the Bergers had recently inherited.  These representations were false. Rafalko Decl., Exh. 4 at 196:25-199:16.

43.     Brasner also directed Wagner to falsify documents that were submitted to Pruco, including the Financial Statement.  Rafalko Decl., Exh. 2 at 73:21-74:13; 79:13-80:20; 96:1-97:1.  Ms. Berger's net worth and finances were artificially inflated by Wagner and Brasner in order to induce Pruco to issue a policy with a higher face amount than that for which Ms. Berger could actually qualify.  *Id.* at 125:15-126:25; 129:10-130:6.

## VI.     PRUCO ISSUED THE BERGER POLICY BASED ON THE LIES IT HAD BEEN TOLD; THE SOURCE AND METHOD BY WHICH THE FIRST PREMIUM PAYMENT WAS MADE DEMONSTRATES COVENTRY'S CONTROL AND THE FACT THAT THE BERGER POLICY LACKED AN INSURANCE INTEREST AT INCEPTION

### A.     <u>Issuance of the Berger Policy</u>

44.     In reliance upon the representations contained in the Application, Client Information Form, Financial Statement and other documents and materials submitted to Pruco, Pruco issued the Berger Policy, No. V1208044, on the life of Ms. Berger in the amount of $10 million.  Farrell Aff. at ¶ 11.  The contract date of the Berger Policy was April 27, 2006.  *See* Berger Policy, Rafalko Decl., Exh. 16.  Brasner, through Ms. Godin at LBEG, represented to Pruco prior to inception that the Trust was being "revamped" and that ownership of the Berger Policy would be transferred to the Trust shortly after issuance.[7]  Rafalko Decl., Exh. 15.  Trust ownership of a life insurance policy is common where the true intention of the insured is "estate conservation" as was represented to Pruco.  Farrell Aff. at ¶ 8.

45.     Brasner was paid a total of $195,337.76 in commissions by Pruco for placing the Berger Policy.  LBEG was paid $34,858.25.  Farrell Aff. at ¶ 4.

### B.     <u>The Source of the Initial Premium Payment and the Machinations Involved With that Payment Show Coventry was in Control and That the Policy was Never Supported by an Insurable Interest at Inception</u>

---

[7]     The owner and beneficiary of the Berger Policy was, in fact, changed to the Trust on June 30, 2006.  *See* Confirmation of Change of Ownership and Beneficiary, Rafalko Decl., Exh. 18.

46.    The Berger Policy was delivered on April 28, 2006, and an initial premium payment of $81,871.75 was made on or about May 2, 2006.  *See* Initial Premium Receipt and Acknowledgement of Life Insurance Policy Delivery, Rafalko Decl., Exh. 17.

47.    Contrary to the representations made to Pruco, the first premium payment was not made by Arlene Berger from her current income and savings.  Rafalko Decl., Exh. 8, at Pru-59. Rather, it was made by Coventry.  But Coventry did not simply issue payment to Pruco – as it would have done if there was a legitimate reason for Coventry to make the payment.  *See* Infinity Bank Records for May, 2006, Rafalko Decl., Exh. 19.

48.    Instead, Coventry and Brasner concealed from Pruco the fact that Coventry made the payment.  This subterfuge was accomplished as follows: on May 1, 2006 Coventry wired $81,871.75 to Infinity's bank account (Rafalko Decl., Exh. 19); Brasner then turned around and arranged for a cashier's check to be made payable to Pruco in that amount.  *See* Infinity Check 1048, dated 5/1/06, Cashier's Check Issued by Wachovia to Prudential dated 5/2/06, Rafalko Decl., Exh. 20.  Wagner testified that the initial premium payment was paid from Coventry, to Brasner, to Pruco, so that Coventry and Brasner could conceal from Pruco that Ms. Berger did not pay the initial premium.  Wagner referred to the initial premium payment as a game of "smoke and mirrors," which was intended to mislead Pruco.  Rafalko Decl., Exh. 2 at 129:10-130:6.

49.    Two months later, after the Berger Trust was created and the loan papers[8] were executed,[9] Bank of America issued two payments pursuant to the NRPF Loan – one directly to

---

[8]       The loan papers, specifically the Note and Security Agreement, required Bank of America to make distribution of the loan proceeds to the insurer as premium.  Rafalko Decl., Exh. 7 at WT-0051.

Pruco in the amount of $331,077.29 as premium for the Berger Policy[10], and the second, a check in the amount of $81,870.75, was made payable to Ms. Berger at Infinity's address (*See* LaSalle Bank check no. 0627077, dated 7/17/06, Rafalko Decl., Exh. 23).  There was no legitimate basis for the second payment.  It was done in this fashion to make it appear that Bank of America was reimbursing Ms. Berger for the initial premium payment.  Rafalko Decl., Exh. 2 at 133:9-134:8.  Of course, Ms. Berger testified that she did not pay any of the premium toward the Berger Policy, so there was nothing to reimburse.  Rafalko Decl., Exh. 4 at 159:15-23.

50.      Upon receipt of the check from Bank of America in the amount of $81,870.75, Brasner had Ms. Berger come to his office and endorse the check over to Infinity.  Rafalko Decl., Exh. 4 at 153:20-154:20.  Brasner deposited this check in Infinity's account (*See* Infinity Bank Records for July, 2006, Rafalko Decl., Exh. 24), and wrote a check for $81,870.75 to Lifetime Assets Corporation, a Coventry affiliate, to reimburse Coventry for the first premium payment. (*See* Infinity Boynton Beach check no. 1058, dated 7/20/06, Rafalko Decl., Exh. 25).

## VII.   AS PLANNED FROM THE BEGINNING, THE BERGER POLICY WAS RELINQUISHED TO BANK OF AMERICA, PURCHASED BY COVENTRY AND RE-SOLD IN THE SECONDARY MARKET

51.      As early as March, 2008 – just before the expiration of the two-year contestability period, and several months before the maturity date of the NRPF Loan – Coventry began shopping the Berger Policy for resale in the secondary market to potential buyers including the ultimate buyer, Lavastone Capital, LLC ("Lavastone").  *See* Exh. 18 to Motion For Seal, D.E.

---

(Continued)

9      The Trust was finalized on June 5, 2006 (*See* Trust Agreement, Rafalko Decl., Exh. 21) and the Note and Security Agreement formalizing the NRPF Loan was executed on July 17, 2006 (Rafalko Decl., Exh. 7) – more than 2 months after the initial premium payment was paid by Coventry (Rafalko Decl., Exh. 19).

10      This payment was wired to Pruco with reference to the originator being Ms. Berger, giving the entirely false appearance that the funds came from Ms. Berger.  *See* Record of 7/17/06 Wire Transfer of $331,077.29, Rafalko Decl., Exh. 22.

#175, at Lava-230, 232.  Lavastone and Coventry were longstanding partners in the secondary market for life insurance, pursuant to an "origination agreement" in place since at least July 1, 2001 (*See* Exh. 14 to Motion For Seal, D.E. #175, at Lava-144; Exh. 26 to Motion For Seal, D.E. #175, at 58:16-60:22) and a servicing and monitoring agreement in place since at least July 1, 2008.  *See* Exh. 10 to Motion For Seal, D.E. #175, at WF-606-664.  Coventry understood that the Trust would relinquish the Berger Policy in satisfaction of the loan, and Coventry wanted to finalize the sale of the Berger Policy as soon as possible after the Berger Policy was relinquished.  *See* Exh. 18 to Motion For Seal, D.E. #175, at Lava-230, 232; Rafalko Decl., Exh. 2 at 139:22-140:15; *see also* Rafalko Decl., Exh. 7 at WT-0058.

52.     Shortly thereafter, in May, 2008, the Bergers' received a $172,828.86 payment arranged by Brasner.  *See* Bergers' Fidelity Account Statement and Fidelity Wire Record for May, 2008, Rafalko Decl., Exhs. 26 and 27.  Brasner told the Bergers that this payment was "an insurance disbursement."  Rafalko Decl., Exh. 6 at 95:22-97:11.

53.     The only insurance coverage Brasner placed concerning the Bergers were the Berger Policy, the American General policy insuring the life of Ms. Berger and a policy insuring the life of Mr. Berger.  Rafalko Decl., Exh. 6 at 90:6-91:6.  All of these policies were part of the same STOLI "free insurance" scheme.  *Id.* at 109:25-110:25.  The only one of these policies that was ultimately sold in the secondary market was the Berger Policy.  *Id.* at 80:21-25; 92:14-93:1; 124:7-13.  Thus, the $172,828.86 payment was part of the STOLI scheme and appears to be tied to the expiration of the contestability period on the Berger Policy and the coming secondary market sale of the Berger Policy.  Rafalko Decl., Exh. 2 at 140:6-15; 273:19-274:22.

54.     On September 15, 2008, the day before loan maturity, Arlene Berger signed an Irrevocable Seller Instruction Letter by which she relinquished all rights, interests, powers and privileges in the Trust and Sub-Trust to Coventry.  *See* Exh. 23 to Motion For Seal, D.E. #175, at

Lava-664-667.  This relinquishment was cosmetic, as Ms. Berger had irrevocably ceded all powers to Coventry years prior when she signed the Power of Attorney.  *See* Exh. 5 to Motion For Seal, D.E. #175, at WF-281-282.

55.     Also on September 15, 2008, Ms. Berger executed a Second Supplement to Trust Agreement, which "permitted" the co-trustee of the Trust (Mr. Berger) to step down as trustee. Mr. Berger stepped down as co-trustee the very same day.  See Exh. 23 to Motion For Seal, D.E. #175, at Lava-668-670.  Again, any powers ostensibly relinquished in these documents were cosmetic, as Mr. Berger had irrevocably ceded all control over the Trust to Coventry years earlier when he signed the Borrower's Power of Attorney.  *See* Exh. 24 to Motion For Seal, D.E. #175, at Proverian-105-106.

56.     Two days later, on September 17, 2008, Bank of America sent notice to the Trust stating that the Trust's obligation to repay the NRPF Loan was satisfied by the Trust's relinquishment of the Berger Policy to Bank of America.  *See* Exh. 19 to Motion For Seal, D.E. #175, at Lava-566.

57.     On December 9, 2008, Bank of America and Coventry entered into an agreement entitled Beneficiary's Release and Consent to Change Beneficiary of Life Insurance Policy.  The effect of this document was to allow Coventry to arrange for the sale of the Berger Policy to a third-party in the secondary market prior to a formal sale of the Berger Policy from Bank of America to Coventry.  *See* Exh. 5 to Motion For Seal, D.E. #175, at WF-283.

58.     On December 10, 2008 Coventry representative Jessica Bunsick ("Ms. Bunsick") called Pruco to request information about the Berger Policy.  Pruco call center employee Tawanna Hollis ("Ms. Hollis") took Ms. Bunsick's call.  *See* Affidavit of Tawanna Hollis,

Customer Service Associate in the Brokerage Call Center of The Prudential Insurance Company of America, at ¶ 2.[11]

59.     Ms. Bunsick misrepresented her identity to Pruco.  Ms. Bunsick represented to Ms. Hollis that she was calling from Wilmington Trust – the then owner and beneficiary of the Berger Policy.  Hollis Aff., ¶ 5, Exh. 1.  Ms. Bunsick answered identification questions posed by Ms. Hollis in order to verify that she was speaking with the policy owner.  Ms. Hollis believed she was providing information to the policy owner.  *Id.* at ¶¶ 3-4, Exh. 1.  Pruco has learned in discovery that Ms. Bunsick misrepresented her identity and was not employed by Wilmington Trust, but by Coventry.  *See* Exh. 4 to Motion For Seal, D.E. #175, at WF-265.

60.     Ms. Bunsick asked Ms. Hollis a number of questions about the value of the Berger Policy, including: the cash surrender value, account value, date of the last premium payment and amount, due date of the next premium payment, monthly cost of insurance, interest rate, the fact that there were no liens or assignments against the policy, and the fact that the Trust was the policy beneficiary.  Hollis Aff., at Exh. 1.  Ms. Hollis answered each of these questions truthfully and accurately.  *Id.* ¶ 6.

61.     Ms. Bunsick also asked, "could you please confirm that since the policy is past the two year mark, that it is past contestability in (*sic*) suicide?"  Ms. Hollis truthfully responded: "Yes, it is past the two year mark."  Hollis Aff., at Exh. 1.

62.     Ms. Bunsick never asked whether Pruco intended to challenge the validity of the Berger Policy, had evidence to suggest that the Berger Policy was invalid, or whether Pruco viewed the two-year contestable period as an absolute bar to challenges to the Berger Policy of any kind.  Hollis Aff., at ¶ 11.  Nor did Ms. Hollis make any representations of any kind about

---

[11]        Thomas Farrell's Affidavit is Attached as Exhibit C to Pruco's Statement of Material Facts.

the validity of the policy.  *Id.* at ¶ 16.  In fact, Ms. Bunsick asked no question, and elicited no response from Ms. Hollis, regarding the validity of the Berger Policy that was not readily ascertainable by Ms. Bunsick from the face of the Berger Policy itself.  *Id.* at Exh. 1; Rafalko Decl., Exh. 16.

63.     Pruco had no intention of inducing any party to purchase the Berger Policy in the secondary market (Farrell Aff., at ¶ 17); similarly, Ms. Hollis had no knowledge of any secondary market transaction involving the Berger Policy, nor intention of inducing anyone to purchase the Berger Policy in the secondary market.  Hollis Aff., at ¶¶ 14-15.  Ms. Hollis, therefore, had no reason to believe that the information she was providing might be used by Lavastone, Wells Fargo or any other entity in purchasing the Berger Policy.  *Id.* at 13.

64.     Two days later, on December 12, 2008, Bank of America, Wells Fargo and AIG Life Settlements (Lavastone's predecessor in interest) entered a Tripartite Entitlement Order (the "Tripartite Order").  The effect of the Tripartite Order was for Coventry to sell the Berger Policy to Lavastone.  *See* Exh. 8 to Motion For Seal, D.E. #175, at WF-411-417.  The terms of the Tripartite order called for Lavastone to pay $1.048 million in connection with acquiring the Berger Policy, a figure which included the sale price for the Berge Policy, an originator fee paid to Coventry and a premium reimbursement to Coventry, among other fees.  *Id.* at 415-416.

65.     Coventry officially "purchased" the Berger policy from Bank of America on December 18, 2008, along with ten other policies.  *See* Exh. 13 to Motion For Seal, D.E. #175, at Lava-34-45.  Of course, this, like so many of the other documents in this case, was a partial truth at best.  While Coventry had not been the owner of the Berger Policy according to Prudential's records, it had been in control of the Berger Policy since before the Berger Policy was issued.  *See* Exh. 5 to Motion For Seal, D.E. #175, at WF-281-282.

66.     The final step in completing this STOLI transaction was for the owner and beneficiary of the Berger Policy to be changed from Wilmington Trust to Wells Fargo, as securities intermediary for Lavastone.  That change request was submitted to Pruco on December 24, 2008 and on January 9, 2009 Pruco processed the ownership and beneficiary change request.  *See* 1/9/09 Letter re: Change of Ownership and Beneficiary, Rafalko Decl., Exh. 28.

67.     Lavastone was not obligated to complete the sale of the Berger Policy until after this change of ownership and beneficiary request was processed.  Exh. 26 to Motion For Seal, D.E. #175,  at 151:23-152:11.  Therefore, as a result of December 18, 2008 agreement between Bank of America and Coventry (*See* Exh. 13 to Motion For Seal, D.E. #175, at Lava-34-45), Coventry was the owner of the Berger Policy from December 18, 2008 through January 9, 2009.  *See* Exh. 13 to Motion For Seal, D.E. #175, at Lava-34-45; Exh. 6 to Motion For Seal, D.E. #175, at WF-322-326.

## VIII.   TESTIMONY OF STEVEN BRASNER

68.     Brasner was deposed in this action on May 19, 2011.  Based upon the criminal charges pending against him, Brasner invoked his Fifth Amendment privilege against self incrimination in response to every substantive question that was asked at his deposition.  Significantly, Brasner asserted his Fifth Amendment privilege in response to the following questions:

- "And your plan from the outset for each of the life insurance policies you obtained insuring the lives of Mr. and Ms. Berger was for those policies to be sold on the secondary market, right?"  *See* Deposition Testimony of Steven Brasner, Rafalko Decl., Exh. 29 at 45:7-14.
- "And you knew from before the time [the Berger] Policy was issued that the policy was being obtained for the purpose of gambling on the life of Ms. Berger, right?"  *Id.* at 46:14-21.
- "And when you procured [the Berger] Policy, you did so knowing it would be sold to investors; is that right?"  *Id.* at 48:2-8.
- "The purpose for [the Berger] Policy was to allow strangers to wager on her [] life; is that right?"  *Id.* at 71:14-19.

- "And your intention and plan from prior to the issuance of [the Berger] Policy was that all of the premium that was ever to be paid for [the Berger] Policy would be paid by secondary market investors?" *Id.* at 145:12-19.
- "And a key component of your STOLI plan was that once the loan which is the subject of the note and security agreement we have been looking at matured which was shortly after the expiration of the contestable period on [the Berger] Policy, that policy would be sold to secondary market investors, is that right?" *Id.* at 178:2-11.
- "But it was important for your STOLI plan that Coventry have control of the Prudential policy from the outset, right?" *Id.* at 184:7-13.


Dated:  August 19, 2011                              PETT FURMAN, PL
                                                     Attorneys for Plaintiff
                                                     2101 N.W. Corporate Blvd., Suite 316
                                                     Boca Raton, FL 33431
                                                     (561) 994-4311
                                                     (561) 982-8985 (fax)


                                                     By:___s/Wendy L. Furman
                                                          Wendy L. Furman
                                                          Fla. Bar No. 0085146
                                                          wfurman@pettfurman.com


                                                     *Of Counsel*
                                                     Stephen A. Serfass *(Admitted Pro Hac Vice)*
                                                     Michael D. Rafalko *(Admitted Pro Hac Vice)*
                                                     Nolan B. Tully *(Admitted Pro Hac Vice)*
                                                     **DRINKER BIDDLE & REATH LLP**
                                                     One Logan Square, Ste. 2000
                                                     Philadelphia, PA 19103-6996
                                                     (215) 988-2700
                                                     Stephen.serfass@dbr.com
                                                     Michael.rafalko@dbr.com
                                                     Nolan.tully@dbr.com

                                                     *Attorneys for Plaintiff*
                                                     *Pruco Life Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 19, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

John K. Shubin, Esq.
Shubin & Bass, P.A.
46 S.W. 1st Street, Third Floor
Miami, FL 33130
<u>jshubin@shubinbass.com</u>
*Counsel for Wells Fargo*


<u>s/Wendy L. Furman</u>
Wendy L. Furman