## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 9:10-CIV-80804-COHN/SELTZER

PRUCO LIFE INSURANCE COMPANY,

       Plaintiff,

vs.

STEVEN M. BRASNER, individually and as
Principal of Infinity Financial Group, LLC;
MARK A. TARSHIS; INFINITY FINANCIAL
GROUP LLC; WELLS FARGO BANK, N.A.,
as Securities Intermediary; and John Does 1-10,

       Defendants.

_____/

## MOTION FOR SUMMARY FINAL JUDGMENT OF
## DEFENDANT WELLS FARGO BANK, N.A., AS SECURITIES INTERMEDIARY,
## AND INCORPORATED MEMORANDUM OF LAW

Defendant Wells Fargo Bank, N.A., as Securities Intermediary ("Wells Fargo"), pursuant to S.D. Local Rule 7.5 and Federal Rule of Civil Procedure 56, hereby moves the Court for entry of a summary final judgment in favor of Wells Fargo and against Plaintiff Pruco Life Insurance Company ("Pruco") on Count I of the Complaint on the ground that, on the undisputed material facts, Wells Fargo is entitled to judgment as a matter of law.  In support of its Motion, Wells Fargo submits this Memorandum of Law and states as follows:

### INTRODUCTION

Desperate to invalidate a $10 million life insurance policy based on misrepresentations made during the application process, but unable to rescind the policy because it failed to challenge its validity within the two-year contestability period, Pruco attempts here to make an end run around its own incontestability clause and have the policy declared void, arguing that the policy was an illegal "wagering contract" because an insurable interest was lacking at inception. The evidence that has been collected and produced over the past year of discovery, however,

does not support Pruco's position.  To the contrary, two irrefutable and dispositive facts have emerged:  *First*, the Pruco life insurance policy at issue here was procured by Arlene Berger to insure her own life for the benefit of her husband (the "Policy"), and thus an insurable interest unquestionably existed at inception.  *Second*, there was no agreement at or before inception, between Mrs. Berger and any specific third party lacking an insurable interest in her life, to sell or assign the Policy to it.  Therefore, the Policy was not a "wagering contract."

Discovery in this case has confirmed, at a minimum, twelve undisputed facts that compel entry of summary judgment for Wells Fargo.  Specifically, it is undisputed that Arlene Berger (1) on her own initiative sought "free" insurance on her own life; (2) intended her husband to be the sole beneficiary; (3) signed the application designating her husband as the Policy's sole beneficiary; and (4) received insurance coverage under the Pruco policy for more than two years, just as she had intended.  Likewise, it cannot be disputed that (5) Mrs. Berger never entered into an agreement with a "stranger" third party at the time of policy inception to later sell or assign her Policy to it.  For certain, neither Wells Fargo nor its client Lavastone made any such agreement with Mrs. Berger.

Although Mrs. Berger created a trust thirty days <u>after</u> inception to hold legal ownership of her policy, Mr. Berger ultimately remained the sole beneficiary of the Policy because he was named as the sole beneficiary of the trust.  Therefore, (6) had Mrs. Berger died while the trust held the Policy, Mr. Berger would have been entitled to receive the Policy's benefits.  It is likewise undisputed that: (7) Mrs. Berger was not "solicited"; (8) she was never promised a "kickback" for taking out the Policy; and, (9) she never received a penny from any sale or resale of the Policy.  Tellingly, (10) Mrs. Berger's policy was <u>not</u> sold by her or by her trust at the end of the contestability period; rather (11) Mrs. Berger voluntarily relinquished the Policy to the

lending bank after the premium financing loan matured.  And, (12) three months <u>after</u> Mrs. Berger relinquished the Policy to the bank, it was sold to Wells Fargo's client, Lavastone.  Based on these indisputable facts and Florida's insurable interest law, Wells Fargo is entitled to summary judgment as a matter of law.

It is anticipated that Pruco will lard its response to this motion with numerous accusations and negative characterizations of the Policy's procurement process.  This Court must not, however, be sidetracked by either the mechanics of the admittedly complicated procurement process or the sale of the Policy on the secondary market.  Although Mrs. Berger's application falsely represented her net worth and included other misrepresentations, any such alleged fraud or misrepresentation in the application process cannot be at issue here.  Pruco has not sued Mrs. Berger for fraud – nor could it have – because the two-year contestability period for such claims expired in May 2008 – more than two years before Pruco filed this lawsuit.  In short, Pruco's case against Wells Fargo is based purely on allegations of ***fraud*** in the procurement process.  But none of these "fraud facts" – no matter how offensive – change the facts that the Policy met the requirements of Florida's insurable interest law and that it was not a "wagering contract."

Simply put, only the following two legal issues are before the Court:  Did an insurable interest exist at the inception of Mrs. Berger's Policy?  And, did Mrs. Berger procure the Policy as a cover for a "wagering contract"?  Based on the ***evidence***, the answers are yes and no, respectively.  Therefore, her Policy cannot be void *ab initio*, and judgment must be entered in favor of Wells Fargo.

## MATERIAL UNDISPUTED FACTS

**1.    Arlene Berger Applies for a Life Insurance Policy Naming Her
Husband Richard Berger as the Policy Beneficiary**

Arlene Berger and her husband Richard Berger often attend financial seminars geared toward retirees (SUF ¶ 2).[1]  In 2005, after hearing about "free" life insurance at these seminars, the Bergers asked their accountant Mark Tarshis about it (SUF ¶ 3).  Because he was not an insurance professional, Mr. Tarshis introduced the Bergers to Steven Brasner, who was a Florida licensed insurance broker/agent (SUF ¶ 4).  At the time, Mr. Brasner was an appointed broker for Pruco in the State of Florida, having entered into, and renewed, a brokerage agreement with Pruco in April 2003 and June 2005, respectively (SUF ¶¶ 5, 6).

At their first meeting with Mr. Brasner, the Bergers expressed an interest in obtaining the "free" life insurance they had heard about (SUF ¶ 7).  Mr. Brasner told them he would look into it (SUF ¶ 7).  A few weeks later, Mr. Brasner contacted the Bergers to let them know that he could help them and invited them to his office to initiate the application process (SUF ¶ 8).  Over the ensuing months, the Bergers willingly signed numerous documents including applications for various life insurance policies (SUF ¶ 10).  They also voluntarily submitted to the medical examinations required by the potential insurers (SUF ¶ 10).

In July 2005, Mr. Brasner submitted an incomplete application to Pruco; thus, despite months of review, the requested policy was not issued (SUF ¶ 11).  The next year, Brasner submitted a second application to Pruco on behalf of Mrs. Berger for a $10 million policy (SUF ¶ 12).  Although the medical information was accurate and truthful, unbeknownst to the Bergers, Mr. Brasner overstated the Bergers' personal financial information in certain supplemental forms

---

[1]    References are to Wells Fargo's Statement of Undisputed Material Facts ("SUF") filed concurrently with this motion and memorandum of law pursuant to S.D. Local Rule 7.5.

submitted to Pruco (SUF ¶ 13).   After undertaking a second underwriting and investigation process, Pruco issued a $10 million policy on the life of Mrs. Berger naming Mrs. Berger as the sole policy owner and naming Mr. Berger as the sole policy beneficiary, each as requested in the application and intended by Mrs. Berger (SUF ¶ 16).   The Policy was put in force on May 10, 2006, after Pruco received the first premium payment for $81,871.75 (SUF ¶ 16).

> ### 2. Arlene Berger Creates a Trust Naming Her Husband As the Co-Trustee and Sole Trust Beneficiary and Seeks Premium Financing from La Salle Bank

In June 2006, the month after Pruco issued the Policy, Mrs. Berger created the Arlene Berger 2006 Life Insurance Trust ("Berger Trust") pursuant to a trust agreement that named Wilmington Trust Company ("Wilmington Trust") as trustee and her husband Richard Berger as co-trustee and sole beneficial owner (SUF ¶ 18).   The next day, the Mr. and Mrs. Berger and Wilmington Trust executed a supplement to the trust agreement to create a sub-trust to borrow funds from LaSalle Bank, N.A. (now Bank of America, N.A.) (the "Bank") to finance the Policy premiums (SUF ¶ 19).   On June 16, 2006, Mr. Brasner sent Pruco a Request to Change Beneficiary/Ownership form, signed by Mrs. Berger, requesting that the owner and beneficiary of the Policy be changed to the Berger Trust, and Pruco confirmed these changes on June 30, 2006 (SUF ¶¶ 20, 21).

The next month, the Berger Trust sub-trust executed a premium financing Note and Security Agreement with the Bank secured by the Policy (SUF ¶ 24).   The Berger Trust sub-trust then borrowed $331,077.29 from the Bank pursuant to the Note and Security Agreement, and the Bank wired the proceeds to Pruco as a premium payment intending that it would keep the Policy in force through maturity of the loan (SUF ¶ 26).

**3.     Mrs. Berger Never Agreed to Sell Her Policy to Anyone, and Mrs. Berger Did Not Receive a Cent Either at the Time of Inception or Later When the Policy Was Eventually Sold By the Bank**

Neither Mr. Brasner nor anyone else solicited or enticed Mrs. Berger to apply for life insurance (SUF ¶ 7).  Mrs. Berger never received any money from Brasner or anyone else in connection with the Policy (SUF ¶ 15).

At no time did Mrs. Berger ever have an agreement with a potential buyer or assignee to sell, transfer, or assign her Policy, or any interest therein, to it (SUF ¶ 14).  Instead, in September 2008 (two and one-half years after Pruco issued the Policy to Mrs. Berger), at the end of the Bank loan period, Mrs. Berger exercised her ability to control the disposition of the Policy by directing the trustee of the Berger Trust in writing to relinquish the Policy to the Bank in satisfaction of the premium finance loan (SUF ¶ 30).

It cannot therefore be disputed that, had Mrs. Berger died during the period between May 11, 2006 and September 17, 2008, her husband (and not any third party) would have been entitled to the full Policy death benefit (minus the amount owed on the Bank loan and any other associated expenses), just as Mrs. Berger intended when she procured the Policy from Pruco (SUF ¶¶ 14, 16, 19).

**4.     After Relinquishment to LaSalle Bank, The Policy Is Sold on the Secondary Market, and Pruco Accepts the Change of Ownership and Beneficiary**

In December 2008, three months after Mrs. Berger directed the trustee of the Berger Trust to relinquish the Policy to the Bank, Coventry First LLC, a licensed life settlement provider, purchased the Policy from the Bank for $560,000 (SUF ¶ 34).  Coventry First then allocated the Policy to its securities account at Wells Fargo Bank, N.A. ("Wells Fargo") and sold the Policy to Lavastone Capital LLC ("Lavastone"), Wells Fargo's client, for a sum in excess of

$1 million (SUF ¶ 34).  Lavastone then allocated the Policy to its securities account at Wells Fargo (SUF ¶ 34).  As a result of these transactions, on December 24, 2008, Pruco received a second change of ownership and beneficiary request naming Wells Fargo as sole owner and beneficiary, which Pruco confirmed by letter in January 2009 (SUF ¶¶ 35, 36).  Since then, Wells Fargo, on behalf of Lavastone, has paid approximately $230,000 in premium payments to Pruco (SUF ¶ 37).  Thus, since inception of the Policy, Pruco has received and accepted over $620,000 in premiums on Mrs. Berger's policy, and an additional $134,000 of premiums paid by Wells Fargo on behalf of Lavastone sits in the Court's registry (SUF ¶¶ 37, 38).

### 5.    Pruco Does Not Claim the Policy to Be Void Until Unfavorable Articles Are Published Nationally About Its Former Agent Brasner

On April 22, 2010, well over a year after Wells Fargo became sole owner and beneficiary of the Policy, Brasner was arrested in Florida, and his arrest was reported in the Wall Street Journal in April and June 2010.  Reacting to this negative publicity, on July 9, 2010, Pruco filed the instant suit attacking the validity of the Policy and seeking damages against only Brasner and Tarshis (and their companies) for fraud and misrepresentation.  Due to Brasner's default and Pruco's settlement with Tarshis, Wells Fargo, as Securities Intermediary, is the sole remaining defendant, and Count I for declaratory judgment is Pruco's sole claim against Wells Fargo.

This Court denied Wells Fargo's earlier motion to dismiss, and the parties have been engaged in discovery for the past eleven months.  Wells Fargo now moves for summary judgment because Pruco cannot prove that the Policy lacked an insurable interest at inception, and therefore, Wells Fargo is entitled to judgment as a matter of law.

## MEMORANDUM OF LAW

### I.

### STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court "shall grant" summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment under Rule 56(c) is appropriate when the court, viewing the record as a whole and drawing reasonable inferences in the light most favorable to the nonmoving party, determines that the Rule 56(c) standard has been met. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 322-23; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The burden then shifts to the nonmoving party, who must set forth specific facts and establish the essential elements of the case on which it will bear the burden of proof at trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. To show the existence of a genuine issue requiring a trial, the nonmoving party must present more than just bare assertions, conclusory allegations or suspicions. *Pastrana v. United States*, 670 F. Supp. 954, 960 (S.D. Fla. 1987) (citation omitted). If the nonmoving party's evidence is not significantly probative, summary judgment should be granted. *Anderson*, 477 U.S. at 249-50.

## II.

## UNDER FLORIDA'S INSURABLE INTEREST STATUTE, THE BERGER POLICY DID NOT LACK AN INSURABLE INTEREST AT INCEPTION

Insurable interest laws arose in England in the 18th century to halt the practice of complete strangers taking out insurance policies on elderly celebrities and persons accused of capital crimes, which, at the time, was being done for gambling and entertainment purposes.  *See* Fla. S. Jud. Comm., S.B. 648 (Mar. 24, 2008) Staff Analysis ("Fla. S.B. 648 Analysis").[2]  Over time, the courts developed the common law rule that a life insurance policy lacking an "insurable interest" in the life of the insured is void *ab initio* because it is considered a wagering contract and contrary to public policy.  *Atkinson v. Wal-Mart Stores, Inc.*, No. 8:08-CV-691-T-30TBM, 2009 WL 1458020, at *3 (M.D. Fla. May 26, 2009) ("Florida courts have long held that insurable interest is necessary to the validity of an insurance contract and, if it is lacking, the policy is considered a wagering contract and void *ab initio* as against public policy.") (quoting *Knott v. State ex rel. Guar. Income Life Ins. Co.*, 186 So. 788, 789-790 (Fla. 1939)).[3]

In 2008, the Florida Legislature passed Laws 2008, c. 2008-36, § 1, eff. July 1, 2008, codified in section 627.404, Florida Statutes, to clarify current Florida common law relating to insurable interests.  Fla. S.B. 648 Analysis.   Before 2008, Florida courts had interpreted Florida law as prohibiting the issuance of a life insurance policy to someone without an insurable interest in the insured, but "the statutory and case law provide[d] very little guidance on determining whether an insurable interest exists."  *Id.*

---

[2]     For the Court's convenience, we have attached, as Exhibit A to this motion, a copy of the Staff Analysis for S.B. 648 dated March 24, 2008.

[3]     A "wagering contract" is "[a]n insurance policy issued to a person who is shown to have no insurable interest in the person or property covered by the policy."  Black's Law Dictionary at 811 (7th ed. 1999).  A wagering contract thus gives the policyholder a "sinister counter interest in having the life come to an end." *Grigsby v. Russell*, 222 U.S. 149, 154 (1911).

Now, there is guidance on how to determine whether an insurable interest exists – section 627.404, Florida Statutes[4] – and this Court must apply the statute to determine whether the Policy had an insurable interest at inception.   Based on the following undisputed facts in evidence, it did because:  (1) Mrs. Berger, the initial Policy owner, had an insurable interest in her own life; (2) the Policy's sole beneficiary, Mr. Berger, had an insurable interest in the life of his wife; and (3) while not directly relevant to the narrow analysis of whether there was an insurable interest at inception of the Policy, the later-formed Berger Trust also had an insurable interest in Mrs. Berger's life because Mrs. Berger was the trust's settlor and Mr. Berger was the trust's sole beneficiary.

## A.   Because Arlene Berger Took Out the Policy On Her Own Life, Under Section 627.404(1), the Policy Had a Valid Insurable Interest at Inception

Prudential concedes – as it must – that Mrs. Berger, on her own initiative, sought out an insurance agent to assist in obtaining a life insurance policy and signed the policy application. Therefore, under Florida's insurable interest statute, she procured the policy on her own life.  *See* Fla. Stat. § 627.404(6) (2008) (stating that the "signature of the proposed insured, having capacity to contract, on the application for insurance shall constitute his or her written consent"). Under section 627.404, any person may procure insurance on her own life and make the policy payable to whomever she pleases – a relative, friend, or a *complete stranger*.  Specifically, section 627.404, provides, in pertinent part, that:

> (1)  Any individual of legal capacity may procure or effect an insurance contract on his or her own life or body **for the benefit of <u>any person</u>**. . . .

Fla. Stat. § 627.404(1) (2008) (emphasis added).  Such an individual has an "insurable interest" with respect to the policy because section 627.404(2)(b) defines an insurable interest to include

---

[4]        For the Court's convenience, the entire statute is appended as Exhibit B to this motion.

the insured who procured the policy:  "1. An individual has an insurable interest in his or ***her own life***, body, and health."  Fla. Stat. § 627.404(2)(b)(1) (2008) (emphasis added).

Section 627.404(1) does not, however, require the "any person" – i.e., the beneficiary – to have an insurable interest in the life of the insured.  Thus, unlike the law in some states, which requires the beneficiary to have an insurable interest at the time the policy is issued, Florida law permits any person to take out a policy on her own life and designate *anyone* else as beneficiary for *any* reason.  The Florida statutory scheme obviously contemplates that the procuring insured, out of self interest, will name a beneficiary that she trusts and whom she believes will not have any motive to hasten her demise.  As the United States Supreme Court has held, the danger posed by so-called "wager" policies disappears when the insured is not afraid to trust the person she has authorized to receive the life insurance proceeds:

> [N]ot only does the objection to wagers disappear but also the principle of public policy referred to, at least, in its most convincing form. . . .  Obviously it is a very different thing from granting such a general license, to allow the holder of a valid insurance upon his own life to transfer it to one whom he, the party most concerned, is not afraid to trust.  The law has no universal cynic fear of the temptation opened by a pecuniary benefit accruing upon a death. . . .

*Grigsby v. Russell*, 222 U.S. 149, 155-56 (1911).

Therefore, Florida's insurable interest statute is consistent with the public policy underlying the insurable interest rule, which is to protect against the potential temptation to harm the insured.

**B.      Even If It Can Be Said that Someone <u>Other Than</u> Arlene Berger Procured the Policy On Her Life, Under Section 627.404(1), There Existed a Valid Insurable Interest at Inception of the Policy Because Her Husband Richard Berger Was Designated the Policy's Sole Beneficiary**

Under Florida statutory law, it is perfectly legal for a person **with no insurable interest** in another person to take out a policy on the life of the other, as long as the benefits of the policy

11

are payable to a person *with* an insurable interest.  *See* Fla. Stat. § 627.404(1) (2008).

Specifically, Section 627.404 provides in pertinent part:

> no person shall procure or cause to be procured or effected an insurance contract
> on the life or body of another individual *unless the benefits under such contract
> are payable to* the individual insured or his or her personal representatives, or to
> *any person having, <u>at the time such contract was made,</u> an insurable interest in
> the individual insured.*

Fla. Stat. § 627.404(1) (2008) (emphasis added).

Here, it is undisputed that Richard Berger was the named beneficiary on his wife's policy

and that Mr. Berger had an insurable interest in "the individual insured."  Specifically, the statute

provides:

> 2.  An individual has an insurable interest in the life, body, and health of another
> person to whom the individual is *closely related* by blood or by law and in whom
> the individual has a *substantial interest engendered by love and affection*.

Fla. Stat. § 627.404(2)(b)(2) (2008) (emphasis added).

It cannot be – and is not – disputed that Richard Berger, as Mrs. Berger's husband of

sixty years, is closely related by law to Mrs. Berger and has a substantial interest in her life

"engendered by love and affection."  *Id.*  As the Policy's beneficiary, the "benefits under [her]

policy" were "payable" to Mr. Berger.  Fla. Stat. § 627.404(1).  Therefore, under Florida law, an

insurable interest existed "at the time such contract was made" whether or not Mrs. Berger

"procured" the insurance contract on her own life (which the evidence shows she did) or whether

it could be said that Brasner procured it (which the evidence does not support).  Simply put, there

existed at inception – as a matter of law <u>and</u> fact – an insurable interest in the Policy.

**C.     Even Though Created <u>After</u> Inception, the Arlene Berger Trust Had an
        Insurable Interest in Mrs. Berger's Life Because Mrs. Berger Was the
        Grantor and Mr. Berger was the Trust's Beneficiary**

Even if it were necessary to look further for an "insurable interest" in Mrs. Berger's

Policy (which it is not), the trust Mrs. Berger created a month after inception also had an

insurable interest because Mrs. Berger was the settlor of the trust and Mr. Berger was the sole

beneficial owner of the trust – and remained so *for two plus years*.  Specifically, Section 627.404

provides in pertinent part that:

> 5. A trust, or the trustee of a trust, has an insurable interest in the life of an individual insured under a life insurance policy owned by the trust, or the trustee of the trust acting in a fiduciary capacity, if [1] *the insured is the grantor of the trust*; . . . [and] [2] the *life insurance proceeds are primarily for the benefit of trust beneficiaries having an insurable interest in the life of the insured*.

Fla. Stat. § 627.404(2)(b)(5) (2008) (emphasis added).

Of course, it is not necessary to show that the trust had an insurable interest here because

it was formed *after* inception, and, under Florida's insurable interest statute, an "insurable

interest need not exist after the inception date of coverage under the contract."  Fla. Stat. §

627.404(1).  It is nonetheless indisputable that, even if the trust had been formed at inception, an

insurable interest would have existed under section 627.404 because Mrs. Berger created the

trust and Mr. Berger was its sole beneficial owner – not Mr. Brasner, not some other third-party,

and certainly not some "stranger investor."

### III.

### UNDER FLORIDA LAW, MRS. BERGER WAS FREE TO SELL, TRANSFER, OR ASSIGN HER POLICY AT ANY TIME AFTER INCEPTION

Florida's insurable interest statute requires an insurable interest to exist *only* at the

inception of the policy:[5]

> (1) Any individual of legal capacity may procure or effect an insurance contract on his or her own life for the benefit of any person, but no person shall procure or cause to be procured or effected an insurance contract on the life or body of another individual unless the benefits under such contract are payable . . . to [a] person having, *at the time such contract was made*, an insurable interest in the

---

[5]     In contrast, Florida's *property* insurable interest statute, requires "an insurable interest in the things insured as *at the time of the loss*."  Fla. Stat. § 627.405(1) (2011) (emphasis added).

individual insured. ***The insurable interest need not exist after the inception date of coverage under the contract.***

Fla. Stat. § 627.404(1) (2008) (emphasis added).  Here, Mrs. Berger signed the application, was the Policy's named insured, and had an insurable interest in her own life at inception, as did her beneficiary husband.  Therefore, under section 627.404(1), even though this did not occur here, Mrs. Berger's policy could have been sold, transferred, or assigned to *anyone* – even a *stranger investor* – at ***any time*** "after the inception date of coverage under the contract" without affecting its validity or nullifying the original existence of an insurable interest.  *Id.*

Indeed, Florida law permits the free assignment of life insurance policies, unless the policy itself precludes assignment.  Fla. Stat. § 627.422 (2011).  Section 627.422 provides, in pertinent part, that:

> A policy may be assignable, or not assignable, as provided by its terms.  Subject to its terms relating to assignability, ***any life or health insurance policy*** under the terms of which the beneficiary may be changed upon the sole request of the policyowner ***may be assigned either by pledge or transfer of title***, by an assignment executed by the policyowner alone and delivered to the insurer, whether or not the pledgee or assignee is the insurer.

Fla. Stat. § 627.422 (2011) (emphasis added).

Significantly, Florida's insurable interest statute does <u>not</u> preclude the insured from transferring the policy to someone without an insurable interest and does <u>not</u> preclude the insured from purchasing a policy with the thought, intent, or desire to later sell or assign it.  Indeed, had the statute attempted to police and regulate the subjective thoughts and desires of policy owners by invalidating policies in which the insured had at any time before inception the intent to transfer or assign the policy, it likely would have opened the floodgates of litigation over insureds' subjective intentions at the time of procurement, sometimes ***years*** after the fact – clearly an impracticable and untenable situation.

**IV.**

**BASED ON FLORIDA'S STATUTORY SCHEME, THE COURT SHOULD NOT LOOK BEHIND THE FOUR CORNERS OF THE POLICY AND OTHER SIGNED DOCUMENTS**

Conceding that both Mrs. and Mr. Berger had an insurable interest in Mrs. Berger's life at the time of inception, Pruco argues that Mrs. and Mr. Berger were merely "listed" as the Policy's owner and beneficiary, respectively, solely for the purpose of the application but, at the time, there was some "understanding" that the Policy would be sold on the secondary market to a stranger-investor. Such an argument, however, requires the Court to look behind the transaction and delve into the minds of nonparties Mrs. and Mr. Berger. This Court should decline to do so for at least three reasons.

First, there is no evidence that Mr. Berger was not the true beneficiary and would not have been entitled to the Policy proceeds (minus repayment of the premium financing) had Mrs. Berger died before relinquishment. Second, as further discussed below, Pruco has uncovered no *evidence* of any "understanding" between Mrs. Berger and a "stranger investor" to sell it her Policy. Third, had the Legislature intended to preclude any such "understandings," it could have legislated against them, but it chose not to. Indeed, so-called "STOLI" (stranger-originated) policies were highly publicized and decried by the insurance industry well before the 2008 rewrite of section 627.404. And when, the next year, proponents attempted to obtain legislation making them unlawful, their efforts failed. Indeed, in the absence of any such legislation, the Court should decline any invitation to analyze the subjective intentions of the insured.

The reasoning of *Lincoln National Life Insurance Co. v. Gordon R.A. Fishman Irrevocable Life Trust*, 638 F. Supp. 2d 1170 (C.D. Calif. 2009) ("*Fishman Trust*") is instructive on this last point. There, the district court granted the beneficiaries' motion for summary

judgment against the insurer, concluding that the policy met the requirements of California's insurable interest statute, which, at the time, was similar to Florida's statute.  As the *Fishman Trust* court reasoned, when legislatures have directly legislated insurable interest laws and have not seen fit to preclude transactions characterized by insurers as "STOLI" transactions, it is not for the court to second guess their motives or to protect a powerful industry that has not succeeded in persuading the legislature to amend its insurable interest laws to preclude them.

In *Fishman Trust*, Dr. Fishman learned about Mutual Credit Corporation's ("MCC") premium financing "program," through which he could receive "free" insurance and money for participating in MCC's program.  *Id.* at 1173.  After speaking with an MCC program promoter, Dr. Fishman formed a trust to purchase and hold life insurance policies on his life.  The trust agreement designated Dr. Fishman's four sons as the trust's beneficiaries.  *Id.* at 1174.  Dr. Fishman and the trust then applied to Lincoln National Life Insurance Company's predecessor seeking to purchase life insurance policies, and Lincoln's underwriters approved the policies. The trust then applied to MCC for premium financing, which MCC provided.  The trust also executed collateral assignments of the policies to MCC.  At the end of the two-year premium financing period, the trust had the options of (a) repaying the debt and retaining the policies; (b) selling the policies to a third party, or (c) surrendering the policies to MCC in satisfaction of its debt.  *Id.* at 1176.  When the notes matured, the trust surrendered the policies to MCC.

Lincoln National then sued MCC and others seeking a declaration that the policies were void at inception because they were "stranger-owned" life insurance policies.  Lincoln National argued that the trust was a sham to hide the ultimate scheme, which was to allow MCC to acquire the trust's policies at the end of the loan period.

CASE NO. 10-CIV-80804-COHN/SELTZER

The district court, applying California law (which at the time was strikingly similar to Florida's current insurable interest statute), concluded that the policies were not void due to the lack of an insurable interest, reasoning that:

> The fact of the matter remains that indeed for a two year period Dr. Fishman through his trust held a[n] insurance policy on his life which if he died during that period would have inured to the benefit of his sons, minus whatever interest MCC had as a creditor on the financing arrangement. . . .  So the fact remains that for two years this not only had the formal appearance of a legitimate life insurance policy on Dr. Fishman's life for the benefit of someone with an insurable interest in the same, ***but was in fact true as well***.

*Id.* at 1179 (emphasis added).

Because of the similarity of the two states' insurable interest statutes at the time, the *Fishman Trust* court's reasoning can – and should – be applied here.  The fact remains that for a two-year period, Mrs. Berger's trust held an insurance policy on her life, which would have, had she died during that period, inured solely to the benefit of the Trust's sole beneficiary, her husband – in accordance with Mrs. Berger's explicit intentions.  There is no evidence to the contrary.

## V.

### THERE IS NO LEGALLY SUFFICIENT EVIDENCE OF ANY "UNDERSTANDING" OR AGREEMENT AT THE TIME OF INCEPTION TO SELL THE POLICY, OR ANY INTEREST THEREIN, TO A THIRD PARTY HAVING NO INSURABLE INTEREST

It is a generally accepted principle that a life insurance policy must be procured in "good faith" and not as a "cover" for a "wagering contract" in favor of one with no insurable interest. 44 Am. Jur. 2d *Insurance* § 978 (2011) (stating the general rule is that all persons have an insurable interest in their own life and may insure their life in good faith for the benefit of any person whom they see fit to name as the beneficiary, "provided it not be done by way of cover for a wagering policy").  As a New York federal district court has reasoned:

> Only one who obtains a life insurance policy on himself 'on his own initiative" and in good faith – that is, with a genuine intent to obtain insurance protection for a family member, loved one, or business partner, rather than an intent to disguise what would otherwise be a gambling transaction by a stranger on his life – may freely assign the policy to one who does not have an insurable interest in him.

*Life Prod. Clearing LLC v. Angel*, 530 F. Supp. 2d 646, 653 (S.D.N.Y. 2008) (citations omitted).

In determining whether a life insurance policy was procured in "good faith" and not as a "cover" for a "wagering contract," the majority of courts have rejected a "subjective intent of the insured" standard in favor of the objective "agreement at inception" standard espoused in *Sun Life Assurance Co. of Canada. v. Paulson*, No. 07-3877(DSD/JJG), 2008 WL 451054 (D. Minn. Feb. 15, 2008) (*Paulson I*). *See Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 735 F. Supp. 2d 130, 139 n.59 (D. Del. 2010).

Under the *Paulson* standard, which should be applied here, to prove that an insurance policy was "intended" as an illegal "wagering contract" on the life of the insured, the insurer must prove two things.[6]  *First*, it must prove that the insured had an agreement with a third-party "stranger" ***at inception*** to later sell or assign the policy to that third party.  *Second*, it must

---

[6]     The *Paulson* objective standard is particularly apropos here because Florida common law follows the objective standard for determining the intention of the parties to a contract.  *See, e.g., Am. Home Assur. Co. v. Larkin Gen. Hosp., Ltd.* 593 So. 2d 195, (Fla. 1992) (stating that the intent of the parties to a contract is to be determined from "the language in the contract, the subject matter of the contract, and the object and purpose of the contract").  Indeed, both this Court and the Magistrate Judge have suggested that the objective standard is applicable here.  *See* Order Denying Defendant Wells Fargo Bank, N.A.'s Motion to Dismiss at 8 [D.E.64] (stating that evidence of "an agreement prior to the issuance of the Berger Policy to assign the policy to an entity without an insurable interest in Ms. Berger's life . . . would demonstrate that the Berger Policy was not procured in good faith); Order on Defendant's Motion to Compel Interrogatory Answers at 6 [D.E.141] (noting that "[w]hether a pre-existing agreement existed is central to the case" and concluding that "Pruco must demonstrate that an agreement to assign the policy to an entity without an insurable interest in Mrs. Berger's life existed at or prior to the inception of the Berger Policy").

identify the specific third party who agreed to and actually did purchase the policy. Indeed, this is the only workable standard. A standard based on the subjective intent of the insured at the time the policy issues would inject great uncertainty into the secondary market for insurance, serve as a disincentive for insurance companies to conduct timely and effective due diligence, and contravene the well-accepted notion that a life insurance policy constitutes personal property. *See First Penn-Pacific Life Ins. Co. v. Evans*, 313 Fed. Appx. 633, 636, 636 n.3 (4th Cir. 2009) (affirming summary judgment against the insurer and agreeing that "evaluating insurable interest on the basis of the subjective intent of the insured at the time the policy issues . . . would be unworkable and would inject uncertainty into the secondary market for insurance"); *Grigsby*, 222 U.S. at 156 ("[L]ife insurance has become in our days one of the best recognized forms of investment and self-compelled saving. So far as reasonable safety permits, it is desirable to give to life policies the ordinary characteristics of property.").

1.      **The *Paulson* Standard**

Both the facts and reasoning of *Paulson I* and *II* are instructive here. In *Paulson*, the policy's owner, Coventry First, LLC ("Coventry"), obtained ownership of the life insurance policy on Mr. Paulson's life for more than two years after Sun Life had issued it. Sun Life sued Mr. Paulson and Coventry claiming that the policy was void *ab initio* for lack of an insurable interest because Mr. Paulson intended, at the time he procured the policy, to transfer it to a third party.

In considering Coventry's motion to dismiss in that case, the district court reasoned that, under state law, a life insurance policy would be void as against public policy if it were "procured under a scheme, purpose, or agreement to transfer or assign the policy to a person without an insurable interest" to evade the law against wagering contracts. *Id.* at *2 (citations

omitted).  It further reasoned that "the *mutual intent* of the insured *and* the third party to avoid the prohibition on wagering contracts determines the existence of such a scheme, purpose, or agreement." *Id.* (emphasis added) (citing 44 Am. Jur. 2d *Insurance* § 1001 (2003)).   It then concluded that the most important factor in determining the parties' intent is whether the transfer of the policy from the insured to the third party "was done in pursuance of a *preconceived agreement*." *Id.* (emphasis added).

The district court granted Coventry's motion to dismiss because, even though Sun Life had alleged that Mr. Paulson "intended" to sell his policy to a third party at the end of the contestability period, it had not alleged that, at the time of procurement, a third party intended to later purchase the policy or identified any third party to whom Mr. Paulson intended to sell the policy.  *Id.*

Sun Life amended its complaint to describe "the emergence of a secondary market for life insurance policies" but postponed the hearing on its motion to amend "to discover evidence of a third party with no insurable interest who, at the time Paulson procured the disputed insurance policies, intended to later obtain those policies."  *Sun Life Assur. Co. of Can. v. Paulson*, No. 07-3877 (DSD/JJG), 2008 WL 5120953, at *2  (D. Minn. Dec. 3, 2008) (*Paulson II*).  After several months of discovery, Sun Life uncovered no evidence that Coventry or other third parties ever communicated with Mr. Paulson prior to or contemporaneous with his procurement of the policies or paid the premiums.  *Id.* at *4.  Thus, Sun Life argued instead that Mr. Paulson's *unilateral intent* to sell the policies permitted an inference that another party intended to buy them at the time they were issued.

The court rejected this argument.  And it also rejected Sun Life's argument that Paulson's agreement with his two insurance agents to help him obtain and transfer the policies satisfied the

20

"mutual intent requirement." *Id.*  It then stated in no uncertain terms that the "***relevant third parties . . . are those with whom Paulson allegedly agreed to assign the policies***." *Id.* (e.a.).

Applying the reasoning of *Paulson*, numerous courts have denied defendants' motions to dismiss to allow plaintiffs to undertake discovery in an attempt to:  (1) uncover evidence of an agreement between the insured and a third party at, or before, inception to later sell, assign, or transfer the policy to the third party; and (2) to discover the identity of any such third party.  *See, e.g., Sun Life Assur. Co. of Can. v. Berck*, 770 F. Supp. 2d 728, 736 (D. Del. 2011) (denying defendants' motion to dismiss to allow the plaintiff to obtain discovery on the identity of the third party, if any, with whom the defendants had an agreement to sell the policy at the time of its procurement); *Lincoln Nat'l Life Ins. Co. v. Schwarz*, No. 09-03361(FLW), 2010 WL 3283550, at *8 (D.N.J. Aug. 18, 2010) (ruling that it would be premature to dismiss the plaintiff's claim that the life insurance policy was void *ab initio* because discovery was essential to determining whether the insured had arranged to sell the policy to a third party with no insurable interest in the insured's life at the time the policy application was submitted); *Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Trust*, No. 09-506-GMS, 2010 WL 2898315, at *8-*9 (D. Del. July 20, 2010) (denying the defendant's motion to dismiss because the plaintiff had alleged that there was some specific third party investor involved in the STOLI scheme prior to submission of the application and "if the facts are true, such party may be identifiable during discovery"); *Lincoln Nat'l Life Ins. Co. v. Calhoun*, 596 F. Supp. 2d 882, 890 (D.N.J. 2009) (denying the defendants' motion to dismiss on the ground that the plaintiff was "entitled to proceed and attempt to discover whether, and with whom, Calhoun had arranged to sell the Policy at the time the Application was submitted to Lincoln National").

When the *Paulson* standard is applied here – as it should be – it will be evident that, even after eleven months of discovery, Pruco cannot meet it.

> ### 2. There was no mutual agreement at the time of procurement between Mrs. Berger and a third-party investor to later sell, assign, or purchase the Policy or any interest therein.

Even though Pruco stated in its response to Wells Fargo's motion to dismiss that the designation of Mr. Berger as the Policy beneficiary was a "sham" intended to convey the false appearance that an insurable interest existed and that there was a "pre-conceived scheme" to sell the policy "on the secondary market to a disinterested stranger-investor," Pruco has uncovered no evidence that Mrs. Berger knowingly participated in any such scheme or formed an agreement with ***anyone*** – let alone a third-party investor – at the Policy's inception to sell or assign the Policy to an entity without an insurable interest in her life. Indeed, Pruco has not sued Mrs. Berger or alleged any facts that would indicate her complicity in any such scheme.

To meet the *Paulson* standard, Pruco must identify a third party who, at the time of inception, had an agreement with Mrs. Berger to buy her Policy. After eleven months of discovery, it still cannot do so. And proof of an agreement between Mrs. Berger and Mr. Brasner, even if there was one, would not be enough to meet this standard. *See Paulson II*, at *2 (stating that an agreement between the insured and her insurance agent does not meet the "mutual intent" standard). To prove that Florida's insurable interest requirement was violated, Pruco must present evidence that Mrs. Berger had an agreement ***with an identified third-party investor*** at or before the inception of the Policy to sell or assign the Policy ***to that third-party investor***. *See Berck; Schlanger; Calhoun.* Pruco has uncovered no evidence of any such

agreement.[7]  For certain, there is no evidence whatsoever that Mrs. Berger had an agreement at any time with Lavastone (or Wells Fargo) to later transfer the Policy or any interest therein.

The case Pruco relied on in opposing Wells Fargo's motion to dismiss, *AXA Equitable Life Insurance Co. v. Infinity Financial Group, LLC*, 608 F. Supp. 2d 1349 (S.D. Fla. 2009), actually supports Wells Fargo's view, not Pruco's, based on the record evidence.  There, the purported insureds held ownership of the policies only provisionally, pending the almost-immediate assignment of the policies to a number of trusts having no insurable interest in the lives of the insureds.  One of the insureds, Carol Sciolino, "submitted a sworn statement describing her recruitment by Brasner, and her understanding that the premiums were to be financed by third parties, and that she would **immediately assign the policy to a third party in exchange for a fee**."  *Id.* at 1354 (emphasis added).  These are not the facts in the present case.  And Mrs. Berger has submitted no such sworn statement here.

Here, Arlene Berger, on her own initiative, approached Brasner to obtain "free" insurance on her life; Mr. Brasner did not solicit her.  Mrs. Berger intended to procure insurance for the benefit of her husband, and, accordingly, he was designated the Policy's sole beneficiary.  The Policy was not immediately assigned to a trust having no insurable interest in Mrs. Berger's life.  The later-created Berger Trust had an insurable interest because Mrs. Berger was the settlor and her husband was the trust's sole beneficial owner.  Mr. Berger remained the trust's only beneficial owner for more than two years – until Mrs. Berger directed the trustee of the Berger

---

[7]      Significantly, Pruco did not allege that Mrs. Berger had an agreement; instead, it alleged that there was a "scheme and design by Mr. Tarshis, Infinity and Mr. Brasner to engage in a STOLI transaction through which the Berger Policy would be sold on the secondary market."  (Compl. at 11 ¶ 47.)  Even if Pruco has circumstantial evidence of such a "scheme and design," that evidence would not meet the *Paulson* standard – and what's more – it would not even meet a "unilateral intent" standard because it did not involve Mrs. Berger.

Trust to relinquish the Policy to the Bank.  Three months <u>after</u> the Policy was relinquished to

LaSalle Bank, LaSalle sold it to Coventry First, which then sold the Policy to Lavastone.  Mrs.

Berger was not promised and did not receive any money upon the sale of her policy either to

Coventry First or afterwards to Lavastone – or at ***any*** other time.

In sum, Pruco has come up with no evidence that Mrs. Berger procured the Policy as a

"cover" for a stranger investor with no insurable interest.  And Pruco has uncovered no evidence

of an agreement between Mrs. Berger and an identified third-party investor at the time of

inception to later purchase the Policy.  Therefore, on these facts, Wells Fargo is entitled to a

summary judgment, holding that, as a matter of law, an insurable interest existed at inception of

the Policy, and therefore it cannot be void *ab initio*.

## VI.

### BECAUSE PRUCO'S "INSURABLE INTEREST" ARGUMENT IS BASED ON ALLEGED MISREPRESENTATIONS IN THE POLICY APPLICATION AND OTHER INDICIA OF FRAUD, ITS RESCISSION CLAIM IS BARRED BY THE POLICY'S INCONTESTABILITY CLAUSE

As the Eleventh Circuit court explained in *Allstate Life Insurance Co. v. Miller*, 424 F.3d

1113, 1115 (11th Cir. 2005), Section 627.455, Florida Statutes, prohibits an insurance company

from challenging a life insurance policy "***for any other reason*** than the articulated exceptions in

the statute" after the policy's mandated two-year incontestability period has expired.  *Id.* at 1115

(emphasis added).  The statute includes only two exceptions, neither of which applies here:  (1)

nonpayment of premiums and (2) at the option of the insurer, as to provisions related to disability

benefits and to additional insurance in the event of an "accidental" death.  Fla. Stat. § 627.455

(2011).  The statute does not make an exception for policies alleged to be – ***on any ground*** –

void *ab initio*.[8]  And the Eleventh Circuit held as much in *Miller*.

In *Miller*, the insurance company claimed – after expiration of the contestability period – that the policy was "void *ab initio*" because an imposter, pretending to be the insured, had submitted to the initial medical evaluation.  The Eleventh Circuit ruled that the insurer was barred from pursuing its claim against the fraudster-insured, stating that, although an insurer may assert any number of grounds ***to rescind or void*** an insurance policy ***before*** the incontestability clause goes into effect, section 627.455 "prevents an insurer from doing so once the policy has been in effect for two years during the life of the insured, ***except on the three grounds enumerated in the statute***."  *Id.* at 1116 (emphasis added).  Indeed, seventy years ago, Judge Cardozo stated that incontestability "means only this, that within the limits of the coverage the policy shall stand, ***unaffected by any defense that it was invalid in its inception***, or thereafter became invalid by reason of a condition broken."  *Metro. Life Ins. Co. v. Conway*, 252 NY 449, 452 (1930) (Cardozo, J.) (emphasis added).

At bottom, this is a fraud case based on Pruco's allegations of fraud in the procurement of the Policy.  Therefore, the holding and logic of *Miller* apply here.  There are very good reasons to apply *Miller* in all so-called "insurable interest" cases, especially where – as here – the purported "lack of insurable interest" was allegedly "concealed" from the insurer by misrepresentations on the Policy application, which are no different from any other types of

---

[8]     Specifically, section 627.455, Florida Statutes, provides that:

*Every* insurance contract shall provide that the policy ***shall be incontestable*** after it has been ***in force*** during the lifetime of the insured for a period of 2 years from its date of issue ***except*** [1] for nonpayment of premiums and ***except***, at the option of the insurer, [2] as to provisions relative to benefits in event of disability and as to provisions which grant additional insurance specifically against death by accident or accidental means.  Fla. Stat. § 627.455 (2011) (emphasis added).

fraud committed in the application process.  For one, if courts do not enforce the incontestability clauses requiring insurer to exercise due diligence in timely uncovering fraud, insurers would be incentivized to turn a "blind eye" to any suspicions and ignore "red flags" – as Pruco did here – especially in high value policies – as the one here – so that they can collect large premium payments for as long as possible.  Such conduct should not be promoted at the expense of innocent purchasers on the secondary market who are far removed from the application process and in no position to uncover any fraud or concealment at inception.

## VII.

### BECAUSE PRUCO'S "INSURABLE INTEREST" ARGUMENT IS BASED ENTIRELY ON ALLEGED MISREPRESENTATIONS AND FRAUD OCCURING AT OR AROUND THE TIME OF INCEPTION, IF THE POLICY IS VOID AB INITIO, WELLS FARGO IS ENTITLED TO THE RETURN OF THE PREMIUMS IT HAS PAID AS A BONA FIDE PURCHASER FOR VALUE ON THE SECONDARY MARKET

Pruco has not alleged that Mrs. Berger knowingly made misrepresentations or committed fraud during the application process.  But even if it had, Pruco did not sue Mrs. Berger, and therefore the issue of Mrs. Berger's complicity in any fraudulent "scheme" cannot be adjudicated by this Court in this case.  Therefore, even if it could be said that Wells Fargo, as assignee of the Policy, stepped into Mrs. Berger's shoes, no fraud can be imputed to Wells Fargo.

Moreover, Pruco has uncovered no evidence – because there is none – that Wells Fargo or its client Lavastone had any involvement in or knowledge of any of the alleged misrepresentations and fraud purportedly committed during the application process.  Therefore, in the event this Court were to declare the Policy void *ab initio*, Wells Fargo and Lavastone would be entitled to a return of the premiums paid to Pruco on the Policy.  *See Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, No. 08-488-MPT, 2011 WL 1195878, at *6-*7 (D. Del. Mar. 30, 2011); *Lincoln Nat'l Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 564-65 (D. Del.

2010);   In dismissing the plaintiff-insurer's claim seeking retainment of premiums, the *Snyder* court aptly reasoned that:

> If an insurance company could retain premiums while also obtaining rescission of a policy, it would have the undesirable effect of incentivizing insurance companies to bring rescission suits as late as possible, as they continue to collect premiums at no actual risk.

*Id.* at 565.

This reasoning applies with full force here, where Pruco:  (1) turned a blind eye to numerous factors, which, under Pruco's standards, could have evidenced a "STOLI transaction," ignored numerous "red flags" of possible secondary market activity identified by its own underwriters, and still chose to issue the Policy; (2) collected over $600,000 in premiums; and (3) did not file suit until four and one-half years after the Policy's inception – and only after two Wall Street Journal articles exposed its own former agent, Mr. Brasner, as a STOLI promoter.  In equity, law, and good conscience, there is no basis, under the facts of this case, to allow Pruco to reap a windfall by retaining the premiums that it has received on the Policy, if the Policy is held to be void *ab initio*.

<u>**CONCLUSION**</u>

For the reasons discussed and under the authorities cited, summary final judgment for Wells Fargo on Count I of the Complaint is appropriate under Federal Rule of Civil Procedure 56(c).

CASE NO. 10-CIV-80804-COHN/SELTZER

Dated: <u>August 19, 2011</u>
Miami, Florida

Respectfully submitted,

<u>/s John K. Shubin</u>
John K. Shubin (Florida Bar Number: 771899)
jshubin@shubinbass.com
Juan J. Farach (Florida Bar Number: 957704)
jfarach@shubinbass.com
David R. Hazouri (Florida Bar Number: 142387)
dhazouri@shubinbass.com
SHUBIN & BASS, P.A.
*Attorneys for Defendant, Wells Fargo*
46 S.W. 1st Street, Third Floor
Miami, Florida 33130
Telephone: (305)381.6060
Facsimile:  (305)381.9457

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 19, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all Counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>     s/ Juan J. Farach</u>
Juan J. Farach, Esq.

CASE NO. 10-CIV-80804-COHN/SELTZER

**SERVICE LIST**
**Pruco Life Ins. Co v. Brasner, et al.**
**Case No. 10-CV-80804 Cohn/Seltzer**
**United States District Court, Southern District of Florida**

Wendy L. Furman, Esq.
wfurman@pettfurman.com
PETT FURMAN, PL
2101 N.W. Corporate Blvd., Suite 316
Boca Raton, Florida 33431
Tel. (561) 994-4311
Fax (561) 982-8985
*Attorneys for Plaintiff Pruco Life Insurance Company*
Service by CM/ECF

Stephen A. Serfass, Esq.
Stephen.serfass@dbr.com
Michael D. Rafalko, Esq.
Michael.rafalko@dbr.com
DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
Tel. (215) 988-2700
Of Counsel/Pro Hac Vice
*Attorneys for Plaintiff Pruco Life Insurance Company*
Service by CM/ECF