**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 10-80804-CV-COHN/SELTZER

Pruco Life Insurance Company,

               Plaintiff,

v.

Steven M. Brasner, individually and as
principal of Infinity Financial Group, LLC,
Mark A. Tarshis, Infinity Financial Group,
LLC, Wells Fargo Bank N.A., as securities
intermediary, and John Does 1-10,

               Defendants.

**PRUCO LIFE INSURANCE COMPANY'S RESPONSE IN OPPOSITION TO
WELLS FARGO BANK, N.A.'S STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pruco Life Insurance Company ("Pruco"), by and through its undersigned counsel, submits its Response to the Statement of Undisputed Material Facts submitted in Support of the Motion for Summary Judgment filed by Wells Fargo Bank, N.A. ("Wells Fargo") [D.E. #188].

1.      Undisputed.

2.      Undisputed.[1]

3.      Disputed.  Wells Fargo characterizes the 2005 interaction between the Bergers and Mark Tarshis ("Mr. Tarshis") as though the Bergers actively sought out "free insurance" on Ms. Berger's life.  In fact, Ms. Berger testified that although the Bergers had heard about the possibility of "free insurance" for senior citizens in good health, the Bergers had no interest in pursuing this free insurance.  Rafalko Decl., Exh. 4 at 49:15-20 ("So we didn't go up to them who gave the seminar because we really weren't interested in even thinking about it, it just wasn't something we were thinking about.  And we just mentioned it to Mark [Tarshis] just to see if he knew anything about it.").

4.      Undisputed.

5.      Disputed.  In or around 2003, Steven Brasner ("Brasner") applied for an appointment, and was appointed, with Pruco as a third party broker who could sell Pruco life insurance policies, among other products.  Pruco was merely one of many life insurance carriers with which Brasner was appointed to sell life insurance policies.  *See* Exh. 1 to Joint Motion To

---

[1]      Pruco notes that Wells Fargo cites to inspection reports prepared by Worldwide Inspection Services ("WIS") in support of the fact that Richard Berger ("Mr. Berger") and Arlene Berger ("Ms. Berger") (collectively, "the Bergers") are in good health.  While Pruco does not dispute Ms. Berger's testimony that "we were both healthy . . . [a]nd basically we are still both healthy" (Deposition testimony of Arlene Berger, Declaration of Michael D. Rafalko, Esq., Exhibit A to Pruco's Motion for Summary Judgment [D.E. #178], Exh. 4 at 54:25-55:2), Pruco does object to Wells Fargo's reliance on the substance of the WIS inspection reports for their truth.  The inspection reports were compiled from telephone interviews with the Bergers, and the information provided to WIS during these calls was from a script that was given to the Bergers by Steven Brasner, the insurance broker responsible for procuring the policies insuring the Bergers' lives.  The information included in the script and subsequently provided to WIS was inaccurate.  Brasner concocted this script so that prospective insureds like Ms. Berger would provide answers that would support the ultimate issuance of an insurance policy on that insured's life.  Rafalko Decl., Exh. 4 at 121:5-122:17.

File Confidential Documents Under Seal, D.E. #175, at PRU-00001-00016.  In 2005, after

moving to Florida, Brasner was re-appointed with Pruco as a third party broker permitted to sell

Pruco insurance products in Florida.  *See* Supplemental Declaration of Michael D. Rafalko, Esq.

attached as Exhibit A, ("Supplemental Decl."), Exh. 1, at PRU-00017-00038.  Brasner, a former

defendant in this matter, was never an employee or agent of Pruco, nor was Brasner ever

appointed to sell Pruco products exclusively.

      6.     Disputed.  It is undisputed that the 2005 broker agreement (the "2005

Agreement") contains the provisions quoted in ¶ 6 of Wells Fargo's SUMF.  It is disputed,

however, that the 2005 Agreement granted Brasner unlimited authority to "solicit and process

applications for life insurance from Pruco on the lives of Florida residents."  The 2005

Agreement also states that the following actions are violations of the 2005 Agreement:

> (g) provid[ing] or offer[ing] to provide any inducement not specified in the Policy
> . . . to any person or entity, as an inducement to purchase any Policy; . . .

> (o) request[ing] that a client pre-sign any Policy related form for use at a later
> date, request[ing] a client to sign any Policy related forms unless completed in its
> entirety or accept[ing] any signed Policy related form unless said forms are
> complete and ready for submission to the Company."

Further, the 2005 Agreement imposed obligations on Brasner as follows:

> (a) to abide by the Company's policies and procedures related to the
> solicitation and sale of Policies, which are identified on Exhibit B and made a part
> thereof;

> (b) to abide by any revised or additional policies and procedures that the
> Company communicates; . . .

> (d) to comply with all applicable insurance laws and regulations; . . .

> (f) to solicit applications for Policies only from applicants for whom the
> Policies are suitable; . . .

> (p) that no Company Policy shall be sold or used in any manner to or with
> a viatical company or be part of a viatical settlement.

Supplemental Decl. at PRU-00018-00021.

Beginning in 2005, Brasner discovered the stranger-originated life insurance ("STOLI") market and went from selling policies in the $50,000-250,000 face to selling policies in the $3 million to $30 million range.  *See* Deposition of Patricia Wagner, Rafalko Decl., Exh. 2A at 25:17-27:12.  In orchestrating STOLI deals Brasner violated each and every one of the above-listed provisions in the 2005 agreement.

- Brasner submitted fraudulent applications and related information to life insurers in violation of Pruco policies and applicable insurance laws and regulations.  Rafalko Decl., Exh. 2A at 73:21-74:13; 125:15-126:25.

- Some 85% of the applications submitted by Brasner after 2005 contained false information aimed at inducing insurers to issue policies that were not suitable for the purported insured.  *Id.* at 53:17-54:18.

- After 2005, Brasner's life insurance business was exclusively aimed at the STOLI market, in violation of Pruco's policies and Brasner's representations in the 2005 Agreement.  *Id.* at 27:20-29:12.

- Brasner asked the Bergers to sign policy-related forms, including policy applications, that were either blank or incomplete.  *Id.* at 52:14-53:15.

- Additionally, in April, 2010, Brasner was arrested and charged with 22 felony counts of grand theft, fraud and other offenses related to the fraudulent procurement of some $78 million in life insurance policies from various carriers.  *See* Leslie Scism, *Regulators Rein In Murky Life Policies*, <u>The Wall Street Journal</u>, June 21, 2010, Rafalko Decl., Exh. 3.

Accordingly, with regard to his interactions with the Bergers, Brasner was acting outside the scope of the Broker Agreement.

7.      Disputed.  The Bergers did not seek out Brasner for the purposes of obtaining free insurance.  After the Bergers learned of the concept of free insurance at the seminars they had attended, they asked Mr. Tarshis if he had heard of it, and he referred them to Mr. Brasner. Rafalko Decl., Exh. 4 at 42:19-43:5; 49:15-22.  Once Tarshis introduced the Bergers to Brasner, Brasner devised the free insurance scheme and procured policies insuring the Bergers, including policy no. V1208044 issued by Pruco and insuring the life of Ms. Berger (the "Berger Policy"). Rafalko Decl., Exh. 4 at 55:17-56:25.  Upon being introduced to the Bergers, and in an effort to

learn about the "free insurance" program, Brasner inquired of Kevin Bechtel at Life Brokerage Equity Group ("LBEG"). The process Bechtel described in response to that inquiry was a STOLI scheme. Rafalko Decl., Exh. 2A at 145:7-146:5; 203:12-22. The Bergers had no involvement whatsoever in determining how to actually obtain "free insurance." Rafalko Decl., Exh. 4 at 55:23-56:5.[2] Further, Ms. Berger testified that she did not request that Mr. Berger be the beneficiary of a life insurance policy that was procured by Brasner. Rafalko Decl., Exh. 4 at 101:8-13. To the contrary, the Bergers were not invited to give any input whatsoever into the information included on the applications submitted for the Berger Policy. Rafalko Decl., Exh. 4 at 62:8-10.

8.      Disputed. After their initial meeting, at which the Bergers mentioned that they had heard of people getting "free insurance,"[3] the next time the Bergers heard from Brasner he told them that he had gotten them a policy. Rafalko Decl., Exh. 4 at 62:8-10 ("We didn't decide anything. [Brasner] was the one who had called us and said oh, I got you a policy. That was how it happened."). The Bergers played no role in the application process, and did nothing except sign the documents where Brasner directed them to sign. *Id.* at 62:15-63:15. At the time Arlene Berger signed the documents, she did not know what she was signing. *Id.* at 64:7-65:11. The application materials sent to Pruco seeking the Berger Policy were completed by Brasner, or by Patricia Wagner ("Ms. Wagner"), Brasner's assistant at Infinity, at Brasner's direction. Rafalko Decl., Exh. 2A at 102:10-104:18. Among other things, Ms. Wagner testified that Brasner directed her to forge Ms. Berger's name on documents submitted to Pruco. *Id.* at 110:22-111:14. Mr. Berger testified that once Brasner took control, "the whole thing was almost

---

[2]      Arlene Berger testified that: "We never asked him how it works because that's not our business. He's in insurance, not us." Rafalko Decl., Exh. 4 at 55:20-22.

[3]      Arlene Berger testified that: "[w]e never asked him for [a policy], we just mentioned it, the whole thing, the concept to him, and he was the one who said I can get you guys insurance…." Rafalko Decl., Exh. 4 at 56: 9-12.

like a fait accompli."  Rafalko Decl., Exh. 6 at 76:3-8.

9.      Disputed.  Ms. Berger did not request that Brasner apply for and obtain life insurance on her life; the Bergers did nothing more than ask Tarshis if he had heard of "free insurance" and then were introduced to Brasner.  Rafalko Decl., Exh. 4 at 42:19-43:5; 49:15-22. After that, Brasner contacted the Bergers and told them that he had gotten them a life insurance policy and that Ms. Berger would have to come in and sign the necessary papers.  *Id.* at 62:15-63:12.  At the time Brasner informed the Bergers that he had obtained the Berger Policy, Ms. Berger did not know who the policy owner would be (*Id.* at 71:14-18), did not know the amount of premium that would be owed under the policy and did not know how that premium would be paid (*Id.* at 72:15-73:11).  The only fact that was material to Ms. Berger's decision to participate in Brasner's STOLI scheme was that the life insurance policy would be "free" to the Bergers – meaning that they would never be obligated to make premium payments on the policy.  *Id.* at 58:25-60:5.  Additionally, Ms. Berger testified that she did not believe that her family would have obtained any money from the Berger Policy even if she had died within the two or three year "free insurance" period.  *Id.* at 76:19-77:4.  Mr. Berger similarly doubted that his family would ever receive the death benefit from the Berger Policy, regardless of when Ms. Berger passed away.  Rafalko Decl., Exh. 6 at 120:1-121:8.

10.     Undisputed.[4]

11.     Disputed.  The first application for life insurance insuring the life of Ms. Berger (the "First Application") was submitted to Pruco in July, 2005.  The First Application was transmitted to Pruco through LBEG, one of many Broker General Agents ("BGA") appointed by Pruco to act as an intermediary between Pruco and third party brokers such as Brasner.  Wells

---

[4]      Not only did the Bergers not read or understand the documents presented to them by Brasner, they had no idea what they were signing.  Mr. Berger stated that when the Bergers were asked to sign documents, Brasner would lay one paper on top of the next, exposing only the signature line of the page and obscuring the text of the document. The Bergers were completely unaware of the substance of these documents.  Rafalko Decl., Exh. 6 at 71:8-74:6.

Fargo's characterization of LBEG as "Pruco's Broker General Agent" may create the false illusion that LBEG was acting on behalf of Pruco in this transaction.  In fact, LBEG's BGA agreement with Pruco states that LBEG "is an independent contractor and is not an employee of [Pruco] . . . [t]he BGA's business and any services provided by the BGA, other than those authorized by this Agreement, are not and will not be represented to be the business of [Pruco]."  *See* Exh. 10 to Supplement to Joint Motion To File Confidential Documents Under Seal, D.E. #198, at PRU-00901-00912.  Moreover, the statement that the First Application was for a $10 million policy "for the benefit of Mr. Berger" is incorrect.  *See* Declaration of Juan Farach, Esq. in Support of Wells Fargo's Motion for Summary Judgment [D.E. #187], at Exh. I.  The First Application was significantly lacking in detail, and did not include any ownership or beneficiary information whatsoever.  *See* Farach Decl., Exh. I, Deposition of Michael McFarland, Vice President of Life Underwriting at The Prudential Insurance Company of America, Supplemental Decl., Exh. 2 at 168:1-24; 177:12-23.  Therefore, it could not be determined who was intended to benefit from any policy that was issued pursuant to the First Application.  In fact, no policy was issued based on the First Application; because Pruco was not provided with the necessary information, despite making several requests it, Pruco placed the First Application in "FIU" status.[5]  *Id.* at 190:14-192:4.

12.     Disputed.  On February 21, 2006, Brasner signed a second application seeking a $10 million life insurance policy insuring the life of Ms. Berger.  Similar to the First Application, this application (hereinafter, "the Second Application") was submitted to Pruco by Brasner via LBEG.[6/7]  Rafalko Decl., Exh. 8.

---

[5]     FIU stands for "further information unavailable," and is Pruco's designation for applications that do not include all the necessary detail to continue the underwriting process.

[6]     As discussed in Paragraph 11, the characterization of LBEG as "Pruco's General Agent" is inaccurate. LBEG, acting as an independent contractor, was one of many BGAs appointed with Pruco.  *See* Exh. 10 to Supplement to Joint Motion To File Confidential Documents Under Seal, D.E. #198, at PRU-00901-00912.

13.     Disputed.[8]  In 2005-2006, the Bergers did not have (and have never had) the net worth to justify $10 million in life insurance coverage.  Rafalko Decl., Exh. 4 at 60:6-61:17.  In 2005, at the time when she agreed to participate in the "free insurance" scheme with Brasner, Ms. Berger's net worth was less than $700,000.  *Id.* at Exh. 6 at 55:19-56:1.  Furthermore, the information on the client identification form that was submitted to Pruco in conjunction with the Second Application vastly overstated every element of the Bergers' net worth, by a factor of more than ten.  Each representation regarding the Bergers' finances on the client identification form was false.  *Id.* at  Exh. 5 at 41:2-43:6; Exh. 6 at 55:19-56:1.  Indeed, based on their actual net worth, the Bergers could not have afforded the premium payments on a $10 million policy.  *Id.* at Exh. 6 at 83:23-84:15.

14.     Disputed.  While Brasner was responsible for procuring the Berger Policy, Brasner and Ms. Berger always knew and agreed that Ms. Berger would have a period of "free insurance," after which the Berger Policy would be owned by another person or entity completely unrelated to Ms. Berger.  Rafalko Decl., Exh. 4 at 60:6-61:22; 65:8-68:6.  Although Ms. Berger had no knowledge of most aspects of the Berger Policy, including that the policy was to be owned by a trust bearing her name and that premium would be financed pursuant to a premium financing loan, Ms. Berger always knew that the Berger Policy would be transferred to investors who would ultimately own the policy and collect the $10 million death benefit upon Ms. Berger's death.  *Id.* at Exh. 4 at 60:6-61:22; 65:8-68:6; Exh. 6 at 69:17-70:3.  Indeed, Ms.

(Continued)

---

[7]     While Pruco does not dispute that the Second Application contains the language quoted by Wells Fargo in Paragraph 12 of its SUMF, this language is irrelevant to this action.  Compl., ¶¶ 58-64 [D.E. # 1].  Because the Berger Policy lacked an insurable interest at inception, it never came into existence.  Accordingly, the Berger Policy never took effect and the Second Application language quoted by Wells Fargo was never triggered.

[8]     It is undisputed that the Second Application included Ms. Berger's accurate date of birth, social security number, home address, and to the best of Pruco's knowledge, her medical information.  It is also undisputed that Ms. Berger completed a medical examination prior to Pruco's issuance of the Berger Policy.  Rafalko Decl., Exh. 8.

Berger testified that once the "free insurance" period was over, she "didn't care" who the owner of the Berger Policy became – pursuant to her agreement with Brasner, she knew that her involvement with the Berger Policy was over.[9]  *Id.* at Exh. 4 at 66:17-20.  Additionally, contrary to Wells Fargo's statement that Ms. Berger "believed that she was the owner of the policy at inception," Ms. Berger's testimony indicates that Brasner never told her who the owner of the Berger Policy was when it was issued.  *Id.*  Moreover, Ms. Berger did not know whether Mr. Berger was ever designated as beneficiary of the Berger Policy and stated unequivocally that she did not direct anyone to install Mr. Berger as the beneficiary.[10]  *Id.* at Exh. 4 at 100:5-102:13. As of June 30, 2006, the beneficiary of the Berger Policy was the Arlene Berger 206 Life Insurance Trust (the "Berger Trust").  The Bergers both testified that they had no idea that the Berger Trust existed.  *Id.* at Exh. 4 at 135:17-23; *Id.* at Exh. 6 at 149:21-24.  Accordingly, the facts and testimony establish that Ms. Berger did not direct anyone to name Mr. Berger as the beneficiary of the Berger Policy and had no knowledge of the existence of the Berger Trust, the named beneficiary of the Berger Policy from June 30, 2006 through January 9, 2009.  *Id.* at Exh. 4 at 101:8-10; 135:17-23.  Furthermore, on January 24, 2006, documents were provided to Brasner for the Bergers' signatures by Coventry Capital I, LLC ("Coventry").  *See* Exh. 24 to Motion For Seal, D.E. #175, at Proverian-85-138.  Brasner's free insurance STOLI scheme was constructed and orchestrated by Brasner and Coventry through the package of documents Brasner directed the Bergers to sign in January, 2006.  *Id.*  Most importantly, Ms. Berger signed an irrevocable power of attorney (the "Power of Attorney") which gave Coventry control over

---

[9]        Although Ms. Berger agreed with Brasner that she would get free insurance for a period of time, after which the policy would be transferred to an unknown third party, at no point did Ms. Berger expect that her family or her husband would receive the death benefit on the Berger Policy.  On this point, Ms. Berger testified that the idea that her family would receive any money from the Berger Policy was "absurd."  Rafalko Decl., Exh. 4 at 76:25-77:4 ("I didn't think that anybody was going to give us $10 million if I died.  I just, it was absurd.").

[10]        In response to the question "[d]id you direct someone to write Richard Berger in as beneficiary?," Ms. Berger responded "[n]o."  Rafalko Decl., Exh. 4 at 101:8-10.

the maintenance and disposition of the yet-to-be issued Berger Policy. *See* Exh. 5 to Motion For Seal, D.E. #175, at WF-281-282. When the STOLI scheme ripened in December, 2008, Coventry's affiliate, Coventry First, LLC (the two affiliated Coventry entities are referred to collectively as "Coventry"), became the owner of the Berger Policy prior to its sale to Lavastone Capital, LLC ("Lavastone").[11] *See* Exh. 8 to Motion For Seal, D.E. #175, at WF-411-417. Although Ms. Berger did not know or understand what she was signing in January, 2006 (Rafalko Decl., Exh. 4 at 62:15-63:12), the Power of Attorney granted Coventry permission to take action with regard to the sale of the Berger Policy. *See* Exh. 5 to Motion For Seal, D.E. #175, at WF-281-282.

15.     Disputed. In May, 2008, the Bergers received a $172,828.86 payment arranged by Brasner. *See* Bergers' Fidelity Account Statement and Fidelity Wire Record for May, 2008, Rafalko Decl., Exhs. 26 and 27. Brasner told the Bergers that this payment was "an insurance disbursement." Rafalko Decl., Exh. 6 at 95:22-97:11. The only insurance policy that Brasner procured on the lives of Richard or Arlene Berger that was ultimately sold in the secondary market was the Berger Policy. *Id.* at 80:21-25; 92:14-93:1; 124:7-13. Thus, the $172,828.86 payment was part of Brasner's "free insurance" STOLI scheme and was tied to the secondary market sale of the Berger Policy. Rafalko Decl., Exh. 2A at 140:6-15; Exh. 2B at 273:19-274:22. This sequence of events is corroborated by Ms. Wagner's testimony regarding the amount and timing of payments to insureds who participated in Brasner's STOLI transactions. Rafalko Decl., Exh. 2A at 147:15-148:9. Additionally, Brasner and Coventry procured the Berger Policy not for the benefit of Mr. Berger but for the purpose of it being sold on the secondary market. *Id.* at Exh. 2A at 125:24-126:25; Exh. 29A 71:7-19.

---

[11]     Lavastone is the current owner of the beneficial interest in the Berger Policy. Wells Fargo is the record owner of the Berger Policy as securities intermediary for Lavastone.

16.    Disputed.  Although Pruco issued the Berger Policy in April, 2006, unbeknownst to Pruco, the Berger Policy was not "for the benefit of [Ms. Berger's] husband Richard Berger." In fact, neither Ms. Berger nor Mr. Berger expected that either they or their family would receive the death benefit under any circumstances.  Rafalko Decl., Exh. 4 at 76:25-77:4  Accordingly, although the Berger Policy, when it was issued, *listed* Mr. Berger as the beneficiary, the Bergers always knew that the ultimate beneficiary would be a third party investor.  *Id.* at Exh. 4 at 60:6-61:22; 65:8-68:6; Exh. 6 at 69:17-70:3.  Further, while it is undisputed that the initial premium payment amount of $81,871.75 was tendered to Pruco on May 2, 2006, Pruco disputes that the Berger Policy was ever actually in force.  Upon receiving this initial premium payment, and believing that the Berger Policy was supported by a valid insurable interest at inception, Pruco placed the Berger Policy in force based on the facts known to it at the time.  Supplemental Decl., Exh. 2, at 33:5-22.  In fact, the existence of an insurable interest was a mere illusion and the Berger Policy was never actually in force, but was rather void *ab initio*.

17.    Undisputed.

18.    Disputed.  Although the documents creating the Berger Trust nominally established Mr. Berger as the beneficial owner of the Berger Trust, Mr. Berger executed a Borrower's Special Irrevocable Power of Attorney ("Borrower's Power of Attorney") in favor of Coventry on January 25, 2006.  *See* Exh. 24 to Motion For Seal, D.E. #175, at Proverian-105-106.  By the Borrower's Power of Attorney, Mr. Berger irrevocably relinquished to Coventry any control he would have held over the Trust or its sole asset, the Berger Policy.[12]  *Id.*  The Borrower's Power of Attorney placed Coventry in control of the Berger Policy beginning in January, 2006, three months before the Berger Policy was issued.  *Id.*  Also, Wells Fargo's

---

[12]    The Coventry NRPF Loan program called for Mr. Berger to be designated as the "co-trustee" of the Trust in order to give the superficial appearance that if Ms. Berger died, Mr. Berger would receive the death benefit.  In fact, the Borrower's Power of Attorney divested Mr. Berger of any control over the Trust or the Berger Policy.  *See* Exh. 24 to Motion For Seal, D.E. #175, at Proverian-105-106; Proverian 131-138.

statement that Ms. Berger "does not recall authorizing the creation of the Berger Trust" is inaccurate; neither Ms. Berger nor Mr. Berger had any knowledge of the Berger Trust prior to this lawsuit.  Rafalko Decl., Exh. 4 at 135:17-23; Exh. 6 at 149:6-151:1.

19.     Disputed.  Just as Ms. Berger never knew the Berger Trust existed, she never knew that the Supplement to Trust Agreement (the "Supplement") or the resulting Premium Finance Sub-Trust were ever created.   Rafalko Decl., Exh. 4 at 148:25-152:15.  Ms. Berger never had control over the Berger Policy, she always did as instructed by Brasner.  *Id.* at 62:11-14.  Therefore, because Ms. Berger never knew these entities existed, it cannot be said that Wilmington Trust, as Trustee, acted at the direction of Ms. Berger.  Similarly, Mr. Berger did not know that the Berger Trust or the Supplement existed (*id.* at Exh. 6 at 155:4-17; 3-20), and, in any event, he had also ceded his authority as Co-Trustee and Beneficial Owner of the Berger Trust to Coventry via the Borrower's Power of Attorney.  *See* Exh. 24 to Motion For Seal, D.E. #175, at Proverian-105-106.  Accordingly, his dual roles Co-Trustee and Beneficial Owner of the Berger Trust were always illusory.

20.     Disputed.  On June 16, 2006, Brasner submitted to Pruco a request for change of ownership and beneficiary on the Berger Policy.  Brasner either directed Ms. Berger to sign this document or had Ms. Wagner forge Ms. Berger's signature; in either circumstance it is undisputed that Ms. Berger did not read the document and had no knowledge of the Berger Trust or any request to change ownership or beneficiary information for the Berger Policy.  Rafalko Decl., Exh. 4 at 135:17-23; 147:12-148:15, Exh. 2 at 110:22-111:14.  Because Pruco was unaware of the STOLI scheme involving the Berger Policy as of June 16, 2006, Pruco believed that the Berger Policy was in force and believed that this change of ownership and beneficiary request was being made in accordance with a "revamping" of Ms. Berger's family trust, as was represented to Pruco during the underwriting process.  Rafalko Decl., Exh. 15.  Therefore, the change of ownership and beneficiary request was accepted by Pruco.  Rafalko Decl., Exh. 18.  In

fact, the Berger Policy was void at inception, and therefore, the provisions in the Berger Policy relating to changes of ownership and beneficiary had never actually taken effect.  Rafalko Decl., Exh. 29A, at 86:6-87:14.

21.     Undisputed.

22.     Disputed.  Not only did Ms. Berger not intend to pay any premium for the Berger Policy, she would not have gone along with Brasner's free insurance plan if she had been required to pay any premium whatsoever to keep the Berger Policy in force.  Rafalko Decl. Exh. 4 at 59:10-60:11.  Neither she nor her family ever paid any premium for the Berger Policy (*Id.* at Exh. 4 at 159:15-23) and, in fact, Ms. Berger and her family could not have afforded to pay premium for the Berger Policy.  *Id.* at Exh. 6 at 83:23-84:15.  Moreover, Ms. Berger never had any intention to retain any insurance policy issued on her life.  *Id.* at Exh. 6 at 70:15-71:6; Exh. 4 at 66:17-67:2.  The intent, plan and agreement among Ms. Berger and Brasner was always that the Berger Policy would be owned by a third party that would collect the death benefit when she died.  *Id.* at Exh. 4 at 65:20-67:2.  Further, while Ms. Berger believed she would have a period of "free insurance," there is no evidence that she "understood" the parameters of the "free insurance" Brasner promised her.  She did not know exactly how long the period of "free insurance" was, how premium payments would be made, the amount of the NRPF Loan, the maturity date of the NRPF loan, the source of the funding for the NRPF loan or the amount of the continuing premium obligation on the Berger Policy.  *Id.* at 95:21-96:6; 113:3-24.  Indeed, until her deposition, Ms. Berger did not even know that the NRPF Loan existed.  *Id.* at 113:3-24.

23.     Disputed.  Ms. Berger did not "seek to obtain premium financing."  As discussed above, Ms. Berger had no knowledge of how premium payments were going to be made on the Berger Policy (other than that she or her family would not be making them) and she had no knowledge that the NRPF Loan existed.  Rafalko Decl., Exh. 4 at 113:3-24.  The loan application for the NRPF Loan was one of the many documents provided by Coventry for the Bergers'

signatures in January, 2006 and, as with all of these documents, Brasner directed Ms. Berger to

sign the loan application, which she did without reading it or understanding its contents. *See*

Exh. 24 to Motion For Seal, D.E. #175, at Proverian-109; Rafalko Decl, Exh. 4 at 62:18-120,

113:3-18. Notably, the NRPF Loan and the loan program with the lender, LaSalle Bank, N.A.

(n/k/a Bank of America and referred to herein as "Bank of America") was administered by

Coventry. *See* Exh. 24 to Motion For Seal, D.E. #175, at Proverian-85; Proverian-88-95; and

Proverian-109. Pursuant to the Power of Attorney and the Borrower's Power of Attorney,

Coventry was in control of the Berger Policy and the NRPF Loan as of January 25, 2006. *See*

Exh. 5 to Motion For Seal, D.E. #175, at WF-281-282. Additionally, Pruco disputes Wells

Fargo's characterization of the first premium payment of $81,875.75 as "advanced" pursuant to

the NRPF Loan. First, the Note and Security Agreement between the Berger Trust and Bank of

America formalizing the NRPF Loan was not finalized until July 17, 2006 – more than two

months after the first premium payment was made. Note and Security Agreement, Rafalko

Decl., Exh. 7. Moreover, the first premium payment was made *by Coventry* (not Bank of

America, the purported premium finance lender), and was made in a purposefully convoluted

sequence to hide from Pruco the fact that the payment was not being made by Ms. Berger.[13] Ms.

---

[13] Coventry and Brasner concealed from Pruco the fact that Coventry made the payment by diverting the payment through Brasner's Infinity bank account and then creating the illusion that the Bergers were responsible for the payment. On May 1, 2006 Coventry wired $81,871.75 to Infinity's bank account (Rafalko Decl., Exh. 19); Brasner arranged for a cashier's check to be made payable to Pruco in that amount. *See* Infinity Check 1048, dated 5/1/06, Cashier's Check Issued by Wachovia to Prudential dated 5/2/06, Rafalko Decl., Exh. 20. Two months later, after the Berger Trust was created and the loan papers were executed, Bank of America issued two payments pursuant to the NRPF Loan – one directly to Pruco in the amount of $331,077.29 as premium for the Berger Policy, and the second, a check in the amount of $81,870.75, was made payable to Ms. Berger at Infinity's address (*see* LaSalle Bank check no. 0627077, dated 7/17/06, Rafalko Decl., Exh. 23). There was no legitimate basis for the second payment. It was done in this fashion to make it appear that Bank of America was reimbursing Ms. Berger for the initial premium payment. Rafalko Decl., Exh. 2 at 133:9-134:8. Of course, Ms. Berger testified, and her bank records confirm, that she did not pay any of the premium toward the Berger Policy, so there was nothing to reimburse. Rafalko Decl., Exh. 4 at 159:15-23. Upon receipt of the check from Bank of America in the amount of $81,870.75, Brasner had Ms. Berger come to his office and directed her to endorse the check over to Infinity. Rafalko Decl., Exh. 4 at 153:20-154:20. Brasner deposited this check in Infinity's account (*See* Infinity Bank Records for July, 2006, Rafalko Decl., Exh. 24), and wrote a check for $81,870.75 to Lifetime Assets Corporation, a Coventry affiliate, to reimburse Coventry for the first premium payment. (*See* Infinity Boynton Beach check no.

(Continued)

Wagner referred to these machinations as "smoke and mirrors" intended to mislead Pruco. Rafalko Decl., Exh. 2A at 129:10-130:6.

24.     Disputed.  The facts surrounding the purported "closing" of the NRPF Loan further evidence the STOLI scheme.  Again, the NRPF Loan was not finalized until more than two months after the first premium payment was made to Pruco.  *See* Rafalko Decl., Exh. 7. This premium payment, as discussed above, was actually made by Coventry through Brasner, neither of whom are parties to the Note and Security Agreement.  *See* note 14, *supra.*  Moreover, the maturity date for the NRPF Loan was September 17, 2008 – almost exactly thirty months from the issuance of the Berger Policy, which is within the period of time that Brasner promised Ms. Berger "free insurance."  Rafalko Decl., Exh. 4 at 97:15-98:1.

25.     Disputed.  Pruco does not dispute that the NRPF Loan documents contemplate the relinquishment of the Berger Policy or Bank of America's foreclosure on the Berger Policy in satisfaction of the NRPF Loan or that the NRPF Loan was nonrecourse (*i.e.* the only collateral for the loan was the Berger Policy).  *See* Exh. 24 to Motion For Seal, D.E. #175, at Proverian-85-138.  But regardless of whether the Berger Policy was relinquished or foreclosed upon, Bank of America *never* bore any risk that it would not recoup the loan amount from the sale of the Berger Policy.  *See* Exh. 22 to Motion For Seal, D.E. #175, at Lava-672-673.  Pursuant to the carefully crafted STOLI scheme orchestrated by Brasner and Coventry, the loan had been insured by Lexington Insurance Company, a subsidiary of American International Group, Inc. ("AIG"), and an affiliate of Lavastone (f/k/a AIG Life Settlements, LLC), the future owner of the Berger Policy.  *Id.*  The insurance coverage was arranged by Coventry in July, 2006 – prior to Bank of America's disbursement of the loan proceeds – and was underwritten by AIG's Risk Solutions

---

(Continued)

1058, dated 7/20/06, Rafalko Decl., Exh. 25).  Each of these steps was intended for the sole purpose of misleading Pruco.  Rafalko Decl., Exh. 2A at 129:2-130:2; 133:19-134:8.

department, which is the exact same department that would eventually underwrite Lavastone's

secondary market purchase of the Berger Policy.  *Id.* at Lava-641-643; Exh. 26 to Motion For

Seal, D.E. #175, at 208:1-216:25.  This insurance coverage allowed Bank of America to make a

risk free loan (for which it was paid a fee) while the risk of the loan was borne by an affiliate of

Lavastone.

26.     Disputed.  In furtherance of the STOLI scheme involving the Berger Policy, Bank

of America was directed by Coventry to disburse a $331,077.29 premium payment to Pruco.  *See*

Exh. 22 to Motion for Seal, at Lava-656.[14]  This amount was intended to keep the Berger Policy

in-force for more than two years, ostensibly bringing the Berger Policy past its contestable

period.  Therefore, when the Berger Policy was relinquished in satisfaction of the NRPF Loan,

the Berger Policy would be marketable to secondary market purchasers such as Lavastone that

will not purchase any life insurance policy that is less than two years old.  *See* Exh. 26 to Motion

For Seal, D.E. #175, at 106:22-107:16.

27.     Disputed.  Although both the Berger Policy and the Second Application include

the language that Wells Fargo has quoted, these provisions never became effective because the

Berger Policy was unsupported by an insurable interest at inception, and was therefore void *ab*

*initio*.

28.     Disputed.  Based on the facts known to Pruco in 2008, Pruco believed that the

contestable period had expired on or about May 10, 2008.  Pruco held this belief because for a

typical life insurance policy the determination of when the contestable period has expired is

simply a calculation of two years from the date that a policy is issued and placed in-force.  *See*

---

[14]     This document is the instruction sheet pursuant to which the loan proceeds were disbursed.  The Berger
Policy is identified by a "Coventry Policy ID" (Exh. 22 to Motion for Seal, at Lava-642) and the Loan is assigned a
"Coventry Loan ID" (*id.* at Lava-644) on the loan disbursement sheet.  Given that Coventry funded the first
premium payment (*see* note 14, *supra*), the only conclusion that can be drawn from these facts is that Coventry was
directing the disbursement of the loan proceeds.

Affidavit of Tawanna Hollis, Customer Service Associate in the Brokerage Call Center of The Prudential Insurance Company of America, Exh. C to Pruco's SUMF, D.E. # 178 at ¶¶ 7-8.  As of May 10, 2008, Pruco was unaware of the STOLI scheme that had been perpetrated against it, and therefore, did not know that the Berger Policy lacked an insurable interest at inception. Deposition of Hope Farrell, Pruco 30(b)(6) Designee, Supplemental Decl, Exh. 3 at 191:1-23.  In May, 2010, after Brasner was arrested by the Florida authorities and charged with 22 counts of fraud related to similar STOLI schemes, Pruco discovered that the Berger Policy was a Brasner STOLI policy.  Rafalko Aff., Exh. 3.  Therefore, as discussed in Paragraph 27, the Berger Policy is void *ab initio* and the contestable period never began to run (and therefore did not expire on May 10, 2008).

29.     Disputed.  The Second Supplement to Trust Agreement, signed by Ms. Berger on or about September 15, 2008, ostensibly "permitted" the co-trustee of the Trust (Mr. Berger) to step down as trustee.  Mr. Berger signed a resignation as co-trustee the very same day.  See Exh. 23 to Motion For Seal, D.E. #175, at Lava-668-670.  Although these documents were signed by the Bergers, they were mere formalities that were in furtherance of the "back-end" STOLI scheme described by Ms. Wagner at her deposition.  Rafalko Aff., Exh. 2 at 158:13-159:8; 295:18-297:18.  These documents were intended to create the illusion that the relinquishment of the Berger Policy was legitimate; in fact, the sequence of events had been planned prior to the issuance of the Berger Policy.[15]  Indeed, Ms. Berger and Mr. Berger always knew that the ultimate owner of the Berger Policy would be a third party.  Rafalko Aff., Exh. 4 at 65:8-67:2.

---

[15]     Both Ms. Berger and Mr. Berger had irrevocably ceded all control over the Berger Policy and the Berger Trust to Coventry years earlier when they signed the Power of Attorney and Borrower's Power of Attorney, respectively.  *See* Exh. 24 to Motion For Seal, D.E. #175, at Proverian-105-106.  Further, neither Ms. Berger nor Mr. Berger ever knew of the existence of the Berger Trust, and Mr. Berger was completely unaware of his role as trustee.  Rafalko Aff., Exh. 6 at 149:21-152:3.

As Mr. Berger described it, the "whole thing was almost like a fait accompli."  Rafalko Aff., Exh. 6 at 76:2-13.

30.     Disputed.  On or about September 16, 2008 Coventry provided Brasner with document for Ms. Berger's signature that, when executed, would relinquish the Berger Policy in satisfaction of the NRPF Loan.  These documents were ultimately signed by Ms. Berger but, pursuant to the Power of Attorney, Coventry already had to authority to take steps to liquidate the Berger Policy and could have used this Power of Attorney to complete the STOLI scheme if Ms. Berger did not sign the relinquishment papers as directed by Brasner.  *See* Exh. 5 to Motion For Seal, D.E. #175, at WF-281-282.

31.     Undisputed.

32.     Disputed.  Wells Fargo's statement that the Berger Policy was relinquished "at Mrs. Berger's direction," is not accurate, as it implies that Ms. Berger knowingly and affirmatively took the step of relinquishing the Berger Policy as settlor of the Berger Trust.  Ms. Berger had no knowledge of any such relinquishment and did not knowingly direct Wilmington Trust to proceed with the relinquishment of the Berger Policy.  Rafalko Aff., Exh. 4 at 151:20-152:2; *id.* at Exh. 5 at 15:13-22.  Indeed, how could Ms. Berger direct a trust to do something when she did not even know the trust existed?  *Id.* at Exh. 4 at 144:12-145:22.  Ms. Berger's deposition testimony establishes that she does not recall ever seeing a document that "relinquished" the Berger Policy.  *Id.* at Exh. 5 at 15:13-16:5.  In fact, as with each of the documents that were presented to her during the course of this STOLI scheme, Ms. Berger simply signed where Brasner directed her to sign.  *Id.* at Exh. 4 at 230:18-232:6.

33.     Disputed.  Pruco does not provide "verbal verifications of coverage."  A verification of coverage is a *written* request that seeks specific information about a given policy. Hollis Aff., ¶¶ 17-18.  A true verification of coverage is never received orally, and is handled by a specific division at Pruco, pursuant to specific policies and procedures.  *Id.*  Through its

cursory and improper reference to the so-called verbal verification of coverage, Wells Fargo misconstrues or obscures the salient facts of the December 10, 2008 phone call.  On that date, Coventry employee Jessica Bunsick called Pruco to request information about the Berger Policy. Pruco call center employee Tawanna Hollis took Ms. Bunsick's call.  *Id.* at ¶ 2.  During this telephone call, Ms. Bunsick misrepresented to Ms. Hollis that she was calling from Wilmington Trust – the owner and beneficiary of the Berger Policy as of December 10, 2008.  *Id.* at ¶ 5; Exh. 1.  Ms. Bunsick asked Ms. Hollis a number of routine questions about the Berger Policy.  *Id.* at Exh. 1.  Ms. Hollis, believing she was speaking with the owner of the Berger Policy, answered each of these questions truthfully and accurately.  *Id.* at ¶ 6.  Ms. Bunsick asked no question, and elicited no response from Ms. Hollis, regarding the validity of the Berger Policy and Ms. Hollis made no representation regarding the validity of the Berger Policy.  *Id.* at ¶¶ 10-11.  Further, when Ms. Hollis was asked if the Berger Policy was beyond its contestable period, she answered truthfully based on the information in Pruco's possession at the time.  *Id.* at ¶¶ 7-8.

34.     Disputed.  On December 12, 2008, Bank of America, Wells Fargo and Lavastone entered a Tripartite Entitlement Order (the "Tripartite Order").  The effect of the Tripartite Order was that Coventry was now obligated to sell the Berger Policy to Lavastone, provided that certain pre-requisite events occurred.  *See* Exh. 8 to Motion For Seal, D.E. #175, at WF-411-417. In deciding to enter the Tripartite order, Lavastone purportedly relied "on Pruco's verification of coverage and other representations."  As discussed in paragraph 33, however, the telephone call that Wells Fargo mislabels a "verification of coverage" was not a verification of coverage at all and, in any event, the information provided in the telephone call was (based on what Pruco had been told by Ms. Bunsick) provided to the owner of the Berger Policy – not to Coventry.  Hollis Aff., ¶¶ 4-5; 17-18.  Further, Wells Fargo cannot point to any other communications from Pruco to Lavastone or Coventry on which Lavastone relied in executing the Tripartite Order.  On December 18, 2008, six days after the Tripartite Order was executed, Coventry officially

purchased the Berger policy from Bank of America, along with ten other policies.  *See* Exh. 13 to

Motion For Seal, D.E. #175, at Lava-34-45.  Lavastone, however, was not obligated to complete

the sale of the Berger Policy until after ownership and beneficiary of the Berger Policy was

changed to Wells Fargo, as Lavastone's securities intermediary.  Exh. 26 to Motion For Seal,

D.E. #175, at 151:23-152:11.  Therefore, as a result of December 18, 2008 agreement between

Bank of America and Coventry (*See* Exh. 13 to Motion For Seal, D.E. #175, at Lava-34-45),

Coventry was the owner of the Berger Policy from December 18, 2008 through January 9, 2009.

*See* Exh. 13 to Motion For Seal, D.E. #175, at Lava-34-45; Exh. 6 to Motion For Seal, D.E.

#175, at WF-322-326.  No documentation reflecting this ownership change was ever submitted

to Pruco.[16]

36.     Disputed.  Pruco admits that on December 24, 2008 Wells Fargo submitted a

change of ownership and beneficiary request to Pruco containing a request to change the Policy's

owner and beneficiary to Wells Fargo Bank, N.A., as securities intermediary.  Pruco denies that

this submission was "[c]onsistent with the change of owner and beneficiary provisions in the

Policy. . .," as the Berger Policy is void *ab initio* and therefore neither it nor any of its individual

provisions ever came into existence.

36.     Undisputed.  Pursuant to Pruco's policies and procedures on processing requests

for changes of ownership and beneficiary on any of the policies that it has issued, Wells Fargo's

request was granted.  *See* Supplemental Decl, Exh. 3 at 69:18-73:25.

37.     Disputed.  Pruco admits that it received and accepted premium payments on the

Berger Policy from May, 2008 through June 25, 2010.[17]  Since this lawsuit was filed, Pruco has

---

[16]     Although the STOLI scheme ultimately culminated with Coventry taking ownership of the Berger Policy
prior to its sale to Lavastone, Brasner also attempted to sell the Berger Policy to a secondary market investor.  If
Brasner had been successful in this endeavor, he would have reaped commissions on those sale proceeds, which
would have gone to Coventry.  Rafalko Decl., Exh. 2B at 295:15-297:8.

[17]     The June 25, 2010 premium payment, in the amount of 34,112.55 was returned by Pruco to Wells Fargo.

placed the Berger Policy in a suspense status and has not accepted premium payments tendered by Wells Fargo for the Berger Policy, pending the outcome of this action.  Wells Fargo has deposited approximately $134,000 of premium payments into the Court registry [*see* D.E. # 111].  The Court's determination of Pruco's declaratory judgment action will determine whether Pruco will accept the premium payments tendered since June, 2010.

38.     Disputed.  Pruco received $619,918.27 in premium payments prior to learning that the Berger Policy was STOLI and therefore void *ab initio*.  Supplemental Decl, Exh. 3 at 191:1-23.

39.     Disputed.  Pursuant to the Servicing Agreement between Lavastone, Coventry and Wells Fargo, Coventry acts as the agent of Lavastone in servicing any life insurance policy that Lavastone acquires from Coventry, including the Berger Policy.  Exh. 26 to Motion For Seal, D.E. #175, at 379:3-380:20.  Further, Lavastone and Coventry are parties to an "Origination Agreement" whereby Coventry identifies life insurance policies for Lavastone to purchase.  *Id.* at 59:8-14.  It is undisputed that Coventry played a significant role in the procurement of the Berger Policy (*See* Exh. 24 to Motion for Seal, D.E. #175, at Proverian-85-138), and it is undisputed that Coventry acts both on its own behalf and as an agent for Lavastone (and its securities intermediary Wells Fargo) in the secondary market for life insurance.  Exh. 26 to Motion For Seal, D.E. #175, at 110:16-114:11; 122:5-22.  Indeed, Lavastone's Corporate Representative testified that Lavastone has *never* acquired a life insurance policy that was not "originated" by Coventry.  *Id.* at 55:13-18.

40.     All additional facts relied upon by Pruco in support of its Opposition to Wells Fargo's Motion for Summary Judgment [D.E. #186] are contained in Pruco's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment [D.E. #178].

Dated:  September 13, 2011

PETT FURMAN, PL
Attorneys for Plaintiff
2101 N.W. Corporate Blvd., Suite 316
Boca Raton, FL 33431
(561) 994-4311
(561) 982-8985 (fax)

By:__s/Wendy L. Furman
       Wendy L. Furman
       Fla. Bar No. 0085146
       wfurman@pettfurman.com

*Of Counsel*
Stephen A. Serfass *(Admitted Pro Hac Vice)*
Michael D. Rafalko *(Admitted Pro Hac Vice)*
Nolan B. Tully *(Admitted Pro Hac Vice)*
**DRINKER BIDDLE & REATH LLP**
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
(215) 988-2700
Stephen.serfass@dbr.com
Michael.rafalko@dbr.com
Nolan.tully@dbr.com

*Attorneys for Plaintiff*
*Pruco Life Insurance Company*

## CERTIFICATE OF SERVICE

I certify that on September 13, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

John K. Shubin, Esq.
Shubin & Bass, P.A.
46 S.W. 1st Street, Third Floor
Miami, FL 33130
jshubin@shubinbass.com
*Counsel for Wells Fargo*

s/Wendy L. Furman
Wendy L. Furman