**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 9:10-CIV-80804-COHN/SELTZER

PRUCO LIFE INSURANCE COMPANY,

      Plaintiff,

vs.

STEVEN M. BRASNER, individually and as
Principal of Infinity Financial Group, LLC;
MARK A. TARSHIS; INFINITY FINANCIAL
GROUP LLC; WELLS FARGO BANK, N.A.,
as Securities Intermediary; and John Does 1-10,

      Defendants.
_____/

**RESPONSE OF DEFENDANT WELLS FARGO BANK, N.A.,**
**AS SECURITIES INTERMEDIARY, IN OPPOSITION TO**
**PRUCO'S MOTION FOR SUMMARY JUDGMENT**

      Defendant Wells Fargo Bank, N.A., as Securities Intermediary ("Wells Fargo"), opposes

the motion for summary judgment filed by Plaintiff Pruco Life Insurance Company ("Pruco")

and, in support, states as follows:

**INTRODUCTION**

      Contrary to Pruco's characterizations, this case it is not about a "STOLI scheme" to "use"

an elderly person to obtain a life insurance policy by a "stranger" with no insurable interest in the

senior's life. Mrs. Berger knowingly and willingly sought out insurance on her life for the

benefit of her husband and children. On the day Pruco issued the policy, she was the

insured/policy owner and her husband was the policy's beneficiary – just as she had intended.

With Pruco's full knowledge, Mrs. Berger later created a trust to own her policy and designated

Mr. Berger as the trust's sole beneficial owner. This remained the status quo for over two years

– just as she had intended. And, Mrs. Berger's trust borrowed the money to pay the policy's

premium payments so that Mrs. Berger would not have to pay any premiums for the first two years – just as she had intended.

When viewed in its proper perspective, it becomes clear that this case is about a large life insurance conglomerate that was so eager to earn huge premiums on an over-sized policy that it ignored its own clear, published company guidelines, turned a blind eye during the underwriting process to innumerable "internal red flags" of what it perceived to be possible life settlement and "STOLI," and then failed to question or investigate its own agent's problematic conduct.  This case is not about this conglomerate's altruistic attempts to prevent or punish the victimization of Florida's seniors.  It is instead about Pruco's attempt to play the "victim" and shift the blame for its own carelessness to an innocent third-party purchaser (Lavastone Capital LLC ("Lavastone") through Wells Fargo, as Securities Intermediary) in the legitimate secondary market and to non-party Coventry Capital I, LLC ("Coventry Capital"), which merely administered the lawful premium financing loan program for non-party LaSalle Bank, N.A. (the lender and secured party).

Recognizing that it has no evidence that Mrs. Berger entered into an "agreement" with any specified investor or other third party at or prior to inception to later sell the policy to such investor or other third party, Pruco has no choice but to rely on pure supposition, unsupported by Florida law or by record evidence, to spin a "STOLI" story.  In its motion, Pruco does not show (because it cannot) how the Berger Policy did not comply with the requirements of Florida's insurable interest statute, section 627.404, Florida Statutes.  Instead, it concocts a theory that the Policy was a common-law "wagering contract," basing its argument solely on the standard-issue loan documentation used by LaSalle Bank and its loan program administrator Coventry Capital.  Coventry Capital's loan administration documents do not, however, prove Pruco's unsupported

and far-fetched theory that the "policy was obtained so that it could be sold to investors." Indeed, the documentation clearly reveals that Coventry Capital's powers were limited and that from policy inception in May 2006 through September 2008, the Bergers continuously retained ownership and control over the policy and the policy benefits (subject to repayment to LaSalle Bank of the outstanding loan balance). Pruco's arguments are refuted by the evidence in this case (including the supplemental declaration of Amy Welsh), or, at the very least, create disputed issues of fact requiring a trial. Therefore, Pruco's theory remains just that: a theory it hopes will obfuscate its own negligence in issuing the policy in the first place, in failing to investigate indicia of fraud during the two-year contestability period, and in misrepresenting (through recorded verifications made to the policy owner's representative and through acceptance and recordation of a change of ownership/beneficiary) and failing to inform potential purchasers that Pruco believed the Policy to be void *ab initio* because it violated Pruco's own ***internal standards and guidelines***.

## ARGUMENT

## I. THE BERGER POLICY WAS NOT AN ILLEGAL "WAGERING CONTRACT" THAT LACKED AN INSURABLE INTEREST AT INCEPTION[1]

Conceding, as it must, that the Policy met all the requirements of Florida's insurable interest statute, section 627.404, Florida Statutes, Pruco is left to argue that the Policy should be declared void *ab initio* because it was a "wagering contract," an argument it makes without even defining that term for the Court. A "wagering contract" is an "insurance policy ***issued to*** a

---

[1]     Wells Fargo relies on its previously filed Statement of Undisputed Material Facts (cited herein as "SUF") and on its Counter-Statement of Material Facts (cited herein as "CSF") filed concurrently with this Response in Opposition. Wells Fargo's counterstatements (found at CSF ¶¶ 1-68) to Pruco's Statement of Undisputed Material Facts (and additional facts found at ¶¶ 69-106) create genuine issues of material fact precluding entry of summary judgment for Pruco.

person who **is shown to have** no insurable interest in the person or property covered by the policy." Black's Law Dictionary 811 (7th ed. 1999) (emphasis added). Here, the Berger Policy was **issued to Arlene Berger** who, under Florida law, had an insurable interest in herself; it was **not** issued to Brasner, the Berger Trust, Coventry, Lavastone, Wells Fargo, or any other third party. Notably, Pruco has not disputed (because it cannot) that if Mrs. Berger had died between May 2006 and September 2008, the **only** payee of death benefits on the Policy would have been Mr. Berger (subject to repayment of any outstanding loan balance), who also indisputably had an insurable interest in Mrs. Berger's life. **All** of Pruco's "fraud facts" are therefore **irrelevant.**[2]

Pruco refers this Court to *TTSI Irrevocable Trust v. ReliaStar Life Ins. Co.*, 60 So. 3d 1148 (Fla. Dist. Ct. App. 2011), contending that it "involved a similar STOLI scheme in which a policy was declared void *ab initio*" as a "wagering contract." (Pruco MSJ at 18.) Not surprisingly, Pruco does not explain how the facts of the two cases are "similar." Indeed, there is no similarity. *TTSI* does, however, serve to illustrate the type of facts needed to support a finding that a policy is, in reality, a wagering contract.

---

[2]     The "fact" that Mrs. Berger "merely signed the documents" she was instructed to "without reading or understanding" them is likewise *irrelevant*. (Pruco MSJ at 8.) *See, e.g., Columbian Nat'l Life Ins. Co. v. Lanigan*, 19 So. 2d 67, 69 (Fla. 1944) (where insurer sued to rescind and cancel life insurance on ground that it issued policy in reliance upon answers on application which were false, the court affirmed judgment for insured, where insured orally gave information to medical examiner, examiner completed the application, and insured signed it without reading it); *Guy v. Commonwealth Life Ins. Co.*, 894 F.2d 1407, 1409 (5th Cir. 1990) (in case where insurer sought to rescind insurance policy *ab initio* based on material misrepresentations on policy application, the court denied rescission and ruled that the insured was entitled to payment of insurance claim, where insured gave the insurance agent her address, social security number, and date of birth; the agent filled out the application; and the insured signed it without reading it). Indeed, Mrs. Berger had no duty to read her policy. *See Chism v. Protective Life Ins. Co.*, 234 P.3d 780, 790 (Kan. 2010) (applying rule that an applicant for insurance has no absolute duty to read her policy in anticipation that her insurance agent will commit fraud or mistake).

4

CASE NO. 10-CIV-80804-COHN/SELTZER

In *TTSI*, the "insured," Verlee Tennant, was approached by her insurance agent, Paul Moses, who sought her permission to take out a policy on her life, specifically naming himself as the beneficiary.  *Id.* at 1149.  Ms. Tennant agreed to the arrangement and signed the application. Instead of listing himself on the application as the policy's beneficiary, however, Mr. Moses designated "TTSI Irrevocable Trust, K.M. Kern, Trustee" as the owner and primary beneficiary of the policy.  The beneficiaries of the trust were Mr. Moses and his children, none of whom had any familial relationship with Ms. Tennant.  ReliaStar Life Insurance Company ("ReliaStar") issued the policy in 2005, and the Trust paid the premiums.  Thus, in that case – entirely unlike this case – ***neither*** the owner/procurer ***nor*** the policy beneficiary had an insurable interest in the life of the insured at the inception of the Policy – a clear violation of Florida's insurable interest statute.

Three years later, when Ms. Tennant received correspondence from ReliaStar, she informed it that she did not have a trust.  ReliaStar then conducted an investigation, which led it to cancel the policy.  After the Trust sued ReliaStar to reinstate the policy, ReliaStar moved for summary judgment arguing that, because the Trust never had an insurable interest in Ms. Tennant's life, the policy was void *ab initio* for lack of an insurable interest.  Mr. Moses counter-argued that he had an insurable interest because Ms. Tennant was a "key client."  *Id.* at 1150. The trial court rejected this argument and ruled that no insurable interest existed at inception under section 627.404, Fla. Stat.

The *TTSI* case illustrates the typical scenario in which courts will find a lack of insurable interest at inception.  Notably, Ms. Tennant did not seek out or request life insurance.  Instead, Ms. Tennant's insurance agent (Mr. Moses) sought the insurance on Ms. Tennant's life and made himself and his children the policy beneficiaries.  Neither Mr. Moses nor his children were

5

related to Ms. Tennant, and thus they had no interest in her remaining alive. Moreover, neither Mr. Moses nor his children fell within any of the categories of persons authorized by section 627.404. The ReliaStar policy therefore met the definition of a wagering contract.

As discussed at length in Wells Fargo's motion for summary judgment, no such facts exist here. Indeed, the facts and the circumstances surrounding the formation and issuance of the policy in *TTSI* are the exact opposite of those that occurred here. Accordingly, it is clear that the Berger Policy is not an unlawful "wagering contract" but rather a valid and enforceable policy that conforms with the provisions of section 627.404.

## II.  BRASNER'S FRAUD DOES NOT CONVERT THE BERGER POLICY INTO AN ILLEGAL "WAGERING CONTRACT" THAT LACKED AN INSURABLE INTEREST AT INCEPTION

### A.  This Case Is Solely About Brasner's Fraud and Pruco's Failure to Timely Detect It

Even a cursory review of Pruco's motion for summary judgment confirms that Pruco's "STOLI" case is nothing more than a fraud complaint against its own agent Steven Brasner. Indeed, Pruco relies on only two "facts" to "prove" that the Policy was both a "wagering contract" and a "stranger-originated" life insurance policy ("STOLI"): (1) Brasner procured a $10 million policy from Pruco by "fraudulent means"; and (2) "Coventry arranged for the premium to be financed through a non-recourse premium financing loan." (Pruco MSJ at 7.) Even if these facts are true, however, they do not prove that any third party was "wagering" on the life of Arlene Berger so as to undermine the undisputable facts that, at inception, the policy owner (Mrs. Berger) and the policy beneficiary (Mr. Berger) both had insurable interests in Mrs. Berger's life.

Among the parade of horribles purportedly committed by Brasner while he was under contract as Pruco's agent are the following: Brasner directed the Bergers to sign documents

applying for a premium financing loan (Pruco MSJ at 9); and he submitted to Pruco a Client Information Form and a Confidential Financial Statement, which were "rife with fraudulent misrepresentations" as to:  (1) the reason for the insurance; (2) Mrs. Berger's finances; (3) the fact that the premium would be financed; and (4) whether there were other policies on Mrs. Berger's life.  (Pruco MSJ at 11.)  Specifically, Pruco asserts that Brasner misrepresented Mrs. Berger's net worth to be $15.95 million to allegedly induce Pruco to issue a $10 million policy and concealed the fact that Mrs. Berger did not pay the first premium payment.  (Pruco MSJ at 11.)  Supposedly, had Pruco known Mrs. Berger's true net worth and that she was borrowing money to pay the premium, it would not have issued the Policy.[3]  (Pruco MSJ at 18.)

Pruco's "facts" and argument prove that its case is really an insurance fraud case against its own life agent.  But because Pruco was not diligent and failed to challenge the validity of the Policy within the two-year contestability period, Pruco had to recharacterize its attempt to rescind the policy on the ground of fraud as an attempt to have the Policy declared void *ab initio* as a "STOLI" policy.  This attempt must fail, however, because Brasner's fraud is irrelevant to the issue of whether there was an insurable interest at inception and because the evidence in this case – including but not limited to the absence of any evidence of an agreement to sell the policy – directly refutes Pruco's suppositions and exposes Pruco's "STOLI" story as a work of pure fiction.

---

[3]  It is worth noting that Pruco does not maintain that its medical underwriting of Mrs. Berger was impacted by the misrepresentation of her net worth.  Therefore, it would appear that Pruco medically underwrote Mrs. Berger appropriately and collected the correct amount of premium for a $10 million policy issued on a woman of her age and health.

**B.      Because Brasner's Fraud Is Imputable to Pruco, Pruco May Not Now Void the Policy**

Pruco is now precluded from challenging the Policy based on the fraudulent misrepresentations of its own agent.  First, under the Policy's incontestability clause, Pruco had two years in which to detect, uncover, and investigate fraud in the procurement of the Policy. Pruco failed to take any legal action during that period, notwithstanding the fact that, as will be discussed below, it was deluged by "internal red flags" of possible fraud in 2005 and 2006. Having chosen to ignore each red flag that cropped up and declined to assess them together as a pattern, Pruco is now barred from asserting a claim based on fraud by *Allstate Life Insurance Co. v. Miller*, 424 F.3d 1113 (11th Cir. 2005), and its progeny.  *See id.* at 1117 (holding that, under Florida law, fraud claims are barred after expiration of the policy's contestability period).

Second, and possibly more important, Pruco's claims based on Brasner's fraud are barred by the general rule that when an insurance agent inserts intentionally fraudulent statements on an application, the insurance company may not void the policy based on these misrepresentations. *See* 46 C.J.S. *Insurance* § 1208 (citing *Cincinnati Life Ins. Co. v. Mickles*, 148 S.W.3d 768, 777 (Ark. 2004) ("[A]n insurer cannot void a policy for misrepresentations when the misstatement in the application is the result of the fraud, negligence, or mistake of the agent.").  Specifically, the law in Florida is that:

> When the agent of an insurance company fills in an application for insurance, his act in doing so is the act of the company.  If the applicant fully states the facts to the agent at the time and the agent writes the answers incorrectly or contrary to the facts stated by the applicant, the company is estopped from making a defense in an action on the policy by reason of the false answer.

*Stix v. Continental Assur. Co.*, 3 So. 2d 703, 704 (Fla. 1941) (*en banc*), *cited in Casamassina v. United States Life Ins. Co.*, 958 So. 2d 1093, 1102 (Fla. Dist. Ct. App. 2007).  *See Guaranty Life Ins. Co. v. Feigley*, 120 So. 2d 804, 806 (Fla. Dist. Ct. App. 1960) (affirming judgment for

insured against insurer where insurer's agent wrote false answers on the policy application). Specifically, when the insurance agent knows the true facts, "*the knowledge of the insurer's agent is imputed to the insurer*." 6 Couch on Ins. § 85:36 (emphasis added). *See also Guerrier v. Commerce Ins. Co.*, 847 N.E.2d 1113, 1118 (Mass. App. Ct. 2006) (affirming judgment for insured who signed blank pages of insurance application in reliance on oral assurances of insurer's agent and holding that trial court "rightly concluded it would be improper to permit [insurer] to void the policy given that it must be bound by the actions of its agent" whose failings were to be imputed derivatively by law to the insurance company).

In sum, Pruco's overriding grievance is that, had it known the true facts about Mrs. Berger's finances and the premium financing, it never would have issued the Policy. (*See* Pruco MSJ at 18.) But it is undisputed that Brasner was Pruco's agent and that Brasner, *knew the true facts about the Bergers*. And *he* submitted the incorrect financial information, and, during the application process, *he* concealed from Pruco the true origin of the initial premium payment.[4] Therefore, Pruco may not seek to void the Policy on the basis of Brasner's fraud. *See* 44A Am. Jur. 2d *Insurance* § 1586 ("[A]n insurer cannot rely upon the falsity of answers in an application where such answers have been inserted by an agent of the insurer engaged in preparing the application, entirely on his or her own motion and without the knowledge of or the direction of an inquiry to the insured, *even though the insurer would not have issued the policy had truthful statements been made.*") (emphasis added).

---

[4] Importantly, Pruco's own written brokerage agreement with Brasner, in effect during the application period, specifically authorized Brasner to "solicit, procure and submit applications for Policies of [Pruco]" and "ensure that all Life Insurance policy and Annuity contract placement requirements are satisfied. . . ." (SUF ¶ 6.) In addition, on the Supplementary Information form submitted in connection with the application, Brasner certified to Pruco that: "I am not aware of any information, other than that stated in this application, that would adversely affect the insurability of all proposed insureds." (CSF ¶ 89 at Ex. 22, PRU-00060.)

III.   **THE PREMIUM FINANCING LOAN WAS NOT AN "AGREEMENT AT INCEPTION" THAT CONVERTED MRS. BERGER'S POLICY INTO AN ILLEGAL WAGERING CONTRACT THAT LACKED AN INSURABLE INTEREST AT INCEPTION**

      A.    **The Policy was not a Wagering Contract Because There is No Evidence that Mrs. Berger Had An Agreement With A Third-Party Investor at Inception**

Conceding that, for the Berger Policy to be considered a "wagering contract," there must have been an agreement between Mrs. Berger and a "stranger" at inception to sell or assign the Policy to it, Pruco casts Coventry Capital[5] in the role of a "stranger third-party investor," and contends that the Bergers had an "agreement" with it to "participate in premium financing." (Pruco MSJ at 11.)  But, once again, the facts do not support Pruco's theory and story.  Not only does Pruco fail to provide any specific evidence of any express agreement – written or oral – between Coventry and the Bergers, but the Supplemental Declaration of Amy Welsh ("Supplemental Welsh Declaration") directly refutes Pruco's argument that the premium financing loan was an "agreement" at inception to sell the policy or any interest therein to a stranger investor.  (CSF ¶ 31.)  Indeed, the evidence in this case definitively establishes that: (i) Coventry Capital was not a third-party investor; (ii) the Bergers did not have an "agreement" with Coventry Capital (or any other third party) to later sell or assign the Policy to it; (iii) the Bergers *never* lost the benefits of, or ceded control over, the Policy before relinquishing it when the loan matured; and (iv) the Bergers never received a dime upon premium financing, relinquishment, or the later sale of the Policy to Coventry First or to Lavastone.

---

[5]    Coventry Capital was the servicing agent and administrator for LaSalle Bank (now, Bank of America) on the premium financing transaction.  (CSF ¶ 31.)  Another entity, Coventry First LLC ("Coventry First") purchased the Berger Policy from Bank of America after relinquishment by the Berger Trust and then later acted as the servicing agent of the Policy once the Policy was sold to Lavastone.

    **1.**      **Coventry Capital Was LaSalle Bank's Loan Administrator and Servicing Agent, Not a Stranger-Investor**

In Florida, the financing of insurance policy premiums is regulated and lawful.  *See* Fla. Stat. §§ 627.826, *et seq.* (2011) (eff. June 12, 2003) (titled "Premium Finance Companies and Agreements").  Here, Coventry Capital's only role in the procurement of the Berger Policy was to act as the loan administrator and servicing agent for the loan that LaSalle Bank provided to Mrs. Berger's trust to finance the premiums needed to keep the Policy in force for the first 26 months after Pruco issued the Policy.  (CSF ¶ 31.)  Mrs. Berger knowingly requested and agreed to obtain premium financing from LaSalle Bank.  (CSF ¶¶ 19, 21.)  All of the LaSalle Bank and Coventry Capital documents the Bergers signed were intended to effectuate the lawful financing of these initial Policy premiums.  (CSF ¶ 31.)  Indeed, Coventry Capital confirmed during a telephone call with Mrs. Berger (at her home phone number) before the loan closed in July 2006 that she was seeking financing from LaSalle.  (CFS ¶¶ 19, 21.)  Coventry Capital never had an "agreement" with Mrs. Berger (or anyone else) at or near inception to sell or transfer the Policy or any interest in it to any person or entity that did not have an insurable interest in Mrs. Berger's life.  (CSF ¶ 31.)

    **2.**      **Coventry Did Not Participate in any STOLI Scheme**

Although Pruco's motion tells a good story, it is based primarily on supposition and is bereft of any actual evidence of a STOLI scheme or of Coventry Capital's involvement in such a scheme.  First, Pruco has no evidence of any "agreement" between Brasner and Coventry Capital.  Second, any alleged fraud that Brasner may have committed may not be imputed to Coventry Capital, so Pruco cannot rely on Brasner's actions or statements to support its theory.  There is also no basis for Pruco's assertion that Brasner and Coventry fraudulently arranged for it to appear that Mrs. Berger paid the first premium payment.  (Pruco MSJ at 12-13.)  Although

Coventry Capital (through its affiliate) made an $81,871.75 advance on behalf of LaSalle Bank to Brasner for the benefit of Mrs. Berger, as the Supplemental Welsh Declaration establishes, Coventry did not advise or instruct anyone on how to forward this payment to Pruco in a manner meant to disguise the source of the funds.  (CSF ¶ 47.)  Indeed, had the LaSalle Bank loan to the Berger Trust not closed and Coventry Capital not been reimbursed in full, as it was through proceeds of the bank loan, Coventry Capital would have sought reimbursement from Brasner. (CSF ¶ 47.)

Pruco's accusation that Coventry marketed the Policy on the secondary market before the two-year loan period expired is also without factual support.    (Pruco MSJ at 13-14.)  No Coventry entity or affiliate ever marketed or attempted to sell the Berger Policy prior to the relinquishment of the Policy in September 2008.  (CSF ¶ 51.)  Rather, in March 2008, an independent broker attempted to sell the Policy to Coventry First!  (CSF ¶ 51.)

Finally, it is noteworthy that although Pruco sought an enlargement of the discovery period to allow it to depose Coventry and/or LaSalle, it never did.  This might explain why Pruco falsely characterizes LaSalle Bank's standard-issue loan documentation as some sort of evidence of a "STOLI" scheme and claims that Coventry "shopped the Policy" to investors before the loan period ended.  But given Pruco's utter lack of diligence during discovery to ascertain the true facts of this case – which ironically mirrors Pruco's lack of diligence during the Berger ownership of the Policy – no credence should be given to the story Pruco now spins.

### 3.    The Bergers Did <u>Not</u> Cede Control Over the Policy to Coventry Through the Powers of Attorney

Referring to LaSalle Bank's standard-issue loan documentation, Pruco contends that both Mrs. Berger and the Berger Trust relinquished all control over the Berger Policy in January 2006 at the initiation of the premium finance loan application.  (Pruco MSJ at 10, 12.)  In taking this

position, Pruco relies on documents that include irrevocable powers of attorney executed by Mrs. and Mr. Berger in favor of Coventry Capital.  (Pruco MSJ at 10.)  However, the powers of attorney make it clear that Coventry Capital's authority under these documents – to "service, maintain, or liquidate" the Berger Policy – was solely obtained in connection with the terms of the loan as set forth in documents, such as the Note and Security Agreement and the Settlor Non-Recourse Security Agreement executed by the Bergers at the same time as the powers of attorney.  (CSF ¶ 31.)  Thus, the term "liquidate" as defined and used consistently throughout these documents describes a power vested in Coventry Capital, as servicing agent for LaSalle, which power would arise only upon the uncured default on the loan or voluntary relinquishment of the Berger Policy in satisfaction of the loan at the direction of Mrs. Berger.  (CSF ¶ 31.)

In sum, all of the LaSalle Bank and Coventry documents Pruco relies on to prove a "STOLI scheme" establish instead that the Bergers sought premium financing; LaSalle Bank loaned the money; and Coventry Capital administered and serviced the loan from beginning to end.  None of the Coventry documents come close to proving an "agreement" between Mrs. Berger and a stranger third-party investor that would meet any sort of reasonable objective standard in determining whether Mrs. Berger acquired her Policy as a "subterfuge."  (Pruco MSJ at 12.)

### 4.   Mrs. Berger Never Received a Cent from the Relinquishment or Later Sale of Her Policy

Finally, conceding that compensation to the insured for "agreeing" to transfer her policy to a stranger is a typical element of a STOLI transaction, Pruco asserts that the Bergers received $172,826.86 as compensation "for their participation in the STOLI scheme involving the Berger Policy."  (Pruco MSJ at 14.)  Pruco is utterly wrong on this point, as the evidence in this case demonstrates instead that the Bergers received this payment as a result of an unrelated life

insurance policy on **Mr. Berger's** life, not on Mrs. Berger's life.

In 2005, a life insurance policy on the life of Mr. Berger was taken out and owned by The Richard Berger Life Trust.  This policy was settled in early 2008 resulting in a payment to the Bergers on May 2, 2008 in the exact amount of $172,828.86.  (CSF ¶ 52.)  The policy on Mrs. Berger's life, on the other hand, was never sold by Mrs. Berger, the Berger Trust, or Brasner but was instead relinquished to LaSalle Bank in satisfaction of the loan obligation five months *after* the Berger's received this $172,828.86 payment Pruco refers to.  (CSF ¶ 52.)  The closing and release of funds from the sale of Mrs. Berger's policy from Bank of America (as successor to LaSalle Bank) to Coventry First and then from Coventry First to Lavastone did not take place until January 2009, nine months *after* the Berger's receipt of the $172,828.86.  (CSF ¶ 52.) Further, Coventry expressly denies that the Bergers ever received any money from any Coventry company at any time in connection with the sale of any interest in the Policy.  (CSF ¶ 52.)  This evidence directly refutes Pruco's claim that the $172,828.86 was paid to the Bergers for their participation in a "STOLI scheme" and should finally put a dagger through the heart of Pruco's factually unsupported theory and desperate attempt to mischaracterize the Berger Policy as a wagering contract or as a STOLI policy.

## IV.   PRUCO IS NOT ENTITLED TO AN ADVERSE INFERENCE AGAINST WELLS FARGO

Left with **no evidence** that the Berger Policy was an unlawful "wagering contract," Pruco's last resort is to argue that Brasner's refusal to answer questions at his deposition raises an adverse inference against Wells Fargo, an entity that was not involved in the Policy's procurement and did not know or deal with Brasner or the Bergers, let alone have an agreement with them.  In a desperate attempt to scrape the bottom of the barrel for proof of a nonexistent "STOLI scheme," Pruco claims that "Brasner's invocation of **his** Fifth Amendment rights"

entitles *it* to "an adverse inference against Wells Fargo," relying on the factors delineated in *LiButti v. United States*, 107 F.3d 110 (2d Cir 1997).  (Pruco MSJ at 16-17.)  Not surprisingly, Pruco does not even attempt to apply the *LiButti* factors to the facts here or demonstrate how they might apply.  Indeed, as we will show, they do not:

(1)      <u>Nature of the relevant relationships.</u>

***Brasner and Wells Fargo, as securities intermediary, never had any relationship.***  To the contrary, it is Pruco that had the relationship with Brasner, its authorized agent for six years.  Therefore, any adverse inference derived from Brasner's invocation of his Fifth Amendment rights – if it is to be imputed to anyone – must be imputed to Pruco, not to Wells Fargo.  And, therefore, this factor militates **against** imputing an adverse inference to Wells Fargo.

(2)      <u>Degree of control of the party [Wells Fargo] over the non-party witness [Brasner].</u>

***Wells Fargo has never had <u>any</u> control over Brasner.***  To the contrary, it is Pruco that had control for six years over its own contract agent Brasner.  Therefore, this factor militates **against** the requested adverse inference.

(3)      <u>The compatibility of the interests of Wells Fargo and Brasner in the outcome of the litigation.</u>

***Brasner has no interest in the outcome of this litigation.***  Whether or not the Policy is declared void or Pruco is found liable for negligent misrepresentation, no such finding will have any effect on Brasner (who was defaulted) or on Brasner's defense to criminal prosecution for insurance fraud.  The only defendant remaining in this case is Wells Fargo, and Pruco has no claim against Wells Fargo for fraud.  Therefore, the fraud that Brasner allegedly committed during the Policy's procurement is not at issue here and will not be tried before this Court.  Nor could it be because: (1) the two-year contestability period for fraud expired ***three years ago***; and,

(2) Brasner's fraud is imputable to Pruco, not Wells Fargo.  Therefore, this factor militates **against** an adverse inference.

      (4)      <u>The role of Brasner in the litigation</u>.

      ***Brasner has no role in this litigation***.  Pruco has alleged that Brasner committed fraud in the procurement process, but, under *Allstate Life Insurance Co. v. Miller*, 424 F.3d 1113 (11th Cir. 2005), the "statute of limitations" has run on any claim by Pruco based on fraud.  The only issue before the Court on Count I is whether there existed, at inception, an insurable interest in the life of Mrs. Berger.  Whether Brasner defrauded Pruco is irrelevant to this question.  Therefore, this factor militates **against** an adverse inference.

      Likewise, Pruco cites *S.E.C. v. Monterosso*, 746 F. Supp. 2d 1253 (S.D. Fla. 2010), for the broad proposition that the Court may draw an adverse inference against Wells Fargo "where the adverse inference is 'trustworthy' and will 'advance the search for truth'."  (Pruco MSJ at 16.)  But Pruco neglects to explain how an adverse inference against Wells Fargo in this case would be "trustworthy" or "advance the search for truth."  Moreover, *Monterosso* supports Wells Fargo's position, not Pruco's.  In that case, the court found that adverse inferences could be drawn against the corporate defendant based on an individual defendant's invocation of his Fifth Amendment privileges because the individual defendant had served as both the COO and the CFO of the corporate defendant during the relevant time period.  No relationship warranting such an imputation to Wells Fargo existed here.  Here, Wells Fargo, as securities intermediary, and Brasner never had ***any*** relationship with each other; instead, it was Pruco that had the relationship with Brasner.  Therefore, if an adverse inference is to be drawn, it should be drawn ***against Pruco***, not against Wells Fargo.

V.     ADOPTING A SUBJECTIVE "INTENT" STANDARD WOULD BE CONTRARY
       TO FLORIDA'S INSURABLE INTEREST STATUTE AND REQUIRE A TRIAL
       ON THE "INTENT" FACTS

       A.      Under Section 627.404, the "Intent of the Insured" Is Irrelevant

       Having no evidence of any agreement that could remotely qualify as "objective" evidence

that Mrs. Berger intended at inception to later transfer her policy to a "stranger," Pruco argues

that the Policy was a STOLI policy because Mrs. Berger "had no intention of keeping" it and that

"she always knew that the Berger Policy would be sold to investors."  (Pruco MSJ at 8.)  Under

Florida's insurable interest statute, however, Mrs. Berger's subjective intentions at the inception

of the policy are irrelevant.

       Under Florida's insurable interest statute an insured is permitted to "procure or effect" an

insurance policy on her own life and then (without any time limitation) assign or otherwise

transfer it to a third party who does not have an insurable interest in her life.  Section 627.404,

Florida Statutes, expressly provides that an insured has an insurable interest in her own life for

the benefit of any person regardless of whether that person has an insurable interest and that

"[t]he insurable interest need not exist after the inception date of coverage under the contract."

Fla. Stat. § 627.404(1).  The statute also makes it clear that "the signature of the proposed

insured, having capacity to contract, on the application for insurance shall constitute his or her

written consent."  Fla. Stat. § 627.404(6).  Moreover, under Section 627.422, Florida Statutes,

absent a contractual restriction in the policy, an insured has the right to assign her insurance

policy to anyone.  Concluding, as Pruco does, that a policy lacks an insurable interest and is

therefore void simply because an insured may have intended from the outset to later transfer it,

would therefore be contrary to the plain language of sections 627.404 and 627.422.  Notably,

neither statute even mentions the word "intent."    Accordingly, where, as here, the insured

herself sought out life insurance and consented to its procurement (naming her husband of over 60 years as sole beneficiary under the policy), and that consent is evidenced by her signature on the application, it is immaterial that she may have intended at the time to sell or transfer it at some later date.

### B.   The Court Should Not Engraft an Intent Element onto Section 627.404

In enacting Section 627.404, the Florida legislature intended to "clarify" the existing common law on insurable interest.  At that time, in 2008, the legislature was free to interpret the existing law as including a "subjective intent" element and engraft it into the statute, but it did not do so.  Instead, it adopted an objective test: (1) did the insured procure or effect the policy?  And if not, (2) did the person who procured the policy designate, as the policy's beneficiary, a person with an insurable interest in the insured?  As long as one of those two objective tests is met, the policy meets the requirements of Florida's insurable interest statute.

A subjective "intent" standard, which would require the court to examine the mental state of the policyowner at the time of procurement, would be difficult for courts to apply and also unfair to policy beneficiaries.  Because insurers typically raise insurable interest challenges years after collecting hefty premiums (and sometimes after the policy procurer is no longer alive), a subjective standard would force a policy beneficiary to prove the intent element many years after inception when it could be impossible to do so.  Such a standard would suffer from significant "hindsight bias," as insurers would argue that the later transfer of the policy itself evidenced the insured's intent, from the outset, to later sell it.

To the extent that there is tension between older common law cases expressing distaste for "wagering contracts" and Florida's explicit statutory provisions, the statutes must prevail. The New York Court of Appeals decision in *Kramer v. Phoenix Life Ins. Co.*, 940 N.E.2d 535

(N.Y. 2010), is illustrative of this point. *Kramer* involved challenges to life insurance policies based upon the insured's alleged undisclosed intent to transfer the policies to a purported "STOLI" investor. There, the court was requested to answer the following certified question: Did the New York insurable interest statute bar an insured from insuring his own life and transferring the policy to a person without an insurable interest if he never intended to provide the insurance for a person with an insurable interest in his life?

After determining, under the plain language of New York's insurable interest statute, that the answer to the question was "no," the court rejected the insurer's argument that it should imply an intent element based upon a public policy against "wagering contracts":[6]

> Finally we recognize the importance of the insurable interest doctrine in differentiating between insurance policies and mere wagers, and that there is some tension between the law's distaste for wager policies and its sanctioning an insured's procurement of a policy on his or her own life for the purpose of selling it. It is not our role, however, to engraft an intent or good faith requirement onto a statute that so manifestly permits an insured to immediately and freely assign such a policy.

---

[6]     It should be noted that under Florida law, a challenge to a contract's validity on public policy grounds is disfavored. *See Mazzoni Farms, Inc. v. E.I. DuPont de Nemours & Co.*, 223 F.3d 1275, 1281 (11th Cir. 2000), *cited in Continental Cas. Co. v. Old Republic Ins. Co.*, No. 06-22628-CIV, 2007 WL 4365719, at *6 (S.D. Fla. Dec. 11, 2007). Indeed, courts must "proceed with extreme caution" when called upon to declare private transactions as contrary to public policy. *Id.* (quoting *Pizza U.S.A. of Pompano Inc. v. R/S Assocs.*, 665 So. 2d 237, 239 (Fla. Dist. Ct. App. 1995)). Courts should also refuse to strike down contracts involving private relationships as void against public policy unless "it is made clearly to appear that there has been some great prejudice to the dominant public interest sufficient to overthrow the fundamental policy of the right to freedom of contract." *Id.* Engrafting a subjective intent requirement onto Florida's insurable interest statute would not only alter the initial contract between Mrs. Berger and Pruco but could result in invalidating policies that comply with all express statutory requirements. Such a result would be contrary to Florida decisional law, predicated on equally sound public policy, holding that contracts should not be voided unless their illegality is clear and certain. *See, e.g., Smurfit-Stone Container Enters., Inc. v. Zion Jacksonville Ltd. P'ship*, 52 So. 3d 55, 58 (Fla. Dist. Ct. App. 2010) ("Sanctity of contract is fundamental in the law of this country.") (citation omitted).

*Id.* at 542 (citation omitted); *see also Settlement Funding, LLC v. AXA Equitable Life Ins. Co.*, No. 09 CV 8685(HB), 2011 WL 1097635, at *5 (S.D.N.Y. Mar. 21, 2011) (upholding the jury verdict against the insurance company on the purchaser's negligent misrepresentation claim; concluding that the evidence supported the jury's findings that the policy, including the incontestability clause, was valid and enforceable and that the purchaser had done nothing wrong regarding the purchase, sale, repurchase and assignment of the policy, and noting that "[w]hile it is beyond peradventure that the evidence taken as a whole raises an eyebrow or two, the problem is for the legislature and not the courts to solve").[7]

As the New York and California courts have concluded, it is up to the legislature, not the courts, to set limitations on insureds' rights to transfer insurance policies or on the purposes for which they can procure insurance.   Indeed, many states have enacted such legislation.   Florida has not.   If Pruco seeks to limit an insured's right to procure or transfer a policy, it has two avenues of recourse: (1) lobby the Florida legislature to amend existing law; or (2) as permitted by Section 627.422, negotiate a contractual limitation on assignability in the policy itself before it is issued.   It is improper for Pruco to ask this Court to judicially rewrite Florida's insurance code to accommodate its view of what the law should be.

---

[7]     Examining California's insurable interest statute, a California appellate court recently reached a similar conclusion.  *See Lincoln Life & Annuity Co. v. Berck*, No. D056373, 2011 WL 1878855, at *7 (Cal. Ct. App. May 17, 2011) (unpublished) (holding that there is no California authority "allowing a court to basically look behind the terms and other formalities of an insurance agreement[] and basically re-write it to reflect what was really going on between the various parties thereto insofar as determining the existence (or lack thereof) of an insurable interest to an insurance policy'"); *see also Lincoln Nat'l Life Ins. Co. v. Gordon R.A. Fishman Irrevocable Life Trust*, 638 F. Supp. 2d 1170, 1179 (C.D. Cal. 2009) (holding that an insurer may not avoid its obligations under policies merely because an insured or trust "intended to exercise the right to sell or transfer them at some point in the future; [the insured's] intent, and the intent of the Trust to exercise its rights, standing alone, are legally irrelevant").

Moreover, a subjective "intent" standard, in addition to being unworkable and unrealistic, would allow insurers to do what Pruco has done here: "turn a blind eye" to its own internal red flags and wait as long as possible to challenge the validity of the policy so that it can collect substantial premiums before declaring the policy void *ab initio*.

As we discussed in Wells Fargo's motion for summary judgment, if the Court were inclined to look beyond the face of the documents and the plain language of the statute, the more appropriate, fair, and practical standard would be the objective standard applied by the district court in *Sun Life Assur. Co. of Can. v. Paulson*, No. 07-3877(DSD/JJG), 2008 WL 451054 (D. Minn. Feb. 15, 2008) (*Paulson I*) and *Sun Life Assur. Co. of Can. v. Paulson*, No. 07-3877 (DSD/JJG), 2008 WL 5120953 (D. Minn. Dec. 3, 2008). This objective standard, requiring evidence of an agreement between the insured and a "stranger" at inception, strikes a fair balance between competing public policy considerations by respecting the insured's property alienability rights and yet enforcing the statutory insurable interest requirements.

## C. If The Existence Of A "Wagering Contract" Depends Upon The "Intent" of Mrs. Berger at the Time of Procurement, Summary Judgment Is Inappropriate

Pruco relies on Mrs. Berger's deposition testimony that she "had no intention of keeping any policy of insurance issued on her life, and that she had no intent or expectation that the Berger Policy would be for her benefit or the benefit of her family" to "prove" that the Policy was, in reality, a "wagering contract" originated by a stranger with no insurable interest. (Pruco MSJ at 7-8; SUMF ¶ 17.) But Mrs. Berger <u>also</u> said in the <u>same</u> deposition sessions:

- "I just said to my kids, if I should die, I said you'll get some money. . . ." (DH Dec. Ex. 2 at 58.)

- "I figured I had free insurance for three years if I should die." (*Id.* at 65.)

- "I would have free insurance for the first two or three years, whatever it was." (*Id.* at 66.)

CASE NO. 10-CIV-80804-COHN/SELTZER

- "I just felt for the first three years, if I should die my kids would inherit or my husband would inherit . . . if I should die in that three years, then my family would get the money." (*Id.* at 72.)

- "I would be the initial owner [of the Policy];" "I was the initial owner, yes." (*Id.* at 202.)

- "I just knew that if I would die my beneficiaries would get the money, so I assumed that meant [I'm] an owner." (DH Dec. Ex. 3 at 14.)

- "[W]hen I was wasn't owner of [the Policy] anymore, [Mr. Berger] wasn't the beneficiary." (*Id.* at 16.)

- "[I was willing to obtain the Policy because] Mr. Berger would obtain the death benefit if [I] died within that [two and a half or three year initial period]." (*Id.* at 17.)

Clearly Mrs. Berger is saying that she wanted to obtain insurance for the benefit of her family and intended her family to receive any death benefits if she were to die, unless and until she chose otherwise at some later date. At the very least, these statements create a disputed issue of material fact (solely under the subjective standard) as to whether Mrs. Berger intended, at inception, to procure a policy on her own life for the benefit of her husband. Therefore, if this Court were to adopt a subjective standard for determining whether the Policy was procured in "good faith" or was an illegal wagering contract, summary judgment would not be appropriate. *See In re Clark*, No. 07-31044-DHW, 2008 WL 5044558, at *4 (Bankr. M.D. Ala. Oct. 2, 2008) ("Summary judgment is often not appropriate where intent is at issue.") (citation omitted).

It is well established under federal and state law that the issue of "intent" is inherently fact based and cannot be resolved on a motion for summary judgment. *See, e.g., In re Bankest Capital Corp.*, 374 B.R. 333, 346-47 (S.D. Fla. 2007) (denying summary judgment because issues of fact remained as to whether debtor made payment with actual intent to hinder, delay, or defraud creditors); *see also Equity Inv. Partners, LP v. Lenz*, 594 F.3d 1338, 1345 (11th Cir. 2010) (holding that summary judgment was improper where issues existed regarding whether the mortgage was intended to secure repayment of prior loans); *State Farm Mut. Auto. Ins. Co. v.*

*Weiss*, 410 F. Supp. 2d 1146, 1159 (M.D. Fla. 2006) (citing *Cohen v. Kravit Estate Buyers, Inc.*, 843 So. 2d 989, 991 (Fla. Dist. Ct. App. 2003) (reversing summary judgment where genuine issues of fact existed as to whether joint venture intended to defraud)).

## VI. SHOULD THIS COURT VOID THE BERGER POLICY, IT WOULD BE INEQUITABLE TO PERMIT PRUCO TO BENEFIT FROM THE TRANSACTION BY RETAINING THE PREMIUMS

### A. Pruco Ignored Its Own Company Policies and Guidelines, as Well As All of the "Red Flags" Apparent on the Berger Applications

Pruco has an ***internal*** company policy against issuing life policies which exhibit indicia that they might be later sold on the viatical or life settlement markets. (CSF ¶ 69.) To guard against inadvertently issuing such policies, Pruco maintained a list of indicia or "red flags," which, if perceived during the underwriting process, were to put the underwriting staff on notice of a "prohibited" policy. (CSF ¶ 71.) At least ***three*** of these Pruco red flags were clearly present here: First, Mrs. Berger was 72, and the policy amount applied for was $10,000,000. Second, Pruco received a wire payment from LaSalle Bank (not from Mrs. Berger) for an upfront, two-year premium payment of $331,077.29 only two months after the policy was put in force and contrary to the quarterly premium payments promised in the life insurance policy application. And third, even though Mrs. Berger's application indicated that no other life insurance existed or was being applied for, Pruco was aware that Mrs. Berger had recently applied for insurance with TransAmerica and knew that there were two unexplained database inquiries, which would indicate that Mrs. Berger had applied for other policies. (CSF ¶¶ 80, 81, 97.)

Indeed, at the very beginning of the application process, Pruco's line underwriters and managers received warnings cautioning them about the Berger policy application. Specifically, in August 2005, Ken Sluyter, Pruco's Vice President of Corporate Underwriting warned that:

> Tech team should probably **pay special attention to the Brasner case**.  Looks
> li[ke] there are a lot of **unanswered questions**.  May be appropriate to explicitly
> **ask about settlement**, ask for an illustration, etc. if the case proceeds.  (Emphasis
> added.)

(CSF ¶ 82.)

Despite the warnings, the line underwriters continued to process the application and continued to observe "red flags" including: (a) the premium mode; (b) the source of premium payments (c) whether there was any intent to make lump sum prepayment of the premiums; (d) the identification of the owner and beneficiary; (e) a signed form trustee statement, third-party financial verification; and (f) a medical authorization form.  (CSF ¶ 84.)  In an effort to assuage their suspicions, Pruco's underwriters explicitly asked Pruco's general agent, Life Brokerage Equity Group ("LBEG"), to obtain an answer from Mrs. Berger to the following question: "Please confirm that the client has no intention of selling this contract in the settlement market." (CSF ¶ 85.)  Pruco never got the answer.

Two months later, in February 2006, Brasner submitted to Pruco, through Pruco's general agent LBEG, a second application for insurance on the life of Mrs. Berger.  (CSF ¶ 89.)  The *same* Prudential underwriters who had reviewed the initial application took note of the previous concerns regarding possible STOLI and other activity and raised new and additional suspicions of a possible "life settlement."  For example:

- March 8, 2006:  "Gloria – This is a case we thought was possible a [*sic*] **settlement case** back in June[.]  We ended up FIUing due to outstanding FC's including 3rd party financials . . . ."  (Emphasis added.)

(CSF ¶ 90.)  Despite the fact that Pruco was told that Mrs. Berger, at the age of 72, had conveniently inherited $7.2 million (just the right amount to qualify for a $10 million policy), Pruco did not question this oddity.  (CSF ¶ 92.)

Instead, the Prudential underwriters continued to document <u>additional</u> "internal red flags": (i) the absence of a trust to take ownership of the policy in light of the "estate planning" purposes stated in the application; (ii) the absence of a trust in connection with the second application, even though the first application called for one; (iii) applications for other life insurance policies Arlene Berger was seeking from other insurers; (iv) Mr. Berger, the source of Arlene's income, purportedly did not have his own life insurance; and (v) a question as to whether Mark Tarshis could serve as an independent source of financial verification given that he operated in the same company as Steven Brasner. (CSF ¶ 90, 94-97.)

Then, within two months of the Policy's in-force date, Pruco received a premium payment of $331,077.29, which amounted to just over two years' worth of payments sufficient to take the policy beyond the contestability period. (CSF ¶ 100.) Had Pruco acted with diligence and cross-referenced this payment with the application and underwriting history, it would have seen that it was contrary to several express statements on the application, and it would have reasoned that the unanticipated payment from a third-party payor was indicative of undisclosed, non-recourse premium financing – another Pruco "red flag." (CSF ¶ 100.) Compounding these lapses and oversights, Pruco's Settlement Options department overlooked the sudden request from Brasner, at about the same time, to change the owner to a Delaware trust, the trustee of which was a banking institution, and did not connect it up with the database history on the Berger Policy. (CSF ¶ 98.) And finally, Pruco's Risk Management department failed to refer the case back to underwriting for review when, just as the Policy was about to hit the end of the two-year contestability period, Pruco began receiving requests for policy information from known secondary-market life-settlement brokers/providers. (CSF ¶ 101.)

Ignoring its own guidelines and the innumerable red flags that populated its databases allowed Pruco to collect substantial premiums over a four-year period – until the embarrassment of its agent making front page news prompted it to initiate this lawsuit.

### B.    Because Pruco Was In the Better Position to Avoid the Loss, the Equities Require That It – Not Wells Fargo – Suffer the Loss

Pruco's inattention during the underwriting process and its failure to fully investigate its "red flags" and suspicions during the two-year contestability period preclude Pruco from retaining the premiums paid to it should the Policy be declared void.  Specifically, it is a well-established equitable principle that "if one of two innocent parties is to suffer a loss, it should be borne by the one whose negligence put in motion the flow of circumstances causing the loss." *Exchange Bank v. Fla. Nat'l Bank*, 292 So. 2d 361, 363 (Fla. 1974); *accord In re Int'l Forum of Fla. Health Benefit Trust*, 607 So. 2d 432, 437 (Fla. Dist. Ct. App. 1992) (stating that "if two innocent parties are injured by a third party, either by negligence or fraud, the one who made the loss possible must bear legal responsibility"); *Jones v. Lally*, 511 So. 2d 1014, 1016 (Fla. Dist. Ct. App. 1987) ("Where one of two innocent parties must suffer a loss as the result of the default of another, the loss shall fall on the party who is best able to avert the loss and is the least innocent."); *United States v. Continental Cas. Co.*, 512 F.2d 475, 478 (5th Cir. 1975) ("[W]here two relatively innocent parties must suffer a loss, the one whose action causes the loss must bear it.").

Here, it is undisputed that neither Wells Fargo nor its client Lavastone (an innocent purchaser for value of the Policy) had anything to do with the application for or procurement of the Policy or any responsibility for the actions of Mrs. Berger or Brasner.  It is undeniable that Pruco's inattention and lack of due diligence enabled Brasner to commit his alleged fraud. Therefore, if the loss must fall on anyone, it should fall on Pruco, not on Wells Fargo or

Lavastone.  Simply put, if this Court were to find (contrary to Wells Fargo's position) that the Policy is void *ab initio* for lack of an insurable interest, Pruco should be required, on equitable grounds, to disgorge the substantial premiums it has received.  A contrary ruling would serve to incentivize Pruco and other insurers to continue to turn a blind eye, fail to investigate obvious indicia of fraud, and then belatedly seek the rescission of questionable policies so that they can collect large premiums for as long as possible before seeking to have a policy declared void *ab initio* as a "wagering contract."  It would also serve to unfairly punish innocent third-party purchasers for the actions of the insurance company's own agents and employees where – as here – there were innumerable indications that the policy applied for would violate the insurance companies' policies and guidelines.

## VII.  PRUCO IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE IT FAILED TO REFUTE WELLS FARGO'S AFFIRMATIVE DEFENSES

In addition to Wells Fargo's other arguments, summary judgment may not be entered for Pruco because it has not refuted Wells Fargo's affirmative defenses.  *See Alejandre v. Deutsche Bank Trust Co. Ams.*, 44 So. 3d 1288, 1289 (Fla. Dist. Ct. App. 2010) ("When a party raises affirmative defenses, a summary judgment should not be granted where there are issues of fact raised by the affirmative defenses which have not been effectively factually challenged and refuted.").  When the defendant asserts affirmative defenses – as Wells Fargo has here – "the plaintiff must either disprove those defenses by evidence or establish the legal insufficiency of the defenses."  *Id.*  In other words, the plaintiff has the burden to demonstrate that the defendant could not prevail.  *Id.  See Pac. Employers Ins. Co. v. Wausau Bus. Ins. Co.*, 508 F. Supp. 2d 1167, 1180 (M.D. Fla. 2007) (denying plaintiffs' motion for summary judgment on the defendant's affirmative defenses where plaintiffs did not provide the court with sufficient evidence to disprove the affirmative defenses).

27

In its answer, Wells Fargo alleged sixteen affirmative defenses and thus Pruco has the burden to refute all sixteen.  It has not.  Specifically, Pruco has not addressed the: (1) Fifth Affirmative Defense, alleging that Pruco's claim is barred by the doctrine of waiver based on Pruco's ignoring all indicia of fraud and then waiting until July 2010 to challenge the validity of the Policy all the while collecting sizeable premiums; (2) Sixth Affirmative Defense, alleging that Wells Fargo's client (*i.e.*, Lavastone) was a bona fide purchaser for value without knowledge of or participation in the alleged fraud at inception; (3) Seventh Affirmative Defense, alleging that Pruco ratified the acts of its agent Brasner, whose acts are imputed to it; (4) Ninth Affirmative Defense, alleging that Pruco is barred by the doctrine of unclean hands because it knew or should have known and/or recklessly turned a blind eye to numerous suspicious circumstances in the application and issuance of the policy; and (5) Tenth Affirmative Defense, alleging that Pruco is equitably estopped from challenging the validity of the Policy based on Pruco's own lack of due diligence and failure to investigate and/or act on numerous internal red flags that arose during the application and procurement process.  In short, this Court may not enter summary judgment for Pruco because Pruco has not refuted or disproved <u>all</u> of Wells Fargo's affirmative defenses.

## VIII.  DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON WELLS FARGO'S NEGLIGENT MISREPRESENTATION COUNTERCLAIM

Pruco seeks summary judgment on Wells Fargo's counterclaim for negligent misrepresentation, arguing that, as part of Pruco's verification of coverage, its employee Tawanna Hollis told only the truth to Coventry employee Jessica Bunsick, did not mislead Coventry, and had no reason to know that the information would be used for or by a third-party

purchaser in the secondary market.  (Pruco MSJ at 20-22).  Pruco's arguments are refuted by the evidence in this case, or, at the very least, create disputed issues of fact requiring a trial.

Pruco has not disputed – because it cannot – that policy owners (possibly desiring to sell or assign their policies) and third parties interested in purchasing policies rely on two basic facts in deciding whether the policy is valid and freely assignable:  (1) whether the policy is beyond the contestability period and (2) whether the insurance company considers the policy "in force" – another term for "valid" or "enforceable."  (*See* CSF ¶¶ 101-04.)  Pruco and every other life insurance company know this to be true.  Therefore, when Pruco began to get requests seeking information about the status of the Berger Policy from what it considered to be life settlement companies, including Coventry Capital and Welcome Funds, in May 2008 and August 2008 (beyond the contestability period), it was on notice that brokers and third-party investors had an interest in purchasing the Policy.  (CSF ¶ 101.)  And when Ms. Bunsick called in December 2008 to request the exact same sort of information on behalf of Wilmington Trust (and pursuant to a written authorization provided to Pruco on May 29, 2008), Pruco was on notice that the policy owner could potentially be interested in selling or otherwise transferring the Policy on the secondary market.  (CSF ¶ 104.)  Because Pruco is in the business of giving this information both orally (as Ms. Hollis did) and in writing to its policy owners and their authorized representatives, it was duty-bound to not only answer the questions truthfully but to disclose any reasons it might have for later declaring the policy invalid, especially in light of its vast database, which was chock full of underwriting red flags and other indicia of an aberrant life settlement –

information that innocent third-party purchasers had no way of accessing directly.  *See* Restatement (Second) of Torts § 552 (1).[8]

Pruco cannot deny that it is in the business of verifying policy information to policyholders who call or write asking for confirmation of various policy attributes, just as bank tellers and other bank employees provide and confirm information to their bank customers who inquire about bank balances and other account attributes.[9]  Like these banks, Pruco knows, or should know, that these inquirers intend to rely on the information they are given.  Regardless of who calls Pruco, it is duty bound to give accurate information and not withhold information that it knows, or should know, would be material in dealing with its policies.

---

[8]     Section 552 of the Restatement (Second) of Torts provides that where a company, like Pruco, supplies information to others in the course of its business, it is liable when it supplies false information and also when it fails to disclose relevant information:

> One who, in the course of [its] business, profession or employment, *or* in any other transaction in which [it] has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if [it] fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552 (1) (emphasis added).  The failure to disclose relevant information is "tantamount to supplying false information."  *Liberty Surplus Ins. Corp. v. First Indem. Ins. Servs., Inc.*, 31 So. 3d 852, 857 (Fla. Dist. Ct. App. 2010) (quoting Restatement (Second) of Torts § 551(1)).  In its July 7, 2011 Order denying Pruco's motion to dismiss Wells Fargo's counterclaim, the Court concluded that Section 552 applies to this case.   (Order [D.E. 142] at 15-16 n. 4.)

[9]     As the Court noted in its Order denying Pruco's motion to dismiss the counterclaim, "[t]he fact that Plaintiff did not make its representations directly to Wells Fargo is inapposite. Under § 552, 'it is not necessary that the maker should have any particular person in mind as the intended, or even the probable, recipient of the information.'   Restatement (Second) of Torts § 552 cmt. h.   'It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it.  It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons, or group.'  Id."  (Order [D.E. 142] at 16.)

Here, through its verification of coverage and otherwise, Pruco represented that the Policy was beyond the 2-year contestability period, and also confirmed the validity of the Policy (CSF ¶¶ 104, 61, 62.)   Pruco's contention that it did not confirm the validity of the Policy is belied by the fact that it confirmed that the Policy was "in grace," which means that, at the time, it was in force, and unless an outstanding premium payment was made, the Policy would lapse at a future date certain.  (CSF ¶ 104.)

In addition to verifying certain information concerning the Policy to both Coventry and Welcome Funds, companies Pruco knew to be secondary-market life-settlement brokers/providers, and to Ms. Bunsick (on behalf of Wilmington Trust, as trustee for the former owner of the Policy), Pruco acknowledged and accepted, by letter dated January 9, 2009, a request to change the owner and beneficiary of the Policy to Wells Fargo, as Securities Intermediary.  (CSF ¶ 106.)[10]  Pruco knew, or should have known, that potential buyers would rely on the information it provided, its acceptance of the ownership change, and its failure to disclose any of its well-documented suspicions and red flags until well <u>after</u> the closing of the sale.  And, it is undisputed that Lavastone relied heavily on the verification information that Pruco provided to Ms. Bunsick (<u>and</u> on Pruco's acceptance and recordation of the ownership change) when it agreed to close on its purchase of the policy for a significant sum.  (CSF ¶ 105.)

Pruco led <u>all</u> of these parties to believe that the Policy was valid even though Pruco had in its computer system, entry after entry of "red flags" and suspicions that the Policy was a "life settlement" policy, which Prudential supposedly "outlawed" throughout its organization.  At

---

[10]     In its capacity as Securities Intermediary, Wells Fargo holds legal title to the Policy on behalf of its client Lavastone through a securities account held by Lavastone.  As defined under Article 5 of the Uniform Commercial Code, a "securities intermediary," such as Wells Fargo, "in its ordinary course of its business maintains securities accounts for others and act[s] in that capacity."  Fla. Stat. § 678.1021(1)(n).  In addition, by assignment dated March 28, 2011, Lavastone assigned its negligent misrepresentation claim to Wells Fargo.

none of those points in time did Pruco ever apprise the brokers, owner, or potential buyer that the Policy was, in its estimation, void *ab initio*. Indeed, *if* the Policy was void *ab initio*, and therefore it never existed, then Pruco negligently misrepresented the status of the Policy when it failed to divulge as much. Therefore, if this Court were to somehow agree with Pruco that the Policy was void *ab initio* (despite the existence of an insurable interest in compliance with Florida's statutes and lack of evidence of a "wagering contract"), then Pruco is liable to Wells Fargo, as securities intermediary for Lavastone, for the damages incurred by Lavastone in reliance on Pruco's representations and failure to disclose.

Simply put, once Pruco decided to ignore its own red flags, issued a $10 million policy, garnered hundreds of thousands of dollars in premiums, failed to investigate or uncover any wrongdoing during the contestability period, and failed to alert inquiring brokers and potential buyers of its suspicions, it became too late to "unring the bell." At the very least, a trial must be had on the fact issues of (1) what Pruco knew or should have known; (2) what it had a duty to disclose to policy owners or inquiring third parties it knew to be participants in the secondary market for life insurance; and (3) whether Lavastone (and Wells Fargo) justifiably relied on Pruco's representations and omissions.

## CONCLUSION

For the reasons discussed and under the authorities cited, this Court should deny Pruco's motion for summary judgment and enter summary final judgment for Wells Fargo.

CASE NO. 10-CIV-80804-COHN/SELTZER

Dated: <u>September 13, 2011</u>
Miami, Florida

Respectfully submitted,

<u>/s John K. Shubin</u>
John K. Shubin (Florida Bar Number: 771899)
jshubin@shubinbass.com
Juan J. Farach (Florida Bar Number: 957704)
jfarach@shubinbass.com
David R. Hazouri (Florida Bar Number: 142387)
dhazouri@shubinbass.com
SHUBIN & BASS, P.A.
*Attorneys for Defendant, Wells Fargo*
46 S.W. 1st Street, Third Floor
Miami, Florida 33130
Telephone: (305)381.6060
Facsimile:  (305)381.9457

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all Counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>    s/ Juan J. Farach    </u>
Juan J. Farach, Esq.

CASE NO. 10-CIV-80804-COHN/SELTZER

**SERVICE LIST**
**Pruco Life Ins. Co v. Brasner, et al.**
**Case No. 10-CV-80804 Cohn/Seltzer**
**United States District Court, Southern District of Florida**

Wendy L. Furman, Esq.
wfurman@pettfurman.com
PETT FURMAN, PL
2101 N.W. Corporate Blvd., Suite 316
Boca Raton, Florida 33431
Tel. (561) 994-4311
Fax (561) 982-8985
*Attorneys for Plaintiff Pruco Life Insurance Company*
Service by CM/ECF

Stephen A. Serfass, Esq.
Stephen.serfass@dbr.com
Michael D. Rafalko, Esq.
Michael.rafalko@dbr.com
DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
Tel. (215) 988-2700
Of Counsel/Pro Hac Vice
*Attorneys for Plaintiff Pruco Life Insurance Company*
Service by CM/ECF