**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 9:10-CIV-80804-COHN/SELTZER

PRUCO LIFE INSURANCE COMPANY,

      Plaintiff,

vs.

STEVEN M. BRASNER, individually and
as Principal of Infinity Financial Group, LLC;
MARK A. TARSHIS; INFINITY FINANCIAL
GROUP LLC; WELLS FARGO BANK, N.A.,
as Securities Intermediary; and John Does 1-10,

      Defendants.

_____/

**COUNTER-STATEMENT OF MATERIAL FACTS OF**
**WELLS FARGO BANK, N.A., AS SECURITIES INTERMEDIARY,**
**SUBMITTED IN OPPOSITION TO AND TO SUPPLEMENT**
**PRUCO LIFE INSURANCE COMPANY'S**
**STATEMENT OF MATERIAL FACTS IN SUPPORT OF**
**PRUCO'S MOTION FOR SUMMARY JUDGMENT**

Defendant Wells Fargo Bank, N.A., as Securities Intermediary ("Wells Fargo"), pursuant

to Rule 7.5(c) of the Local Rules of the United States District Court for the Southern District of

Florida, files this Counter-Statement of Material Facts in opposition to, and to supplement with

additional facts, the Statement of Undisputed Facts submitted by Pruco Life Insurance Company

("Pruco") in support of its Motion for Summary and sets forth the following material facts that

raise genuine issues to be tried:

**I.       RESPONSE TO PRUCO'S STATEMENT OF FACTS**[1]

      1.       The report entitled "Stranger-Originated Life Insurance ("STOLI") and the Use of

Fraudulent Activity to Circumvent the Intent of Florida's Insurable Interest Law" released in

---

[1]       Pursuant to Local Rule 7.5.C., this Counter-Statement in opposition corresponds with the
order and paragraph numbering used in Pruco's Statement of Undisputed Material Facts.

January 2009 by the Florida State Office of Insurance Regulation is irrelevant to this case. First, "STOLI policies" are an insurer-coined term used to denote policies that insurers believe are not subject to required incontestability clauses so that insurers can seek to void such policies years after inception and the capture of tens of thousands in premiums. Second, although the Office of Insurance Regulation has defined and discussed such policies, the Florida legislature has not defined them, regulated them, made them illegal, or passed any "anti-STOLI" legislation. Third, the Report was issued in January 2009, three years after the issuance of the Berger Policy, months after the Berger Trust no longer owned the Policy, and a month after Lavastone Capital LLC ("Lavastone") purchased the Policy. Moreover, the OIR Report is inadmissible because it is hearsay.

2.      See ¶ 1 above.

3.      The OIR Report is irrelevant and is inadmissible hearsay. Moreover, there is no evidence that Mrs. Berger was told that she would "receive a profit, less the cost of the loan and interest" or that she would "collect a significant cash payment" for her "participation in the scheme." (DH Dec. Ex. 2 at 177, 206).[2]

4.      The OIR Report is irrelevant and is inadmissible hearsay published after the facts that are at issue in the case.

5.      Thomas Farrell, Vice President of Life Underwriting at Prudential, was not disclosed as a potential witness, was not designated as a Rule 30(b)(6) corporate representative with knowledge on this topic, and is not a fact witness with personal knowledge. Therefore, any and all statements included in Mr. Farrell's affidavit are incompetent hearsay and cannot serve as record evidence of any fact. Moreover, the statement in footnote 2 is disputed because the debt

---

[2]      Filed concurrently with this Counterstatement is the Declaration of David R. Hazouri, dated September 13, 2011 ("DH Dec. Ex.___"), which attaches as exhibits the depositions, deposition excerpts and other documents referenced in this Counterstatement.

was for reimbursement on a portion of the commission on the Berger Policy.  (DH Dec. Ex. 5 at 282-289).

6.     Brasner's assistant Patricia Wagner refers to "life settlement" policies, not "STOLI" policies.   (DH Dec. Ex. 6 at 32).   The only relevance of the alleged (and not substantiated) "jump" in 2005 in the policy amounts of policies placed by Brasner would be to show that Pruco had one more "red flag" to which it turned a blind eye.

7.     Brasner is no longer a defendant and any fraud in the application for the Berger Policy or any other policy is not – and cannot be – at issue in this case as the two year incontestability clause has long expired.   Brasner's actions with respect to other and later policies are irrelevant and inadmissible as evidence.

8.     Lawsuits filed against Brasner and his company by other insurance companies are irrelevant here.  Moreover, any "facts" presented in the Wall Street Journal article of June 21, 2010 are inadmissible hearsay.

9.     Brasner's arrest and the charges against him for insurance fraud are irrelevant here.  Pruco has presented no facts showing that any of the charges or offenses was related to Brasner's conduct in the procurement of the Berger Policy.

10.    Mrs. and Mr. Berger approached their accountant, Mark Tarshis, and inquired about "free" insurance, but Mrs. Berger did not use the word "scheme" to describe what she had heard about at the seminars she had attended.  (DH Dec. Ex. 2 at 42-47).  The fact that Mrs. Berger "approached" Tarshis refutes Pruco's position that Mrs. Berger was "approached," "solicited," "induced," or "used" to obtain a policy on her own life.

11.    Patricia Wagner never used the term "STOLI"; her testimony on pages 28-29 refers to "life settlements."  Moreover, her full testimony on pages 32-35 reveals that what the

Bergers participated in was a "back-end" life settlement option arrangement as opposed to a "front-end" stranger owned transaction. (DH Dec. Ex. 6 at 32-35). Mrs. Berger did not "agree" to participate in a "STOLI scheme." Instead, she said that she "let Brasner go forward in an effort to get free insurance." (DH Dec. Ex. 2 at 59).

12.     The reference to Mrs. Wagner's testimony relating to Kevin Bechtel is inadmissible double hearsay. Moreover, Life Brokerage Equity Group ("LBEG") *was Pruco's general agent.* (DH Dec. Ex. 38 at 17). And last, see paragraph 5, above, as to any "fact" derived from Mr. Farrell's affidavit.

13.     Mrs. Berger stated that she wanted life insurance to benefit her children and her husband. (DH Dec. Ex. 2 at 58, 72). This is a "legitimate purpose" for procuring life insurance.

14.     Mrs. Berger had an approximately $700,000 estate in 2005-2006. (DH Dec. Ex. 2 at 86-87; Ex. 4 at 55-56).

15.     The Bergers did not represent to Pruco a net worth of $15.95 million. Pruco's agent Brasner fabricated the "fact" that Mrs. Berger recently inherited some $7.2 million. (DH Dec. Ex. 6 at 96-97). Mrs. Berger never told anyone that she had inherited any money or property.

16.     Mrs. Berger never testified that she "agreed to participate in [a] STOLI scheme." (DH Dec. Ex 2 at 55-56).

17.     Mrs. Berger intended to "keep" her insurance policy for a 2-3 year period. (DH Dec. Ex. 2 at 54, 66, 72, 202). Mrs. Berger knew that her husband would not receive the death benefit if she died after the 2-3 year "free" insurance period expired. (DH Dec. Ex. 2 at 202; Ex. 3 at 14-17; Ex. 4 at 70, 113).

18.     Mrs. Berger wanted and sought "free insurance." (DH Dec. Ex. 2 at 59-60, 105-

06; Ex. 3 at 17; Ex. 4 at 69).  Nonetheless, Mr. Berger acknowledged that he and his wife always had the option to pay off the premium financing loan and take over premium payments.  (DH Dec. Ex. 4 at 70, 113).

19.    Mrs. Berger knew that her policy was being financed, knew the amount of the premium financing loan, knew that LaSalle Bank, N.A. ("LaSalle") was the lender, knew that her trust was the obligor, knew what her primary rights and obligations were under the loan terms including her loan-maturation options, and agreed to the foregoing prior to the loan closing.  (DH Dec. Ex. 1 (Supplemental Declaration of Amy Welsh dated Sept. 12, 2011) at ¶ 21).

20.    Although Mrs. Berger testified in 2011 that she was not aware of the trust, she nonetheless willingly signed all the documents required to create the trust.  (DH Dec. Ex. 2 at 135-36, 144-50, 167, 199-201, 230-32; Declaration of Juan J. Farach, dated August 19, 2011 ("Farach Dec.") Exs. M, N, R).

21.    The Bergers signed all documents that Brasner and Patricia Wagner asked them to for the purpose of obtaining "free insurance" and for the purpose of obtaining non-recourse premium financing, not for the purpose of selling Mrs. Berger's policy on the secondary market. (DH Dec. Ex 2 at 144-52, 230-232; Ex. 1 at ¶¶ 12-22).

22.     Pruco's admission that Mrs. Berger does not know (and has never known) the identity of the current owner/beneficiary of the Policy confirms that she had no agreement with anyone to sell her Policy on the secondary market – and, for sure, no agreement to sell it to Lavastone.  (Declaration of Michael D. Rafalko, dated August 19, 2011 ("Rafl. Dec.") Ex. 17).

23.    Mr. Berger testified that neither he nor Mrs. Berger would own or control the Policy beyond the "free insurance" period.  (DH Dec. Ex. 4 at 69).  Mr. Berger did not testify that "pursuant" to any "scheme" the Policy would be "transferred to investors."  (Id. at 70).

Indeed, Mr. Berger understood that at the end of the 2-3 year "free" insurance period they could give the policy up or pay the premium.  (Id. at 70, 113).

24.     The February 21, 2006 application was the second application submitted by Brasner for Mrs. Berger. (See ¶ 89, below).  The first application was submitted on July 11, 2005 and was ultimately shelved by Prudential for lack of information and suspicions that Brasner was submitting a STOLI application.  (See ¶¶ 79-86, below).

25.     The November 28, 2005 Worldwide Inspection Services ("WIS") report, which was based upon a telephone interview, merely confirmed the exact same financial information contained in the July 11, 2005 and February 21, 2006 Berger applications.  (DH Dec. Ex. 8 at 138-141; Compare Ex. 22 and Farach Dec. Ex. J).  The financial information was not "verified" to Mrs. Rutherford but was taken by Mrs. Rutherford from a prior interview she had conducted with Mr. Berger in conjunction with an unrelated policy application.  (DH Dec. Ex. 8 at 138-141).

26.     Mrs. Berger never confirmed the financial information listed.  See ¶ 25 above.

27.     Mrs. Berger could not remember how the information was supplied, and with respect to the financial information, she referred Rutherford to whatever her husband's previous response was.  (DH Dec. Ex. 2 at 129:  "I did not answer financial info;" see also at 122-123) Ironically, Pruco claims it ultimately did not rely on the WIS report as a matter of policy as it had already begun performing independent verification of this information for such policies in-house. (DH Dec. Ex. 7 at 116-117).

28.     The December 12, 2005 Life Expectancy Report is unauthenticated, inadmissible hearsay evidence of no probative value.

29.     See ¶¶ 5 and 28 above.  The last statement is unsupported by evidence and is

inadmissible hearsay.

30.　　The Proverian documents cited in ¶ 30 are incomplete and inadmissible hearsay. Moreover, while the Stated Rate of Interest (which is calculated for purposes of compliance with Chapter 815 of the Illinois Statutes) was 18.94%, the actual Interest Rate on the loan was 11.23%. (Farach Dec. Ex. R at WT 51-58).

31.　　Wells Fargo welcomes the Court's scrutiny of the Authorization to Release Medial Records and Special Irrevocable Power of Attorney ("Power of Attorney") in conjunction with the other completed loan documents. The plain language of the powers of attorney the Bergers executed ("POAs"), as well as the overall structure of the transaction created by the remaining trust and loan documents, demonstrates that the powers conveyed to Coventry Capital I LLC ("Coventry Capital") by the POAs were expressly (a) received by Coventry Capital in its limited capacity as servicing agent and administrator for LaSalle on the loan and (b) solely for the purposes of servicing the loan according to the terms of the trust and loan agreements. (Farach Dec. Exs. K, M, N, O, R; DH Dec. Ex. 1 at ¶¶ 10-11, 19-20). Specifically, Coventry Capital's power to "liquidate" the Policy would arise only in the event that Mrs. Berger defaulted on the loan or elected to relinquish the Policy to LaSalle in satisfaction of the trust's loan obligation. (Id.) The POAs, the trust, and subtrust were created solely to allow LaSalle to take a security interest in the Policy as collateral for the loan, and were not created or implemented to hide any transaction. (Id.; DH Dec. Ex. 1 at ¶ 16). Subject to LaSalle's security interest, Mrs. Berger, as Settlor, retained control over the Policy during the life of the loan, including the right to direct the Trustee to repay the loan or relinquish the Policy to LaSalle even in advance of the loan maturity date. (DH Dec. Ex. 1 at ¶ 18). If Mrs. Berger had died, the Policy death benefits in excess of the loan amount were to be paid to her husband as the beneficial owner of the trust

and subtrust.  (Farach Dec. Exs. K, M, N, O, R; DH Dec. Ex. 1 at ¶ 18).  Neither Coventry

Capital nor any of its affiliates ever used and never authorized anyone to use the POAs or any of

the other loan or trust documents for any purpose that was inconsistent with the loan agreement,

including for the purpose of acquiring the Policy, marketing the Policy, or attempting to sell the

Policy.  (DH Dec. Ex. 1 at ¶ 23).

32.     See ¶ 31 above.

33.     Mr. Berger voluntarily signed the trust documents.  (Farach Dec. Ex. M at WT

0064, 0065; Ex. N at WT 0076; Ex. S at LAVA 00663, 00670; DH Dec. Ex. 1 at ¶¶ 15, 16, 21).

34.     See ¶ 31 above.

35.     There is no evidence that the Berger application was a "STOLI transaction."

36.     The American General Life Insurance Company policy (Rafl. Dec. Ex. 12) is the

best evidence of its contents.  Mrs. Wagner's testimony is inconclusive, and Mrs. Wagner does

not refer to any "STOLI scheme."  (DH Dec. Ex. 6 at 106-113).

37.     The Client Information Form is the best evidence of its contents.

38.     No comment.

39.     No comment.

40.     No comment.

41.     There is no evidence of record establishing that Brasner provided this

information.  Additionally, the bracketed language was inserted by Pruco's counsel and was not

part of the original.

42.     No comment.

43.     In the cited testimony, Mrs. Wagner states that she falsified only the financial

information.

44.     Pruco did not rely on several of the material representations contained in the policy applications, including the purpose of the policy, the absence of a trust at inception to hold the policy, and the lack of coverage on Mr. Berger, which Pruco questioned Mrs. Berger about separately.  (See ¶¶ 75-97, below).  In addition, Pruco did not rely on the financial and other information contained in the application, but undertook to verify in-house through its Special Investigations Unit the source of her third-party verification, Tarshis, directly, and run reports of the Bergers using various public informational databases called Data Verification Reports.  (See ¶¶ 75-97, below).  In addition, Godin did not say ownership of the Policy would be transferred to the Trust shortly.  (Rafl. Ex 15).  As to Farrell's testimony, see ¶ 5 above.

45.     See ¶ 5 above.

46.     No comment.

47.     In anticipation of the loan closing, Coventry Capital, through its affiliate, advanced $81,871.75 ("Advance") on behalf of LaSalle for the initial premium payment under the Policy.  (DH Dec. Ex. 1 at ¶¶ 28, 29).  Coventry Capital did not instruct Mrs. Berger or anyone else on how to forward this payment to Pruco.  (Id.)   The Advance was not made to conceal premium financing, but rather to facilitate the payment of the premium which became due before the documents related to the loan were executed and, where required, recorded with the Secretary of State in Delaware.  (Id.)  This $81,871.75 advance was made part of the total loan amount funded by LaSalle when the loan closed in July 2006.  (Id.)  This advance was subsequently reimbursed after the loan closed.  (Id.)  Had the Loan not closed, Coventry Capital would have sought reimbursement of this advance from Mr. Brasner.  (Id.)

48.     See ¶ 47 above.

49.     See ¶ 47 above.

50.     See ¶ 47 above.

51.     Neither Coventry First, nor any of its affiliates ever had any agreement with Mrs. Berger, Brasner, or anyone else, at or prior to, the inception of the Policy to sell or otherwise transfer the Policy (or any interest therein) to BOA, Coventry First or any of its Affiliates, or any other person or entity.  (DH Dec. Ex. 1 at ¶ 22).  Prior to September 15, 2008, neither Coventry First, nor its affiliates, knew, understood, or agreed that the Policy would be relinquished.  (Id. at ¶ 25).  After conducting a reasonable search, Coventry First has been unable to locate documents suggesting a plan at the inception of the Policy to have the Policy relinquished in satisfaction of the Loan, and Coventry First and its affiliates are unaware of any such "plan."  (Id.)  Neither Coventry First nor any of its affiliates marketed or attempted to sell the Policy prior to the relinquishment of the Policy in September 2008.  (Id. at ¶ 27).   Rather, on March 17, 2008, an independent broker attempted to sell the Policy to Coventry First, and on April 22, 2008, Coventry First then submitted the Policy to a potential funder for its review.  (Id.)  Neither Coventry First nor the potential funder elected to make an offer for the Policy.  (Id.)

52.     The evidence of record demonstrates that, in fact, a life insurance policy on the life of Mr. Berger was taken out and owned by The Richard Berger Life Trust dated 8/12/2005 and that this was the policy that was settled in early 2008 resulting in a payment to the Bergers in the exact amount of $172,828.86 on May 2, 2008.  (DH Dec. Comp. Ex. 11).  The Berger Policy, on the other hand, was never sold by either Brasner or Mrs. Berger but was relinquished to LaSalle in satisfaction of the loan obligation five months *after* the Berger's receipt of the above amount.  (DH Dec. Ex. 1 at ¶ 24).  The closing of the sale and release of funds from the sale from LaSalle to Coventry First and from Coventry First to Lavastone did not take place until January 2009, nine months *after* the Berger's receipt of this unrelated payment.  (DE 175-9 at WF 415-

417).  Further, Coventry First and its affiliates expressly deny that the Bergers ever received any money at any time in connection with the sale of any interest in the Policy.  (DH Dec. Ex. 1 at ¶ 26)  As does Mrs. Berger.  (DH Dec. Ex. 2 at 177).

53.     See ¶ 52 above.

54.     See ¶ 31 above.

55.     See ¶ 31 above.

56.     No comment.

57.     The Beneficiary's Release and Consent to Change Beneficiary of Life Insurance Policy is the best evidence of its contents, and Well Fargo disputes Pruco's mischaracterization of it.

58.     Ms. Bunsick, as a Coventry employee, had written authorization to call Pruco on behalf of Wilmington Trust as Trustee for any and all information concerning the Berger Policy, which authorization Prudential had previously received from Coventry on May 29, 2008 and December 1, 2008.  (DH Dec. Exs. 13, 14; Ex. 1 at ¶ 30; Ex. 15).

59.     See ¶ 58 above.  Therefore, Tawanna Hollis was effectively speaking with the record owner of the Policy, and there was no misrepresentation by Coventry Capital.

60.     To the extent that the Court determines that the Policy is void *ab initio*, Ms. Hollis did not answer these questions accurately because Pruco knew or should have known of the purported "STOLI scheme" and fraud perpetrated by Brasner, its own agent, and should have either caused Ms. Hollis to tell the caller either that the Policy was invalid or that Pruco was aware of numerous facts and circumstances raising suspicion within Pruco that the Policy was part of a purported "STOLI scheme."  (See ¶¶ 69-106, below.)

61.     Ms. Bunsick asked Ms. Hollis, "could you please confirm that since the policy is

past the two year mark, that it is past contestability **and** suicide?"  (DH Dec. Ex. 15 at 6).  To the extent that the Court determines that the Policy is void *ab initio*, Ms. Hollis did not answer this question accurately because Pruco knew or should have known of the purported "STOLI scheme" and fraud perpetrated by Brasner, its own agent, and should have either caused Ms. Hollis to tell the caller either that the Policy was invalid or that Pruco was aware of numerous facts and circumstances raising suspicion within Pruco that the Policy was part of a STOLI scheme.  (See ¶¶ 69-106, below).  Pruco also believed at the time of the call that the Policy owner was in the process of attempting to sell the Policy in the secondary life settlement market based on contacts Pruco began receiving shortly after the contestability period expired from what it believed were secondary market life settlement brokers/providers.  (See ¶¶ 101-103, below).

62.     Ms. Hollis represented on behalf of Pruco that as of the date of the call, December 10, 2008, **Pruco** considered the Policy valid and in-force and beyond the two-year contestability and suicide period. (DH Dec. Ex. 15).

63.     See ¶ 60 above and ¶ 69 below.

64.     The Tripartite Entitlement Order is the best evidence of its contents; Wells Fargo disputes Pruco's characterization of the Order and its purpose.

65.     See ¶ 31 above.

66.     There is no evidence to support Pruco's contention that the sale of the Policy to Lavastone was part of any alleged STOLI transaction.

67.     No comment.

68.     Brasner's refusal to testify is irrelevant.  Any adverse inference cannot be imputed to Wells Fargo as a matter of law.

## II.    WELLS FARGO BANK, N.A.'S COUNTER-STATEMENT OF FACTS[3]

### A.    Pruco Underwriting Guidelines

69.    Pruco began examining the life settlement market sometime in 2003, and, by 2004, Pruco had identified what it came to refer to as stranger-originated or "STOLI" life insurance transactions.  (DH Dec. Ex. 5 at 35).  On July 25, 2005, Pruco issued a written policy paper to its employees and third-party producers regarding Pruco's hostility to life settlements in general and STOLI transactions in particular.  (Id. at 40-42, 44-45; DH Dec. Ex. 16).

70.    In December 2005, Pruco added a new Subsection D to its Life Underwriting Guide (or "LUG Memo") meant to further address this specific activity to its underwriters.  (DH Dec. Ex. 5 at 43, 77-79; Ex. 17 at PRU-01073 et seq.)  Subsection D was the sole source of written guidelines Pruco's underwriters were to refer to and follow during the 2005-2006 period in dealing with suspected life settlement applications.  (DH Dec. Ex. 5 at 66-67; Ex. 7 at 51-53; Ex. 17).

71.    Entitled "Settlement Contracts, Viatical Contracts, Investor Owned Life Insurance, (IOLI), Stranger Owned Life Insurance (SOLI), and Non-Recourse Premium Financing," this subsection described the specific life settlement and STOLI-related transactions that Pruco disapproved of as well as the specific characteristics or "red flags" of this activity that underwriters were to look for and address.  (DH Dec. Ex. 5 at 81-82; Ex. 7 at 54-55; Ex. 17 at

---

[3]    These additional facts are submitted primarily in support of Wells Fargo's counterclaim for negligent misrepresentation.   The submission of these facts showing Pruco's awareness of "internal red flags" and its failure to follow its own underwriting guidelines, while supportive of the negligent misrepresentation counterclaim, is not to be construed in any way as an admission that the Policy is a "STOLI" policy or a "wagering contract."   To the contrary, Wells Fargo disputes Pruco's claim and its allegations.  Moreover, the negligent misrepresentation counterclaim becomes moot to the extent that this Court rejects Pruco's claim.   See 7/7/11 Order denying Pruco's motion to dismiss Wells Fargo's counterclaim [D.E. 142] at 18 (counterclaim is asserted as an "either/or proposition" in that it "seeks the damages suffered in reliance on [Pruco's] misrepresentations and omissions **only** to the extent that this Court declares the Policy void ab initio.")

PRU 01073 et seq.)

72.     At PRU-01076, the LUG Memo advises and directs its underwriters as follows with respect to detecting signs of STOLI activity:

**[Confidential Material –Please refer to PRU-01076 filed under seal]**

(DH Dec. Ex. 17 at PRU-01076.)

73.     Pruco knew that it needed to look behind the information provided on the typical high-face-value application to determine whether STOLI activity was present.  (See also, DH Dec. Ex. 5 at 99).  Pruco also knew that evidence of a STOLI transaction might not become evident until after the two-year contestability period.  (Id. at 45-46).

74.     In addition, Pruco knew that the third-party broker who produced the contract for Pruco could be one of the participants in a STOLI transaction.  (Id. at 104, 110-111).

**B.     First Berger Application**

75.     Bekah Pyle was Pruco's senior new business account manager responsible for handling the Berger applications.  (DH Dec. Ex. 18 at 12-13, 20-21, 26).

76.     Pruco did not provide Ms. Pyle with any written guidelines or policies to follow in recognizing or detecting the presence of life settlement activity in general or STOLI activity in particular.  (Id. at 49-50).

77.     Cheryl Evenson, the senior life underwriting specialist handling the Berger applications, was not aware of Pruco's underwriting guidelines concerning detection of life settlement or STOLI activity.  (DH Dec. Ex. 7 at 13-14, 55-60, 81-84).

78.     Underwriting officer Gloria Flattum, who co-signed the issuance of the Berger Policy, likewise did not receive any training in these STOLI-detection guidelines until sometime in 2007 or 2008.  (DH Dec. Ex. 19 at 25, 27-31).

79.     Underwriting on the initial Berger application commenced in late July 2005, and all underwriting activity associated with processing this "First Handling" was electronically recorded in the form of underwriters' notes maintained in a designated Pruco database.  (DH Dec. Ex. 7 at 71-73; Ex. 9).

80.     Mrs. Berger's initial application for a $10 million policy was missing a significant amount of information, including the proposed beneficiary, input on Pruco's medical form, and a dated signature from the insured.  (DH Dec. Ex. 7 at 61-64; DE 175-3).  Accompanying the initial application was a Transamerica Insurance application form containing medical information on Mrs. Berger from a recent medical exam.  (DH Dec. Ex. 7 at 79-80; 99-100; Ex. 20 at PRU 00686-00714).

81.     Also included on the Pruco application was the following information: (a) the proposed purpose of the policy, which was marked "estate conservation;" (b) the source of the premium payments, which was marked as the insured's "current income or savings account;" (c) an indication that no third-party adviser for the insured was involved; and (d) figures showing the insured's combined net worth at $10.5 million.  (DE 175-3).  Finally, the application indicated that Mrs. Berger had no other policies in-force and was not applying for any other life insurance.  (Id.)

82.     On August 17, 2005, shortly after Pruco began processing Mrs. Berger's initial application, Ms. Evenson and Ms. Flattum, received the following directive, forwarded by senior technical underwriter Phil Chuba, and issued by the Vice President of corporate underwriting, Ken Sluyter:

> Tech team should probably pay special attention to the Brasner case. Looks like there are a lot of unanswered questions.  May be appropriate to explicitly ask about settlement, ask for an illustration, etc. if the case proceeds.

> Ms. Evenson – The application was not in good order with a lot of detail left off.  We don't know the owner and the bene details.  These are red flags of a potential settlement case.  Please question the producer as to who wil [sic] be the bene and owner, ask for a copy of the illustration, a full copy of the trust and ask then [sic] to confirm that the client has no intention of selling this contract in the Settlement market.

(DH Dec. Ex. 7 at 81-85; Ex. 19 at 43-45; Ex. 9 at PRU-01231; Ex. 5 at 172-173).

83.    In response, Ms. Evenson posted written requests for the missing information as field communications ("FC's") on Pruco's website to Prudential's general agent, LBEG.  (DH Dec. Ex. 7 at 85-86).  In addition, and because Pruco was highly motivated to write these large face-value policies, on August 30, 2005, Ms. Pyle independently advised LBEG employee Joann Godin by email about the additional information that was needed from the insured to complete the initial Berger application.  (DH Dec. Ex. 18 at 76-85; Ex. 7 at 86-87; Ex. 21).

84.    Ms. Pyle's August 30th email lays out the follow-up questions underwriting specifically sought answers to relevant to the STOLI "red flags" raised, including: (a) the premium mode; (b) the source of premium payments (c) whether there was any intent to make lump sum prepayment of the premiums; (d) the identification of the owner and beneficiary; (e) a signed form trustee statement, third-party financial verification; and (f) a medical authorization form.  (DH Dec. Ex.  18 at 84-85; Ex. 21).

85.    Most importantly, Pyle forwarded the underwriters' direct question concerning STOLI, which was stated as follows: "Please confirm that the client has not [the] intention of selling this contract in the settlement market." (DH Dec. Ex. 18 at 84-85; Ex. 7 at 92-93; Ex. 21).  Pruco **never** got an answer to this question.   (DH Dec. Ex. 18 at 85; Ex. 7 at 92-93).  Significantly, Pruco's experience has been that when it does pursue this question, the suspect applicants have typically withdrawn their applications.  (DH Dec. Ex. 19 at 70-71; Ex. 5 at 46).

86.     The initial application was therefore "FIU'd" on October 7, 2005  (DH Dec. Ex. 7 at 96-97), meaning the application was closed for lack of sufficient information but was subject to reactiviation if the missing information was later received within certain times frames.  (DH Dec. Ex. 18 at 92; Ex. 7 at 49-50).

C.     **Second Berger Application**

87.     Pruco's general agent continued to submit supplemental information for Pruco's consideration through December 2005, including the missing medical information on Mrs. Berger as well as an unsolicited third-party inspection report confirming Mrs. Berger's claimed net worth of $10.5 million.  (DH Dec. Ex. 7 at 109-118; Ex. 9 at PRU-01232).

88.     During this interim period, Pruco considered offering Mrs. Berger a preliminary medical rating on the policy but would not finalize the underwriting analysis because of remaining the unanswered questions and the concerns of STOLI.  (Id.)

89.     Then, on February 27, 2006, Brasner and LBEG submitted a second and more complete application to Pruco for the same policy.  (DH Dec. Ex. 18 at 103-107; Ex. 7 at 120-124; Exs. 22, 23).  As with the first application, this application stated the following: (a) the purpose of the policy was for "estate conservation;" (b) the source of the premium payments would be the insured's "current income or savings account;" (c) that Mrs. Berger did not consult any third-party advisers; (d) that her combined net worth was $10.5 million; and (e) that she did not have, and was not applying for, any other life insurance.  (DH Dec. Exs. 22, 23).

90.     In underwriting the second Berger application, Ms. Evenson re-incorporated the underwriter notes from the initial application, including the record of Pruco's concerns of possible STOLI activity.  (DH Dec. Ex. 7 at 125-133; Ex. 9 at PRU 01223-01226).  Even with a more complete application form designating Mrs. Berger as the owner of the policy and Mr.

Berger as its beneficiary, Ms. Evenson and Ms. Flattum had continuing and additional concerns regarding the second application regarding suspected settlement activity:

> Ms. Evenson to Ms Flattum on March 8, 2006:  This is the case we thought was a possible settlement case (sic) back in June.  We ended up FIUing due to outstanding FC's [field communications] including 3rd party financials.  We now have a complete application.  Felt we still need financials. How amount determined, how much insurance spouse has inforce [sic] . . . .

> Ms. Flattum to Ms. Evenson on March 9, 2006: . . .

> **[Confidential Material –Please refer to PRU 01226-01227 filed under seal for remainder of quoted paragraph]**

(DH Dec. Ex. 9 at PRU 01226-01227).

91.    Mrs. Berger's $16 million net worth, as recited by Ms. Flattum, was derived from a single-page, <u>undated</u> financial statement forwarded to Pruco by its general agent (LBEG) and purportedly provided by the Bergers' longstanding financial advisor, Mark Tarshis.  (DH Dec. Ex. 5 at 225-226; Ex. 24).   The $16 million dollar figure, however, contradicted the $10.5 million recited on: (a) the initial Berger application submitted in July 2005; (b) the third-party inspection report Pruco received in November 2005; and (c) the second Berger application, which was received less than a month before in late-February 2006.  (DE 175-3; DH Dec. Ex. 9 at PRU 01232; Ex. 22; Ex. 7 at 109-118).

92.    Pruco accepted the proposition that the 72-year-old conveniently *inherited* $7.2 million of real estate at the precise time she needed to show a net worth in excess of $15 million, which at the growth rate ascribed by Ms. Flattum, would just barely justify a $10 million policy for estate conservation purposes.  (DH Dec. Ex. 7 at 135-136; Ex. 9 at PRU 01226- 01227).

93.    Further, Pruco accepted the purported source of the information – Mark Tarshis – even though Pruco's investigation of Mr. Tarshis revealed that he was a life insurance broker as

well as a financial planner operating out of the same companies (Infinity Financial Group/Infinity Tax Advisors) and at the same Boynton Beach, FL office as Mr. Brasner. (DH Dec. Ex. 7 at 149-151; Ex. 10 at PRU 01219-01221; Ex. 19 at 58-59). Pruco also did not question why it took Mrs. Berger over nine months to get this one-page financial statement. (DH Dec. Ex. 10).

94.     In addition, Pruco accepted other answers to follow-up questions that were nothing more than ad-hoc excuses tailored to fend off Pruco's inquiries. For example, it was only at Pruco's prompting that it was told by its general agent that Mr. Tarshis had thoroughly evaluated and recommended the Pruco policy to Mrs. Berger, an assertion that was directly contradicted in every way by answers on both of Mrs. Berger's application forms. (DH Dec. Ex. 7 at 138-139; Ex. 9 at PRU 01227).

95.     When Pruco pressed for the reason why a life insurance trust was not taking ownership of the proposed policy for the estate conservation purposes, it was told for the first time (and nine months after the date of her initial application) that Mrs. Berger was in the process of "revamping" her trust and would hold it in her name until then. (DH Dec. Ex. 9 at PRU 01227).

96.     Finally, when Pruco questioned why Mr. Berger was not applying for insurance for himself as the bread-winner, Pruco was told within a one-month span that Mr. Berger was applying (Id.), then that he was not applying (Id. at PRU-01161), and then that he had applied but did not like the rates he was getting quoted (Id.).

97.     In addition, before issuing the Berger Policy, Pruco's underwriters ran a check on a shared industry database (Insurance Activity Index or "IAI") to determine if there were any prior applications or current life insurance policies in effect for Mrs. Berger. (DH Dec. Ex. 7 at

74-75, 102-103, 154-158; Ex. 25).  In spite of the facts that (a) the IAI report came back with at least two "hits" for non-Prudential companies, (b) Pruco's underwriting file already contained evidence that Mrs. Berger had applied to Transamerica Insurance for a policy, (c) and on both her applications Mrs. Berger denied having any existing policies or recent policy applications, both Ms. Evenson and Ms. Flattum overlooked these inconsistencies.  (Id.; Ex. 19 at 66-69).

###     D.    Initial Owner Change

98.    Two months after Pruco issued the Policy to Mrs. Berger, she submitted a form requesting that both the owner and the beneficiary of the policy be changed to Wilmington Trust Company as an institutional Delaware trustee of the Arlene Berger 2006 Life Insurance Trust.  (DH Dec. Ex. 26 at 69-72; Ex. 27).  This change was contrary to Mrs. Berger's statement on her application that she was to be the owner.  (See DH Dec. Ex. 22).

99.    Pursuant to Pruco's Settlement Options Guidelines, any such change in ownership within six months of policy issuance required further determination of the reasons for the change for the purpose of determining insurable interest at inception, including a possible referral back to underwriting.  (DH Dec. Ex. 26 at 56-57, 70-80).  This procedure is due in part to the fact that Pruco believed that STOLI promoters often use trusts to disguise the true nature of their transactions.  (Id. at 81-82, 84).  There is no evidence of record tending to suggest that Pruco took this step in response to Mrs. Berger's request.  (Id. at 80-81).

100.    In addition, in July 2006, just three months after the Policy's issuance, Pruco received a $331,077.29 pre-payment of just over two years' worth of premiums for the Berger Policy.  (DH Dec. Ex. 26 at 217-218; Ex. 28 at PRU 01194).  This prepayment was contrary to Mrs. Berger's statements on her application that she would be paying quarterly premiums and she did not intend to make any premium prepayments within the first twelve months of her

policy.  (DH Dec. Ex. 22).  Prudential admits that such an unscheduled prepayment taking the policy just beyond the contestability period could be a sign of STOLI activity and that it just missed it.  (DH Dec. Ex. 5 at 257-259; Ex. 26 at 101-105).  In fact, Pruco admittedly misread all these red flags and more.  (DH Dec. Ex. 5 at 259).

### E.   **Prudential Learns the Policy Is For Sale**

101.    In May 2008, the same month that the contestability period for the Berger Policy expired, Pruco began to receive requests for information regarding the Policy's status from companies that Pruco had previously identified as life settlement brokers.  (DH Dec. Ex. 29 at 55-61, 98-100; Ex. 13 at PRU 00504-00509; Ex. 30).  These included Coventry Capital on May 29, 2008 and later, Welcome Funds on August 21, 2008.  (Id.)  The May 29, 2008 contact from Coventry Capital was on behalf of record owner Wilmington Trust as Trustee, and included a fully executed authorization from Wilmington Trust authorizing Coventry Capital to obtain all policy-related information from Pruco on Wilmington Trust's behalf.  (DH Dec. Ex. 13).  Pruco would receive **another** such notice of authorization from Coventry Capital on **December 1, 2008**.  (DH Dec. Ex. 14).

102.    Pruco provided the requested information and then followed up in writing to both companies telling them that Pruco believed that their requests were related to the policy owner seeking to "settle" the Berger Policy in the secondary market.  (DH Dec. Ex. 29 62-74, 95-96, 102-105; Exs. 31, 32; Ex. 26 at 135-136).  These letters were not meant to convey Pruco's belief that an illegal transaction was occurring, but merely to advise the owner that there may be a tax consequence associated with a sale.  (Id.)

103.    At the same time, Pruco tracked these secondary market contacts as a part of its written post-issuance policies for detecting STOLI activity over the life of a policy.  (DH Dec.

Ex. 29 at 45, 74-76, 88-89, 101-102; Exs. 33, 34; Ex. 26 at 48-49, 106-109, 139-140).

Apparently, however, Pruco did not take these secondary market inquiries as a cue to review or

re-analyze the history of the Berger Policy.  (Id.)

**F.      Lavastone Relies On Pruco's Negligent Misrepresentations**

104.    Rather, when contacted on December 10, 2008 by Coventry Capital as authorized

representative of Wilmington Trust, Prudential again advised that the Berger Policy was still in-

force (and "in grace") and had passed the two-year contestability **and** suicide period.  (DH Dec.

Ex. 29 at 126-127; Exs. 13, 35 at PRU-00661; Exs. 36, 15).  Pruco was and is in the business of

providing this information to its policy owners, insureds, and beneficiaries as well as their

authorized representatives.  (DH Dec. Ex. 29 at 14-16; Ex. 26 at 127-129, 133-134).

105.    The information provided by Pruco was conveyed through Coventry First directly

to Well Fargo, as fiscal agent for Lavastone, and then to Lavastone directly, for the purpose of

effecting a sale of the Berger Policy.  (Farach Dec. Ex. Y (DE 175-27) at 333-344; Ex. 37).  In

reliance upon these representations from Pruco, Lavastone proceeded with purchasing the Berger

Policy.  (Id.; Farach Dec. Ex. Z (DE 175-28) at 7-8, 21, 84-88, 209-210).

106.    On January 9, 2009, Pruco acknowledged and recorded Wilmington Trust's

December 24, 2008 request to change the owner and the beneficiary of the Berger Policy to

Wells Fargo, as securities intermediary.  (DH Dec. Ex. 26 at 109-110; Farach Dec. Exs. V, W).

Only upon this further representation from Pruco did Lavastone close (allow funds to be released

from escrow) on the purchase of the Berger Policy for an amount in excess of $1 million.  (DE

175-27 at 149-153, 351-354; DE 175-28 at 209-210).  Pruco does not dispute that Lavastone has

been paying the monthly premiums on the Policy or tendering the same to the Court ever since.

(Farach Dec. Ex. Z at 22, 186-187).

CASE NO. 10-CIV-80804-COHN/SELTZER

Dated: September 13, 2011
      Miami, Florida

Respectfully submitted,

/s John K. Shubin
John K. Shubin (Florida Bar Number: 771899)
jshubin@shubinbass.com
Juan J. Farach (Florida Bar Number: 957704)
jfarach@shubinbass.com
David R. Hazouri (Florida Bar Number: 142387)
dhazouri@shubinbass.com
SHUBIN & BASS, P.A.
46 S.W. 1st Street, Third Floor
Miami, Florida 33130
Telephone: (305)381.6060
Facsimile:  (305)381.9457
*Attorneys for Defendant, Wells Fargo*

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all Counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

      s/ Juan J. Farach
      Juan J. Farach, Esq.

CASE NO. 10-CIV-80804-COHN/SELTZER

**SERVICE LIST**
**Pruco Life Ins. Co v. Brasner, et al.**
**Case No. 10-CV-80804 Cohn/Seltzer**
**United States District Court, Southern District of Florida**


Wendy L. Furman, Esq.
wfurman@pettfurman.com
PETT FURMAN, PL
2101 N.W. Corporate Blvd., Suite 316
Boca Raton, Florida 33431
Tel. (561) 994-4311
Fax (561) 982-8985
*Attorneys for Plaintiff Pruco Life Insurance Company*
Service by CM/ECF

Stephen A. Serfass, Esq.
Stephen.serfass@dbr.com
Michael D. Rafalko, Esq.
Michael.rafalko@dbr.com
DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
Tel. (215) 988-2700
Of Counsel/Pro Hac Vice
*Attorneys for Plaintiff Pruco Life Insurance Company*
Service by CM/ECF