UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10-80804-CIV-COHN/SELTZER

PRUCO LIFE INSURANCE COMPANY,

        Plaintiff,

v.

STEVEN M. BRASNER, individually and as
Principal of Infinity Financial Group, LLC;
MARK A. TARSHIS; INFINITY FINANCIAL
GROUP LLC; WELLS FARGO BANK, N.A.,
as Securities Intermediary; and John Does 1-10,

        Defendants.

_____/

## ORDER GRANTING PLAINTIFF PRUCO LIFE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT WELLS FARGO BANK, N.A.'S MOTION FOR SUMMARY FINAL JUDGMENT

**THIS CAUSE** is before the Court upon Plaintiff Pruco Life Insurance Company's

("Pruco's") Motion for Summary Judgment [DE 177] ("Pruco's Motion") and the Motion

for Final Summary Judgment of Defendant Wells Fargo Bank, N.A., as Securities

Intermediary [DE 186] ("Wells Fargo's Motion"). The Court has considered Pruco's

Motion, Wells Fargo's Response [DE 200], Pruco's Reply [DE 213], Wells Fargo's

Motion, Pruco's Response [DE 198], Wells Fargo's Reply [DE 214], the parties' related

submissions, the argument of counsel at the October 21, 2011 hearing [DE 240], and is

otherwise advised in the premises.

### I. BACKGROUND

This case arises from the fraudulent procurement of a $10 million insurance

policy on the life of Arlene Berger ("the Berger Policy"). Plaintiff Pruco Life Insurance

Company ("Pruco"), a subsidiary of The Prudential Life Insurance Company of America,

issued the policy in 2006.  The current owner and beneficiary is Defendant Wells Fargo

Bank, N.A. ("Wells Fargo"), as securities intermediary.

### A. Mrs. Berger Seeks "Free Insurance"

In 2005, Mrs. Berger and her husband, Richard Berger, attended a number of

seminars at which they learned about a "whole new concept [] that if you're healthy and

you're within a certain age, you could get basically free insurance for a number of years

. . ." Deposition of Arlene Berger [DE 181-1] ("Arlene Berger Deposition") at 46:24-47:1.

The Bergers approached their accountant, Mark Tarshis, to inquire about this "free

insurance" concept. Id. at 12:19-23; 46:15-47:9.  Mr. Tarshis did not know anything

about the free insurance, so he introduced the Bergers to Steven M. Brasner, a

licensed insurance producer with Pruco and other carriers. Id. at 42:7-43:5; 45:5-47:9.

Ultimately, Mrs. Berger decided to let Mr. Brasner pursue insurance for her. Id. at

58:25-59:0.

At the time, Mrs. Berger had no need or want for life insurance. Id. at 60:6-11.

She did not have an estate to protect that was anywhere close to the amount of $10

million. See id. at 103:14-109:25.  Her net worth was always lower than $1 million.  In

June 2006, for instance, the Bergers' combined net worth was around $600,000 or

$700,000, an amount far less than $10 million.  Deposition of Richard Berger [DE 183-

1] ("Richard Berger Deposition") at 55:19-56:1.

The Bergers never paid any premium for the Berger Policy.  Arlene Berger Dep.

at 159:19-23.  When Mrs. Berger decided to let Mr. Brasner pursue insurance for her,

she did not know how much insurance he would obtain or how much the premium

would be. Id. at 58:25-59:9.  Neither Mrs. nor Mr. Berger ever had any intention to pay

any premium for the policy. Id. at 59:10-25; Richard Berger Dep. at 70:22-71:6. In fact, there was no circumstance under which they would have paid a premium for any policy that Mr. Brasner obtained, nor could they have paid a premium on a $10 million policy. Arlene Berger Dep. at 59:22-25; Richard Berger Dep. at 83:23-85:18. The only reason that Mrs. Berger was willing to go along with this insurance plan was because it was free for her. Arlene Berger Dep. at 60:12-15.

Neither Mr. nor Mrs. Berger ever had any intention of controlling or keeping any insurance policy issued through Mr. Brasner on Mrs. Berger's life. Arlene Berger Dep. at 97:15-98:11; Richard Berger Dep. at 69:17-70:3, 70:15-70:20, 84:18-85:18. Mrs. Berger always knew that the policy would ultimately be owned by a third party who would collect the death benefit when she died if she died after the free insurance period. Arlene Berger Dep. at 65:20-66:16. Mr. Brasner never told Mrs. Berger who the ultimate owner of the policy would be. Id. at 66:17-20. Mrs. Berger never asked him who the owner would be, nor did she care. Id. at 66:20-67:2.

### B. Pre-Application

On November 29, 2005, Worldwide Inspection Services, a third-party vendor that verifies a prospective insured's finances and net worth, among other information, completed an Inspection Report on Mrs. Berger. Inspection Report [DE 178-6]; Deposition of Kathleen A. Rutherford [DE 178-7] ("Rutherford Deposition") at 16:22-17:25. The Inspection Report stated that Mrs. Berger was seeking insurance for "estate planning," that she had no other life insurance, and that she had a $250,000 annual income, $2.5 million in real estate, $6 million in stocks, $250,000 in personal assets, $700,000 in cash assets, $1 million in Certificates of Deposit, and $10.45 million in total

assets and net worth.  Inspection Rep.  All of this information was false, but when Mrs.

Berger was interviewed on November 28, 2005 in connection with the preparation of the

Inspection Report, she provided the answers that Mr. Brasner and his assistant, Patricia

Wagner, had told her provide during the call.  Arlene Berger Dep. at 122:7-124:22,

127:18-129:15; Rutherford Dep. at 138:10-141:7.  The Inspection Report was submitted

to Pruco in support of the Application for the Berger Policy, and was considered in

determining whether to issue the policy.  Affidavit of Thomas Farrell [DE 178-26]

("Farrell Affidavit") ¶ 7.[1]

On December 12, 2005, Life Brokerage Equity Group ("LBEG"), which was

eventually listed as the broker general agency on the Berger Policy, Farrell Aff. ¶ 4,

ordered a life expectancy report on Mrs. Berger.  See 12/13/2005 Life Expectancy

Report [DE 178-8].  "Life expectancy reports are used to gauge the life expectancy of a

prospective insured and are used to calculate the life insurance policy in the secondary

market for life insurance.  The longer the insured's projected life expectancy, the less

valuable a policy is likely to be in the secondary market because of the continuing

obligation to pay premium over many years before the insured dies and the death

--------

[1]    Wells Fargo objects to the Farrell Affidavit because "Thomas Farrell, Vice President of Life Underwriting at Prudential, was not disclosed as a potential witness, was not designated as a Rule 30(b)(6) corporate representative with knowledge on this topic, and is not a fact witness with personal knowledge."  Wells Fargo's Counter-Statement of Material Facts in Opposition to and to Supplement Pruco's Statement of Material Facts [DE 202].  Pruco replies that "Mr. Farrell's affidavit was submitted on behalf of Pruco because Michael McFarland, Pruco's Vice President of Corporate Underwriting designated as a 30(b)(6) deponent in this matter, was unavailable to sign the affidavit prior to the filing of Pruco's summary judgment brief."  Pruco's Response to Wells Fargo's Additional Material Facts [DE 212] at 2 n.1.  Mr. McFarland also signed an affidavit adopting Mr. Farrell's affidavit.  See Affidavit of Michael McFarland [DE 212-1].  Therefore, the Court considers the Farrell Affidavit as admissible evidence.

benefit becomes payable." Farrell Aff. ¶ 14.

On January 25, 2006, LaSalle Bank, the predecessor in interest to Bank of America, pre-approved the Berger Policy for a non-recourse premium financing loan ("NRPF Loan"), which would be administered by Coventry and loaned by Bank of America. See Coventry Letter and NRPF Loan Forms [DE 175-25 at Proverian-0085-0095, 0109]. In connection with the NRPF Loan, The Arlene Berger 2006 Life Insurance Trust ("Trust") would be created to take ownership of the Berger Policy, and a premium financing sub-trust ("Sub-Trust") would also be created. Id. at Proverian 0131-0138, 0111-0123. A $10 million policy on Mrs. Berger's life would be obtained from Pruco, the Trust would own the policy, and the Sub-Trust would apply for the NRPF Loan. Id. at Proverian 0095, Proverian-0131-0138, Proverian-0122-0123. For the first two years, the policy premium would be financed with Bank of America as the lender, the Trust as the borrower, and Coventry as the program administrator, id. at Proverian-0088-0095. The NRPF Loan would generate interest at a high rate. See id. at Proverian-0095.

As part of the NRPF Loan program, Mrs. Berger executed an Authorization to Release Medical Records and Special Irrevocable Power of Attorney [DE 175-6] ("Power of Attorney") at WF-0281-0282. Mr. Berger executed a Borrower's Special Irrevocable Power of Attorney [DE 175-25 at Proverian-0105-0106] ("Borrower's Power of Attorney"). Essentially, the Power of Attorney and Borrower's Power of Attorney placed Coventry in position to hold control over the Berger Policy, the NRPF Loan, and the Trust before the Application was ever submitted or the Trust was ever created. See id. at Proverian-0085-0138.

5

The NRPF Loan was eventually issued.  See Note and Security Agreement [DE 178-4] at 2.  The Bergers never knew the amount or source of the NRPF Loan that ultimately paid the premium for the Berger Policy.  Arlene Berger Dep. at 113:3-24.  Mrs. Berger stated at her deposition that she had no knowledge of a trust being created bearing her name at any point in time.  Arlene Berger Dep. at 135:21-23.  Neither Mr. Brasner, Ms. Wagner, nor Mr. Tarshis ever discussed anything having to do with a life insurance trust with Mrs. Berger.  Id. at 135:24-136:2.

### C. Application

On February 21, 2006, Mrs. Berger and Mr. Brasner submitted the Application to Pruco.  Application for Life Insurance or Policy Change [DE 178-5] ("Application").  Along with the Application, Mr. Brasner submitted a Client Information Form [DE 178-5 at Pru-59-60], representing that the $10 million face amount of the Berger Policy was based on an "estate analysis," that the purpose of the insurance was "estate conservation," that Mrs. Berger would pay the premium through her "current income or savings account," and that she had $274,000 in annual income, $700,000 in cash assets, $700,000 in savings, a $2.5 million home, $7 million in investments, and $250,000 in personal property.  On March 8, 2006, Ms. Wagner submitted to Pruco, through LBEG, a Confidential Financial Statement [DE 178-11], see also 03/08/06 Email [DE 178-10], which, despite Mr. Tarshis's signature, was altered by Mr. Brasner and Ms. Wagner to show that Mrs. Berger had a net worth of $15.95 million, Deposition of Patricia Wagner [DE 179-1] ("Wagner Deposition") at 96:1-97:7.  Such representations grossly overstated Mrs. Berger's actual net worth.  See Continued Deposition of Arlene Berger [DE 182-1] ("Arlene Berger Deposition, Continued") at

6

41:2-43:6; Richard Berger Dep. at 55:19-56:1.  Ms. Wagner testified that the purpose

for inflating Mrs. Berger's net worth was to justify a policy with a higher face amount

than that for which Mrs. Berger could actually qualify because the policy was eventually

to be owned by someone other than the Bergers.  Wagner Dep. at 125:15-126:25,

129:10-130:6.  As for the premium payment, Ms. Wagner explained at her deposition

that Mr. Brasner designed the premium as what he called "smoke and mirrors,"

meaning "[h]ave the client pay it, that way it appears to [] come from the client therefore

it doesn't cause any red flags.  So in essence, . . . it was to mislead."  Id. at 129:23-

130:6.

### D. Berger Policy Issuance

Relying on the Inspection Report, the Application, the Client Information Form,

and the Financial Statement, Pruco issued the Berger Policy, number V1208044, on

Arlene Berger's life in the amount of $10 million, on April 27, 2006.  Farrell Aff. ¶ 11;

Berger Policy [DE 178-13].  For placing the Berger Policy, Mr. Brasner earned a

$195,337.76 commission, and LBEG, the broker general agency, earned a $34,858.25

commission.  Farrell Aff. ¶ 4.  The Berger Policy was delivered on April 28, 2006, and

an initial premium payment of $81,871.75 was made on May 2, 2006.  See Initial

Premium Receipt and Acknowledgment of Life Insurance Policy Delivery [DE 178-14].

Though the Initial Premium Receipt reflected that the initial premium payment

was received from Mrs. Berger, see id., Coventry actually made the payment.

Specifically, Coventry wired $81,871.75 to Infinity's bank account, see Business Cash

Manager Checking Statement [DE 178-16], after which Mr. Brasner, through Infinity,

arranged for a cashier's check to be made payable to Pruco in the same amount, see

7

5/1/06 Infinity Check 1048 and 5/2/06 Wachovia Cashier's Check [DE 178-17].  Though Wells Fargo characterizes Coventry's payment as an "advance" "on behalf of LaSalle for the initial premium payment . . . [which] was not made to conceal premium financing," Wells Fargo's Counter-Statement of Material Facts in Opposition to and to Supplement Pruco's Statement of Material Facts [DE 202] ("Wells Fargo's Counter-Statement of Facts"), Ms. Wagner testified that the initial premium payment was designed to mislead and to prevent causing red flags by making it seem like the payment came from Mrs. Berger, Wagner Dep. at 129:10-130:2.

### E. Post-Issuance

Less than one month after the Berger Policy was issued, on June 5, 2006, the Trust was finalized, see Trust Agreement [DE 178-18], and on June 30, 2006, the Berger Policy's owner and beneficiary was changed to the Trust, see Confirmation of Change of Ownership [DE 178-15].  Thereafter, on July 17, 2006, the Note and Security Agreement [DE 178-4] formalizing the NRPF Loan was executed.  Bank of America then issued two payments pursuant to the NRPF Loan—one $331,077.29 payment to Pruco as premium for the Berger Policy, see 7/17/06 Wire Transfer [DE 178-19], and a second $81,870.75 check payable to Mrs. Berger, see 7/17/06 LaSalle Bank Check 0627077 [DE 178-20].  Upon receipt of the $81,870.75 check, Mrs. Berger, at Mr. Brasner's direction, went to Mr. Brasner's office and endorsed the check over to Infinity. See Arlene Berger Dep. at 153:20-154:20.  Mr. Brasner then deposited the check into Infinity's account, see Infinity Bank Records July 2006 [DE 178-21], and wrote a check for $81,870.75 to a Coventry affiliate to reimburse Coventry for the first premium payment, see Infinity Boynton Beach Check 1058, dated 7/20/06 [DE 178-22].

8

In April 2008, Coventry submitted the Berger Policy to a potential secondary buyer for review. See 4/22/08 "Pre-Offer Review" Email [DE 175-19]. Then, in May 2008, the same month that the policy's contestability period expired, Mr. Brasner wired a $172,828.86 payment to the Bergers for what he described as "an insurance disbursement." See Bergers' Fidelity Account Statement and Fidelity Wire Record, May 2008 [DE's 178-23, 178-24]; Richard Berger Dep. at 95:22-97:11. According to Ms. Wagner, clients in Mr. Brasner's schemes were told that they could possibly get more money if they waited for the two-year contestability period to expire and then sold their policy on the secondary market. Wagner Dep. at 273:19-274:22.

On September 15, 2008, the day before loan maturity, Mrs. Berger signed an Irrevocable Seller Instruction Letter [DE 175-24], relinquishing all rights, interests, powers, and privileges in the Trust and Sub-Trust to Coventry, despite the fact that she had already signed the Power of Attorney years before. The same day, Mrs. Berger executed a Second Supplement to Trust Agreement, permitting Mr. Berger to step down as trustee, despite the fact that Mr. Berger had already signed the Borrower's Power of Attorney years before. See id. Two days later, on September 17, 2008, Bank of America sent notice to the Trust that the Trust's obligation to repay the NRPF Loan was satisfied by the Trust's relinquishment of the Berger Policy to Bank of America. See Satisfaction Notice [DE 175-20].

Thereafter, on December 9, 2008, Bank of America and Coventry entered into a Beneficiary's Release and Consent to Change Beneficiary of Life Insurance Policy [DE 175-6 at WF-0283]. The following day, on December 10, 2008, Coventry representative Jessica Bunsick called Pruco regarding the Berger Policy, and Pruco's

9

call center employee Tawanna Hollis answered the call. <u>See</u> Affidavit of Tawanna

Hollis [DE 178-27] ("Hollis Affidavit") ¶ 2. Ms. Bunsick did not identify herself as calling

from Coventry; instead, she said she was "calling from Wilmington Trust Company." <u>Id.</u>

¶ 3. Ms. Hollis verified, through identification questions, that she was speaking with the

Trust, which was, at the time, the policy's owner. <u>Id.</u> ¶ 4. Had Ms. Hollis known she

was talking to a Coventry employee, and not someone from the Trust, she would not

have provided any information about the Berger Policy in the manner that she did. <u>Id.</u> ¶

5. But because she believed that she was speaking to the policy owner, she answered

questions about the Berger Policy including the cash surrender value and account

value, information about the premium payments, the monthly cost of insurance and

interest rate, whether there were liens or assignments against the policy, and she

confirmed that the Trust was the policy beneficiary. <u>Id.</u> ¶ 6. When Ms. Bunsick asked,

"could you please confirm that since the policy is past the two year mark, that it is past

contestability in suicide?," Ms. Hollis confirmed that "Yes, it is past the two year mark."

<u>Id.</u> ¶ 7. Ms. Hollis had no knowledge or expectation that the information would be used

in connection with any sale of the Berger Policy or the beneficial interest therein in the

secondary market, nor did she intend to induce any party to purchase the Berger Policy

in the secondary market. <u>Id.</u> ¶¶ 13, 14. She had no knowledge or expectation of any

contemplated or pending secondary market transaction involving the Berger Policy. <u>Id.</u>

¶ 15. She made no representations regarding whether the Berger Policy was

supported by an insurable interest at inception, nor did Ms. Bunsick ask anything about

insurable interest. <u>Id.</u> ¶ 16.

On December 12, 2008, Bank of America, Wells Fargo, and AIG Life

10

Settlements (the predecessor in interest of Wells Fargo's client, Lavastone), entered into a Tripartite Entitlement Order [DE 179-9 at WF-0411-0417] ("Tripartite Order"). The Tripartite Order called for Lavastone to pay $1.048 million in connection with acquiring the Berger Policy.  Id.  This figure included, among other fees, the sale price for the policy, an originator fee paid to Coventry, and a premium reimbursement to Coventry. See id. at WF-0415-0416.

Coventry officially purchased the Berger Policy from Bank of America on December 18, 2008.  See Life Insurance Policy Purchase Agreement [DE 175-14]. Finally, on December 24, 2008, Pruco received a request to change the owner and beneficiary of the Berger Policy once again, this time to Wells Fargo, as securities intermediary for Lavastone.  See Request for Change of Ownership and Beneficiary [DE 178-25 at PRU-00351-00352].   Pruco processed the request and confirmed the change on January 9, 2009.  See Letter Re: Change of Ownership and Beneficiary [DE 175-25 at PRU-00350].

### F. Complaint and Procedural History

On July 9, 2010, Pruco filed its five-count Complaint against Defendants Wells Fargo, Infinity Financial Group LLC ("Infinity"), Infinity's principal, Mr. Brasner, Infinity's employee, Mark A. Tarshis, and John Does 1-10.  See Complaint [DE 1].  The Court entered a Default Final Judgment [DE 61] against Mr. Brasner and Infinity on January 4, 2011, and entered an Order Dismissing Defendant Mark A. Tarshis [DE 136] on June 6, 2011.  Accordingly, Wells Fargo is the only remaining Defendant.  Pruco brings only one count against Wells Fargo: Count I for declaratory judgment that the Berger Policy lacked an insurable interest at inception and is therefore void ab initio.  Wells Fargo

11

brings a Counterclaim [DE 73] for negligent misrepresentation against Pruco.

In the instant Motions, each party seeks summary judgment on the declaratory judgment claim.  Specifically, Pruco argues that the Berger Policy is void *ab initio* for lack of an insurable interest at the Policy's inception because the policy was a wagering contract, whereas Wells Fargo contends that the policy is valid.  Pruco also claims that it is entitled to retain the premium payments, but Wells Fargo requests a return of the premiums it has paid.  Finally, Pruco's Motion seeks summary judgment on the negligent misrepresentation Counterclaim, but Wells Fargo contends that disputed issues of material fact preclude summary judgment on the Counterclaim.[2]

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), the Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To discharge this burden, the movant must show that "there is an absence of evidence to support the non-moving party's case."  Id. at 325.

---

[2]     Wells Fargo only intends to pursue its counterclaim if Pruco prevails on the declaratory judgment claim.  See Wells Fargo's Response to Pruco's Motion to Dismiss [DE 90] at 16-17 ("This is an either/or proposition.  Wells Fargo seeks the damages suffered in reliance on Pruco's misrepresentation and omissions **only** to the extent that this Court declares the Policy void *ab initio*.  Therefore, the Court need not address Wells Fargo's Counterclaim[] if it rules against Pruco on its declaratory judgment claim . . . ")

After the movant has met its burden, the burden of production shifts to the non-moving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [the Court may] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In making this determination, the Court must decide which issues are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

### III. ANALYSIS

The parties' Motions for Summary Judgment raise three issues: (1) whether the Berger Policy is void *ab initio* for lack of an insurable interest; (2) if the policy is void *ab initio*, whether Pruco must return Wells Fargo's premium payments; and (3) whether Pruco is entitled to summary judgment on the negligent misrepresentation counterclaim. The Court addresses each issue in turn.

## A. Lack of an Insurable Interest

The primary dispute is whether the Berger Policy is void *ab initio* for lack of an insurable interest. "Florida courts have long held that insurable interest is necessary to the validity of an insurance contract and, if it is lacking, the policy is considered a wagering contract and void *ab initio* as against public policy." Atkinson v. Wal-Mart Stores, Inc., No. 8:08-cv-691-T-30TBM, 2009 WL 1458020, at *3 (M.D. Fla. May 26, 2009) (citing Knott v. State ex rel. Guar. Income Life Ins. Co., 186 So. 788, 789-90 (Fla. 1939)); Knott, 186 So. at 790 ("it has been uniformly held that a contract of insurance upon a life in which the insurer has no interest is a pure wager, that gives the insurer a sinister counter-interest in having the life come to an end."); see also Fla. Stat. § 627.404(1). Pursuant to Florida Statute § 627.404, an "insurable interest" includes several enumerated interests, including (1) an individual's interest in her own life, body, and health and (2) an individual's interest in the life, body, and health of "another person to whom the individual is closely related by blood or by law and in whom the individual has a substantial interest engendered by love and affection." Fla. Stat. § 627.404(2)(b)2. As the Court noted in its Order Denying Wells Fargo's Motion to Dismiss [DE 64], "the [Berger] Policy listed Mrs. Berger as the owner and Mr. Berger as the beneficiary. Mrs. Berger had an insurable interest in her own life, see Fla. Stat. § 627.404(2)(b)1, and as the insured individual's husband, Mr. Berger had an insurable interest as well . . . , see Fla. Stat. § 627.404(2)(b)2." Pruco Life Ins. Co. v. Brasner, Case No. 10-80804-CIV, 2011 WL 134056, at *4 (S.D. Fla. Jan. 7, 2011) ("Pruco I"). However, the policy was ultimately assigned to Wells Fargo, an entity with no insurable interest in Mrs. Berger's life.

14

Florida law generally permits a life insurance policy to be assigned to an entity with no insurable interest in the life of the insured, <u>see</u> Fla. Stat. § 627.404(1), but only if such assignments are made "in good faith, and not [as] sham assignments made simply to circumvent the law's prohibition on 'wagering contracts,'" <u>AXA Equitable Life Ins. Co. v. Infinity Fin. Group, LLC</u>, 608 F. Supp. 2d 1349, 1356 (S.D. Fla. 2009); <u>see also Sciaretta v. Lincoln Nat'l Life Ins. Co.</u>, Case No. 9:11-cv-80427, DE 32 at 7-8 (S.D. Fla. Sept. 9, 2011).  In other words, a life insurance policy assignment may not serve as a cloak to a wagering agreement.  <u>See Grigsby v. Russell</u>, 222 U.S. 149, 156 (1911) ("cases in which a person having an interest lends himself to one without any, as a cloak to what is, in its inception, a wager, have no similarity to those where an honest contract is sold in good faith").  The Court must therefore determine whether the Berger Policy is a valid contract, which was procured in good faith, or whether it is a mere wagering contract, which is void *ab initio* for violating Florida's public policy against wagering contracts.[3]

### 1. The Berger Policy Was Procured in Bad Faith

A policy is procured in bad faith if it is procured with the intention that it will be assigned or otherwise transferred to a person or entity with no insurable interest in the

---

[3]     Wells Fargo urges the Court not to read a subjective intent element into Florida's insurable interest statute, <u>see</u> Wells Fargo's Resp. at 18-21, but as this Court already held at the motion to dismiss stage, Florida law requires good faith.  <u>See Pruco I</u>, 2011 WL 134056, at *4 (citing <u>AXA Equitable Life</u>, 608 F. Supp. 2d at 1356).  In denying Wells Fargo's Motion to Dismiss, this Court noted that if Pruco could prove its allegations that Mrs. Berger never intended to maintain the policy herself and Mr. Berger never intended to retain his interest, then "such facts would demonstrate that the Berger Policy was not procured in good faith, and that there was therefore no valid insurable interest." <u>Id.</u> (citing <u>AXA Equitable Life</u>, 608 F. Supp. 2d at 1356-57; <u>Rubenstein</u>, No. 09-21741-CIV-UNGARO, DE 28 at 5.).

life of the insured.  See, e.g., AXA Equitable Life, 608 F. Supp. 2d at 1357 (holding that

if the insured never intended to maintain policies, then policies were void for lack of

insurable interest); Sciaretta, Case No. 9:11-cv-80427, DE 32 at 8 (finding insurance

company sufficiently pled counterclaim based on allegations that individuals procured

policy "with the *intent* of transferring the Cotton Policy to a STOLI investor with no

insurable interest in Mr. Cotton's life" (emphasis added)).[4]  Such intentions may be

evidenced by factors such as (1) a pre-existing agreement or understanding that the

policy is to be assigned to one having no insurable interest, see AXA Equitable Life,

608 F. Supp. 2d at 1357; Rubenstein, Case No. 09-21741-CIV-UNGARO, DE 28 at 5;

see also Pruco I, 2011 WL 134056, at *4; (2) the payment of some or all of the

_____

[4]  Numerous cases from outside the Southern District of Florida have also looked
to intent to determine whether a policy was procured in good faith.  See, e.g., Wuliger v.
Mfrs. Life Ins. Co., 567 F.3d 787, 790 (6th Cir. 2009) ("The viators' purchases of the
insurance policies with the *intent* to re-sell them to Liberte immediately constituted
insurance fraud, because the viators never *intended* to insure their own lives")
(emphasis added); Principal Life Ins. Co. v. Lawrence Rucker 2007 Insurance Trust,
735 F. Supp. 2d 130, 148 (D. Del. 2010) ("Rucker") ("he clearly *intended* to sell the
beneficial interest in the Policy at the time it was procured.") (emphasis added); Lincoln
Nat'l Life Ins. Co. v. Calhoun, 596 F. Supp. 2d 882, 889 (D.N.J. 2009) ("Insureds begin
to run afoul of the insurable interest requirement, however, when they *intend* at the time
of the policy's issuance, to profit by transferring the policy to a stranger with no
insurable interest at the expiration of the contestability period." and "issues of intent are
crucial to this determination") (emphasis added); see also, e.g., Grigsby v. Russell, 222
U.S. 149, 156 (1911) ("cases in which a person having an interest lends himself to one
without any, as a cloak to what is, in its inception, a wager, have no similarity to those
where an honest contract is sold in good faith"); Lakin v. Postal Life & Cas. Ins. Co.,
316 S.W.2d 542, 552 (Mo. 1958) (looking to the purpose for procuring the policy
finding, "This unquestionably constituted one transaction whereby appellant caused to
be issued for his own benefit a policy of insurance, for which he paid the premium, on [a
life] in which he had no insurable interest. 'The wager life insurance contract rule,
applies were a policy has been taken out by, and the premiums paid by, a person who
has no insurable interest in the life of the insured, or when it has been assigned for
speculative purposes").

premiums by someone other than the insured, and in particular, by the assignee, <u>see</u> <u>AXA Equitable Life</u>, 608 F. Supp. 2d at 1357; <u>Rubenstein</u>, Case No. 09-21741-CIV-UNGARO, DE 28 at 5; or (3) the lack of a risk of actual future loss, <u>Calhoun</u>, 596 F. Supp. 2d at 889 (citing <u>Paulson I</u>, 2008 WL 451054, at *2 n.4 ("[t]he insurable interest requirement developed to curtail the use of insurance contracts as wagering contracts by distinguishing between contracts that sought to dampen the risk of actual future loss and those that instead sought to speculate on whether some future contingency would occur") (citation and quotations omitted)); <u>Rucker</u>, 735 F. Supp. 2d at 138 (same).

Both Mrs. and Mr. Berger testified at their depositions that neither of them ever intended to maintain the Berger Policy.  <u>See</u> Arlene Berger Dep. at 97:15-98:11; Richard Berger Dep. at 69:17-70:3, 70:15-70:20, 84:18-85:18.  Mrs. Berger stated that she always knew that the policy would ultimately be owned by a third party who would collect the death benefit when she died if she died after the free insurance period. Arlene Berger Dep. at 65:20-66:16.  The Bergers' testimony thereby shows that they intended for the policy to be assigned or otherwise transferred to a person or entity with no insurable interest in Mrs. Berger's life and that there was a pre-existing understanding that the policy would be assigned to someone with no insurable interest. This alone is enough to show that the policy was not procured in good faith.  <u>See</u>, <u>AXA</u> <u>Equitable Life</u>, 608 F. Supp. 2d at 1357; <u>Sciaretta</u>, Case No. 9:11-cv-80427, DE 32 at 8.

Contrary to Wells Fargo's assertion, the Court need not identify the existence of a preexisting agreement formed between Mrs. Berger and a specific third party to hold that the Berger Policy was an illegal wagering contract.  <u>See</u> Wells Fargo's Resp. at 21. Wells Fargo cites no binding law in support of this proposition; rather, it relies on two

17

unpublished decisions from a District of Minnesota case: <u>Sun Life Ins. Co. of Can. v.</u>

<u>Paulson</u>, Case No. 07-3877(DSD/JJG), 2008 WL 451054 (D. Minn. Feb. 15, 2008)

("<u>Paulson I</u>") (dismissing claim where complaint failed to identify a third party to whom

the insured intended, at inception, to sell its policy) and <u>Sun Life Ins. Co. of Can. v.</u>

<u>Paulson</u>, Case No. 07-3877(DSD/JJG), 2008 WL 451054 (D. Minn. Dec. 3, 2008)

("<u>Paulson II</u>") (confirming that Minnesota law requires an identified third party to have

entered into an agreement with the insured).  This Court declines to adopt such a

restrictive test, and agrees with the court in <u>Principal Life Ins. Co. v. Lawrence Rucker</u>

<u>2007 Insurance Trust</u>, 735 F. Supp. 2d 130, 148 (D. Del. 2010) ("<u>Rucker</u>"), that "a

preconceived agreement between the insured and ultimate purchaser is not required to

invalidate a policy for lack of insurable interest."  As the <u>Rucker</u> Court noted, the

<u>Paulson</u> test presents the following dangers:

> In addition to directing the wrong result in cases like this, the <u>Paulson</u> . . .
> bilateral intent analysis provides a blueprint for making otherwise
> impermissible transactions unassailable.  If this court applied the rule
> advocated by [the trust], insureds and third-party co-conspirators could
> acquire policies and simply wait until they are issued before choosing from
> among a host of willing buyers. Indeed, this strategy appears consistent with
> the active market for these policies, where identifying a buyer after the fact
> may yield the highest price.
>
> In short, this transaction was no less a gamble because Rucker did not meet
> his policy's purchaser before applying for it. To hold otherwise is, in this
> court's view, to elevate the form of the agreement over the substance of the
> scheme and the policy of Delaware's insurable interest statute.

<u>Id.</u> at 149.  Thus, the fact that there was a pre-existing understanding that the Berger

Policy would be assigned to someone with no insurable interest, regardless of whether

Mrs. Berger or anyone else had selected the eventual third party purchaser, goes to

show that there was an intent to assign or otherwise transfer the policy to a person or

entity with no insurable interest in the life of the insured, and that the policy was therefore procured in bad faith.[5]

The other factors evidencing bad faith are also present here. Specifically, the Bergers never paid any premium for the policy. Arlene Berger Dep. at 159:19-23. Neither Mrs. nor Mr. Berger ever had any intention to pay any premium for the policy, and there was no circumstance under which they would have or could have paid a premium for the policy. Arlene Berger Dep. at 59:10-25; Richard Berger Dep. at 70:22-71:6, 83:23-85:18. Rather, in accordance with the elaborate scheme described more fully above, Mr. Brasner arranged for Coventry to pay the premiums, but to make it appear that Mrs. Berger had paid the premiums. See supra. Moreover, Mrs. Berger had no need or want for life insurance. Id. at 60:6-11. She did not have an estate to

---

[5]        Wells Fargo is mistaken in its suggestion that this Court has already adopted the Paulson test. See Wells Fargo's Mot. at 18 n.6. In denying Wells Fargo's Motion to Dismiss, the Court held, "Plaintiff's allegations here, if proven, would show that there was an agreement prior to the issuance of the Berger Policy to assign the policy to an entity without an insurable interest in Mrs. Berger's life. Such facts would demonstrate that the Berger Policy was not procured in good faith, and that there was therefore no valid insurable interest." Pruco I, 2011 WL 134056, at *4. In ruling on Wells Fargo's Motion to Compel [DE 96], the magistrate judge wrote, "In order to prevail on its claim that no insurable interest existed, Pruco must demonstrate that an agreement to assign the policy to an entity without an insurable interest in Mrs. Berger's life existed at or prior to the inception of the Berger Policy." Pruco Life Ins. Co. v. Brasner, Case No. 10-80404-CIV, DE 141 at 6 (S.D. Fla. July 5, 2011). Both decisions require a demonstration that Mrs. Berger did not intend to retain her interest in her life insurance policy, but neither decision requires that Pruco identify the third party to whom the policy was to be sold.
        Additionally, the Court acknowledges that Pruco believes that even if the Court were to adopt the Paulson test, the Berger Policy meets the test because "Coventry had an agreement with Ms. Berger some three months before the Berger Policy was issued that she would participate in the NRFP program." Pruco's Resp. at 26. However, because the Court declines to adopt the Paulson test, the Court need not address whether the agreement to participate in the NRFP Program constituted an agreement at inception to sell the policy to a third party without an insurable interest.

protect that was anywhere close to the amount of $10 million, see id. at 103:14-109:25, and her net worth was always lower than $1 million. See Richard Berger Dep. at 55:19-56:1. Therefore, the evidence also shows that the Bergers did not pay the premiums and that there was no risk of actual future loss, both of which confirm that the Berger Policy was procured in bad faith. See AXA Equitable Life, 608 F. Supp. 2d at 1357; Rubenstein, Case No. 09-21741-CIV-UNGARO, DE 28 at 5; Calhoun, 596 F. Supp. 2d at 889; Rucker, 735 F. Supp. 2d at 138 (same).

Accordingly, the record evidence shows that the Berger Policy was neither procured nor transferred in good faith, but was instead procured with the intention that it would be assigned or otherwise transferred to a person or entity with no insurable interest in Mrs. Berger's life. The Berger Policy therefore amounts to an illegal wagering contract. Consequently, the Court finds the policy to be void *ab initio* for violation of Florida's public policy against wagering contracts.

### 2. Wells Fargo's Affirmative Defenses Do Not
### Preclude Summary Judgment

"When a party raises affirmative defenses, a summary judgment should not be granted where there are issues of fact raised by the affirmative defenses which have not been effectively factually challenged and refuted." Alejandre v. Deutsche Bank Trust Co. Ams., 44 So. 3d 1288, 1289 (Fla. Dist. Ct. App. 2010) (citations and quotations omitted). Wells Fargo contends that Pruco has failed to disprove the following affirmative defenses: (1) Pruco's claim is barred by waiver based on Pruco's ignoring all indicia of fraud and then waiting until July 2010 to challenge the Policy's validity, all while collecting sizeable premiums; (2) Pruco is barred by the doctrine of

20

unclean hands because it knew or should have known and/or recklessly turned a blind eye to numerous suspicious circumstances in the application and issuance of the policy; (3) Pruco is equitably estopped from challenging the validity of the Policy based on Pruco's own lack of due diligence and failure to investigate and/or act on numerous internal red flags that arose during the application and procurement process; (4) Lavastone was a bona fide purchaser for value without knowledge of or participation in the alleged fraud at inception; and (5) Pruco ratified the acts of its agent, Mr. Brasner, whose acts are imputed to it. Wells Fargo's Resp. at 27-28. Pruco responds that it has refuted all of these affirmative defenses. Pruco's Reply at 9-10. The Court agrees that none of the affirmative defenses preclude summary judgment.

First, the defenses of waiver, unclean hands, and equitable estoppel are based on Pruco's alleged lack of diligence and purported failure to investigate red flags identified in the underwriting of the Berger Policy. However, the evidence shows that though certain red flags may have arisen during the underwriting process, Pruco's underwriters complied with Pruco's underwriting guidelines and pursued all red flags that were identified. See Pruco's Reply at 10. Michael McFarland, Pruco's Vice President of Corporate Underwriting, testified that Pruco's underwriters were specifically trained on what information should be included in the underwriting notes and what information should not be. Deposition of Michael McFarland [DE 201-5] ("McFarland Deposition") at 160:4-161:4. When red flags arose, Pruco gathered and investigated the necessary information prior to issuing the policy. See, e.g., Deposition of Rebecca Pyle [DE 2-1018] ("Pyle Deposition") at 77:6-79:10 (discussing email answering underwriters' questions regarding the first application). For instance, Pruco investigated

21

Mr. Tarshis, the purported source of the financial statement in the Application, and followed up on any missing information. See 03/14/06 Pyle Email [DE 178-12]; Research Regarding Tarshis [DE 195-3 at 99-102]; Confidential Financial Statement [DE 178-11], 03/08/06 Email [DE 178-10]. Pruco also investigated why the Bergers were not seeking an insurance policy on Mr. Berger's life, and determined that he was no longer applying for coverage because his medical history qualified him for only the lowest level of coverage. See Underwriting Notes [DE 195-3 at 103-113] at PRU-01227, PRU-01161. These investigations, along with others demonstrate Pruco's diligence in considering and rejecting each of the red flags. Ultimately, Pruco issued the policy believing that there was a valid insurable interest based on information upon which it was permitted to rely according to Florida's insurable interest statute. See Farrell Aff. ¶ 11; Fla. Stat. § 627.404(3) (entitling an insurer to rely upon applicant's statements, declarations, and representation made regarding insurable interest). Thus, because Pruco diligently investigated all red flags, the defenses of waiver, unclean hands, and equitable estoppel do not preclude summary judgment.

Second, the bona fide purchaser for value defense fails because the policy is void ab initio. A contract that is void ab initio never goes into effect. See, e.g., Rubenstein, No. 09-21741-CIV-UNGARO, DE 28 at 5 ("if the Policy is void ab initio because an insurable interest is lacking, the incontestability clause would be of no effect."). Therefore, because Lavastone never took valid title to the Berger Policy, Lavastone is not a bona fide purchaser. See Zurstrassen v. Stonier, 786 So. 2d 65, 68 (Fla. Dist. Ct. App. 2001) (noting that a void deed cannot pass title, even to a subsequent innocent purchaser).

22

Finally, the ratification defense fails because Mr. Brasner was an insurance broker, not an insurance agent. In the ratification affirmative defense argument, Wells Fargo relies on the "general rule that when an insurance agent inserts intentionally fraudulent statements on an application, the insurance company may not void the policy based on these misrepresentations." Wells Fargo's Resp. at 8-9 (citing 6 Couch on Ins. § 85:36 for the proposition that "when the insurance agent knows the true facts, 'the knowledge of the insurer's agent is imputed to the insurer"). Wells Fargo further argues, "an insurer cannot rely upon the falsity of answers in an application where such answers have been inserted by an agent of the insurer engaged in preparing the application, entirely on his or her own motion and without the knowledge of or the direction of an inquiry to the insured, even though the insurer would not have issued the policy had truthful statements been made." Id. at 9 (quoting 44A Am. Jur. 2d *Insurance* § 1586). However, these rules are irrelevant here because Mr. Brasner was not an insurance <u>agent</u>, but was instead an insurance <u>broker</u>. As the Florida Supreme Court wrote in <u>Almerico v. RLI Ins. Co.</u>, 716 So.2d 774, 776 (Fla. 1998), an insurance broker is responsible for "soliciting insurance from the public under no employment from any special company, and, upon securing an order, placing it with a company selected by the insured or with a company selected by himself or herself." Essentially, an insurance broker is a middleman between the insured and the insurer. <u>Zawilski v. Golden Rule Ins. Co.</u>, Case No. 10-1222, 2011 WL 3359658 at*4 (M.D. Fla. Aug. 04, 2011). Unlike an agent, "an insurance broker is not exclusively employed by any specific company." <u>Id.</u> (citing <u>Almerico</u>, 716 So. 2d at 776–77). As such, "an insurance broker is an agent of the insured," not of the insurer. <u>Id.</u>; <u>see also</u> <u>Steele v. Jackson Nat'l Life Ins. Co.</u>,

691 So.2d 525, 527 (Fla. Ct. App. 1997) ("an independent agent or broker acts on behalf of the insured rather than the insurer.").  Mr. Brasner's knowledge is thus not imputable to Pruco because Mr. Brasner was not Pruco's agent.

Accordingly, the affirmative defenses do not preclude the Court from entering summary judgment in Pruco's favor on the insurable interest issue and declaring the Berger Policy to be void *ab initio*.

### B. Return of Premium Payments

Having found the policy to be void *ab initio*, the Court now must determine which party is entitled to the premium payments.  Normally, Florida law provides that when an insurance law violation "renders the insurance contract void, the insured[] [is] entitled to restitution of the premiums paid on the insurance contract.  The insurer must place the insured back in the same position the insured was in before the effective date of the policy through the return of the premium." Gonzales v. Eagle Ins. Co., 948 So. 2d 1, 3 (Fla. Dist. Ct. App. 2006) (citing 9 Fla. Jur. 2d, Cancellation § 35 (2004); see also Leonardo v. State Farm Fire & Cas. Co., 675 So. 2d 176, 179 (Fla. Dist. Ct. App. 1996) (equating voiding an insurance policy with rescission of the policy, and stating that "[w]here an insurer seeks to rescind a voidable policy, it must both give notice of rescission and return or tender all premiums paid within a reasonable time after discovery of the grounds for avoiding the policy.").  However, where a policy is declared void *ab initio* due to the policy's fraudulent procurement, some courts have allowed insurers to seek to retain premiums.  See, e.g., PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust, No. 08-572 (MJD/SRN), 2010 WL 2539755, at **4-5 (D.

24

Minn. Mar. 2, 2010) (stating that public policy requires allowing an insurer to seek to retain premiums, as "[a] contrary rule would be an invitation to commit fraud"); <u>James v. Ins. Co. of N. Am.</u>, 18 S.W. 260, 260 (Tenn. 1891) (requiring return of premiums only upon a showing that there was no intentional fraud on the part of the insured); <u>Curry v. Wash. Nat'l Ins. Co.</u>, 194 S.E. 825, 826 (Ga. Ct. App. 1937) (holding that insured was entitled to return of premiums paid, unless he was guilty of actual fraud); <u>see also Wuliger v. Mfrs. Life Ins. Co.</u>, 567 F.3d 787, 799-800 (6th Cir. 2009) (holding that unjust enrichment claim as basis for returning premiums would be without merit when premiums were paid pursuant to an express insurance contract).

   Wells Fargo contends that Pruco should not be permitted to retain the premiums because it "turned a blind eye to numerous facts, which, under Pruco's standards, could have evidenced a 'STOLI transaction,' ignored numerous 'red flags' of possible secondary market activity identified by its own underwriters, and still chose to issue the Policy," and then collected premiums and did not file suit until four and a half years after the policy's inception. Wells Fargo's Mot. at 27. However, Florida's insurable interest statute entitled Pruco to rely on the representations provided to Pruco during the underwriting process. <u>See</u> Fla. Stat. § 627.404(3) ("An insurer shall be entitled to rely upon all statements, declarations, and representations made by an applicant for insurance relative to the insurable interest which such applicant has in the insured; and no insurer shall incur any legal liability except as set forth in the policy, by virtue of any untrue statements, declarations, or representations so relied upon in good faith by the insurer."). Additionally, Pruco resolved any "red flags" that arose during the underwriting process before issuing the Berger Policy. <u>See</u> *supra* (discussion on

25

affirmative defenses).  Finally, Pruco had no reason to know the Berger Policy was an illegal wagering contract until the Wall Street Journal published a story about Mr. Brasner's frauds in 2010.

In a recent Florida case where a policy was declared void *ab initio* for lack of an insurable interest at inception, <u>TTSI Irrevocable Trust v. Reliastar Life Ins. Co.</u>, 60 So. 3d 1148 (Fla. Dist. Ct. App. 2011), the court held, "Where a party wrongfully procures a life insurance policy on an individual in whom it has no insurable interest, the party is not entitled to a return of premiums paid for the void policy," <u>id.</u> at 1149.  The <u>TTSI</u> decision distinguished between a declaration that a policy is void or rescission of the policy, which is an equitable remedy where the primary obligation is to undo the original transaction and restore the former status of the parties, and a declaration that a policy is void *ab initio*.  <u>Id.</u> at 1150.  Where a policy is void *ab initio*, "neither party [can] elect to give effect to the policy at issue because it was void at the outset.  Furthermore, as a general rule, contracts that are void as contrary to public policy will not be enforced by the courts and the parties will be left as the court found them."  <u>Id.</u> (citing <u>Harris v. Gonzalez</u>, 789 So. 2d 405 (Fla. Dist. Ct. App. 2001) and <u>Castro v. Sangles</u>, 637 So. 2d 989 (Fla Dist. Ct. App. 1994)).

Here, like in <u>TTSI</u>, the policy is void *ab initio* for lack of an insurable interest.  Wells Fargo nonetheless attempts to distinguish this case from <u>TTSI</u> because there, the party seeking return of the premiums was the one who wrongfully procured the policy and paid the premiums, whereas here, Wells Fargo was not the party responsible for the Berger Policy's wrongful procurement.  Wells Fargo's Reply at 12.  The parties agree that Mr. Brasner committed fraud in procuring the Berger Policy, <u>see</u> Wells

Fargo's Resp. at 6; Wells Fargo's Reply at 12, but they disagree as to the effect of Mr. Brasner's fraud. Wells Fargo concedes, however, that if Mr. Brasner had named himself as the owner or beneficiary, paid the premiums, and then sought to have Pruco return the premiums to him, then TTSI would apply and Pruco would be entitled to retain the premiums. Wells Fargo's Reply at 12. The fact that Mr. Brasner concocted an elaborate scheme to cover up the fact that this was a wagering policy and the fact that Wells Fargo ultimately purchased the policy as securities intermediary for Lavastone does not change the fact that Florida law does not return of the premiums. See TTSI, 60 So. 3d at 1150. To the extent that Wells Fargo believes it should not be held responsible for the premium payments, nothing in this Court's Order prevents Wells Fargo from seeking reimbursement from an appropriate person or entity. Therefore, like TTSI, this Court will leave the parties as it found them and decline to award Wells Fargo the return of its premium payments.[6]

---

[6]     Wells Fargo also argues that because Pruco's "insurable interest" argument is based on misrepresentation and fraud, the request to retain premiums is barred by the policy's incontestability clause. Wells Fargo's Mot. at 24-26. The Court already evaluated and rejected this argument at the motion to dismiss stage. See Pruco I, 2011 WL 134056, at **4-6 (adopting the majority view allowing a lack of insurable interest claim to proceed despite the expiration of an incontestability clause); id. at **7-8 (permitting Pruco to proceed with its request to retain the premium payments, and noting, "In the event that an insurer seeks to declare a policy void ab initio due to a policy's fraudulent procurement, however, some courts have allowed insurers to seek to retain premiums."). The Court declines to reevaluate this argument in this Order.

## C. Negligent Misrepresentation Counterclaim

Because the Court has found the Berger Policy to be void *ab intio* and declined to order the premium payments returned to Wells Fargo, the Court now turns to Wells Fargo's Counterclaim.  In its Counterclaim, Wells Fargo "seeks damages against [Pruco] for its negligent misrepresentations regarding the validity of the Berger Policy at issue in this action, including [Pruco's] verification of coverage, which Wells Fargo's client [Lavastone] relied upon in acquiring the Berger Policy."  Counterclaim [DE 73 at 20-35] ¶ 1.  Pruco argues that Wells Fargo cannot prove its Counterclaim as a matter of law.

To prevail on its negligent misrepresentation Counterclaim, Wells Fargo must prove each of the following elements: "(1) a misrepresentation of a material fact; (2) the representor made the representation without knowledge as to its truth or falsity, or under circumstances in which he ought to have known of its falsity; (3) the representor intended that the misrepresentation induce another to act on it; (4) injury [resulted] to the party acting in justifiable reliance on the misrepresentation."  Souran v. Travelers Ins. Co., 982 F.2d 1497, 1504 (11th Cir. 1993) (citations and quotations omitted).  Pruco contends that Wells Fargo cannot prove the first and third elements.[7]

### 1. There Were No Misrepresentations of Material Fact

The first element requires a misrepresentation of material fact.  Souran, 982 F.2d at 1504.  The Counterclaim alleges that Pruco made representations confirming the

---

[7]       Pruco's Motion states that it "focuses on Wells Fargo's inability, as a matter of law, to make out the First, Third and Fourth elements of a negligent misrepresentation claim," Pruco's Mot. at 20, but Pruco does not articulate an argument relating to the Fourth element.

validity and incontestability of the Berger Policy in the course of its business.  Counterc̄l. ¶¶ 37-38.  Pruco contends that it never made the misrepresentations alleged, highlighting that when Coventry's employee, Jessica Bunsick, spoke to Pruco's call center employee, Tawanna Hollis, Ms. Bunsick "never asked – and Ms. Hollis made no comment or representation – about the validity or enforceability of the Berger Policy, the underlying insurable interest, any misrepresentations transmitted to Pruco in support of the Policy, Pruco's dealings with Mr. Brasner, whether the two-year contestable period is a bar to an insurable interest challenge – which, as a matter of law, it is not – or any other information that might arguably be used in support of a negligent misrepresentation claim."  Pruco's Mot. at 21.  Pruco claims that all of Ms. Hollis's statements were true.  Id. at 21-22.  Ms. Hollis's deposition testimony confirms Pruco's argument.

Ms. Hollis testified that she answered questions about the Berger Policy's cash surrender value, account value, and premium payments, information about the monthly cost of insurance and interest rate, whether there were liens or assignments against the policy, and she confirmed that the Trust was the policy beneficiary.  Hollis Aff. ¶ 6.  She made no representations regarding whether the Berger Policy was supported by an insurable interest at inception, nor did Ms. Bunsick ask her anything about insurable interest.  Id. ¶ 16.  When Ms. Bunsick asked Ms. Hollis, "could you please confirm that since the policy is past the two year mark, that it is past contestability in suicide?," Ms. Hollis confirmed that "Yes, it is past the two year mark."  Id. ¶ 7.  Considering that the policy was issued on April 27, 2006 and Ms. Hollis confirmed that the policy was past the two-year mark on December 10, 2008, her statement was not false.

29

The Counterclaim also alleges that Pruco discovered "numerous 'internal red flags' . . . during the underwriting process and afterwards," id. ¶ 37, based upon which, it "knew or should have known that its representations were not true . . . [o]r it made these representations without knowledge of their truth or falsity," id. ¶ 38.  However, as discussed above, Pruco resolved any "red flags" that arose during the underwriting process before issuing the Berger Policy.  See supra (discussion on affirmative defenses).  Thus, the Counterclaim fails as a matter of law because the record evidence does not show that Pruco made any misrepresentations of material fact.

### 2. Pruco Did Not Intend to Induce a Third-Party Investor to Acquire the Berger Policy

In addition, the record evidence does not prove the third element required for Wells Fargo to prevail on its negligent misrepresentation Counterclaim.  The third element requires that the representor intended for the misrepresentation to induce another to act on it.  Souran, 982 F.2d at 1504.  The Counterclaim alleges that Plaintiff "either intended or expected, through its verification of coverage and other representations, to induce a third-party investor to acquire the Berger Policy in the secondary market."  Countercl. ¶ 40.  Pruco claims that there is no record evidence that it intended to induce Lavastone, Wells Fargo's client, to purchase the Berger Policy.  Pruco's Mot. at 23.  Once again, Ms. Hollis's deposition testimony confirms Pruco's argument.

Ms. Hollis stated that when she provided information to Ms. Bunsick, she had no knowledge or expectation that the information would be used in connection with any sale of the Berger Policy or the beneficial interest therein in the secondary market, nor

did she intent to induce any party to purchase the Berger Policy in the secondary market.  Hollis Aff. ¶¶ 13, 14.  She did not even have any knowledge or expectation of any contemplated or pending secondary market transaction involving the Berger Policy. Id. ¶ 15.  Importantly, when Ms. Bunsick called, she did not identify herself as calling from Coventry, but rather said she was "calling from Wilmington Trust Company," id. ¶ 3, which was the policy owner at the time.  Ms. Hollis testified that she verified, through identification questions, that she was speaking with the Trust, which she knew to be the policy owner at the time.  Id. ¶ 4.  Had Ms. Hollis known she was talking to a Coventry employee and not someone from the Trust, she would not have provided any information about the Berger Policy in the manner that she did.  Id. ¶ 5.  Therefore, Pruco, through Ms. Hollis, could not have intended or expected to induce a third-party investor to acquire the Berger Policy in the secondary market because Ms. Hollis testified that this was never her intent, and she never even knew she was speaking to anyone other than the policy's owner.  Thus, the Counterclaim fails as a matter of law not only because Pruco did not make any misrepresentations of material fact, but also because it never intended for any statements to induce a third-party to purchase the Berger Policy on the secondary market.  Accordingly, the Court will enter summary judgment in Pruco's favor on the negligent misrepresentation Counterclaim.

### IV. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED AND ADJUDGED** that Plaintiff Pruco Life Insurance Company's Motion for Summary Judgment [DE 177] is **GRANTED**, and the Motion for Final

Summary Judgment of Defendant Wells Fargo Bank, N.A., as Securities Intermediary

[DE 186] is **DENIED**.  The Court will enter a separate final judgment consistent with this

ruling.

      **DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County,

Florida, on this _14th_ day of November, 2011.

<br>

                                **JAMES I. COHN**
                                **United States District Judge**

Copies provided to:
Counsel of record via CM/ECF