## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-CV-80804-COHN/Seltzer

Pruco Life Insurance Company,

Plaintiff,

vs.

Steven M. Brasner, individually and as
principal of Infinity Financial Group, LLC,
Mark A. Tarshis, Infinity Financial Group,
LLC, Wells Fargo Bank, N.A., as Securities
Intermediary, and John Does 1-10,

Defendants.

---

## JOINT PRETRIAL STIPULATION

Plaintiff Pruco Life Insurance Company ("Pruco") and Defendant Wells Fargo Bank, N.A., as securities intermediary ("Wells Fargo"), by and through their undersigned counsel, submit this Joint Pretrial Stipulation pursuant to S.D. Fla. Local Rules 16.1(d) and (e).

### I.    CONCISE STATEMENT OF THE CASE

#### A.    Plaintiff's Statement of the Case[1]

This action relates to a $10 million policy of insurance (the "Berger Policy") issued by Pruco on the life of Florida citizen Arlene Berger ("Mrs. Berger").  On November 14, 2011, this Court granted summary judgment in favor of Pruco, holding that the Berger Policy was void *ab initio* because it was an illegal wagering contract lacking an insurable interest at inception.

---

[1]    Wells Fargo disagrees with Pruco's statement of the case as it contains irrelevant allegations and fails to focus on the central issues to be tried as determined by the Court in its September 21, 2012 Order Granting Wells Fargo's Rule 60(b) Motion [DE 287]: "trial on the issue of which party is entitled to the premiums paid in 2009 and 2010" and resolution of the "factual dispute as to Pruco's knowledge of the fraud and the fact that the Berger Policy was an illegal wagering contract."  (Order at 4, 8.)  Wells Fargo has filed a motion *in limine* [DE 304].  Pruco will be filing a response in opposition to Wells Fargo's motion *in limine*.

Having found that the Berger Policy was void *ab initio*, the Court declined to return any of the premium paid for the Berger Policy to Wells Fargo, which was, as of November 14, 2011, the record owner and beneficiary of the Berger Policy, as securities intermediary for its client Lavastone Capital, LLC ("Lavastone").  In declining to return premium, the Court relied on the general rule that the parties to contracts that are void as contrary to public policy will be left as the court found them.  D.E. # 246 at 26 (citing *TTSI Irrev. Trust v. Reliastar Life Ins. Co.*, 60 So.3d 1148, 1150 (Fla. Dist. Ct. App. 2011)).

On December 22, 2011, subsequent to the Court's summary judgment order, Wells Fargo was able to obtain a privileged Pruco Special Investigation Unit Report (the "SIU Report") from the Florida Department of Financial Services ("FDOFS").  D.E. # 253 at 2.  Based on the SIU Report, Wells Fargo filed a motion for relief from final judgment under Federal Rule of Civil Procedure 60(b), contending that the SIU Report constituted new evidence because it purportedly showed that Pruco was aware of Steven Brasner's fraudulent stranger originated life insurance ("STOLI") conduct in 2008, yet failed to bring the instant lawsuit until mid-2010.[2]  Pruco responded to Wells Fargo's Rule 60(b) motion and argued, *inter alia*, that the SIU Report was privileged and that, in any event, it was not new evidence because Wells Fargo knew the facts referenced in the SIU Report before the summary judgment hearing held by the Court on October 21, 2011 and well before the Court issued its summary judgment opinion on November 14, 2011.

On July 23, 2012, this Court adopted Judge Seltzer's report and recommendation finding that Pruco had waived any privilege attaching to the SIU Report by providing it to the FDOFS.

---

[2]     Steven Brasner was the third party broker who procured, with the assistance of others, the Berger Policy as an illegal wagering contract on Mrs. Berger's life.  Brasner was formerly a defendant in this matter, and on January 4, 2011 Pruco obtained a judgment against Brasner in the amount of $195,337.76.  D.E. # 61.

D.E. # 275.  Subsequently, on September 21, 2012, the Court granted Wells Fargo's Rule 60(b) motion in part, and ordered a trial limited to the issue of which party was entitled to the $206,969.23 in premium that was paid to Pruco in 2009 and 2010 for the Berger Policy.  D.E. # 287.  The order granting Wells Fargo's Rule 60(b) motion did not disturb the Court's prior ruling that the Berger Policy is void *ab initio* and that Pruco is entitled to retain the $412,949.04 in premium paid to Pruco prior to 2009.  D.E. # 287 at 4-5.

In order to prove that it should be awarded the $206,969.23 that is at issue in this trial, Wells Fargo must prove that Pruco, in failing to challenge the Berger Policy in 2008, engaged in deceptive or misleading conduct.  This requires proving that Pruco was willfully and purposely dishonest in failing to challenge the validity of the Berger Policy sooner.  *See* Black's Law Dictionary (9th Ed. 2009) (defining "misleading" as "calculated to be misunderstood" and defining "deceit" as "[t]he act of intentionally giving a false impression" or "[a] false statement of fact made by a person knowingly or recklessly.").  Additionally, even if Wells Fargo is able to show that Pruco was affirmatively deceptive or misleading, Wells Fargo must then show that Pruco was more responsible for Wells Fargo paying the $206,969.23 in premium for a void policy than Wells Fargo was responsible by failing to investigate the Berger Policy prior to purchasing it.  *See Stewart v. Stearns & Culver Lumber Co.*, 48 So. 19, 25 (Fla. 1908) ("[t]he courts will not in general aid either party to enforce an illegal agreement, but will leave the parties where they place themselves with reference to such illegal agreement, except . . . where the parties are not *in pari delicto*….").

First, Wells Fargo cannot show that Pruco intentionally and affirmatively deceived or misled Wells Fargo, or anyone else for that matter, by failing to bring its lawsuit sooner.  As described in the SIU Report, in 2008 Pruco knew only that another life insurance carrier, AXA

Equitable, had filed a civil action against Brasner alleging that five policies that he produced were STOLI (the "AXA Lawsuit").   Though the allegations in the AXA Lawsuit were unsubstantiated, Pruco did learn that the complaint had been filed, and in the beginning of July 2008, did a search for all policies on Pruco's books for which Steven Brasner was the broker of record.

At that time, Pruco's investigation revealed that the Berger Policy was the only policy that Brasner ever placed with Pruco.  Pruco then looked at the Berger Policy and found that although there were concerns raised during underwriting that the policy was being obtained for the purpose of selling it, all those concerns were fully vetted and resolved before the decision was made to issue the Berger Policy.  In short, Pruco reviewed its underwriting, found that its underwriting was thorough and was satisfied that it had received adequate confirmation that the Berger Policy was not STOLI.[3]  Accordingly, Pruco concluded that it had sufficiently resolved the questions surrounding the Berger Policy during underwriting, and the unsubstantiated allegations about Brasner made by another life insurer did not rise to a level that would require Pruco to re-examine the Berger Policy.  Pruco's conclusion in 2008 was not frivolous or without basis – in fact, this Court similarly concluded that Pruco's underwriting was thorough in the opinion granting summary judgment in favor of Pruco.  D.E. # 246 at 25.  Based on its review of its underwriting and the status of the Berger Policy in 2008 (including the fact that it was still owned by the Arlene Berger 2006 Life Insurance Trust (the "Trust"), which was represented to Pruco during underwriting to be the intended owner of the Berger Policy pursuant to Mrs. Berger's estate plan), Pruco decided that the mere existence of the allegations against Brasner

---

[3]      In hindsight, of course, all of Pruco's diligence during underwriting was met with lies and deception from Brasner and those working with him to hide the STOLI nature of the Berger Policy.

made by another insurer were not sufficient to justify launching a more invasive investigation into the validity of the Berger Policy. Nothing about this decision was affirmatively deceptive or misleading, and Wells Fargo cannot prove otherwise. Accordingly, there is no reason to depart from the general rule that parties to a contract that is void *ab initio* must be left where the court finds them.

Second, Wells Fargo's client Lavastone is far from an innocent purchaser for value in this case, and in fact has no one to blame but itself and its business associates, primarily Coventry First, LLC ("Coventry"), for having paid $206,969.23 in premium in 2009 and 2010 for a void policy. Indeed, before the premium financing loan which funded the first two years of premium was finalized with LaSalle Bank, N.A. (now known as Bank of America),[4] Lexington Insurance Company, a subsidiary of AIG and a corporate cousin of Lavastone, had its "risk solutions" department examine the Berger Policy.[5] After this examination, Lexington agreed to extend premium finance insurance coverage ("PFIC") to Bank of America, coverage which was ostensibly intended to insure Bank of America against the risk that the premium finance loan would not be repaid – but it also allowed AIG to maintain an interest in the Berger Policy even while it appeared to be owned by the Trust. In other words, if the loan were not repaid, Bank of America could recover the amount of the loan from Lexington, and Lexington would be entitled to take possession of the policy, which would have been either relinquished in satisfaction of the loan or foreclosed upon by Bank of America. The bottom line is that AIG had an opportunity to review the Berger Policy, including the facts and circumstances surrounding its procurement, in

---

[4]     LaSalle Bank, N.A. merged in 2008 with Bank of America, N.A. and therefore, the entities are referred to collectively herein as "Bank of America."

[5]     At all relevant times, the risk solutions department at AIG consists of four to five underwriting professionals.

July 2006.  Wells Fargo conveniently leaves these facts out in its description of Lavastone as an "innocent purchaser" in 2009.

That is not all, however.  In 2008, when Lavastone was deciding whether the Berger Policy fit Lavastone's criteria for purchase, Lavastone undertook an examination of the Berger Policy which was conducted by the very same AIG risk solutions department that underwrote the PFIC.  In addition to this review, Lavastone asked its "originator" to conduct further due diligence on the Berger Policy prior to purchasing it.  What entity was Lavastone's "originator?"  Coventry, the very same entity that orchestrated the STOLI scheme in this case, including paying the first premium in a way that was intentionally meant to deceive Pruco into thinking the funds came from Mrs. Berger's income or savings, as had been represented to Pruco on the application for the Berger Policy.  Therefore, Lavastone knew or should have known about the STOLI scheme involving the Berger Policy through three different avenues:  (i) during its underwriting of the PFIC in July 2006; (ii) through its "originator," Coventry, who conducted due diligence for Lavastone prior to Lavastone's purchase of the Berger Policy in 2008; and (iii) through Lavastone's 2008 pre-purchase review process, conducted by the same underwriters who reviewed the Berger Policy in 2006.  When one compares these facts to Pruco's experience – in which the STOLI scheme was actively and consistently hidden from Pruco through lies, forgery and deceit – it becomes clear that Wells Fargo and its client Lavastone were in a better position than Pruco to identify the true nature of the Berger Policy, decline to purchase it, and avoid paying the $206,969.23 in premium that is at issue in this trial.

### B.   Defendant's Statement of the Case

#### 1.   Summary of Case[6]

Plaintiff Pruco Life Insurance Company ("Pruco") filed this action against Wells Fargo and others in 2010 seeking to invalidate the $10 million life insurance policy that it had issued four years earlier in 2006, and to retain about $620,000 in premiums, which it had collected on this policy over this four-year period.  Pruco's challenge, however, was brought long after the statutorily-prescribed 2-year contestability period for such challenges had expired.

The $10 million policy at issue insures the life of non-party Arlene Berger, who named her husband as sole beneficiary at the time Pruco issued the policy in April 2006 ("Policy").  Mr. Berger remained the sole ultimate beneficiary for more than two years after Pruco issued the Policy, at which time (September 2008) Mrs. Berger voluntarily relinquished the Policy to her trust's premium finance lender to satisfy debts secured by the Policy.  Later that year (in December 2008), a life settlement provider licensed in Florida to deal in the legitimate secondary life insurance market (Coventry First LLC) purchased the Policy from the lender.  Coventry then sold it to Wells Fargo's client, Lavastone Capital LLC ("Lavastone"), which paid over $1 million for the Policy, including reimbursement of certain premiums.  Upon request and after this transfer, Pruco confirmed Wells Fargo, as securities intermediary, as the Policy's sole owner and beneficiary.

Pruco's complaint alleged that the Policy was a "stranger-originated life-insurance" policy (referred to by the insurance industry as a "STOLI" policy), obtained through fraudulent

---

[6]   Pruco disagrees with Wells Fargo's statement of the case to the extent it concerns matters that have already been definitively decided by the Court, for example, the application of the two-year contestability period in the Berger Policy and the validity of the Berger Policy itself.  Both of these issues, among others, were decided by the Court in its November 14, 2011 order granting summary judgment in favor of Pruco and are not among the issues presently before the Court for trial.

misrepresentations about Mrs. Berger's net worth and with the express purpose of reselling it to third parties on the secondary market.  Pruco contends that such policies are illegal wagering contracts in the State of Florida.  Wells Fargo, on the other hand, maintains that, because Mrs. Berger knowingly sought out and obtained the Policy on her own life and because at the Policy's inception her husband was the sole beneficiary of the Policy, the Policy complies with Florida's insurable-interest statute (section 627.404, Fla. Stat.) and therefore cannot be an illegal wagering contract.  Wells Fargo also maintains that the Policy's incontestability clause (which is required by Florida's incontestability statute, section 627.455, Fla. Stat.) bars Pruco's belated challenge, brought four years after the Policy issued.

Both during its underwriting of the Policy and after issuing the Policy, Pruco repeatedly "turned a blind eye" to indicia of fraud and its own "suspicions" concerning the Policy and its agent/broker Brasner.  In fact, during the underwriting process for this Policy in 2005 and 2006 (which included two applications and lasted about 10 months), numerous "red flags" were noted by Pruco's underwriting employees.  Yet Pruco ultimately ignored these concerns, issued the Policy in spite of them, and made ***no effort*** to investigate its suspicions, even though, under the Policy's contestability clause, it had only two years to uncover any fraud or other deficiency in the application.  Instead, Pruco collected over $600,000 in premiums and waited over four years after issuing the Policy and over two years ***after*** the Policy's contestability period ran (and ***after*** its agent/broker Brasner was arrested) to seek to void the Policy by bringing this action in July 2010.

## 2.   Summary Judgment Ruling and Subsequent Rule 60(b) Order

In November 2011, this Court granted summary judgment in favor of Pruco and against Wells Fargo declaring the Berger Policy void *ab initio* on the ground that it lacked an insurable interest at inception.  It also ruled that Pruco was entitled to retain all of the premiums it had collected on this policy (approximately $620,000).   The Court then entered an amended final judgment in favor of Pruco and against Wells Fargo.

In late December 2011, after the court had entered its summary judgment order and entered a final judgment, Wells Fargo (pursuant to a Public Records Act request) independently received a copy of a Pruco report (referred to as the "special investigation unit" report ("SIU Report" or "Report")) from the Florida Department of Financial Services.  This SIU Report had been the subject of Wells Fargo's motion to compel that had been pending before the Court's summary judgment ruling.  The SIU Report confirmed that Pruco's prior statements made in its summary judgment motion and in other related papers it filed – that it first learned of any fraud associated with Brasner in 2010 through a *Wall Street Journal* article and thus that it had no reason to suspect that the Policy could be an illegal wagering contract until then – were false.

The SIU Report reveals that, as early as 2008, Pruco considered the Policy "suspicious" but did nothing because "it was already outside of the contestability period."  More specifically, in July 2008, Pruco identified the Policy as "one of Brasner's in force cases that appeared suspicious as a potential settlement case."  Thus, the SIU Report confirms that Pruco again (in July 2008) reviewed and assessed the Policy to be "a potential settlement case" even though Pruco's underwriters had supposedly resolved the red flags that arose during the underwriting process in 2005 and 2006.  Despite these new doubts, Pruco made the conscious decision in 2008 not to further investigate the validity of the Policy and took no further action until 2010.

9

Had Pruco diligently investigated its <u>additional</u> suspicions in 2008 (which suggested fraud based on inflated net worth and that the Policy was allegedly an illegal wagering contract), and then sought to rescind or otherwise challenge the Policy in 2008 – as it should have – the Policy would not have been available for sale on the secondary market.  And Lavastone would not have bought it for over $1 million and paid Pruco over $200,000 in premiums on a purportedly void Policy.

Having just obtained the evidence (*i.e.*, SIU Report) it sought since before the summary judgment order, Wells Fargo filed a motion for relief from judgment pursuant to Rule 60(b).  By Order dated September 21, 2012 [DE 287], the Court granted Wells Fargo's motion in part, concluding that "the information contained in the SIU Report raises a disputed issue of fact regarding which party is entitled to the premiums paid in 2009 and 2010," and denied it in part, refusing to set aside its prior finding and declaration that the Policy was a wagering contract and void *ab initio*.

In its 60(b) Order, the Court concluded that the SIU Report "contains more information than simply Pruco's knowledge of the AXA lawsuit."  (Order at 6.)  Rather, "the SIU Report also reveals that '(1) Brasner was named in 'a STOLI lawsuit'; (2) Pruco looked for any Pruco policy originating from Brasner and found the Berger Policy; (3) the Policy 'appeared suspicious as a potential settlement case'; but (4) Pruco failed to follow-up purportedly because it was 'outside the contestability period by that time,' and (5) "Pruco's review of publicly available information of Mrs. Berger's home, revealed a 'strong indication of inflated net worth.'"  (Order at 6 (citing Reply [DE 264] at 3 and SIU Report [Ex. A to Motion [DE 253]] at 1-2).)

Accordingly, the Court "reopen[ed] this case for a [bench] trial on the issue of which party is entitled to the premiums paid in 2009 and 2010."  (Order at 4.)  The Court ordered a trial

on this issue because "[Pruco's] SIU Report raises a factual dispute as to Pruco's knowledge of the fraud and the fact that the Berger Policy was an illegal wagering contract." The Court further ruled that an issue of fact exists "as to whether this Court should depart from the general rule articulated in [*TTSI Irrevocable Trust v. Reliastar Life Insurance Co.*, 60 So. 3d 1148 (Fla. Dist. Ct. App. 2011)] and order the premium payments from 2009 and 2010 returned to Wells Fargo." (*Id*. at 8.) Before Pruco filed this action, Wells Fargo had paid Pruco $206,969.23 in premiums in 2009 and 2010.

## II.   BASIS OF FEDERAL JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), insofar as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between Plaintiff and Defendants.

## III.   PLEADINGS RELATED TO THE ISSUES

1.     Complaint of Pruco Life Insurance Company filed July 9, 2010 [DE 1].

2.     Answer and Affirmative Defenses of Wells Fargo filed February 4, 2011 [DE 73].

## IV.   UNRESOLVED MOTIONS REQUIRING ACTION BY THE COURT

1.     Pruco's motion *in limine* [DE 301].

2.     Wells Fargo's motion *in limine* [DE 304].

## V.   CONCISE STATEMENT OF UNCONTESTED FACTS[7]

1.     The Court has jurisdiction over the parties.

2.     Arlene and Richard Berger (together, "the Bergers") are citizens of Florida. Mr. Berger retired and moved with Mrs. Berger to Florida in 1993. Since then, they have lived in the

---

[7]     While the parties do not contest these facts, each party reserves the right to object to the relevancy of any or all of these facts at trial.

same house at 14466 Via Royale, Delray Beach, Florida.  Mr. and Ms. Berger have been married for over 60 years.

3.      In their retirement, the Bergers often attended financial seminars geared toward retirees.  During one or more of these seminars, the Bergers heard about the possibility that older people, if they are in good health, could obtain some form of "free" life insurance.

4.      Starting in 2003, the Bergers hired an accountant, Mark Tarshis, to prepare their annual federal income tax returns.  Mr. Tarshis has never been a certified public accountant. During a visit to Mr. Tarshis in 2005, the Bergers asked Mr. Tarshis about the "free" life insurance they had heard about in the financial seminars they attended.  Mr. Tarshis responded that he was not knowledgeable about the "free" life insurance, but took the Bergers down the hall to the office of Steven Brasner, who was also a Florida licensed insurance broker and shared office space with Mr. Tarshis.  During this period, Mr. Brasner's office was located at 1301 North Congress Ave., Boynton Beach, Florida.

5.      Mr. Brasner was appointed as a non-exclusive broker for Pruco beginning in 2003 under a written agreement.   Mr. Brasner entered a second, written non-exclusive broker agreement with Pruco in June 2005, when he moved from New York to Florida.   Under this second agreement, Mr. Brasner was appointed to produce Pruco life insurance policies.

6.      Pruco terminated Mr. Brasner's appointment in November 2007.

7.      In 2005 and 2006, Life Brokerage Equity Group, Inc. ("LBEG") was an appointed Florida broker general agency under a written broker general agency agreement with Pruco for the placement of life insurance policies.

8.      On July 15, 2005, LBEG submitted to Pruco an initial application for a $10 million life insurance policy on the life of Mrs. Berger ("Initial Application").

9.      On the Client Information Sheet submitted to Pruco in connection with the Initial Application, information was supplied by Mr. Brasner stating that Ms. Berger's net worth was in excess of $10 million dollars.

10.     Upon receipt and initial analysis of the Initial Application, Pruco voiced concerns internally about the possibility that the policy was a "settlement case."  Pruco's underwriters then solicited additional information through LBEG and ultimately gave the application what Pruco calls "FIU" status on October 7, 2005 for lack of information.  On that same day, a Pruco underwriter sent Mrs. Berger a letter advising that Pruco had not received all the information necessary to complete Pruco's underwriting on the Initial Application and that Pruco would continue the application process once the information was received.

11.     In November 2005, LBEG forwarded medical information concerning Mrs. Berger to Pruco, including records of Mrs. Berger's treating physician.  Also in November 2005, LBEG forwarded to Pruco a third-party "Inspection Report" completed by Kathy Rutherford of Worldwide Inspection Services.   The Inspection Report was purportedly based upon Ms. Rutherford's calls to the Bergers and various persons listed by the Bergers as references and included the same false information regarding the Berger's net worth as being $10.45 million.

12.     On or about January 25, 2006, Mrs. Berger signed an Insured's Authorization to Release Medical Records and Special Irrevocable Durable Power of Attorney.

13.     On February 21, 2006, LBEG forwarded a second application to Pruco for issuance of a $10 million life insurance policy on the life of Mrs. Berger ("the Second Application").  The Second Application indicated that Mrs. Berger was to be the owner of the policy and that her husband, Mr. Berger, was to be the sole beneficiary.

14.     As with the Initial Application, Brasner also supplied Pruco with a Client Information Sheet that stated as follows:

    i.    The purpose and $10 million face amount of the Berger Policy were determined based upon an "estate analysis;"

    ii.    The purpose of the insurance was "estate conservation;"

    iii.    The source of the initial and future premiums was to be Mrs. Berger's "current income or savings account";

    iv.    Premium would be paid by Mrs. Berger;

    v.    Mrs. Berger had an annual income of $274,000;

    vi.    Mrs. Berger had savings of $700,000;

    vii.    Mrs. Berger's home was valued at $2.5 million;

    viii.    Mrs. Berger had investments valued at $7 million;

    ix.    Mrs. Berger had personal property valued at $250,000.

These statements made by Brasner (in the Client Information Sheet) were false.

15.     On March 6, 2006, at the request of Pruco underwriters, Pruco's "special investigation unit" ("SIU") prepared a "data verification report" ("DVR") concerning the Bergers.

16.     On March 8, 2006, LBEG submitted to Pruco a document forwarded to LBEG by Brasner's assistant, Patricia Wagner, and purporting to be a revised "Confidential Financial Statement," which stated that Mr. and Mrs. Berger's assets included:

    i.    Personal real estate in the amount of $3.5 million;

    ii.    Commercial and investment real estate valued at $4.5 million (which was allegedly recently inherited from deceased, non-immediate family members);

    iii.    Stocks and mutual funds valued at $6 million;

    iv.    Certificates of deposit valued at $1 million;

    v.    Personal property valued at $250,000 and;

    vi.    Total annual income of $274,000.

Each of these statements made by Brasner was false.

14

17.     The Confidential Financial Statement appeared to be signed by Mark Tarshis, but discovery in this litigation revealed that Mr. Tarshis' signature on the Confidential Financial Statement had been forged by Wagner, at Brasner's direction.

18.     On March 14, 2006, LBEG advised Pruco by email that Mr. Tarshis was the Bergers' financial planner and tax advisor.

19.     In that same March 14, 2006 email, LBEG stated that Mr. Tarshis recommended that Mrs. Berger obtain the Policy after evaluating Mrs. Berger's estate and tax situation.

20.     On March 16, 2006, at the request of Pruco underwriters, Pruco SIU prepared a supplemental DVR concerning Mr. Tarshis.  SIU did not contact Mr. Tarshis.

21.     On April 27, 2006, Pruco issued the Berger Policy, No. V1208044, on the life of Mrs. Berger in the amount of $10 million with her husband, Mr. Berger, as the designated beneficiary under the Policy.

22.     The Policy was delivered on April 26, 2006.  On or about May 2, 2006, Pruco received an initial premium payment for the Policy of $81,871.75.  Pruco accepted this payment. Pruco thereafter put the Policy "in force" on May 10, 2006.

23.     Shortly after the Policy was put in force, it was amended to change the terms from providing a flat $10 million death benefit to providing a flat $7.5 million death benefit with a $2.5 million death benefit rider.

24.     The Policy (at pp. 5 & 9) provides as follows:

**OWNERSHIP**

Unless a different owner is named in the application, the owner of the contract is the Insured.   If a different owner is named, we will show that owner in an endorsement to the contract.  This ownership arrangement will remain in effect unless you ask us change it.

**You may change the ownership of the contract** by sending us a request in a form that meets our needs.  We may ask you to send us the contract to be endorsed.  If we receive your request in a form that meets our needs, and the contract if we ask for it, we will file and record the change, and it will take effect as of the date you signed the request.

**BENEFICIARY**

**You may designate or change a beneficiary** by sending us a request in a form that meets our needs.   We may ask you to send us the contract to be endorsed.  If we receive your request, and the contract if we ask for it, we will file and record the change and it will take effect as of the date you signed the request.

25.     The Policy (at p. 5) also contains a two-year contestability clause.

26.     On June 5, 2006, the Arlene Berger 2006 Life Insurance Trust dated 6/5/06 ("Berger Trust") was created to own the Berger Policy.  On June 16, 2006, a "Request To Change Beneficiary/Ownership" form, signed by Mrs. Berger, was forwarded to Pruco by Mr. Brasner.  The form requested a change of the owner and beneficiary of the Policy to Wilmington Trust Company, as Trustee for the Berger Trust.

27.     By letter dated June 30, 2006, Pruco provided written confirmation of its acceptance of the change of ownership from Mrs. Berger to Wilmington Trust Company, as Trustee of the Berger Trust.

28.     On July 18, 2006, LaSalle Bank made a $331,077.29 payment to Pruco for the Policy premium in the form of a wire transfer.  Pruco accepted this payment.

29.     The July 18, 2006 premium payment of $331,077.29 was an amount that was sufficient to keep the Policy in force for at least two years.

30.     In May 2008, Pruco began to receive requests for information regarding the Policy from companies that Pruco recognized as participants in the secondary market for life insurance.  These included Coventry Capital on May 29, 2008 and later, Welcome Funds on

16

August 21, 2008.  The May 29, 2008 contact from Coventry Capital was on behalf of record owner Wilmington Trust as Trustee, and included a fully executed authorization from Wilmington Trust authorizing Coventry Capital to obtain all policy-related information from Pruco on Wilmington Trust's behalf.  Pruco received another such notice of authorization from Coventry Capital on December 1, 2008.

31.     Pruco provided the information requested by Coventry Capital and Welcome Funds and then followed up in writing to both companies stating that Pruco had "determined that this information is being provided in connection with the potential sale of this policy under a viatical or life settlement agreement."  The letter then advises Coventry Capital and Welcome Funds that such secondary market transactions may have federal income tax consequences.

32.     On or about July 10, 2008, Pruco became aware that AXA Equitable Life Insurance Co. filed a lawsuit on June 6, 2008 in the U.S. District Court of Florida against Steven Brasner, Infinity Financial Group of Boynton Beach and others alleging that these defendants had "obtained $73 million in fraudulent, stranger-originated life insurance (STOLI) policies." The AXA lawsuit was styled, *AXA Equitable Life Ins. Co. v. Infinity Fin. Group, LLC, et al.*, Case No. 08-80611-HURLEY (S.D. Fla.) (the "AXA Lawsuit").  The AXA Lawsuit, *inter alia*, sought rescission of five life insurance policies issued by AXA, based on allegations that the policies were procured pursuant to a STOLI scheme.

33.     Upon learning of the AXA Lawsuit, Pruco conducted a review in July 2008 of Brasner's "in force" policies issued by Pruco (including the Berger Policy).  As part of this review, Pruco reviewed the underwriting file from the Berger Policy and identified that Pruco's underwriters had concerns that the Berger Policy was a "settlement policy."  In its internal July 21, 2008 email, a Pruco underwriter stated that the "Berger case does look suspicious" and that

17

"[Pruco] had concerns about that one [Berger Policy] being a settlement case" and they "put a note in the file but the underwriters documented that SIU was able to verify [Mrs. Berger's CPA] who indicated her [net worth] was $15 [million]."

34.     As of July 2008, the Berger Policy was still owned by the Berger Trust.

35.     On September 16, 2008, Mrs. Berger signed an Irrevocable Seller Letter as Settlor of the Berger Trust, directing the Trustee to fully relinquish the Policy to LaSalle Bank (now known as Bank of America) in full satisfaction of the loan it supplied to finance the initial Policy premiums.

36.     On September 17, 2008, Bank of America sent notice to the Berger Trust that its obligation to repay the premium finance loan was fully satisfied by the relinquishment.

37.     In December 2008, LaSalle Bank, Wells Fargo Bank, N.A., as Securities Intermediary, and Lavastone Capital LLC (f/k/a AIG Life Settlements LLC) ("Lavastone") entered into a Tripartite Entitlement Order (dated as of December 18, 2008) that permitted the sale and transfer of the Berger Policy from Bank of America to Coventry First LLC ("Coventry First"), and then simultaneously to Wells Fargo Bank, N.A., as Securities Intermediary on behalf of Lavastone, subject to a future closing and release of funds from escrow upon satisfaction of certain specified conditions subsequent.

38.     The terms of the Tripartite Order called for Lavastone to pay $1.048 million in connection with acquiring the Berger Policy, a figure which included the sale price for the Berger Policy ($560,000), an originator fee paid to Coventry First ($374,756.00) and a premium reimbursement to Coventry First ($112,071.12), among other fees.

39.     On December 24, 2008, Wells Fargo Bank, N.A., as Securities Intermediary, submitted a "Change of Ownership and Beneficiary Request" form to Pruco requesting to change the Policy's owner and beneficiary to Wells Fargo Bank, N.A., as Securities Intermediary.

40.     By letter dated January 9, 2009, Pruco provided written confirmation to Wells Fargo, as Securities Intermediary, that Pruco had accepted the request for a change of ownership and beneficiary.

41.     Wells Fargo, as Securities Intermediary, holds the Berger Policy in a securities account on behalf of Lavastone pursuant to a "Purchaser's Securities Account Control Agreement" dated as of July 1, 2008 between Lavastone and Wells Fargo, as Securities Intermediary.

42.     On April 22, 2010, Steven Brasner was arrested by the Florida authorities and was charged with twenty-two counts of insurance fraud in connection with his STOLI activities on life insurance policies issued by AXA.

43.     Pruco's Special Investigation Unit (SIU) investigated the Berger Policy, and on June 8, 2010, generated the SIU Report.  The SIU Report states that Brasner's "name came up again in 2008 as he was named in a STOLI lawsuit from AXA.  Underwriting did a review of the business of the two BGAs originally named in the lawsuit which included Brasner's business. They identified one of Brasner's in force cases that appeared suspicious as a potential settlement case but it was already outside of the contestability period by that time: Arlene Berger (V1 208 044).  SIU was asked to determine if there was any documented evidence of inflated or fraudulent financial data in this case."

44.     On July 9, 2010, Pruco filed its complaint in this action.

45.     Prior to the filing of its Complaint on July 9, 2010, Pruco had received $619,918.27 in premium for the Berger Policy.

46.     Of the total amount of premium received by Pruco for the Berger Policy, $206,969.23 was received in 2009 and 2010.  The remaining $412,949.04 in premium was received by Pruco in 2006.

47.     On November 4, 2011, this Court issued an order denying Wells Fargo's motion for summary judgment and granting Pruco's motion for summary judgment [DE 246].

48.     After the entry of summary judgment, Wells Fargo filed a motion, on January 9, 2012, based on newly discovered evidence (Pruco's SIU Report) seeking to have the judgment set aside pursuant to Federal Rule of Civil Procedure 60(b).

49.     On September 21, 2012, this Court entered an Order granting in part Wells Fargo's Rule 60(b) motion [DE 287], vacated its November 14, 2011 summary judgment order and the amended final judgment "only as to the issue of which party is entitled to the premiums paid on the Berger Policy in 2009 and 2010," and reopened this case for a trial on this issue (*i.e.*, which party is entitled to the premiums paid in 2009 and 2010).

50.     Pursuant to its 60(b) Order, the Court then scheduled a trial for the two-week trial period commencing April 15, 2013.

## VI.   CONTESTED ISSUES OF FACT TO BE LITIGATED AT TRIAL

### A.   Pruco's Statement of Contested Issues of Fact to be Tried[8]

1.     Whether, when Mrs. Berger executed an Authorization to Release Medical Records and Special Irrevocable Power of Attorney in favor of non-party Coventry Capital LLC ("Coventry Capital") on January 25, 2006, Mrs. Berger relinquished all control over the Berger Policy and the NRPF Loan to Coventry Capital?

2.     Whether Mr. Berger executed a Borrower's Special Irrevocable Power of Attorney in favor of Coventry Capital on January 25, 2006, and whether, by this document, Mr. Berger relinquished any control he would have held over the Berger Trust or its sole asset, the Berger Policy, to Coventry Capital?

3.     Whether, based on her actual net worth in 2005-2006, Mrs. Berger would have qualified for $10 million in life insurance coverage at that time?

4.     Whether the statement in the email to Pruco from LBEG dated March 14, 2006 that Mr. Tarshis recommended that Mrs. Berger obtain the Policy after evaluating Mrs. Berger's estate and tax situation was false?

5.     Whether the funds for the initial premium payment of $81,871.75 were provided by Coventry Capital to Brasner and then deposited by Brasner into Infinity's bank account?

6.     Whether Brasner procured a cashier's check to conceal from Pruco the true source of the first premium payment?

---

[8]     Wells Fargo expressly reserves its right to object to the relevancy of these alleged facts or factual issues, as well as any legal conclusion that Pruco asserts or seeks to have the Court conclude from its recitation of the alleged facts.  Wells Fargo maintains that most of these alleged facts and factual issues are beyond the scope of the premium issue that is set for trial pursuant to the Court's 60(b) order.  Wells Fargo thus filed a motion *in limine* [DE 304] to address the bulk of these irrelevant allegations made by Pruco.

7.      Whether Coventry Capital and Brasner concealed from Pruco the fact that Coventry Capital paid the initial premium?

8.      Whether the initial $412,948.04 in premium for Berger Policy was financed through a non-recourse premium financing loan from LaSalle Bank (the "NRPF Loan") even though the LaSalle Bank loan papers were not finalized until after the Berger Policy was issued?

9.      Whether the existence of the NRPF Loan was ever disclosed to or known by Pruco?

10.     Whether the Berger Policy was pre-approved on or about January 25, 2006 by LaSalle Bank for the NRPF Loan (and thus before the Second Application was submitted to Pruco) even though the NRPF Loan to the Berger Trust did not close until July 17, 2006?

11.     Whether the NRPF Loan was orchestrated and administered by Coventry Capital?

12.     Whether, despite the NRPF Loan, Coventry Capital – and not the lender LaSalle Bank – provided the funds to pay the initial premium?

13.     Whether the NRPF Loan Note and Security Agreement was executed on July 17, 2006, calling for LaSalle Bank to finance the first $412,948.04 in premium for the Berger Policy (including the $331,077.29 wired by LaSalle Bank to Pruco on July 17, 2006)?

14.     Whether LaSalle Bank sent a check for $81,870.75 payable to Arlene Berger at the address of Brasner's business, Infinity?

15.     Whether LaSalle Bank sent payment of $64,167.89 to Lexington Insurance Company (an alleged affiliate of Lavastone) for what Lavastone called Premium Finance Insurance Coverage ("PFIC") with respect to the Berger Policy?

16.     Whether the PFIC which was ostensibly to insure LaSalle Bank against the risk that the NRPF Loan would not be repaid?

17.     Whether the PFIC was structured to work as follows:  if the NRPF Loan were not repaid, LaSalle Bank could recover the amount of the NRPF Loan from Lexington, and Lexington would be entitled to take possession of the Berger Policy, which by that time would have been either relinquished in satisfaction of the NRPF Loan or seized by LaSalle Bank as the sole collateral for the NRPF Loan when LaSalle Bank (then known as Bank of America) foreclosed on the NRPF Loan?

18.     Whether the PFIC allowed Lavastone, through its alleged affiliate, Lexington Insurance Company, to maintain an interest in the Berger Policy and the right to ultimately take possession of it?

19.     Whether the PFIC was underwritten by an AIG department called "risk solutions," and whether that department consisted of approximately 4-5 underwriting professionals?

20.     Whether the NRPF Loan program was structured to ensure that the Berger Trust would relinquish the Berger Policy in satisfaction of the loan upon maturity, so the Berger Policy could be sold in the secondary market?

21.     Whether Pruco's review of Brasner's book of business and the Berger Policy in July 2008 revealed anything that should have triggered a more extensive review of the facts and circumstances surrounding the Berger Policy's procurement?

22.     Whether, pursuant to the contractual arrangements between them, Coventry acted on behalf of Lavastone to identify life insurance policies that fit within Lavastone's criteria for purchase?

23.     Whether Coventry had express or apparent authority to act as Lavastone's agent with respect to Lavastone's purchase of life insurance policies, including the Berger Policy, in the secondary market for life insurance?

24.     Whether Pruco's termination of Brasner in 2007 was based on failure to repay a debt or related to any STOLI activity by him?

25.     Whether Pruco's review of the Berger Policy in July 2008 revealed that Brasner had been terminated in 2007 for failure to repay a debt and that he had only one Pruco policy – the Berger Policy – that currently appeared as "in-force" in Pruco's records?

26.     Whether Pruco's review in July 2008 of the underwriting file confirmed whether Pruco's underwriters had diligently and thoroughly vetted any concerns that the Berger Policy was a "settlement policy" and, based on information they received during underwriting from Brasner and those working with him to procure the Berger Policy, had determined that the Berger Policy was being procured for estate planning purposes?

27.     Whether, on July 1, 2008, Lavastone's predecessor, AIG Life Settlements LLC (referred to herein as "Lavastone"), entered into a "Servicing and Monitoring Agreement" with Coventry First LLC ("Coventry First") as "Servicer" for Lavastone, and Wells Fargo as "Fiscal Agent" for Lavastone?

28.     Whether, on July 1, 2008, Wells Fargo entered into a "Purchaser's Securities Account Control Agreement" with Lavastone wherein Wells Fargo agreed to act as "Securities Intermediary" for Wells Fargo for the purpose of holding the life insurance policies purchased by Lavastone in a securities account?

29.     Whether, on July 1, 2008, Lavastone and Wells Fargo entered into a "Fiscal Agency Agreement" wherein Wells Fargo agreed to provide services to Lavastone in connection with the life insurance policies owned by Lavastone?

30.     Whether, on July 1, 2008, Coventry First, Wells Fargo, and Lavastone entered into a "Life Policies Origination Agreement" whereby Coventry First became the "Originator and Seller" for life insurance policies that would then be conveyed to Lavastone, as the "Purchaser;" and whether, in these transactions, Wells Fargo, pursuant to the Life Policies Origination Agreement, would facilitate the purchases and sales of life insurance policies from Coventry First to Lavastone as "Fiscal Agent?"

31.     What services does Wells Fargo, as Fiscal Agent, provide under the "Fiscal Agency Agreement" dated as of July 1, 2008 by and between Lavastone and Wells Fargo, as Fiscal Agent?

32.     What services do Wells Fargo, as Fiscal Agent, and Coventry First provide under the "Servicing and Monitoring Agreement" dated as of July 1, 2008 by and among Lavastone, Coventry First, and Wells Fargo, as Fiscal Agent?

33.     What services do Wells Fargo, as Fiscal Agent, and Coventry First provide under the "Life Policies Origination Agreement" dated as of July 1, 2008 among Coventry First, Wells Fargo, as Fiscal Agent, and Lavastone?

34.     Whether Mrs. Berger had ceded all powers concerning the Berger Policy to Coventry Capital prior to September 15, 2008 (*i.e.*, the date prior to maturity of the Bank of America loan), which is when she signed a document that relinquished all rights, interests, powers and privileges in the Berger Policy to Bank of America?

35.     Whether Mr. Berger had ceded all control over the Berger Trust to Coventry Capital prior to September 15, 2008, when he stepped down as "co-trustee" of the Berger Trust?

36.     Whether, on December 10, 2008, Coventry representative Jessica Bunsick ("Ms. Bunsick") called Pruco to request information about the Berger Policy and whether Pruco call center employee Tawanna Hollis ("Ms. Hollis") took Mrs. Bunsick's call?

37.     Whether Ms. Bunsick represented to Pruco that she was calling from Wilmington Trust, the then owner and Beneficiary of the Berger Policy?

38.     Whether Ms. Bunsick answered identification questions posed by Ms. Hollis in order to verify that she was speaking with the policy owner?

39.     Whether Ms. Bunsick was not employed by Wilmington Trust, but by Coventry?

40.     Whether Ms. Hollis answered each of the questions posed by Ms. Bunsick truthfully and accurately?

41.     Whether, on or about December 12, 2008, Wells Fargo, Lavastone, and Coventry First entered into a Tripartite Entitlement Order (the "Tripartite Order"), and whether the effect of the Tripartite Order was for Coventry First to sell the Berger Policy to Lavastone.

42.     Whether, by entering into an agreement entitled Beneficiary's Release and Consent to Change Beneficiary of Life Insurance Policy on December 9, 2008, this document allowed Coventry First (or Coventry Capital) to arrange for the sale of the Berger Policy to a third-party in the secondary market prior to a formal sale of the Berger Policy from Bank of America to Coventry First?

43.     Whether, prior to December 16, 2008, Lavastone conducted a "pre-offer review" of the Berger Policy to determine whether it fit Lavastone's criteria for purchasing life insurance policies?   If so, whether this "pre-offer review" was conducted by the "risk solutions"

department at AIG, and whether this is the same department that underwrote the PFIC coverage for Lexington?

44.     Whether all or some of the due diligence conducted prior to Lavastone's purchase of the Berger Policy was delegated to Coventry First, as the seller, originator and servicer of life insurance policies purchased by Lavastone?

45.     Whether, to the extent that Lavastone was not obligated under the Tripartite Order to complete the purchase of the Berger Policy until after this change of ownership and beneficiary request was processed by Pruco, whether Coventry First was the owner of the Berger Policy from December 18, 2008 through January 9, 2009?

46.     Whether Coventry First officially "purchased" the Berger policy from Bank of America on December 18, 2008, along with ten other policies?

47.     Whether the final step in completing the sale to Lavastone was for the owner and beneficiary of the Berger Policy to be changed from Wilmington Trust to Wells Fargo, as securities intermediary for Lavastone and whether that change request was submitted to Pruco on December 24, 2008 and on January 9, 2009 Pruco processed the ownership and beneficiary change request?

48.     Whether, as a result of Brasner's arrest and the subsequent media coverage, including publication of the arrest in the Wall Street Journal, Pruco, at the direction of its law department, began an investigation into the Berger Policy in April 2010?

49.     Whether Pruco concluded that the Berger Policy was STOLI based on the information learned by Pruco's Special Investigation Unit in April, May and June of 2010?

50.     Whether Mrs. Berger had $700,000 in cash assets at any time relevant to this lawsuit?

**B.**      **Wells Fargo's Statement of Contested Issues of Fact to be Tried[9]**

1.      Whether Pruco had actual or constructive knowledge (or inquiry notice) of Brasner's fraud and the questionable nature of the Policy since at least 2008 (as evidenced in the SIU Report and otherwise)?  If so, when did Pruco have such actual or constructive knowledge (or inquiry notice), and did Pruco take any action on such knowledge?

2.      Whether Pruco knew or should have known that the Berger Policy violated Pruco's own internal guidelines and policies, including Pruco's "Life Underwriting Guidelines" Manual?  If so, when did Pruco know or should it have known, and whether Pruco took any action on this knowledge?

3.      Whether Pruco adequately investigated and resolved the suspicions and red flags concerning the Policy that arose in 2008 (as evidenced in the SIU Report and otherwise)?

4.      Whether Pruco negligently turned a blind eye to several indicia that, if timely and properly investigated, would have led Pruco to rescind or seek to void the Policy before it was sold in December 2008 to Wells Fargo's client (Lavastone) for value on the secondary market?

5.      Whether Pruco's own inattentiveness and laxity lead to the availability of the Policy on the secondary market, and, if so, whether Pruco deserves to retain the premiums paid to and accepted by it after the Policy was sold to Wells Fargo's client (Lavastone) in December 2008?

---

[9]      Wells Fargo's statement of the disputed facts to be tried is based on the scope of the Court's 60(b) Order and the central issue to be tried pursuant to that Order.  Moreover, as stated above, Wells Fargo has expressly reserved the right to object to the relevancy of Pruco's alleged facts and alleged disputed facts.  Nonetheless, to the extent the Court considers any such facts to be relevant, Wells Fargo reserves the right to supplement its statement of factual issues and legal issues to be tried, and supplement its witness and exhibit lists, if necessary.

6.      Whether, had Pruco diligently investigated and appropriately acted upon and resolved its suspicions in 2008, the Policy would not have been available to be bought or sold on the secondary market and Wells Fargo would not have paid over $200,000 in premiums for the Policy that Pruco over two years later challenged as being void?

7.      Whether, as stated in the SIU Report, "[r]eview of Company [Pruco] records and internet research found indication this was a STOLI"?

8.      Whether SIU and others at Pruco had access to the same Company records and internet research in 2008 (or earlier) as they did when the SIU investigation and SIU Report was prepared in 2010?

## VII.   CONCISE ISSUES OF LAW ON WHICH THERE IS AGREEMENT

1.      The Court has jurisdiction over the parties.

2.      Under Florida law (as codified in Section 627.404, Florida Statutes), to be valid, a life insurance policy must be supported by an insurable interest at inception.

3.      Florida's incontestability statute is codified in Section 627.455, Florida Statutes.

## VIII.  CONCISE ISSUES OF LAW FOR DETERMINATION BY THE COURT

### A.      <u>Pruco's Statement of Concise Issues of Law</u>[10]

1.      Whether the Berger Policy lacked an insurable interest at inception because it was procured in bad faith, pursuant to an agreement or understanding that it would be later transferred to a stranger investor lacking an insurable interest in Mrs. Berger's life?

---

[10]     Wells Fargo reserves the right to object or otherwise challenge the relevance of the questions of law set forth in Pruco's statement below.

2.     Whether, as a general rule, contracts that are void ab initio as contrary to public policy will not be enforced by the courts, and the parties will be left as the court found them?

3.     Whether Courts will depart from this general rule when the party seeking a declaration that a contract is void *ab initio* has been deceptive or misleading?

4.     Whether, even where the party seeking a declaration that the contract is void *ab initio* has been deceptive or misleading, courts will depart from this general rule only where the party seeking a declaration that the contract is void *ab initio* [*i.e.* Pruco] is more at fault for failing to discover that the contract was illegal than the proponent of the void *ab* initio contract [*i.e.* Wells Fargo and Lavastone]?

5.     Whether, pursuant to or as a result of the various contractual relationships between and among Lavastone, Wells Fargo, and Coventry, Coventry's knowledge of the facts surrounding the procurement of the Berger Policy, including but not limited to the fact that Coventry provided the funds for the first premium payment, is imputed to Wells Fargo?

6.     Whether Wells Fargo bears the burden of proof at trial for demonstrating that Pruco was affirmatively deceptive or misleading in failing to assert a challenge to the Berger Policy after learning about the AXA Lawsuit in 2008?

7.     Whether, if it has the burden of proof, Wells Fargo must affirmatively prove that: (i) Pruco acted with knowledge and intent to deceive Wells Fargo; and (ii) if that is so, Pruco's malfeasance is greater than that of Wells Fargo?

B.    **Wells Fargo's Statement of Concise Issues of Law**[11]

1.    Whether the general rule that courts will not enforce contracts declared to be void *ab initio* as contrary to public policy and will leave the parties as the court found them, applies to life insurance contracts that have been sold to a third party on the secondary market?

2.    Whether the Court will apply the forfeiture exception to the general rule where the insurer had suspicions and available information that could have led it rescind or otherwise challenge the validity of the policy?

3.    Whether the Court will apply any other applicable exception to the general rule?

4.    Whether the Court will depart from the general rule where allowing the insurer to retain premiums on a policy that has been declared void *ab initio* results in a windfall to the insurer?

5.    Whether the Court will depart from the general rule where the insurer knew or should have known of indicia of fraud, yet continues to collect premiums and fails to challenge the validity of the policy until several years later?

6.    Where a life insurance policy has been declared void *ab initio*, is the insurer required to return all premiums it has received under the policy?

7.    Whether, to the extent applicable, Wells Fargo's affirmative defenses of waiver, estoppel, unclean hands, and/or laches preclude Pruco from retaining any premiums it has received under the Berger Policy?

8.    Which party bears the burden of proof at trial on the issue of which party is entitled to the premiums paid in 2009 and 2010?

---

[11]    Pruco reserves the right to object or otherwise challenge the relevance of the questions of law set forth in Wells Fargo's statement below.

**IX.     PRETRIAL DISCLOSURES/WITNESS AND EXHIBIT LISTS**

1.      Pruco's Pretrial Disclosure/Witness and Exhibit List [DE 298/299] is attached as Schedule "A".

2.      Wells Fargo's Pretrial Disclosure/Witness and Exhibit List [DE 300] is attached as Schedule "B".

**X.      OBJECTIONS TO EXHIBITS**

1.      Pruco's Objections to Wells Fargo's Exhibits are attached as Schedule "C".

2.      Wells Fargo's Objections to Pruco's Exhibits are attached as Schedule "D".

**XI.     ESTIMATED TRIAL TIME**

The Parties estimate that the trial will take one to two days.

**XII.    ESTIMATED ATTORNEY'S FEES**

Not applicable at this juncture.[12]

---

[12]     Wells Fargo reserves the right to seek entitlement to attorneys' fees and costs under Section 627.408, Florida Statutes.

Dated: March 29, 2013

| | |
|---|---|
| PETT FURMAN, PL<br>2101 N.W. Corporate Blvd., Suite 316<br>Boca Raton, FL 33431<br>(561) 994-4311<br>(561) 982-8985 fax<br><br><br>By: /s Wendy L. Furman_____<br>Wendy L. Furman<br>Fla. Bar No. 0085146<br>wfurman@pettfurman.com<br><br>*Of Counsel*<br>Stephen A. Serfass<br>Nolan B. Tully<br>**DRINKER BIDDLE & REATH LLP**<br>One Logan Square<br>Suite 2000<br>Philadelphia, PA 19103-6996<br>(215) 988-2700<br>Stephen.Serfass@dbr.com<br>Nolan.tully@dbr.com<br><br>*Attorneys for Plaintiff Pruco Life Insurance<br>Company* | Shubin & Bass<br>46 SW 1st Street, 3rd Floor<br>Miami, FL 33130<br>Phone: 305-381-6060<br>Fax: 305-381-9457<br><br><br>By: /s Juan J. Farach_____<br>John K. Shubin<br>Fla. Bar No. 771899<br>jshubin@shubinbass.com<br>Juan J. Farach<br>Fla. Bar No. 957704<br>jfarach@shubinbass.com<br><br>*Attorneys for Defendant Wells Fargo N.A.,<br>As Securities Intermediary* |

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2013, I served the foregoing document on all Counsel of record identified on the attached Service List in the manner specified.

/s Juan J. Farach_____

**SERVICE LIST**
**Pruco Life Ins. Co v. Brasner, et al.**
**Case No. 10-CV-80804 Cohn/Seltzer**
**United States District Court, Southern District of Florida**

Wendy L. Furman, Esq.
wfurman@pettfurman.com
PETT FURMAN, PL
2101 N.W. Corporate Blvd., Suite 316
Boca Raton, Florida 33431
Tel. (561) 994-4311
Fax (561) 982-8985
*Attorneys for Plaintiff,*
*Pruco Life Insurance Company*
Service by CM/ECF

Stephen A. Serfass, Esq.
Stephen.serfass@dbr.com Nolan B. Tully, Esq.
Nolan.tully@dbr.com
DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
Tel. (215) 988-2700
Of Counsel/Pro Hac Vice
*Attorneys for Plaintiff,*
*Pruco Life Insurance Company*
Service by CM/ECF

Raoul G. Cantero, Esq.
raoul.cantero@miami.whitecase.com
Maria J. Beguiristain, Esq.
mbeguiristain@miami.whitecase.com
WHITE & CASE LLP
Southeast Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, FL 33131-2352
Tel. (305) 371-2700
*Co-Counsel for Defendant*
*Wells Fargo Bank, N.A., as Securities Intermediary*
Service by CM/ECF